**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT**

-------------------------------------------------------------------X

| | |
|---|---|
| EDUARDO DIAZ-BERNAL, FLORENTE BARANDA-BARRETO, EDILBERTO CEDEÑO-TRUJILLO, WASHINGTON COLALA-PEÑARRETA, JULIO SERGIO PAREDES-MENDEZ, CRISTOBAL SERRANO-MENDEZ, JOSE SOLANO-YANGUA, SILVINO TRUJILLO-MIRAFUENTES, GERARDO TRUJILLO-MORELLANO, EDINSON YANGUA-CALVA, and AMILCAR SOTO VELASQUEZ, | ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| JULIE MYERS, Former Assistant Secretary of Homeland Security for Immigration and Customs Enforcement ("ICE"), JOHN TORRES, Former Director, ICE Office of Detention and Removal Operations ("DRO"), BRUCE CHADBOURNE, Field Office Director, ICE DRO Boston, JIM MARTIN, Deputy Field Office Director, ICE DRO, GEORGE SULLIVAN, Assistant Field Office Director, ICE DRO, WALTER WILKOWSKI, Resident Agent in Charge, ICE Office of Investigations, New Haven, CT, RICHARD MCCAFFREY, ICE Hartford Fugitive Operations Team ("HARFOT") Supervisory Detention and Deportation Officer, HARFOT Agents JAMES BROWN, RONALD PREBLE, STEPHEN RICCARDI, MICHELLE VETRANO-ANTUNA, and GEORGE LEWIS, ICE Agents BRIAN GEARY, DAVID HAMILTON, DEREK MOORE, DAVID OSTROBINSKI, DAVID REILLY, WILFREDO RODRIGUEZ, WILFRED VALENTIN, EDGAR VASQUEZ, JOHN DOES 1-10, and the UNITED STATES, | ) ) Civil No. 3:09-CV-1734 ) (SRU) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

-------------------------------------------------------------------X

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs allege the following upon information and belief:

1.      Just after dawn on June 6, 2007, approximately twenty Immigration and Customs Enforcement ("ICE") agents swept into Fair Haven, a predominantly Latino neighborhood in the City of New Haven. Without search warrants or consent from the residents, the ICE agents raided numerous private residences, including those of Plaintiffs.

2.      Once inside the homes, ICE agents accosted people in the midst of their morning routines.  They interrupted people in showers, barged in on couples asleep in their beds, and awoke parents dozing until their alarm clocks rang.

3.      Without cause or reasonable suspicion, ICE agents interrogated and arrested residents based on their skin color and physical appearance.  In some cases, agents arrested people in front of their families and young children.

4.      Within three hours, ICE agents had arrested and detained twenty-nine residents of New Haven, forcing them from their homes and into federal custody, where they would remain for days, and in some cases, weeks.  Federal immigration authorities had not previously determined that most of those they arrested were in violation of immigration law, and the agents who stormed through Fair Haven had no reason to assume that those they arrested lacked immigration status.

5.      Upon arrest, ICE agents did not apprise Plaintiffs of their legal rights, including their right to counsel and right to remain silent.

6.      Plaintiffs bring this suit in order to remedy their discriminatory and unconstitutional arrest, detention, and treatment at the hands of ICE agents.

7.      The New Haven raids ("the raids") were not a product of routine immigration enforcement.  Hartford ICE agents deliberately chose to conduct raids in New Haven in retaliation for the City's efforts to improve public safety for all its residents by integrating immigrants and Latinos into civic life.

8.      ICE agents carefully planned and orchestrated the raids just as New Haven political and community leaders gained national attention for their innovative  public safety policies.

9.      In the months before the raids, New Haven elected officials, police leaders, senior municipal officers, and community leaders designed and approved a program that made an optional municipal identification card ("Elm City Resident Card") available to all city residents, regardless of their national origin or immigration status.

10.     The development of the Elm City Resident Card earned national attention, and its implementation widespread praise, but some federal government officials viewed the program as a threat to their immigration enforcement authority.  Just thirty-six hours after the City's Board of Aldermen formally approved the Mayor's historic Elm City Resident Card program, ICE agents raided New Haven's Latino neighborhood and arrested Plaintiffs.

11.     To punish New Haven, Hartford ICE agents used a broken and blunt tool—ICE's National Fugitive Operations Program ("NFOP"), a program authorized by Congress in order to target dangerous criminal fugitive aliens.

12.     The NFOP, however, lacked adequate management, supervision, training, and oversight.  The program, under the direction of Defendants Julie Myers and John Torres, imposed the strict requirement that Fugitive Operations Teams ("FOTs") in ICE offices around the country make one thousand arrests annually.

13.     Individual FOTs failed to apprehend enough dangerous criminal fugitives to meet their quotas.  Rather than eliminate or lower the quotas, however, Defendant Torres, with the approval of Defendant Myers, amended the program to permit individual teams to count arrests of non-dangerous, non-criminal, non-fugitives—in other words, bystanders—toward their annual quotas.

14.     Senior ICE personnel pressured FOTs, including the Hartford FOT ("HARFOT"), to meet these arrest quotas.  ICE supervisors, however, failed to match the pressure to apprehend fugitives with the training and supervision required to do so lawfully.

15.     The pressure to meet increased quotas, the change to counting non-fugitive arrests towards the quota, and the failure by senior ICE officials to train and supervise FOT members adequately resulted in widespread and well-documented constitutional violations across the country.  The New Haven raid was no different.

16.     Once they chose New Haven as a target, Hartford ICE agents created a raid plan and prepared for execution, obtaining supervisor approval and agency support.

17.     Senior ICE officials knew that the quota system, coupled with inadequate FOT training and lacking supervisory structures, were causing widespread constitutional violations by FOTs throughout the country.  They also knew that these constitutional violations would continue.  However, these senior officials acting directly or through their agents nevertheless authorized the New Haven raids.

18.     ICE officials supervising the planning and execution of the New Haven raids knew that inadequate supervision and training would result in constitutional violations in this particular operation, but they did nothing to correct the problems.  Consequently, senior and mid-level supervisory ICE personnel share direct responsibility for Plaintiffs' harms.

19.      Plaintiffs seek relief for harms caused by senior ICE personnel who supervised the raids, ICE officers who planned the raids, and ICE agents who carried out the operation.

## JURISDICTION AND VENUE

20.      This Court has jurisdiction over the Plaintiffs' claims arising under the U.S. Constitution and federal statutes pursuant to 28 U.S.C. §§ 1331 and 1361, and supplemental jurisdiction over claims arising under the laws of the State of Connecticut pursuant to 28 U.S.C. § 1367.  Jurisdiction to grant a declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

21.      Venue is proper in this district under 28 U.S.C. § 1391(b) in that all events complained of and giving rise to Plaintiffs' claims arose in this district.

## PARTIES

### Plaintiffs

#### *Residents of Fillmore Street Home*

22.      Plaintiff **Eduardo Diaz-Bernal** ("Plaintiff Diaz-Bernal") is a resident of Fair Haven and of Latino race and ethnicity.  Defendant ICE agents arrested and unlawfully detained Plaintiff Diaz-Bernal on June 6, 2007.

23.      Plaintiff **Washington Colala-Peñarreta** ("Plaintiff Colala-Peñarreta") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Colala-Peñarreta on June 6, 2007.

#### *Residents of Peck Street Home*

24.      Plaintiff **Florente Baranda-Barreto** ("Plaintiff Baranda-Barreto") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Baranda-Barreto on June 6, 2007.

25.     Plaintiff **Silvino Trujillo-Mirafuentes** ("Plaintiff Trujillo-Mirafuentes") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Trujillo-Mirafuentes on June 6, 2007.

26.     Plaintiff **Gerardo Trujillo-Morellano** ("Plaintiff Trujillo-Morellano") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Trujillo-Morellano on June 6, 2007.

27.     Plaintiff **Edilberto Cedeño-Trujillo** ("Plaintiff Cedeño-Trujillo") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Cedeño-Trujillo on June 6, 2007.

### *Residents of Barnes Avenue Home*

28.     Plaintiff **Edinson Yangua-Calva** ("Plaintiff Yangua-Calva") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Yangua-Calva on June 6, 2007.

29.     Plaintiff **Jose Solano-Yangua** ("Plaintiff Solano-Yangua") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Solano-Yangua on June 6, 2007.

### *Residents of Warren Place Home*

30.     Plaintiff **Cristobal Serrano-Mendez** ("Plaintiff Serrano-Mendez") was a resident of Fair Haven at the time the raids occurred and is of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Serrano-Mendez on June 6, 2007.

31.     Plaintiff **Julio Sergio Paredes-Mendez** ("Plaintiff Paredes-Mendez") is a resident of Fair Haven and of Latino race and ethnicity. Defendant ICE agents arrested and unlawfully detained Plaintiff Paredes-Mendez on June 6, 2007.

***Resident of Atwater Street Home***

32.    Plaintiff **Amilcar Soto Velasquez** ("Plaintiff Soto Velasquez") is a resident of Fair Haven and of Latino race and ethnicity.  Defendant ICE agents arrested and unlawfully detained Plaintiff Soto Velasquez on June 6, 2007.

## ICE Defendants

33.    Defendant **Julie Myers** was the Assistant Secretary of Homeland Security for ICE at all times relevant to this Complaint, at which time she was responsible for the implementation of the policies, practices, and/or customs of ICE and the NFOP.  Defendant Myers is sued in her personal capacity.  During all times relevant to this Complaint, Defendant Myers acted under color of federal law.

34.    Defendant **John Torres** was the Director or Acting Director of the ICE Office of Detention and Removal Operations ("DRO") during all times relevant to this Complaint. Defendant Torres had responsibility and the power of approval for the implementation of all fugitive operations and created the policy, practice, and/or custom under color of which the FOTs conducted their raids.  Defendant Torres was the federal official charged with responsibility for the training and supervision of all DRO officers, and the administration and implementation of FOT policies, practices, and/or customs for all regional offices.  Defendant Torres is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Torres acted under color of federal law.

35.    Defendant **Bruce Chadbourne** is the Field Office Director for the Boston, Massachusetts regional DRO Field Office, which manages the Hartford, Connecticut sub-office. Defendant Chadbourne is the federal official charged with the ultimate responsibility for the training and supervision of all ICE officers in the Boston region, which includes Connecticut, and

for the administration and implementation of the regional office's policies, practices, and/or customs. Defendant Chadbourne is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Chadbourne acted under color of federal law.

36.    Defendant **Jim Martin** is the Deputy Field Office Director for the Boston regional DRO Field Office, which governs the Hartford sub-office. Defendant Martin has supervisory responsibility for all of the ICE Defendants in the Boston region. Defendant Martin is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Martin acted under color of federal law.

37.    Defendant **George Sullivan** is the Assistant Field Office Director for the Hartford DRO sub-office and is responsible for supervising all of the ICE Defendants in the Hartford office. Defendant Sullivan was Operational Supervisor for the New Haven raids, which meant that he both personally participated in planning the raids and directly supervised the execution of the operation. Defendant Sullivan is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Sullivan acted under color of federal law.

38.    Defendant **Walter Wilkowski** is a Resident Agent in Charge for the ICE Office of Investigations in New Haven, Connecticut. He worked with other federal officials to thwart the City's plan to launch its Elm City Resident Card and to hide his involvement in the effort. Defendant Wilkowski is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Wilkowski acted under color of federal law.

39.    Defendant **Richard McCaffrey** is the Supervisory Detention and Deportation Officer of HARFOT and is responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP in Connecticut. As the on-site supervisor in the New Haven raids, he was responsible for monitoring and advising subordinate

ICE agents in the field and coordinating with local law enforcement agencies.  He also directly took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs. Defendant McCaffrey is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant McCaffrey acted under color of federal law.

40.     Defendant **James Brown** was a Deportation Officer of the HARFOT and was responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP during all times relevant in this Complaint.  He took part in the New Haven raids and the processing and detention of Plaintiffs.  Defendant Brown is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Brown acted under color of federal law.

41.     Defendant **Ronald Preble** is a Deportation Officer of the HARFOT and responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP.  He took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs.  Defendant Preble is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Preble acted under color of federal law.

42.     Defendant **Stephen Riccardi** was a Deportation Officer of the HARFOT and responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP.  He took part in the New Haven raids and the processing and detention of Plaintiffs.  Defendant Riccardi is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Riccardi acted under color of federal law.

43.     Defendant **Michelle Vetrano-Antuna** is a Deportation Officer of the HARFOT and responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP. As Case Officer for the New Haven raids, Defendant

Vetrano-Antuna helped plan and execute the raid. Defendant Vetrano-Antuna took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs. Defendant Vetrano-Antuna is sued in her personal capacity. During all times mentioned in this Complaint, Defendant Vetrano-Antuna acted under color of federal law.

44.    Defendant **George Lewis** is an Immigration Enforcement Agent of the HARFOT and responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP. He took part in the New Haven raids and the processing and detention of Plaintiffs. Defendant Lewis is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Lewis acted under color of federal law.

45.    Defendant **Brian Geary** is an ICE Immigration Enforcement Agent and responsible for carrying out ICE operations and policies, practices, and/or customs. He took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs. Defendant Geary is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Geary acted under color of federal law.

46.    Defendant **David Hamilton** is an ICE Immigration Enforcement Agent and responsible for carrying out ICE operations and policies, practices, and/or customs. He took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs. Defendant Hamilton is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Hamilton acted under color of federal law.

47.    Defendant **Derek Moore** is an ICE Immigration Enforcement Agent and responsible for carrying out ICE operations and policies, practices, and/or customs. He took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs. Defendant Moore is sued in

his personal capacity.  During all times mentioned in this Complaint, Defendant Moore acted under color of federal law.

48.    Defendant **David Ostrobinski** is an ICE Deportation Officer and responsible for carrying out ICE operations and policies, practices, and/or customs. He took part in the New Haven raids and the processing and detention of Plaintiffs.  Defendant Ostrobinski is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Ostrobinski acted under color of federal law.

49.    Defendant **David Reilly** is an ICE Deportation Officer and responsible for carrying out ICE operations and policies, practices, and/or customs.  He took part in the New Haven raids and the arrest and detention of Plaintiffs.  Defendant Reilly is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Reilly acted under color of federal law.

50.    Defendant **Wilfred Valentin** is an ICE Immigration Enforcement Agent and responsible for carrying out ICE operations and policies, practices, and/or customs.  He took part in the New Haven raids and the arrest, processing, and detention of Plaintiffs.  Defendant Valentin is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Valentin acted under color of federal law.

51.    Defendant **Wilfredo Rodriguez** is an ICE Immigration Enforcement Agent and responsible for carrying out ICE operations and policies, practices, and/or customs.  He took part in the New Haven raids and the arrest and detention of Plaintiffs.  Defendant Rodriguez is sued in his personal capacity.  During all times mentioned in this Complaint, Defendant Rodriguez acted under color of federal law.

52.    Defendant **Edgar Vasquez** is an ICE Deportation Officer and responsible for carrying out ICE operations and policies, practices, and/or customs. He took part in the New Haven raids

and the processing and detention of Plaintiffs. Defendant Vasquez is sued in his personal capacity. During all times mentioned in this Complaint, Defendant Vasquez acted under color of federal law.

53.     Defendants **John Does 1-10** are ICE agents. They are responsible for carrying out ICE operations and policies, practices, and/or customs. Defendant Does 1-10 personally participated in the New Haven raids and the arrest, processing, and/or detention of Plaintiffs. They are sued in their personal capacities. During all times mentioned in this complaint, Defendant Does 1-10 acted under color of federal law.

54.     Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 1 through 10, inclusive, and therefore sue those Defendants by fictitious names. These Doe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

55.     Defendant **United States** is sued under the Federal Tort Claims Act for the tortious acts of its employees.

## STATEMENT OF FACTS

56.     Just after dawn on June 6, 2007, HARFOT and other ICE agents, along with other federal and state officers, swept into Fair Haven, New Haven's Latino neighborhood, burst into homes and bedrooms, and arrested residents who appeared to be Latino, without an arrest warrant for any of the Plaintiffs or a search warrant for any of their homes. Nor did any person consent to the ICE agents' entry into Plaintiffs' residences.

57.     The HARFOT agents ("HARFOT Defendants"), including Defendants McCaffrey, Brown, Preble, Riccardi, Vetrano-Antuna, and Lewis, who planned, coordinated, led, and directly

participated in the raid were charged with apprehending and removing dangerous criminal fugitive aliens from the United States. A fugitive alien is someone who has been previously ordered deported, excluded, or removed but who has not left the country.

58.     ICE agents, including Defendants McCaffrey, Brown, Preble, Riccardi, Vetrano-Antuna, Lewis, Geary, Hamilton, Moore, Ostrobinski, Reilly, Valentin, Vasquez, and John Does 1-10 (hereafter "ICE Raid Officers"), among others, conducted the New Haven raids. Defendant McCaffrey supervised the operation.

59.     Defendant McCaffrey divided the ICE Raid Officers into four teams ("ICE Raid Teams"), each led by one of the HARFOT Defendants. Two of the four ICE Raid Teams participated in the arrests of Plaintiffs. All four ICE Raid Teams participated in the processing and detention of Plaintiffs. Each ICE Raid Team was accompanied by agents from other federal agencies and state law enforcement officers.

60.     Defendant Vetrano-Antuna was the leader of the first team ("ICE Team #1"), which included Defendants McCaffrey, Hamilton, Valentin, and John Does 1-3. ICE Team #1 made arrests at the Atwater Street residence, where members of ICE Team #1 arrested Plaintiff Soto Velasquez, and at homes including Peck Street and Barnes Avenue, where members of ICE Team #1 arrested Plaintiffs Baranda-Barreto, Trujillo-Mirafuentes, Trujillo-Morellano, Cedeño-Trujillo, Yangua-Calva, and Solano-Yangua.

61.     Defendant Preble was the leader of the second team ("ICE Team #2"), which included Defendants Reilly, Moore, Geary, and John Does 4-6. ICE Team #2 made arrests at homes including those at Fillmore Street and Warren Place, where members of ICE Team #2 arrested Plaintiffs Diaz-Bernal, Colala-Peñarreta, Serrano-Mendez, and Paredes-Mendez.

62.     Defendant Brown was the leader of the third team ("ICE Team #3"), which included Defendants Ostrobinski, Lewis, Rodriguez, and John Does 7-8. ICE Team #3 made arrests at Atwater Street, including the arrest of Plaintiff Soto Velasquez, and later rejoined the other ICE Raid Teams in the processing phase of the operation.

63.     Defendants Riccardi and Vasquez were the co-leaders of the fourth team ("ICE Team #4"), which included Defendant John Does 9-10.  ICE Team #4 made arrests at homes of persons who are not Plaintiffs in this Complaint and rejoined the other ICE Raid Teams in the processing phase of the operation.

64.     ICE Raid Officers used a "target list" as a pretext for entering homes without search warrants or consent and seizing residents without cause or suspicion.

65.     The target list contained grossly outdated and erroneous leads; the list bore little connection to the residents whose homes were invaded.   HARFOT supervisors, including Defendants Chadbourne, Sullivan, Martin, McCaffrey, and Vetrano-Antuna, knew that the list had been prepared without sufficient investigation, verification, or surveillance but authorized the home raids even so.

66.     ICE Raid Officers, some with weapons drawn, forced their way into Plaintiffs' homes without consent or a search warrant, assumed control of the homes, and in some cases dragged half-dressed residents from their beds, leaving them little choice but to comply with the agents' demands.

67.     Upon information and belief, some of the ICE Raid Teams did not include any Spanish speakers, even though the operation targeted Latino-looking residents in a predominantly Latino neighborhood.

68.     The operation led to the unlawful arrests of twenty-nine men and women, ten of whom are Plaintiffs in this suit.  Plaintiffs' individual stories follow by household.

**Fillmore Street Residence**

69.     On the morning of June 6, 2007, Plaintiffs Colala-Peñarreta and Diaz-Bernal were at their residence at Fillmore Street in Fair Haven, which they shared with another roommate.

70.     Early in the morning, Plaintiff Colala-Peñarreta left the apartment for work, but returned to his residence when he realized he had left something behind.  When he arrived back at his building, Plaintiff Colala-Peñarreta saw a uniformed officer at the outer door.  Plaintiff Colala-Peñarreta saw that the door was open, and soon other officers appeared.

71.     These officers were Defendant members of ICE Team #2.

72.     The Defendant members of Team #2 approached Plaintiff Colala-Peñarreta and asked him if he lived there.  When Plaintiff Colala-Peñarreta answered in the affirmative, they asked to see identification.  Plaintiff Colala-Peñarreta indicated that his identification was inside, at which point the Defendants handcuffed him and forced him into the building and up the stairs.

73.     When they reached the landing outside Plaintiff Colala-Peñarreta's apartment door, several Defendant members of ICE Team #2 drew their guns, which severely frightened Plaintiff Colala-Peñarreta.  The Defendants demanded that Plaintiff Colala-Peñarreta open his locked residence to let them enter.

74.     Plaintiff Colala-Peñarreta at no time gave the Defendant members of Team #2 or any other law enforcement official accompanying Team #2 consent to enter the residence, nor did any other resident there.  Plaintiff Colala-Peñarreta was afraid the Defendants with armed guns would hurt him or others inside if he did not do as he was ordered.

75.   Without a search warrant and without consent to do so, and with guns drawn, the Defendant members of ICE Team #2 forcibly entered the apartment.

76.   Once inside, the Defendants asked Plaintiff Colala-Peñarreta who else lived in the apartment. Plaintiff Colala-Peñarreta responded that Eduardo Diaz-Bernal also lived there.  With guns still drawn, the Defendants looked for Plaintiff Diaz-Bernal.

77.   Defendants told Plaintiff Colala-Peñarreta they were immigration agents only after they had entered the living room.  They forced Plaintiff Colala-Peñarreta to sit in the living room while they searched the apartment.

78.   Meanwhile, at the time of the Defendants' entry into the apartment, Plaintiff Diaz-Bernal was in the bathroom, about to enter the shower.  He suddenly heard loud banging on the bathroom door and voices ordering him to hurry and get out.  Plaintiff Diaz-Bernal was immediately frightened.

79.   When Plaintiff Diaz-Bernal opened the bathroom door, approximately four Defendants were standing immediately outside, blocking his exit.

80.   Plaintiff Diaz-Bernal was wearing only shorts and a shirt.  He wanted to put on pants, so he made a motion toward his bedroom, indicating that he wanted to change.  At this, a Defendant shouted at him not to move and two Defendants grabbed his arms and forced him to the kitchen.

81.   Throughout the encounter with Plaintiff Diaz-Bernal, the Defendants spoke harshly and loudly.  Plaintiff Diaz-Bernal answered their questions because he was afraid.

82.   From the kitchen, two Defendants, one on each side, pulled Plaintiff Diaz-Bernal to the living room, where several other Defendants were guarding Plaintiff Colala-Peñarreta, who was handcuffed.

83.     The Defendants searched Plaintiff Diaz-Bernal, made him sit on the floor, and asked him who else lived in the apartment.  He answered that he and two roommates lived there.

84.     Two Defendants held Plaintiff Diaz-Bernal and Plaintiff Colala-Peñarreta while approximately four others searched the apartment.  At no time did Plaintiff Diaz-Bernal and Plaintiff Colala-Peñarreta feel free to leave.

85.     The Defendants then pulled Plaintiff Diaz-Bernal and Colala-Peñarreta to their feet and handcuffed Plaintiff Diaz-Bernal.

86.     Defendants did not arrest or detain any fugitive in the apartment shared by Plaintiffs Diaz-Bernal and Colala-Peñarreta.

87.     Defendants did arrest a fugitive in another apartment in the same building.  An Immigration Judge subsequently reopened that person's immigration proceedings and granted her relief from removal.

### Peck Street Residence, First Floor

88.     Early in the morning on June 6, 2007, Plaintiff Cedeño-Trujillo was in the bathroom brushing his teeth when he heard someone banging loudly on the back door of his apartment on Peck Street in Fair Haven.  Plaintiff Cedeño-Trujillo lived in the apartment with his wife, son, young daughter, and his cousin Plaintiff Trujillo-Mirafuentes, who was asleep in his own bedroom.

89.     Just as Plaintiff Cedeño-Trujillo heard the banging, his daughter told him someone was at the door.  Plaintiff Cedeño-Trujillo went to the back door to see who it was and a Defendant yelled "Police!"  The Plaintiff heard people climbing the stairs to the apartment on the second floor.

90.     Plaintiff Cedeño-Trujillo thought something was wrong and wanted to check whether the people outside were police officers.  Since there was no peephole, Plaintiff Cedeño-Trujillo opened the door a crack.  Uniformed Defendants from ICE Team #1 pushed open the door and rushed in, some of them armed.  Defendants wore jackets that read "ICE" or "Police."

91.     Once inside, Defendants proceeded to block all exits to the apartment.

92.     At no time did any apartment resident or owner consent to the entry of Defendant members of ICE Team #1 or any other law enforcement officer accompanying ICE Team #1, nor did Defendants have a warrant to search or enter the premises.

93.     A Defendant asked Plaintiff Cedeño-Trujillo in English if he recognized a man in a picture.  Plaintiff Cedeño-Trujillo indicated that he did not recognize the man.

94.     Plaintiff Cedeño-Trujillo's daughter was frightened and tried to stand by her father, but a Defendant member of Team #1 grabbed her roughly and took her to another room.  She was on the verge of tears, but the Defendant insisted on interrogating her as to the location of her mother.

95.     In the meantime, another Defendant member of Team #1 barged into Plaintiff Trujillo-Mirafuentes's bedroom and awoke him from his sleep.

96.     The Defendant gestured Plaintiff Trujillo-Mirafuentes to the living room, where another Defendant ordered Plaintiff Trujillo-Mirafuentes back to his bedroom to put on a shirt. The Defendant members of Team #1 then handcuffed Plaintiff Trujillo-Mirafuentes and left him in the living room.

97.     Plaintiffs Trujillo-Mirafuentes and Cedeño-Trujillo asked the Defendants what was happening, but Defendants did not answer.  Some of the Defendants began to laugh.  Plaintiffs Trujillo-Mirafuentes and  Cedeño-Trujillo did not feel free to leave.

98.     A Defendant ordered Plaintiff Cedeño-Trujillo to his bedroom, where another Defendant brought in Plaintiff Cedeño-Trujillo's daughter.  His daughter was terrified.

99.     Without Plaintiff Cedeño-Trujillo's permission, the Defendant member of Team #1 ordered the girl to telephone her mother, Plaintiff Cedeño-Trujillo's wife.  The Defendant then took Plaintiff Cedeño-Trujillo's young daughter out of her father's sight to complete the call.

100.    A Defendant led Plaintiff Cedeño-Trujillo back into the living room.  When Plaintiff Cedeño-Trujillo's cell phone began to ring, the Defendant seized it and did not allow Plaintiff Cedeño-Trujillo  to answer it.

101.    Plaintiff Cedeño-Trujillo's wife arrived home shortly.

102.    Defendants handcuffed Plaintiff Cedeño-Trujillo in front of his wife and daughter.

103.    The Defendants took Plaintiffs Trujillo-Mirafuentes and Cedeño-Trujillo out of their home and placed them into a van.  At no point did the Defendants identify themselves, advise Plaintiffs of their rights, explain why they were being taken into custody, or even that they were being placed under arrest. At no time during the encounter did Plaintiff Trujillo-Mirafuentes or Plaintiff Cedeño-Trujillo feel free to leave.

104.     Defendants did not arrest or detain any fugitive in the first floor Peck Street apartment.

**Peck Street Residence, Second Floor**

105.    In the early morning of June 6, 2007, Plaintiff Baranda-Barreto was asleep in his second floor apartment on Peck Street in Fair Haven, where he lived with relatives, including his nephew, Plaintiff Trujillo-Morellano.  Plaintiff Trujillo-Morellano was also asleep in his bedroom at that time.

106.    Plaintiff Baranda-Barreto was awakened by loud banging on the front door and went into the living room.  He was only partially dressed and not wearing a shirt.

107.    Outside, Defendant members of ICE Team #1 rang the doorbell and pounded on the front door.

108.    Plaintiff Baranda-Barreto then also heard beating on the back door.  When he asked who it was at the back door, he heard a Defendant yell, "Police!"

109.    Plaintiff Baranda-Barreto wanted to check whether the people outside were police officers.  Since there was no peephole, Plaintiff Baranda-Barreto opened the door a crack.

110.    Plaintiff Baranda-Barreto asked who the Defendants were looking for.  The Defendant member of Team #1 at the door answered that they were looking for "Chavez."   Plaintiff Baranda-Barreto responded that there was no Chavez living in the apartment.

111.    A Defendant member of Team #1 pushed through the door.   Other Defendant members of ICE Team #1 then rushed through the open door into Plaintiff's Baranda-Barreto's home.

112.    At least one of the Defendants was visibly armed with a pistol.  Another Defendant stood with arms outstretched across the back doorway to prevent anyone from leaving.

113.    No one in the house gave permission for the Defendant members of Team #1 to enter, or for any other law enforcement officer accompanying Team #1 to enter.   No Defendant possessed or displayed a search warrant authorizing entry.

114.    Plaintiff Baranda-Barreto's wife and son awoke and rushed into the living room.  Plaintiff Baranda-Barreto's wife asked the Defendants what was happening, but the Defendants refused to answer.

115.    The Defendant member of Team #1 blocking the back door asked Plaintiff Baranda-Barreto a question in English.  His son translated that the officer had asked whether Plaintiff Baranda-Barreto had immigration papers.  Plaintiff Baranda-Barreto indicated that he did not want to answer, but the Defendant continued to ask questions.

116.    In the meantime, another of the Defendant members of Team #1 tried to open the door to the bedroom of Plaintiff Baranda-Barreto's cousin.  The room was empty because his cousin had already left for work.

117.    The bedroom door was locked, so the Defendant hit the door with his hand and then kicked repeatedly at the door.  The Defendant left black shoe marks on the door and caused permanent damage to the lock.

118.    The Defendant then went to the door of Plaintiff Trujillo-Morellano's bedroom.  The door was unlocked.  Before Plaintiff Trujillo-Morellano could get up out of bed, two Defendants rushed into his room.  Confused and having just woken up, he asked who it was.

119.    One of the Defendants shouted that they wanted to know the whereabouts of "Chavez."  The Defendant showed Plaintiff Trujillo-Morellano a photograph of a man while Plaintiff Trujillo-Morellano and his girlfriend were still lying in bed.

120.    Plaintiff Trujillo-Morellano responded that he did not know anyone named Chavez.

121.    No one who lived in the house was named Chavez.

122.    The Defendant members of ICE Team #1 told Plaintiff Trujillo-Morellano and his girlfriend to get out of bed and ordered them to get dressed, the Defendants as watched.

123.    The Defendants then handcuffed Plaintiff Trujillo-Morellano and his girlfriend and led them to the living room.

124.    At that point, there were approximately four Defendant members of Team #1 in the apartment, some of whom were armed with guns. Some wore jackets that said "ICE," and others wore jackets that said "Police."

125.    During the course of these events, Plaintiffs Baranda-Barreto and Trujillo-Morellano did not feel free to leave.

126.    The Defendants took Plaintiffs Baranda-Barreto and Trujillo-Morellano and Trujillo-Morellano's girlfriend outside and put them in a van.

127.    On the way to the van, Plaintiff Trujillo-Morellano's girlfriend asked a Defendant where they were going. The Defendant laughed, and taunted that they were going to a concert by Juan Gabriel, a famous Mexican singer.

128.    Plaintiff Trujillo-Morellano asked the Defendants several times what was happening, but they refused to answer. The Defendants did not explain why they came to the apartment, what they were doing, where they were taking them, any rights that they may have, or even that they were being placed under arrest.

129.    Defendants did not arrest or detain any fugitive in the second floor Peck Street apartment.

### Barnes Avenue Residence

130.    Just after dawn on June 6, 2007, Plaintiffs Yangua-Calva and Solano-Yangua, brothers, were at their residence at Barnes Avenue in Fair Haven.  Plaintiff Solano-Yangua was asleep in his bed.

131.    In the early morning hours, Plaintiff Yangua-Calva was sitting in the living room when he heard hard knocking at the door to the apartment.  He rose from the sofa to look through the peephole.

132.     Before he reached the door, approximately six Defendant members of ICE Team #1 burst through and entered his home without a search warrant or consent.  Plaintiff Yangua-Calva immediately saw that the Defendants were armed.

133.     A male Defendant showed Plaintiff Yangua-Calva a photo of a man and asked in Spanish if Plaintiff Yangua-Calva recognized the man.

134.     Plaintiff Yangua-Calva did not recognize the man in the photo.

135.     When Plaintiff Yangua-Calva said that he did not recognize the man in the picture, the Defendant shoved him onto the sofa with both hands and told him he was arrested.  No Defendant asked Plaintiff Yangua-Calva any other questions before arresting him.

136.     When Plaintiff Yangua-Calva asked why he was being arrested, the Defendant told him not to ask questions, and that they were immigration officers.

137.     Acting solely on the basis of Plaintiff Yangua-Calva's Latino appearance and the fact that he spoke Spanish, the Defendant grabbed Plaintiff Yangua-Calva, handcuffed him, and made him sit on the sofa.

138.     The Defendant member of Team #1 told Plaintiff Yangua-Calva that he had to go with them.  When Plaintiff Yangua-Calva asked to be allowed to change out of his work clothes, the Defendant refused.

139.     At the time Defendant members of Team #1 entered the apartment, Plaintiff Solano-Yangua was asleep in his bed.

140.     Plaintiff Solano-Yangua was abruptly awakened when a Defendant member of ICE Team #1 yanked the sheets off his bed and ordered him in English to get up.  Plaintiff Solano-Yangua rose and saw two armed Defendants in his bedroom.

141.   During his entire exchange with the Government agents, Plaintiff Solano-Yangua did not feel free to leave, but instead felt compelled to answer the Defendants' questions and obey their commands.

142.   No one in the house had given any Defendant or any other law enforcement agent consent to enter the residence or Plaintiff Solano-Yangua's bedroom.  The Defendants appeared to target Plaintiff Solano-Yangua based on his Latino appearance.

143.   The Defendants exerted such control over Plaintiff Solano-Yangua that they did not even allow him to use the bathroom before leaving.

144.   Without identifying themselves or telling him that he was arrested, the Defendant members of Team #1 grabbed Plaintiff Solano-Yangua, handcuffed him, and took him, along with Plaintiff Yangua-Calva, downstairs, where they put them both into a vehicle.

145.   Defendants arrested one fugitive at the Barnes Avenue apartment.  An Immigration Judge subsequently reopened that person's immigration proceedings and granted him relief from removal.

### Warren Place Residence

146.   On the morning of June 6, 2007, Plaintiff Serrano-Mendez was lying on the couch in his apartment, waiting for a ride.  His roommate, Plaintiff Paredes-Mendez, was asleep in his own room.

147.   Plaintiff Serrano-Mendez looked out the front window and saw Defendant members of ICE Team #2 who appeared to be police officers.

148.   As the members of ICE Team #2 pounded on both the front and back doors of the apartment, Plaintiff Serrano-Mendez hurried to inform the other residents that the police had surrounded the apartment.

149.    Frightened by the knocking, Plaintiff Paredes-Mendez had already awoken.  Plaintiff Paredes-Mendez went to the living room window and saw people in uniforms at the entrance to his house.  He left the living room and returned to his bedroom.

150.    After Plaintiffs Serrano-Mendez and Paredes-Mendez left the living room, their roommate Eugenio Perez-Cuando entered the living room.

151.    Mr. Perez-Cuando then exited the apartment through the living room door.  When he exited, Mr. Perez-Cuando left the door to the apartment ajar.

152.    Mr. Perez-Cuando proceeded down the building's common staircase to meet the Defendant members of ICE Team #2 at the building's front door.

153.    Without identifying themselves or asking permission, Defendant members of ICE Team #2 entered the building's foyer.

154.    Defendant Members of ICE Team #2 climbed up the stairs and, without Mr. Perez-Cuando's consent, entered the apartment.

155.    Plaintiffs Paredes-Mendez and Serrano-Mendez returned to the living room around the same time. As they did, they saw Defendant members of ICE Team #2 in uniform with holstered handguns standing in the living room.

156.    At no time did either of Plaintiffs, or any other member of the household, grant Defendant members of ICE Team #2, or any other law enforcement officer accompanying ICE Team #2, permission to enter the home, nor did the Defendants possess a search warrant authorizing their entry.

157.    Without identifying themselves, the Defendants demanded that both Plaintiffs sit down on the couch in the living room.  At that point, Defendants did not know the Plaintiffs' names.

158.    The Defendants held up a picture of a woman.  Defendants claimed she was dangerous and indicated they were going to search the house to find her.

159.    While a Defendant member of ICE Team #2 searched the other rooms of the house, others stood in the living room and blocked the entrances so that Plaintiffs Serrano-Mendez and Paredes-Mendez could not leave.

160.    The Defendants asked Plaintiffs Serrano-Mendez and Paredes-Mendez several questions, including how many people lived in the apartment, who lived on the third floor, and the race of those residents.

161.    During the course of these events, neither Plaintiff Serrano-Mendez nor Plaintiff Paredes-Mendez felt free to leave.

162.    Without asking other questions, the Defendants then handcuffed both men and forced them to stand against the wall.  They searched the pockets of Plaintiffs Serrano-Mendez and Paredes-Mendez, removed everything they found, and took the two men outside to a vehicle.

163.    Defendants did not arrest or detain any fugitive in the Warren Place apartment.

**Atwater Street Residence**

164.    Early in the morning on June 6, 2007, Plaintiff Soto Velasquez was sleeping next to his girlfriend in her bedroom on Atwater Street in Fair Haven.

165.    Defendant members of ICE Team #1 and ICE Team #3 advanced upon the apartment where Plaintiff Soto Velasquez and his girlfriend slept.  Stationed at both the front and back entrances, Defendants repeatedly rang the doorbell at the front of the house while another group of Defendants banged on the back door.

166.   Without a warrant, the Defendant members of ICE Team #1 and ICE Team #3 barged into the residence. No person gave permission to enter the residence, nor could any person have been reasonably construed to have given such permission.

167.   Plaintiff Soto Velasquez was awoken by Defendants as they came through the front door and went to the back of the apartment to let other Defendants in through the back door.

168.   The Defendants banged on the door of the bedroom where Plaintiff Soto Velasquez and his girlfriend slept.  When his girlfriend opened the bedroom door, the Defendants shouted at Plaintiff Soto Velasquez to move into the hallway. Frightened, he complied and went into the hallway with all of the other inhabitants, who at this point had also been detained.

169.   Without asking for permission, the Defendants began to search drawers and closets.

170.   The Defendants asked Plaintiff Soto Velasquez several questions.  Frightened by the presence of the Defendants and intimidated by their close physical presence and aggressive behavior, Plaintiff Soto Velasquez felt compelled to answer their questions.

171.   During the course of these events, Plaintiff Serrano-Mendez did not feel free to leave.

172.   Defendants eventually took Plaintiff Soto Velasquez out of the apartment and placed him in a waiting vehicle.

173.   Defendants did not arrest or detain any fugitive in the Atwater Street residence.

### Processing and Detention

174.   Defendant ICE Raid Officers arrested and/or detained each Plaintiff before asking about or learning each Plaintiff's nationality or immigration status—or even knowing their names.

175.   Each Plaintiff was frightened and intimidated by the Defendant ICE Raid Officers' harsh language, conduct, and display of weapons.

176.   The Defendants ICE Raid Officers did not inform any Plaintiff of his rights.

177. At no time during their seizures did any Plaintiff feel free to leave. No Defendant explained why he or she was in each Plaintiff's apartment or why he or she was seizing each Plaintiff.

178. From Plaintiffs' homes, Defendant ICE Raid Officers forced each Plaintiff into a van and detained him there, in handcuffs, until the Plaintiffs were transferred to a bus. Each Plaintiff spent several hours handcuffed in the van and then the bus until Defendant ICE Raid Officers eventually took each Plaintiff to Hartford. At no time did any of the Defendant ICE Raid Officers explain to any Plaintiff where they were going.

179. Once at the Hartford Office of DRO, Defendant ICE Raid Officers chained each Plaintiff's ankles with metal foot cuffs and placed them in a small room with approximately thirty other people.

180. Defendant ICE Raid Officers fingerprinted, photographed, and interviewed each Plaintiff without a lawyer present. During the examination of each Plaintiff, no Defendant informed the Plaintiffs that each had a right to remain silent and to have counsel present.

181. Plaintiffs Diaz-Bernal, Cedeño-Trujillo, Trujillo-Mirafuentes, Trujillo-Morellano, and Baranda-Barreto each asked to make a telephone call at some point, but Defendants either denied or ignored this request.

182. During the interviews, Defendant ICE Raid Officers handed each Plaintiff forms in English, which the Plaintiffs could not read, and instructed each Plaintiff to sign. Defendants did not translate the forms into Spanish.

183. The primary language of each Plaintiff is Spanish.

184. Many of the Plaintiffs, including Plaintiffs Cedeño-Trujillo, Colala-Peñarreta, and Trujillo-Mirafuentes, felt that they had no choice but to sign the forms. Plaintiffs Serrano-Mendez

and Paredes-Mendez signed the forms only because they believed, wrongly, that Defendants would release them if they signed.

185.   When Plaintiff Solano-Yangua asked for a translator, the same Defendant officer who had arrested him at his home orally translated some, but not all, of the documents to him.

186.   When Plaintiffs Serrano-Mendez, Baranda-Barreto, and Trujillo-Morellano asked for translation, the Defendant ICE Raid Officers explained to each of them that the document was related to his bond, and that they would be able to go free once they had paid the bond.

187.   The Defendant ICE Raid Officers stated that if these Plaintiffs signed the documents before them, they would not be harmed.  Nervous, confused, and afraid of the consequences of not signing, these Plaintiffs signed the forms.

188.   When Plaintiff Diaz-Bernal asked whether he had to sign, a Defendant ICE Raid Officer told him if he did not sign, he would have to pay $15,000 to stay in the country and fight the case. Then the Defendant had Plaintiff Diaz-Bernal sign another form in English without explaining what it said. Only later did Plaintiff Diaz-Bernal learn that this form said he could consult an attorney and included, in English, a list of lawyers.

189.   Defendants took those Plaintiffs who refused to sign the forms back to the Hartford DRO Office the next day, where these Plaintiffs felt that they had no choice but to sign the forms. In the end, the Defendant ICE Raid Officers ensured that each Plaintiff signed the forms.

190.   After the initial interview process, the Defendant ICE Raid Officers placed Plaintiffs back in cells.  That night or the next day, Defendants transferred all Plaintiffs, in handcuffs and leg irons, to Wyatt Detention Facility, in Central Falls, Rhode Island.

191.    All Plaintiffs except Baranda-Barreto and Cedeño-Trujillo moved, through counsel, for a bond redetermination before an Immigration Judge.  The Immigration Judge who conducted each bond hearing reduced the bond for each Plaintiff.

192.    At Wyatt Detention Facility, Defendants unlawfully detained each Plaintiff for various periods of time: Plaintiff Baranda-Barreto for approximately three days; Plaintiff Cedeño-Trujillo for approximately six days; Plaintiffs Trujillo-Mirafuentes, Trujillo-Morellano and Soto Velasquez for approximately sixteen days; Plaintiffs Solano-Yangua, Yangua-Calva, and Diaz-Bernal for approximately seventeen days; and Plaintiffs Serrano-Mendez and Paredes-Mendez for approximately twenty-seven days.  Plaintiff Colala-Peñarreta spent approximately sixteen days in detention, during approximately one week of which he had to sleep on the cement floor of the cell.

### Hartford ICE Officers' Decision to Target and Raid New Haven

193.    Defendants decided to raid New Haven in order to punish the City and its residents for lawful municipal public safety policies of which Defendants disapproved.  These policies aimed to integrate all residents, including Latino immigrants, into civic life.

194.    Since 2000, New Haven, Connecticut has experienced rapid growth in its new immigrant population.  Immigrants from Mexico, Guatemala, Jamaica, and Ecuador, among other countries, have come to New Haven to live, work, and raise families, making this City of 125,000 their home.  Of an estimated 15,000 new immigrants in the City, at least 3,000 to 5,000 reside in Fair Haven, a predominantly Latino neighborhood of New Haven.

*New Haven Responds to New Immigrant Populations*

195.    As new immigrants arrived in New Haven, city and community leaders and residents took steps to integrate them into civic life, for the benefit of these new residents as well as the longer-term residents of New Haven, U.S. citizen and immigrant alike.

196.    In 2005, New Haven city officials and residents became aware of a growing public safety problem: immigrants often did not possess government-issued identification cards recognized by the police and other city officials and, without identification, could not open bank accounts, making them easy targets for robbery and other crime.

197.    In addition, many new immigrants, without recognizable identification, feared to report crimes they had suffered or witnessed to police, concerned that police would demand identification and report to ICE the names of individuals who could not produce recognizable government-issued identification.

198.    Many new immigrants in New Haven are paid in cash, or they cash checks at one of a handful of payday lenders. Both strategies left these workers vulnerable to robbery and violent attacks, especially at the end of a work-week. Robbers targeted immigrants, or Latino people assumed to be immigrants, in areas near payday lenders, but victims were often reluctant to report these crimes to the police.

199.    This public safety problem in Fair Haven occasionally had fatal consequences. On or about October 18, 2007, a Latino maintenance worker at Chabaso Bakery was stabbed to death on his way to cash his paycheck.

200.    Between the years 2005 and 2007, local organizations and New Haven officials developed several policy proposals to respond to threats faced by New Haven's Latinos and immigrants and improve public safety for all city residents.

201.    First, in December 2006, the New Haven Police Department ("NHPD") issued General Order 06-02; this order provided that, in general, NHPD officers would not inquire about the immigration status or other confidential information of persons they encountered, nor report to ICE any immigration status information they might obtain, nor make civil immigration arrests.

202.    Second, city officials created a program that would provide residents who otherwise had no proof of identification with a municipal identification card, called the Elm City Resident Card.

203.    This program would fulfill the core local government functions of promoting public health and safety for all city residents and ensure that immigrant and Latino residents enjoyed the same freedom of movement and peace as other residents of New Haven.

204.    In order to improve public safety, the Elm City Resident Card program would make it easier for immigrants to open bank accounts and to store their money in a secure place rather than on their person.  The program would allow all residents to access local libraries, parks, and public beaches, so that families could participate more fully in the life of the community. The program also encouraged all residents to report crimes.

205.    The program was first proposed in 2005 in a report released by local immigrants' rights organizations Junta for Progressive Action, Inc. ("Junta") and Unidad Latina en Acción ("ULA").  The report, *A City to Model: Six Proposals for Protecting Public Safety and Improving Relationships Between Immigrant Communities and the City of New Haven*, outlined six proposals, including the Elm City Resident Card program and a policy barring New Haven police involvement in civil immigration enforcement.

206.    Local community groups, including ULA and Junta and the congregation of St. Rose of Lima, a prominent Catholic Church in New Haven, urged New Haven officials to adopt the Elm City Resident Card as a response to public safety concerns.

207.    On or about October 4, 2005, New Haven Mayor John DeStefano, Jr. announced that the City would make a municipal identification card available to all New Haven residents, regardless of immigration status.

208.    The City took no immediate steps to implement the municipal identification card program after the Mayor's announcement.

*New Haven's Public Safety Proposals Gain Local and National Attention*

209.    In early 2007, the City's plans to offer a municipal identification card took on new momentum and concreteness as municipal officials undertook efforts in earnest to implement the program.

210.    Throughout the spring of 2007, New Haven's public safety and integration efforts earned national media attention.  One op-ed characterized the City as a "safe haven" for immigrant communities.

211.    On or about March 5, 2007, *The New York Times* reported that the program would be the first of its kind in the nation.  NBC Nightly News also reported on the Elm City Resident Card program on or about March 20, 2007, and the *Washington Post* did the same on or about April 10, 2007.

212.    On or about April 12, 2007, an editorial in *The Seattle Post-Intelligencer* discussed a number of integrationist policies in New Haven, including the Elm City Resident Card, and recommended that Seattle consider similar measures.

213.    On or about April 15, 2007, *The New York Times* published an op-ed in the Connecticut, New Jersey, and Long Island sections of its Sunday edition lauding New Haven's public safety policies.

214.    There was significant local media attention to the municipal identification card program, including stories in *The Yale Daily News* on or about April 1, 2007 and *The New Haven Independent* on or about May 8, 2007.

*Federal Antipathy to New Haven's Public Safety Proposals Intensifies*

215.    As New Haven's Elm City Resident Card program gained national media attention, federal officials closely monitored the City's proposal.

216.    From March to June 2007, ICE officials in Washington, D.C., New Haven, Boston, and Hartford, including Defendant Wilkowski, and lawyers in the U.S. Attorney's Office in Connecticut exchanged dozens of emails and an unknown number of phone calls expressing concern about the Elm City Resident Card program.

217.    These emails characterized the Elm City Resident Card program as an effort to undercut the policing of undocumented immigrants.  Their email correspondence developed into strategy sessions to prevent the adoption of the program altogether.

218.    One email from the U.S. Attorney's Office for the District of Connecticut on or about March 28, 2007 disclosed that Defendant Wilkowski "ha[d] been talking to his headquarters about the fact that New Haven is becoming a sanctuary city."  According to the email, Defendant Wilkowski was "getting in touch with two people who know a lot about sanctuary cities" and planned to arrange a meeting between them and the U.S. Attorney's Office so that the "office can decide what, if anything, needs to be done."

219.   These federal officials devised a scheme to infringe upon and frustrate New Haven's public safety proposals, even though these policies were well within the traditional functions of local government.

220.   In a series of emails throughout May 2007, the lawyers in the U.S. Attorney's Office in Connecticut and ICE agents, including Defendant Wilkowski, continued to strategize about how to respond to New Haven's policies.

221.   On or about May 11, 2007, an email from the U.S. Attorney's Office indicated that Defendant Wilkowski had a conference call with several Assistant U.S. Attorneys to discuss how to address the "headaches in New Haven."

222.   On or about May 17, 2007, the Finance Committee of the New Haven Board of Aldermen held a public hearing to consider whether to accept funds from a private foundation that had been committed to fund the first year of the City's proposed Elm City Resident Card program.

223.   Hundreds of persons attended this public meeting, and dozens testified in support of the Elm City Resident Card program.  No witness testified in opposition to the program.

224.   Mayor John DeStefano testified personally at the Finance Committee hearing, stating it was only the fourth time he had done so in his fourteen-year tenure.

225.   He described the Elm City Resident Card program as "a fundamental acknowledgment of an individual's worth and dignity—by giving a name to those among us."  Other witnesses include Bishop Peter Rosazza, Father James Manship of St. Rose of Lima Church, and representatives of ULA and Junta, the community organizations that had first proposed the Elm City Resident Card program.

226. The Finance Committee voted, 25 to 1, to recommend to the full Board of Aldermen that it approve receipt of the foundation grant for the Elm City Resident Card program. This vote was widely reported in the local press.

227. A few days after the Finance Committee's vote, on or about May 21, 2007, ICE attorneys and agents, including Defendant Wilkowski, forwarded press articles to each other. Their comments took on a racially charged tone. In one email, an ICE attorney wrote: "Yale is loading up the Amistad with illegal aliens and sailing them to freedom, while [ICE counsel] openly weeps in Hartford."

228. Working with lawyers in the U.S. Attorney's Office throughout May 2007, Defendant Wilkowski drafted a letter to the mayor of New Haven "outlining some of the concerns with a city identification card . . . so the Mayor understands the consequences of what he is doing" and to "discourage him from implementing this ID card program."

229. The federal officials planned to release their letter to the public. Although ICE officials, including Defendant Wilkowski, and lawyers at the U.S. Attorney's Office worked closely together to write the letter, their emails evidence an agreement to disguise the collaboration between ICE and the U.S. Attorney's Office for the District of Connecticut ("USAO" or "USA").

230. On or about June 3, 2007, Defendant Wilkowski memorialized this cover-up in an email to ICE Attorneys John Marley and Paul Gleason, writing: "This [letter] will be coming from USA [the United States Attorney's Office]—no nexus to ICE."

231. By early June 2007, another email from the U.S. Attorney's Office confirmed the longstanding nature of federal hostility to the City's lawful plan: "we've been working with

[Defendant] Walter [Wilkowski] . . . on this [issue] since the City's idea to issue id cards to illegal aliens (which first started about 2 years ago) began to get traction."

*HARFOT Defendants and Other ICE Defendants Plan the New Haven Raid*

232.    As Defendant Wilkowski, other ICE officials in Hartford, Boston, and Washington, D.C., and lawyers in the U.S. Attorney's Office tracked the development of the Elm City Resident Card program, their colleagues at the Hartford ICE Office planned an attack in response to the Elm City Resident Card program and New Haven's other integrative policies.

233.    On or about April 6, 2007, during the peak of national media attention on New Haven's policies, Defendant McCaffrey began drafting a written plan ("Operational Plan") detailing the proposed execution of an FOT action to raid New Haven-area homes and compiling a "target list" of alleged fugitives in New Haven.

234.    On or about April 20, 2007, just five days after publication of *The New York Times* op-ed, Defendant McCaffrey completed the "target list" and proposed Operational Plan for an FOT action in New Haven.

235.    Planning for their first and only raid of the year, Defendants including HARFOT members included only New Haven-area addresses in their target list.

236.    Out of the approximately 5,500 outstanding administrative warrants for fugitives allegedly residing within HARFOT's jurisdiction, Defendants including HARFOT members selected approximately thirty-three addresses in the New Haven area.

237.    Defendants including HARFOT members mined various sources for the names of New Haven residents who might be within their jurisdiction, using databases riddled with inconsistencies and errors.

238.   Upon information and belief, Defendants McCaffrey and Vetrano-Antuna found a sufficient number of names of immigration fugitives with New Haven addresses in order to justify submitting a plan to their supervisors.

239.   On or about April 20, 2007, Defendant McCaffrey submitted the plan to Defendants George Sullivan, Jim Martin and Bruce Chadbourne at the Hartford and the Boston regional DRO office for approval.

240.   On or about April 20, 2007, Defendant McCaffrey also submitted the plan to supervisory officials at ICE Headquarters in Washington, D.C., including Defendant Torres and others at the national DRO Headquarters.

241.   Senior ICE personnel, including Defendants Chadbourne and Torres, authorized the raid on or about May 4, 2007.

242.   Defendants Torres and Chadbourne each personally reviewed and approved the proposed Operational Plan drafted by Defendant McCaffrey.

243.   Defendants Torres and Chadbourne each conveyed their approval to Defendant McCaffrey.

244.   HARFOT enlisted the help of other federal and local agencies, including the Connecticut State Police.  Officials from these agencies were assigned to individual raid teams.

245.   On or about April 30, 2007, Defendant Vetrano-Antuna invited Connecticut State Police officer Carmine Verno to join in on the raid, saying that it "should be a fun time!!"

246.   On or about May 9, 2007, Defendant McCaffrey, the supervising officer of HARFOT, sent notice that he would need "as much assistance from as many officers in DRO as is operationally possible" to more than twenty officers who would participate in the raid.

247.    Despite the breadth of this outreach, and in contravention of ICE's official policy and practice, Defendants did not make meaningful attempts to cooperate with New Haven law enforcement when planning or conducting this raid.

248.    In a subsequent internal investigation conducted by ICE, Defendant McCaffrey acknowledged that he had failed to notify the NHPD in advance of the operation, as required by ICE policies and procedures.

249.    On the evening of June 4, 2007, the entire Board of Aldermen voted overwhelmingly to approve the Finance Committee's recommendation to accept foundation funds to support the Elm City Resident Card program, making New Haven the first city in the nation to agree to approve a program of this kind.

250.    This vote was widely reported in the local press.

251.    On June 6, 2007, a mere thirty-six hours later, Defendants invaded Plaintiffs' homes.

252.    Later that day, in its first official statement regarding the raid, ICE made plain its retaliatory intent, declaring through spokesperson Marc Raimondi, "There is truly no safe haven for fugitive aliens."

### Senior ICE Officials Supervise the New Haven Raids Under the National Fugitive Operations Program ("NFOP")

253.    The HARFOT Defendants who planned, coordinated, led, and directly participated in the raid did so as part of the NFOP, a widely criticized program authorized to identify, locate, apprehend, and remove *dangerous fugitive* aliens from the United States, in particular those convicted of crimes.

254.    In 2007, there were approximately seventy-five FOTs operating in the United States, including HARFOT.

255.   FOTs typically consist of seven members.   The HARFOT team consisted of Supervisory Detention and Deportation Officer ("SDDO") Defendant McCaffrey, Immigration Enforcement Agent ("IEA") Defendant Lewis, four Deportation Officers ("DOs"), Defendants Brown, Preble, Riccardi, and Vetrano-Antuna, and a Deportation Assistant.

256.   The SDDO is responsible for planning fugitive operations carried out by the SDDO and the DOs with support from other team members.

257.   Although Congress and ICE originally established the NFOP to target dangerous criminal fugitives, ICE increasingly focused NFOP resources on *non*-criminal, *non*-dangerous, *non*-fugitive immigrants, especially after Defendant Torres became Acting Director of DRO in 2006.

258.   Prior to 2006, FOT enforcement policy directed that at least seventy-five percent of total yearly arrests by each FOT had to be fugitive aliens with criminal convictions. This policy was generally consistent with NFOP's mandate to target dangerous fugitives.

259.   NFOP policy instructed that FOTs aim for a target number of at least 125 fugitive arrests per year.   Pre-2006 FOT enforcement policy did not allow non-fugitive, non-criminal status violators to count toward these annual fugitive arrest quotas.

260.   In or about January 2006, Defendant Torres, then Acting Director of DRO, instituted a new quota system, requiring each seven-member FOT to make one thousand fugitive arrests per year.

261.   Defendant Torres also eliminated the prior seventy-five percent target for criminal fugitives, thus removing any incentive for FOTs to concentrate on locating and apprehending the dangerous criminal fugitives for which Congress had funded the NFOP.

262. Instead, Defendant Torres established a priority system for targeting fugitives, directing FOTs to focus on arresting dangerous and/or criminal fugitives, with the lowest priority on non-criminal fugitives.

263. In practice, Defendant Torres's new system resulted in a sharp decrease of criminal fugitives arrested and a marked increase in the arrest of non-criminal individuals.

264. When Defendant Torres became the Director of DRO, no longer merely an Acting Director, he again amended the terms for FOT compliance with the quota system.

265. In a memorandum dated September 29, 2006 and addressed to all Assistant Directors, Deputy Assistant Directors, and Field Office Directors, which would include Defendants Chadbourne, Martin, and Sullivan, Defendant Torres set forth new criteria for meeting the mandatory FOT quota.

266. His new plan maintained the one thousand arrests per year quota system and the priority categories, but now allowed up to five hundred "collateral" arrests—bystanders who were neither fugitives nor criminals but who were encountered by FOTs while allegedly searching for actual fugitives—to count towards the annual one thousand arrest quota.

267. Thus, the FOTs no longer had to make one thousand fugitive arrests, but could instead count up to five hundred non-fugitive, non-criminal bystanders toward their yearly total.

268. Defendant Torres' changes to FOT policy operated in direct contravention of the NFOP's congressional mandate—to target dangerous, criminal fugitives.

269. At all relevant times, Defendant Torres reported directly to Defendant Myers, the head of ICE.

270. Upon information and belief, Defendant Torres advised Defendant Myers of the implementation of the FOT quota system and its later amendment, and Defendant Myers

approved the quota system and its amendment by Defendant Torres, including the change that allowed bystanders to count in satisfaction of the annual total.

271.    After Defendant Torres established his new quota system in September 2006, FOTs increasingly began to arrest bystanders.  As a result of Defendant Torres's quota system, the percentage of criminal fugitives arrested by FOTs in 2007 decreased drastically, while arrests of non-fugitive bystanders soared.

272.    In 2007, the vast majority of FOT arrests (approximately ninety-one percent) were either in the lowest priority category (non-dangerous, non-criminal fugitives) or not fugitives at all.

273.    None of the Plaintiffs in this action was arrested as a fugitive, and thus none fit into even the lowest of Defendant Torres' categories.

274.    Defendants Torres and Myers' dramatic policy shift directly caused extensive arrests of bystanders and meant that FOT enforcement tactics, authorized to target dangerous fugitives, were unleashed upon a far wider class of people—including bystanders.

275.    The policy decisions of Defendants Torres and Myers caused widespread constitutional violations as FOTs across the country, under pressure to meet quotas that could be satisfied in large part by arresting non-fugitives, raided homes, awakened families in their beds, and unlawfully entered homes in plainclothes.

276.    FOTs are not authorized by law to enter a private home without a search warrant or consent.  However, after Defendant Torres implemented his new policy, FOTs across the country raided homes without search warrants or consent.

277.    Defendants Torres and Myers implemented a quota system which encouraged FOTs to conduct raids circumventing the Fourth and Fifth Amendments in order to meet their quotas.

278. Defendants Torres and Myers knew or should have known that their FOT policies would inevitably lead to widespread constitutional violations against bystanders.

279. The raids resulting in the arrest of Plaintiffs were similar to other home raids across the country. These similarities suggest an unlawful pattern and practice of warrantless and abusive home raids, which was set in motion by Defendants Torres and Myers.

280. Since Defendant Torres established his FOT policies, which Defendant Myers approved, the NFOP has come under increasing public criticism for a pattern of widespread constitutional violations, which include warrantless home invasions, racial profiling, coercive questioning, arresting individuals without probable cause, detaining individuals without reasonable suspicion, and denying detainees access to counsel and telephones.

281. This criticism, which included numerous national media reports, lawsuits against Defendants Myers and Torres and other senior ICE personnel, and specific communications and warnings issued by members of Congress and advocacy groups, put Defendants Myers and Torres on notice of the unconstitutional conduct of their subordinates.

282. ICE's Office of Professional Responsibility ("OPR") has been aware of widespread misconduct among immigration officers for years.

283. Defendants Torres and Myers caused widespread unlawful conduct of FOTs by unilaterally requiring all Field Office Directors to adhere to the FOT quota system and to report their arrest numbers to DHS management to determine whether each Field Office met its annual quota.

284. Despite reports of widespread violations, Defendant Myers continued to publicize, and laud as "successful," the department's dramatic increase in immigration arrests since the creation of the NFOP. This position, as reflected in press releases and statements to the media touting

43

ICE's NFOP accomplishments, encouraged and implicitly authorized unconstitutional behavior by subordinates.

285.   Despite numerous findings of violations of rights in the course of FOT enforcement actions, Defendants Torres and Myers did not, upon information and belief, meaningfully discipline or cause to be disciplined any officer responsible for such unconstitutional conduct.

286.   On or about April 20, 2006, senior ICE officials, including Defendant Myers, announced the launch of an FOT initiative called "Operation Return to Sender," which Field Offices were directed to carry out in order to target dangerous fugitives.

287.   At its inception, Defendant Myers publicly praised Operation Return to Sender, saying that "America's welcome does not extend to immigrants who come here to commit crimes" and assuring that ICE "w[ould] leave no stone unturned in hunting down" criminal aliens.

288.   *DHS Today*, an internal ICE publication distributed to all ICE offices, reported that, under Defendant Myers' directive, "virtually every field office in the nation from ICE's Office of Investigations and its Office of Detention and Removal Operations carried out [the Operation Return to Sender] enforcement operation in conjunction with numerous state and local law enforcement agencies."

289.   Operation Return to Sender resulted in the arrests of thousands of individuals through residential raids.  Most of these arrests were bystanders.

290.   Since Operation Return to Sender began, media reports, civil complaints, testimony at congressional hearings, and sworn statements have attested to the widespread constitutional violations perpetrated by FOTs.

291.   The New Haven raid that is the subject of this Complaint was conducted as part of Operation Return to Sender.

292.    Approximately thirteen days after the ICE misconduct in this raid drew national concern, Defendant Myers again touted the "great strides" made by her agency in increasing the number of FOTs nationwide from seventeen to approximately sixty since 2006 and for having "developed and implemented a comprehensive enforcement strategy" as part of their "successful detention and removal management."

293.    Defendant Myers' remarks contained no mention of precautions or safeguards against unconstitutional conduct by FOTs.

294.    Because of the public outcry over prior unconstitutional FOT operations across the country, by the time of the New Haven raids, Defendant ICE supervisors, including Myers, Torres, Chadbourne, Martin, and Sullivan, knew of the likelihood that improperly supervised FOTs would result in constitutional violations.

295.    Even after the public attention to the constitutional violations that occurred during the New Haven raids, ICE officials continued with the enforcement operation nonetheless, making more arrests in the area based on this same plan in the days that followed.

296.    On or about August 17, 2009, more than two years after the New Haven raids, ICE Assistant Secretary John Morton agreed that the quota system was "not a good way to go about" enforcement and announced that the quota system would be abolished.

297.    Defendants Myers and Torres were aware of widespread and recurring constitutional violations occurring under color of the ICE policies, programs and/or customs that they created, administered, and/or approved.

298.    Although they knew about these widespread constitutional violations long before the New Haven raids, both Defendants Myers and Torres failed to act to prevent future illegal conduct.

299.    Moreover, the constitutional violations committed by FOTs as a result of the policies of Defendants Myers and Torres were so widespread as to constitute constructive acquiescence of Defendants Myers and Torres in their roles as supervisors of and policymakers for the NFOP.

300.    At all relevant times herein, the NFOP training program was woefully inadequate to prevent FOT officers from engaging in frequent and egregious constitutional violations during residential enforcement and other operations. It did not sufficiently instruct agents in how to conduct residential raids or make other arrests without violating constitutional rights.

301.    The FOT training program consisted of a one-time, three-week class for new FOT members, which focused on teaching participants how to use the FOT database system and perform other administrative tasks.

302.    Although it was purportedly mandatory, many FOT members never attended this training. Defendant McCaffrey, for example, upon information and belief never attended the FOT training. Even those who would ultimately attend the training could work for up to two years on the team before they attended any FOT training.

303.    The NFOP provided no national refresher course or in-service training days at any time to inform agents of new legal developments or ensure their understanding of lawful enforcement tactics.

304.    This inadequate training created an unreasonable risk that FOT members would engage in unconstitutional actions.

305.    Furthermore, in the New Haven raid operation, FOTs worked with other federal and state officials such as Postal Inspectors and U.S. Marshals. Upon information and belief, at all relevant times herein, the NFOP had no training program at all that provided instruction to these

"partnering" agencies, even though these other agencies regularly participated in FOT activities alongside FOT members.

306.    Reviewing the FOT training program in early 2007, the Office of the Inspector General ("OIG") concluded that it was insufficient, as many officers had never attended it and ICE offered no national refresher course.

307.    In March 2007, the OIG submitted a report to Defendants Torres and Myers and others that warned that the training program was inadequate and must be changed, and contained numerous recommendations for improvements.

308.    Although they were aware of the gross and obvious inadequacies of the FOT training program, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan neglected to change the training policies to prevent further constitutional violations or to implement the training reforms recommended by the OIG report.

309.    By failing to create and implement an adequate training program for the HARFOT Defendants and other federal and state law enforcement participants in the New Haven raid, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan acted with deliberate indifference to the rights of people targeted by their subordinates.  They knew that their agents would confront residential raid situations, that such raids present agents with difficult situations that call for special training, that the current FOT training was inadequate, that FOT teams had a long and known history of mishandling home raids, and that their ICE agent subordinates were likely to commit egregious constitutional violations in home raids in the absence of proper training. Defendants' failure to create an adequate training program caused Plaintiffs' injuries.

310.    Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were also grossly negligent in their supervisory duties and acted with deliberate indifference to an obvious need for closer supervision of the Operational Plan and the execution of the New Haven raids.

311.    Defendants Chadbourne and Torres personally reviewed and approved the Operational Plan prepared by Defendant McCaffrey.

312.    One week after the raid, on or about June 13, 2007, one of Defendant Chadbourne's subordinates voiced his support in an email, writing that Chadbourne had done a "good job showing a set of balls by going back into the City and arresting 3 more people" despite the public criticism following the first day of the New Haven raids.

313.    Before executing the New Haven raid, Defendants McCaffrey and Sullivan prepared a memorandum called an "A/S Note."  An A/S Note is the term for a memorandum submitted to the Assistant Secretary.

314.    The A/S Note regarding the New Haven operation noted the recent vote approving the Elm City Resident Card program but nevertheless advised Defendant Myers that the raid "will commence" on June 6.

315.    Defendant Sullivan forwarded the A/S Note to Defendants Chadbourne and Martin on or about June 5, 2007.

316.    On information and belief, the A/S Note was sent to Defendant Torres and then to Defendant Myers to advise her of the New Haven raids before the raids commenced.

317.    Defendants Myers, Torres, Chadbourne, Martin, and Sullivan thus knew that HARFOT would be engaging in residential raids, a situation that demands close supervision and careful planning to avoid violating constitutional rights.

318.   Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were aware of the high risk of constitutional violations that FOT raids presented by virtue of numerous media and internal investigations indicating as much.

319.   Based on the numerous recommendations in government reports on FOT enforcement policy and practice, as well as from media and other sources, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan knew that the current supervisory structure was inadequate, they knew that proper supervision would make the situation less difficult, and they knew that subordinates were likely to commit constitutional violations without adequate supervision.

320.   Defendants Myers, Torres, Chadbourne, Martin, and Sullivan either deliberately or recklessly disregarded that risk by failing to adequately supervise the operation, and that failure caused Plaintiffs' constitutional injuries.

## CLAIMS RELATING TO PLAINTIFFS' UNLAWFUL ARREST

### FIRST CLAIM FOR RELIEF

#### Fourth Amendment
#### (*Bivens*: ICE Defendants)

321.   The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

322.   Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10 entered Plaintiffs' residences without search warrants or consent, in violation of the Plaintiffs' right to be free from unreasonable searches under the Fourth Amendment to the United States Constitution.

323.   Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10 investigated, searched, seized and/or arrested the Plaintiffs intentionally, knowingly and without probable

cause and/or detained the Plaintiffs intentionally, knowingly, and without reasonable suspicion. In so doing, the afore-named Defendants violated the Plaintiffs' right to be free from unreasonable searches and unreasonable seizures under the Fourth Amendment to the United States Constitution.

324.    As a result of Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10's actions, the Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

**Defendant Supervisors Myers, Torres, Chadbourne, Martin, and Sullivan are Liable for Subordinate ICE Raid Officers' Fourth Amendment Violations**

325.    Defendants Myers, Torres, Chadbourne, Martin, and Sullivan are liable in their individual capacities as the supervisors of Defendant ICE Raid Officers for the violations of Plaintiffs' Fourth Amendment rights.

326.    Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were personally involved in and actually caused the aforementioned violations of Plaintiffs' Fourth Amendment rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which ICE Raid Officers engaged in the Fourth Amendment violations against Plaintiffs.

*Defendants Myers and Torres Created and Implemented a Policy, Practice, and/or Custom that Caused Widespread Fourth Amendment Violations*

327.    Defendant Myers, as the Assistant Secretary of Homeland Security for ICE, and Defendant Torres, as Director of the ICE Office of DRO, were responsible for promulgating, implementing, and administering the policies, practices and/or customs of the NFOP.

328.     Defendants Myers and Torres were personally involved in and proximately caused the violations of Plaintiffs' rights by creating, promulgating, implementing, and administering a policy, practice, and/or custom under which FOTs were required to make one thousand arrests a year and by allowing bystander arrests to count towards that quota.

329.     Defendant Torres personally crafted the heightened yearly arrest quota system and the policy allowing bystander arrests to count towards the quota, and Defendant Myers approved, promoted, and encouraged it.

330.     Because the quota system of Defendant Torres and Myers put immense pressure on FOTs to meet their annual numbers, the policy of Defendant Torres and Myers directly and foreseeably resulted in FOTs committing widespread constitutional violations, including violations of the Fourth Amendment, in the execution of their mandated arrests.

331.     In fact, Defendants Myers and Torres wanted FOTs to reach their arrest quotas without regard to whether probable cause was satisfied for each arrest or necessary consent was obtained to enter each home.

*Defendants Myers and Torres Allowed a Policy, Practice, and/or Custom of Widespread Fourth Amendment Violations To Continue Despite Actual Knowledge of These Widespread Violations*

332.     Defendants Torres and Myers created a policy, practice, and/or custom under color of which widespread Fourth Amendment violations occurred.  Defendants Torres and Myers had actual knowledge that widespread Fourth Amendment violations were occurring as a result of their policies, practices, and/or customs, but failed to act to remedy the situation, thus acquiescing in the widespread Fourth Amendment violations of which Plaintiffs' injuries were part.

333.     Defendants Myers and Torres were personally involved in and proximately caused the violations of Plaintiffs' rights through their deliberate indifference to actual knowledge of

widespread Fourth Amendment violations committed by FOTs all over the country prior to the violation of Plaintiffs' constitutional rights.

334.   Since the constitutional violations of FOTs were so widespread, they became a custom of constitutional violations in the face of which Defendants Myers and Torres deliberately refused to act, despite pleas for them to do so.  The refusal of Myers and Torres to act, despite notice and actual knowledge, amounts to acquiescence to Plaintiffs' constitutional violations for which they are personally liable.

*Defendants Myers, Torres, Chadbourne, Martin, and Sullivan Failed to Implement an Adequate Training Program Sufficient To Prevent Widespread Fourth Amendment Violations*

335.   Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were personally involved in and proximately caused the violations of Plaintiffs' rights through their deliberate indifference to Plaintiffs' constitutional rights.  Defendants Myers, Torres, Chadbourne, Martin, and Sullivan (1) knew to a moral certainty that in an effort to satisfy their FOT quotas and otherwise, ICE Raid Officers and other subordinates would confront residential raids situations, for which they were woefully ill-trained; (2) knew that an effective training program would have made ICE Raid Officers and other subordinates less likely to violate Fourth Amendment rights; and (3) knew that under the current training program, ICE Raid Officers and other subordinates were inadequately trained, were committing widespread Fourth Amendment violations throughout the country, and would continue to do so.

336.   The inadequacy of the training program was not only obvious, but had been reported to Defendants Myers and Torres by internal investigations and external criticisms.  Despite this knowledge, Defendants Myers and Torres failed to create or implement an adequate training program and were deliberately indifferent to Plaintiffs' rights.

*Defendants Myers, Torres, Chadbourne, Martin, and Sullivan Failed To Supervise the New Haven Raids so as To Prevent Fourth Amendment Violations*

337. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were personally involved in and proximately caused the aforementioned violations of the Plaintiffs' Fourth Amendment rights through their deliberate indifference to the rights of Plaintiffs in failing to adequately supervise subordinates Defendant ICE Raid Officers, who proximately caused the violations of Plaintiffs' Fourth Amendment rights.

338. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan had actual knowledge of the details of the New Haven raids prior to the operation's implementation and exercised approval and control over the Operational Plan.

339. Despite the obvious need for close supervision of the enforcement action due to the inexperience of Defendant ICE Raid Officers in carrying out residential raids and the known political sensitivity of the situation, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan egregiously failed to supervise ICE Raid Officers' actions to ensure that Fourth Amendment violations did not occur, evidencing gross negligence in supervising ICE Raid Officers and deliberate indifference to the rights of Plaintiffs.

340. Specifically, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan knew to a moral certainty that ICE Raid Officers and other subordinates would confront this residential raid situation. Residential raids enforcement actions require close and careful supervision to prevent frequent Fourth Amendment violations; and without careful supervision, Fourth Amendment violations were likely to occur.

341. Despite the obvious need for close supervision, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan failed to adequately supervise the enforcement operation of their subordinates, whose actions proximately caused Plaintiffs' injuries.

342. As a result of Defendants' Myers, Torres, Chadbourne, Martin, and Sullivan's acts and/or omissions, the Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

## SECOND CLAIM FOR RELIEF

### Fifth Amendment Equal Protection
(*Bivens*: ICE Raid Officers)

343. The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

344. Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10 stopped, detained, investigated, searched, seized and/or arrested the Plaintiffs, doing so knowingly and intentionally, and motivated by a retaliatory animus against people of the Plaintiffs' race, ethnicity, and/or perceived national origin in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the United States Constitution.

345. The above-named Defendants deprived Plaintiffs of basic due process protections by targeting them for their race, ethnicity, and/or perceived national origin in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

346. As a result of above-named Defendants' actions, the Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

## THIRD CLAIM FOR RELIEF

### Fifth Amendment Due Process
(*Bivens*: ICE Defendants)

347. The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

348. Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10 civilly arrested, detained without procedural protections, and deprived Plaintiffs of their liberty in a manner that was without due process of law and was fundamentally unfair in the totality of the circumstances, in violation of the Plaintiffs' rights under the Fifth Amendment of the United States Constitution.

349. The retaliation motivating this raid, reprehensible disregard for basic protections of law, and violative invasion of private spaces constitutes an abuse of state authority that shocks the conscience and offends even the most minimal standards of acceptable official behavior.

350. As a result of the actions of Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10, the Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

**Defendant Supervisors Myers, Torres, Chadbourne, Martin, and Sullivan are Liable for Subordinate ICE Raid Officers' Fifth Amendment Violations**

351. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan are liable in their individual capacities as the supervisors of Defendant ICE Raid Officers for the violations of Plaintiffs' due process rights.

352. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were personally involved in and actually caused the aforementioned violations of Plaintiffs' due process rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which ICE Raid Officers engaged in the due process violations against Plaintiffs.

*Defendants Myers and Torres Created and Implemented a Policy, Practice, and/or Custom that Caused Widespread Due Process Violations*

353. Defendant Myers, as the Assistant Secretary of Homeland Security for ICE, and Defendant Torres, as Director of the ICE Office of DRO, were responsible for promulgating, implementing, and administering the policies, practices and/or customs of the NFOP.

354. Defendants Myers and Torres were personally involved in and proximately caused the violations of Plaintiffs' rights by creating, promulgating, implementing, and administering a policy, practice, and/or custom under which FOTs were required to make one thousand arrests a year and could count bystander arrests toward that quota.

355. Defendant Torres personally crafted the heightened annual arrest quota system and policy allowing bystander arrests to count towards the quota, and Defendant Myers approved, promoted, and encouraged it.

356. Because the NFOP quota system established and maintained by Defendants Torres and Myers put immense pressure on FOTs to meet their yearly numbers, the policies of Defendants Torres and Myers directly and foreseeably resulted in FOTs committing widespread constitutional violations, including violations of due process, in the execution of their mandated arrests.

357. In fact, Defendants Myers and Torres wanted FOTs to reach their arrest quotas and detain individuals without regard to whether FOT procedures comported with due process.

*Defendants Myers and Torres Allowed a Policy, Practice, and/or Custom of Widespread Due Process Violations To Continue Despite Actual Knowledge of These Widespread Violations*

358. Defendants Torres and Myers created a policy, practice, and/or custom under color of which widespread due process violations occurred.  Defendants Torres and Myers had actual knowledge that widespread due process violations were occurring as a result of their policies,

practices, and/or customs, but failed to act to remedy the situation, thus acquiescing in the widespread constitutional violations of which Plaintiffs' injuries were part.

359. Defendants Myers and Torres were personally involved in and proximately caused the violations of Plaintiffs' rights through their deliberate indifference to actual knowledge of widespread constitutional violations committed by FOTs all over the country prior to the violation of Plaintiffs' constitutional rights.

360. Since the constitutional violations of FOTs were so widespread, they became a custom of constitutional violations in the face of which Defendants Myers and Torres deliberately refused to act, despite pleas for them to do so.  The refusal of Myers and Torres to act, despite notice and actual knowledge, amounts to acquiescence to Plaintiffs' constitutional violations for which they are personally liable.

*Defendants Myers, Torres, Chadbourne, Martin, and Sullivan Failed to Implement an Adequate Training Program Sufficient To Prevent Widespread Due Process Violations*

361. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were personally involved in and proximately caused the violations of Plaintiffs' rights through their deliberate indifference to Plaintiffs' constitutional rights.  Defendants Myers, Torres, Chadbourne, Martin, and Sullivan (1) knew to a moral certainty that in an effort to satisfy their FOT quotas and otherwise, the ICE Raid Officers and other subordinates would confront residential raids situations, for which they were woefully ill-trained; (2) knew that an effective training program would have made the ICE Raid Officers and other subordinates less likely to violation constitutional rights; and (3) knew that under the current training program, the ICE Raid Officers and other subordinates were inadequately trained, were committing widespread due process violations throughout the country, and would continue to do so without proper training.

362. The inadequacy of the training program was not only obvious, but had been reported to Defendants Myers and Torres by internal investigations and external criticisms.  Despite this knowledge, Defendants Myers and Torres failed to create or implement an adequate training program and were deliberately indifferent to Plaintiffs' rights.

*Defendants Myers, Torres, Chadbourne, Martin, and Sullivan Failed To Supervise the New Haven Raids so as To Prevent Due Process Violations*

363. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan were personally involved in and proximately caused the aforementioned violations of the Plaintiffs' constitutional rights through their deliberate indifference to the rights of Plaintiffs in failing to adequately supervise subordinates Defendant ICE Raid Officers, who proximately caused the violations of Plaintiffs' Fifth Amendment rights.

364. Defendants Myers, Torres, Chadbourne, Martin, and Sullivan had actual knowledge of the details of the New Haven raid prior to its implementation and exercised approval over the Operational Plan.

365. Despite the obvious need for close supervision of the enforcement action due to the inexperience of Defendant ICE Raid Officers in carrying out residential raids and the known political sensitivity of the situation, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan egregiously failed to supervise the actions of ICE Raid Officers and other agents to ensure that due process violations did not occur, evidencing gross negligence in supervising subordinate ICE agents and deliberate indifference to the rights of Plaintiffs.

366. Specifically, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan knew to a moral certainty that the ICE Raid Officers and other subordinates would confront this residential raid situation. Residential raids enforcement actions require close and careful supervision to

prevent frequent due process violations; and without careful supervision, due process violations were likely to occur.

367. Despite the obvious need for close supervision, Defendants Myers, Torres, Chadbourne, Martin, and Sullivan failed to adequately supervise the enforcement operation of their subordinates, whose actions proximately caused Plaintiffs' injuries.

368. As a result of Defendants' Myers, Torres, Chadbourne, Martin, and Sullivan's acts and/or omissions, the Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

**FOURTH CLAIM FOR RELIEF**

**Tenth Amendment**
(***Bivens*: ICE Defendants)**
**(Declaratory Judgment Act, 28 U.S.C. §§ 2201-02: United States)**

369. The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

370. Defendant ICE officers, federal officials including Defendants Sullivan, McCaffrey, Vetrano-Antuna, and Wilkowski, and the United States usurped the "residual power left to the states" by intentionally interfering with and plotting to frustrate local New Haven policies that created a safe and open environment for immigrant residents.

371. These policies included the Elm City Resident Card program, which fulfilled core local government functions by promoting public health and safety. Protecting public welfare is a traditional police power reserved to the states and protected from infringement by the Tenth Amendment.

372. By acting to frustrate core local government functions, federal officials and the United States, through its employees, violated the Tenth Amendment.

373. As a result of the violations of the Tenth Amendment committed by Defendant ICE officers and the United States, Plaintiffs suffered concrete and particularized injury.

374. Plaintiffs' interest in Defendant ICE officers and the United States refraining from interfering in matters of local sovereignty is aligned with the City of New Haven's interest, as evidenced by the fact that city officials, including Mayor DeStefano, forcefully objected to the infringement by Defendant ICE officers and the United States, through its employees, upon city policies through their retaliatory raid.

375. As a result of the actions of the Defendant ICE officers and the United States, the Plaintiffs suffered damages, including but not limited to violations of their constitutional rights, loss of liberty, and emotional distress.

376. Although the federal courts are divided on the issue, and the Supreme Court recently granted certiorari on the question but then declined to reach the issue, Plaintiffs acknowledge that private party standing for Tenth Amendment claims has been foreclosed in the Second Circuit. *See* Brooklyn Legal Services Corp. v. Legal Services Corp., 462 F.3d 219, 234-36 (2d Cir. 2006). Nevertheless, Plaintiffs make a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

### FIFTH CLAIM FOR RELIEF

**Federal Tort Claims Act**
**(28 U.S.C. § 1346(b): the United States)**
**(All Plaintiffs)**

377.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

 *Assault and Battery*

378.    ICE Raid Officers entered the apartments at Warren Place, Barnes Avenue, Peck Street (first and second floor), and Fillmore Street knowing that their actions could cause harm or offensive contact to the Latino residents within, including Plaintiffs.

379.    ICE Raid Officers detained Mr. Colala-Peñarreta outside of his home with the knowledge that their actions could cause harm or offensive contact to him.

380.    As a result of ICE Raid Officers' actions, each Plaintiff was put at risk of harm and offensive contact, and also suffered harmful or offensive contact.

381.    The actions of ICE Raid Officers constitute negligent and intentional assault and battery under Connecticut common law.

*False Arrest and False Imprisonment*

382.    ICE Raid Officers knowingly and intentionally arrested, detained, and imprisoned each Plaintiff without a search warrant and without probable cause.  ICE Raid Officers lacked any reasonable basis for apprehending each Plaintiff.

383.    Once they arrested the Plaintiffs, ICE Raid Officers unlawfully restrained and took them into custody.  ICE Raid Officers unlawfully detained each Plaintiff in federal and/or state facilities for up to approximately twenty-seven days.  As a result of this detention, the Plaintiffs still suffer emotional distress.

384.    ICE Raid Officers' actions constitute false arrest and false imprisonment under Connecticut common law.

*Trespass*

385.    ICE Raid Officers entered the property of each Plaintiff, except Mr. Soto Velasquez, without his consent and against his will.  ICE Raid Officers also lacked legal authority, in the form of search warrants or reasonable suspicion, to enter the home of each Plaintiff.

386. As a result of this unlawful invasion, each Plaintiff suffered a loss of his privacy in his own home and immediate emotional distress for himself and his family.

387. ICE Raid Officers' actions constitute trespass under Connecticut common law.

*Unreasonable Interference with the Seclusion of Another*

388.   When ICE Raid Officers unlawfully entered the home of each Plaintiff without consent and without a search warrant, all Plaintiffs except Mr. Colala-Peñarreta were enjoying the privacy of their homes.

389.   For example, Plaintiffs Serrano-Mendez and Yangua-Calva sat on their couches awaiting rides, Plaintiff Trujillo-Morellano lay asleep next to his girlfriend, and Plaintiff Diaz-Bernal was half-dressed and about to enter the shower.

390.   At these quiet and intimate moments, and at others like them during the morning for each Plaintiff except Mr. Colala-Peñarreta, ICE Raid Officers came into homes without reason or warning, in a manner that offends common standards of reason and decency.

391.   ICE Raid Officers' actions constitute unreasonable interference with the seclusion of another under Connecticut common law.

*Abuse of Process*

392.   The United States, through the action of ICE officials including Defendants Sullivan, McCaffrey, Vetrano-Antuna, and Wilkowski, abused the legal process for a purpose for which it was not intended when they (a) proposed, developed, secured ICE headquarters approval for, approved, and conducted the New Haven operation that is the subject of this action; (b) issued warrants for the arrests of the fugitives on the "target list" for the New Haven operation; (c) attempted to execute some or all of the warrants issued; and (d) raided homes in New Haven's Latino neighborhood, including addresses not contained on the target list, and arrested far more

bystanders (twenty-four) than actual fugitives (five), all done in order to punish New Haven for its lawful, immigrant-friendly public safety policies.

393.   ICE officials, including Defendants, committed the tort of abuse of process by obtaining and/or using an administrative warrant issued for an unknown individual for this ulterior purpose. Rather than use the warrants to apprehend known fugitives, Defendants obtained warrants to justify a raid that retaliated against New Haven's local policies.

394.   In short, the warrants were a pretext for retaliation by officials and an agency against residents of a city with whose lawful policy choices the agency disagreed, political fights, and an unconstitutional invasion of municipal police powers.

395.   The Plaintiffs suffered damages as a result of Defendants' manipulation of a legal process.

396.   Defendants' actions constitute an abuse of process under Connecticut common law.

*Civil Conspiracy*

397. ICE officials, including Defendants Sullivan, McCaffrey, Vetrano-Antuna, and Wilkowski, joined with other government officials at the U.S. Marshals Service, U.S. Postal Service, Department of State Bureau of Diplomatic Security, Federal Bureau of Investigation, and the Connecticut State Police to plan and execute the June 6, 2007 home raids.  These home raids were unlawful in and of themselves:  the raids were concocted to retaliate against lawful municipal policies with which ICE disagreed.

398.   ICE officials, including Defendants, also used tortious means to execute the raid:  they entered private homes without consent or search warrants and detained and arrested Plaintiffs without reasonable suspicion or probable cause.

399.    Defendants committed numerous overt acts in furtherance of this conspiracy.  They sent emails recruiting participants.  They gathered information about possible targets from other agencies' databases.  The raid was premeditated and carefully orchestrated.

400.    As a result of this conspiracy, Plaintiffs suffered unlawful detention and arrest. Defendants' actions constitute civil conspiracy under Connecticut common law.

*Negligent Hiring, Training and Supervising*

401.  The unlawful conduct of government officers during the home raids of June 6, 2007, stems from negligent hiring, retention, supervision, and training by Defendants Myers, Torres, Chadbourne, Martin, Sullivan, and McCaffrey and the United States.

402.  Defendants have a duty to hire and retain only competent employees and to properly supervise and train these agents.

403.  The ICE Raid Officers that raided Plaintiffs' homes lacked proper supervision and training.  The conduct of these officers not only violated interests protected by the Constitution and under common law, but also violated ICE's own regulations and internal policies.

404.  Widespread misconduct by FOTs across the country alerted, or should have alerted, Defendant United States to inadequate hiring, training, supervision, and retention practices by June 2007.  Instead of addressing the program's inadequacies, ICE used an FOT enforcement operation as its weapon against New Haven's novel policies.

405.    Defendants' actions constitute negligent hiring, training, and supervision under Connecticut common law.

406.    The United States is liable pursuant to the Federal Tort Claims Act ("FTCA") for the tortious acts of its employees in "circumstances where the United States, if a private person,

would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

407.   At all times relevant to this Complaint, ICE officials including Defendants acted within the scope of their employment and/or their official duties as employees of ICE and the Department of Homeland Security ("DHS"), an agency of the U.S. Government.

408.   In these circumstances, if the United States were a private person, liability would be imposed in accordance with the law of Connecticut.

409.   All Plaintiffs have also administratively exhausted their claims under the FTCA. Pursuant to 28 U.S.C. § 2675(a), the Plaintiffs filed FTCA administrative claims with DHS for the tortious actions constituting assault and battery, false arrest and false imprisonment, trespass, unreasonable interference with the seclusion of another, civil conspiracy, abuse of process, and negligent hiring, training, and supervising committed by ICE officers. DHS denied the claims of all Plaintiffs except for that of Mr. Colala-Peñarreta and Mr. Soto Velasquez on April 30, 2009. DHS denied Mr. Soto Velasquez's claim on  December 7, 2009, and denied Mr. Colala-Peñarreta's claim on December 12, 2009.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims for which a jury trial is authorized.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)   Enter a declaratory judgment that the actions of Defendants Myers, Torres, Chadbourne, Martin, Sullivan, Wilkowski, McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, John Does 1-10 and the United States which resulted in the home-entry, detention, arrest, and post-arrest

processing of the Plaintiffs, violated the United States Constitution and Connecticut common law.

    (2)    Award Plaintiffs compensatory damages in an amount to be proven at trial.

    (3)    Hold Defendants jointly and severally liable for compensatory damages.

    (4)    Award Plaintiffs punitive damages in an amount to be proven at trial.

    (5)    Award Plaintiffs the cost of this action and reasonable attorney fees.

    (6)    Grant such other relief as the Court deems just and equitable.


Dated May 21, 2010
New Haven, Connecticut

    Respectfully submitted,


    _____/s/_____
    Muneer I. Ahmad (ct28109)
    Michael J. Wishnie (ct27221)
    Hope Metcalf (ct424312)
    Estella Cisneros, Law Student Intern
    Anjali Dalal, Law Student Intern
    Sara Edelstein, Law Student Intern
    Ana Muñoz, Law Student Intern
    Mark Pedulla, Law Student Intern
    Hunter Smith, Law Student Intern

    JEROME N. FRANK
    LEGAL SERVICES ORGANIZATION
    Yale Law School
    P.O. Box 209090
    New Haven, Connecticut 06520
    Phone: (203) 432-4800

    Counsel for Plaintiffs