# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EDUARDO DIAZ-BERNAL, *et al.*,          :
                                         :
          Plaintiffs,                    :
                                         :          Civil No. 3:09-CV-1734 (SRU)
v.                                       :
                                         :
JULIE MYERS, *et al.*,                   :
                                         :
          Defendants.                    :          June 17, 2010
                                         :

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF INDIVIDUAL-CAPACITY FEDERAL DEFENDANTS

## Table of Contents

**TABLE OF AUTHORITIES** ..................................................................................... iii

**INTRODUCTION** ............................................................................................... 1

**PLAINTIFFS' ALLEGATIONS AND THEIR REMOVAL PROCEEDINGS** ..................... 4

**I.   Allegations Concerning the June 6, 2007 Enforcement Operation and Federal "Retaliation" Against New Haven.** ............................................................... 5

**II.  Allegations Against Supervisory ICE Defendants Located in Boston and Connecticut (Defendants Chadbourne, Martin & Sullivan).** ................................................. 7

**III. Allegations Against Senior ICE Officials Located In Washington, D.C. (Defendants Myers & Torres).** .......................................................................................... 8

**IV.  Plaintiffs' Removal Proceedings** ...................................................................... 10

**ARGUMENT** .................................................................................................... 12

**I.   The Claims Against Defendants Myers, Torres, Chadbourne, and Martin Should Be Dismissed Because The Court Lacks Personal Jurisdiction Over These Defendants.** ... 12

    A.  Connecticut's Long-Arm Statute Does Not Authorize the Exercise of Jurisdiction Over Defendants Myers, Torres, Chadbourne or Martin. ................................. 13

    B.  Plaintiffs Have Not Alleged That Defendants Myers, Torres, Chadbourne or Martin Expressly Aimed Conduct at Connecticut, As Required For the Exercise of Personal Jurisdiction Consistent With Due Process. ...................................... 16

**II.  The INA Prohibits Subject Matter Jurisdiction Over Constitutional Claims That Plaintiffs Brought, or Could Have Brought, in Their Removal Proceedings.** ............. 22

    A.  Section 1252(b)(9) Limits Plaintiffs to Pursuing Their Constitutional Claims in Their Immigration Proceedings and in the Court Of Appeals, Thus Precluding Jurisdiction in This Court. ............................................................................ 24

    B.  Section 1252(g) Bars Plaintiffs' First, Second and Third Claims For Relief, Which Challenge Government Decisions To "Commence Proceedings." ................................. 28

    C.  Section 1252(a)(2)(B)(ii) Bars Judicial Review of Plaintiffs' Claims Challenging Decisions by Senior ICE Officials Concerning the NFOP and Training and Supervision Related to That Program............................................................ 32

**III. The Rule Articulated in *Heck v. Humphrey* Precludes The Plaintiffs Who Lost Their Motion to Suppress in Removal Proceedings from Pursuing a Collateral Attack on Those Proceedings in This Action.** .................................................................... 35

**IV.  The INA's Statutory Scheme and the Political Branches' Plenary Authority Over Immigration Are Special Factors That Counsel Against Implying a *Bivens* Remedy.** . 36

    A.  The INA's Comprehensive Scheme, Which Includes An Avenue to Protect Constitutional Rights, Counsels Against Recognizing a *Bivens* Remedy. ...................... 37

B.   The Political Branches' Plenary Power Over Immigration Also Counsels Against Recognizing a *Bivens* Remedy. ..................................................................40

**V.   Plaintiffs Lack Standing to Bring Their Purported Tenth Amendment Claim.............. 43**

**VI.   Qualified Immunity Bars Plaintiffs' Claims Against the Individual Defendants.......... 44**

A.   The Qualified Immunity Standard..................................................................44

B.   Qualified Immunity Bars Plaintiffs' Tenth Amendment Claim Against Defendants Sullivan, McCaffrey, Vetrano-Antuna and Wilkowski...................................45

C.   Qualified Immunity Bars Plaintiffs' Fourth Amendment Claims Against Supervisory Defendants Myers, Torres, Chadbourne, Martin, and Sullivan.......................47

   1.   *Applicable Pleading Standard When Suing Supervisors*...................................... 47

   2.   *The Complaint Fails to Allege a Plausible, Non-Conclusory Fourth Amendment Claim Against the Supervisory Defendants.* ................................... 49

      a.   The Complaint fails to allege a plausible claim that Myers or Torres created or allowed the continuance of a policy under which unconstitutional practices occurred..................................................... 50

      b.   The Complaint fails to allege a plausible claim that the Supervisory Defendants were grossly negligent in supervising the subordinate ICE Agents. ....................................................................................... 56

      c.   The Complaint fails to allege a plausible claim that the Supervisory Defendants exhibited deliberate indifference to the Plaintiffs' constitutional rights.................................................................... 58

D.   Qualified Immunity Bars Plaintiffs' Fourth Amendment Claims Against Defendants Riccardi and Vasquez. ..........................................................................60

E.   Qualified Immunity Bars Plaintiffs' Due Process Claims Because They Are Properly Analyzed Under the Fourth Amendment. ......................................................60

F.   Qualified Immunity Bars Plaintiffs' Equal Protection Claims Against Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin. ........................62

   1.   *Plaintiffs Have Not Sufficiently Alleged An Equal Protection Claim Against Any Defendant.* ............................................................................. 63

   2.   *Plaintiffs Have Not Alleged That Defendants Riccardi or Vasquez Were Personally Involved in the Alleged Equal Protection Violation.* ....................... 68

   3.   *Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin Are Entitled to Qualified Immunity as to the Equal Protection Claim.*............... 68

**CONCLUSION ........................................................................................... 69**

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Aguilar de Polanco v. U.S. Dept. of Justice*, 398 F.3d 199 (2d Cir. 2005)...................................... 38

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ......................................................................... 27, 28

*Ajlani v. Chertoff*, 545 F.3d 229 (2d Cir. 2008)......................................................... 23, 24, 29, 30

*Albright v. Oliver*, 510 U.S. 266 (1994) ................................................................................... 61

*Alfaro Motors, Inc. v. Ward*, 814 F.2d 883 (2d Cir. 1987) ............................................................ 51

*Ali v. Gonzales*, 502 F.3d 659 (7th Cir. 2007) .......................................................................... 29

*Ali v. Mukasey*, 524 F.3d 145 (2d Cir. 2008) ........................................................................... 29

*Al-Jundi v. Rockefeller*, 885 F.2d 1060 (2d Cir. 1989)............................................................ 53, 55

*Almeida-Amaral v. Gonzales*, 461 F.3d 231 (2d Cir. 2006) ......................................................... 23

*Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004)................................... 56, 58

*Anderson v. Creighton,* 483 U.S. 635 (1987) ............................................................................ 46

*Arar v. Ashcroft*, 532 F.3d 157 (2d Cir. 2008), *vacated and superceded en banc*, 585 F.3d 559 (2d Cir. 2009).................................................................................................................. 25

*Argueta v. ICE*, No. 08-1652, 2009 WL 1307236 (D.N.J. May 7, 2009).................... 18, 28, 31, 36

*Argueta v. ICE,* No. 10-1479 (3d Cir.) (appeal docketed Feb. 25, 2010)..................................... 18

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................................ passim

*Atwood v. Town of Ellington*, 468 F. Supp. 2d 340 (D. Conn. 2007)............................................ 56

*Barclay v. Hughes*, 462 F. Supp. 2d 314 (D. Conn. 2006) ..................................................... 16, 17

*Barrett v. United States*, 646 F. Supp. 1345 (S.D.N.Y. 1986)...................................................... 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................ 47, 55, 57

*Bellamy v. Mt. Vernon Hosp.*, No. 07-1801, 2009 WL 1835939 (S.D.N.Y. July 16, 2009) ........ 50

*Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79 (2d Cir. 2004)..................................... 13

*Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008)................................................................ 37, 61

*Birdsall v. City of Hartford*, 249 F. Supp. 2d 163 (D. Conn. 2003) ...................................... 58, 62

*Bonhometre v. Gonzales*, 414 F.3d 442 (3d Cir. 2005) ................................................................ 24

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219 (2d Cir. 2006) ................. 44, 46

*Bush v. Lucas*, 462 U.S. 367 (1983) ........................................................................................ 41, 43

*Calcano-Martinez v. INS*, 232 F.3d 328 (2d Cir. 2000) ............................................................... 24

*Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691 (S.D.N.Y. 2002) ...................................................... 10

*Caldarola v. Calabrese*, 298 F.3d 156 (2d Cir. 2002).................................................................. 44

*Calder v. Jones*, 465 U.S. 783 (1984)......................................................................................... 17

*Calix-Chavarria v. Gonzalez*, Civil No. 06-0820, 2006 WL 1751783 (M.D. Pa. June 22, 2006) 36

*Carey v. Maloney*, 480 F. Supp. 2d 548 (D. Conn. 2007) ........................................................... 58

*Carty v. Beech Aircraft Corp*, 679 F.2d 1051 (3d Cir. 1982) ...................................................... 21

*Chaiken v. VV Publishing Corp.*, 119 F.3d 1018 (2d Cir. 1997).................................................. 16

*Chappell v. Wallace*, 462 U.S. 296 (1983) ................................................................................... 41

*Cheng Fan Kwok v. INS*, 392 U.S. 206 (1968) ............................................................................ 23

*Clark v. Dowty*, No. 05- 1345, 2007 WL 2022045 (D. Conn. July 9, 2007)................................ 62

*Clebda v. H.E. Fortna and Brother, Inc.*, 609 F.2d 1022 (1st Cir. 1979)..................................... 21

*Cohen v. Clemens*, 321 Fed. App'x 739 (10th Cir. 2009) ........................................................... 36

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) ........................................................................... 50

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ........................................................ 37

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998).................................................................. 62

*Daud v. Gonzales*, 207 Fed. App' 194 (3d Cir. 2006)................................................... 29, 30, 31

*Davis v. Mara*, 587 F. Supp. 2d 422 (D. Conn. 2008)................................................................. 12

*De Canas v. Bica*, 424 U.S. 351 (1976)....................................................................................... 38

iv

*Demore v. Kim*, 538 U.S. 510 (2003) ............................................................... 39

*Doe v. American Nat'l Red Cross*, 112 F.3d 1048 (9th Cir. 1997) ..................... 18

*Dotson v. Griesa*, 398 F.3d 156 (2d Cir. 2005) ........................................... 38, 40

*Durham v. Lappin*, No. 05-cv-1282, 2006 WL 2724091 (D. Colo. Sept. 21, 2006) ................... 19

*El-Badrawi v. DHS*, 579 F. Supp. 2d 249 (D. Conn. 2008) ................................... passim

*Elgharib v. Napolitano*, 300 F.3d 597 (6th Cir. 2010) ........................................ 32, 34

*Fiallo v. Bell,* 430 U.S. 787 (1977) ................................................................ 41

*Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192 (D. Conn. 2006) ............ 10

*Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003) .................................. 36, 54, 55

*Graham v. Connor*, 490 U.S. 386 (1989) ...................................................... 61

*Green v. McCall*, 710 F.2d 29 (2d Cir. 1983) ......................................... 13, 14, 15

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) ................................................. 62

*Hadayat v. Gonzales*, 458 F.3d 659 (7th Cir. 2006) ...................................... 29, 31

*Hanson v. Denckla*, 357 U.S. 235 (1958) ....................................................... 21

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206 (2d Cir. 2003) ............... 45, 60, 69

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................. 44, 46

*Hatami v. Chertoff*, 467 F. Supp. 2d 637 (E.D. Va. 2006) ............................... 33, 34

*Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010) ......................................... passim

*Heck v. Humphrey*, 512 U.S. 477 (1994) ............................................. 3, 35, 36

*Hill v. Pugh*, 75 Fed. App'x 715 (10th Cir. 2003) .......................................... 19

*Hudson Valley Black Press v. IRS*, 409 F.3d 106 (2d Cir. 2005) ........................... 40

*Humphries v. Various Federal USINS Employees*, 164 F.3d 936 (5th Cir. 1999) ............. 31

*Hunter v. Bryant*, 502 U.S. 224 (1991) ....................................................... 45

*In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005) ............. 25

v

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003).......................................17

*In Re Terrorist Attacks*, 538 F.3d 71 (2d Cir. 2008).................................................17, 20

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497 (D. Conn. 2009).....................4

*INS* v. *Aguirre-Aguirre*, 526 U.S. 415 (1999).............................................................41

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ...........................................................23

*Jackson v. District of Columbia*, 672 F. Supp. 22 (D.D.C. 1987) ..................................55

*James v. Bauet*, No. 09-609, 2009 WL 3817458 (S.D.N.Y. Nov. 11, 2009)...........................2, 56

*Johnson v. Rardin*, 952 F.2d 1401 WL 9019 (10th Cir. Jan. 17, 1992).......................................19

*Juarez v. Holder*, 599 F.3d 560 (7th Cir. 2010).........................................................29

*Kronisch v. United States*, No. 83 Civ. 2458, 1997 WL 907994 (S.D.N.Y. Apr. 14, 1997), *aff'd in part and rev'd in part on other grounds* 150 F.3d 112 (2d Cir. 1998) ..............................15

*Kucana v. Holder*, 130 S. Ct. 827 (2010) ..............................................................passim

*Kulakov v. INS*, No. 06- 0754, 2007 WL 1360728 (W.D.N.Y. May 7, 2007)..............................36

*Laverne v. Corning*, 522 F.2d 1144 (2d Cir. 1975) .....................................................45

*Lee v. Carson*, 645 F. Supp. 1430 (S.D.N.Y. 1986) ..................................................15

*Loa-Herrera v. Trominski*, 231 F.3d 984 (5th Cir. 2000)..............................................34

*Mahmud v. Oberman*, 508 F. Supp. 2d 1294 (N.D. Ga. 2007)......................................18

*Malley v. Briggs*, 475 U.S. 335 (1986) ....................................................................44

*Martel v. Town of South Windsor*, 562 F. Supp. 2d 353 (D. Conn. 2008) ..........................44

*Mateo v. Fischer*, No. 08 Civ. 7779 (RJH) (DCF), 2010 WL 431229 (S.D.N.Y. Feb. 8, 2010)..52

*McCabe v. Basham*, 450 F. Supp. 2d 916 (N.D. Iowa 2006) ........................................18, 20

*McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded on other grounds*, 42 U.S.C. § 1997(e).................................................................................................................24

*McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992)............................................62

*Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir.1989) ......................................56

vi

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .................................................................... 45

*Moss v. U.S. Secret Service*, 2007 WL 2915608 (D. Or. Oct. 7, 2007), *rev'd in part, dismissed in part on other grounds*, *Moss v. U.S. Secret Service,* 572 F.3d 962 (9th Cir. 2009) ................ 18

*Nat'l Union Fire Ins. Co. v. Am. Eurocopter Corp.*, No. CV 09-136, 2009 WL 2849130 (D. Haw. Aug. 26, 2009) ........................................................................................................ 21

*Newton v. City of New York*, 640 F. Supp. 2d 426 (S.D.N.Y. 2009) ...................................... 50, 58

*Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215 (S.D.N.Y. 2000) .......................................... 18

*O'Vadka v. Blum*, No. 06-698, 2007 WL 1550429 (N.D. Ind. May 24, 2007) ........................... 46

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987)........................................... 12

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ....................................................... 67

*Pettengill v. Curtis*, 584 F. Supp. 2d 348 (D. Mass. 2008).......................................................... 21

*Pettus v. Morgenthau*, 554 F.3d 293 (2d Cir. 2009) ................................................................... 57

*Pinto-Montoya v. Mukasey*, 540 F.3d 126 (2d Cir. 2009) ............................................................ 23

*Poe v. Leonard*, 282 F.3d 123 (2002) ..................................................................................... 53, 56

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008) ......................................................................... 41

*Randall v. Pettiford,* No. 08-3594, 2010 WL 1072164 (D.S.C. Feb 22, 2010).......................... 19

*Rank v. Hamm*, 2007 WL 894565 (S.D.W.Va. March 21, 2007)................................................. 18

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984)................................. 21

*Ruiz v. Mukasey*, 552 F.3d 269 (2d Cir. 2009) .......................................................................... 32

*Saucier v. Katz*, 533 U.S. 194 (2001) .................................................................................. 46, 69

*Savin v. Ranier*, 898 F.2d 304 (2d Cir. 1990) ........................................................................... 16

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ......................................................................... 37, 39

*Sealey v. Giltner*, 116 F.3d 47 (2d Cir. 1997)........................................................................... 52

*Siegert v. Gilley,* 500 U.S. 226 (1991)......................................................................... 46, 48, 69

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995) ...................................................... 61

*Sissoko v. Rocha*, 509 F.3d 947 (9th Cir. 2007) ........................................................ 31

*Spear v. Hugles*, No. 08-4026, 2009 WL 2176725 (S.D.N.Y. July 20, 2009) ........................... 50

*Spencer v. City of Stamford*, No. 3:06-cv-1209 (JCH), 2007 WL 1186042 (D. Conn. April 19, 2007) ........................................................................................................... 53

*Tavarez v. Reno*, 54 F.3d 109 (2d Cir. 1995) ............................................................. 35

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118 (1939) ..................................... 44

*Theodoropoulos v. INS*, 358 F.3d 162 (2d Cir. 2004) ..................................................... 25

*Thomas v. Ashcroft*, 470 F.3d 491 (2d Cir. 2006) .................................................... 13, 68

*Turkmen v. Ashcroft*, 589 F.3d 542 (2d Cir. 2009) ....................................................... 67

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135 (2d Cir. 2001) ................. 16

*United Nat'l Ins. Co. v. Waterfront N.Y. Realty, Corp.*, 948 F. Supp. 263 (S.D.N.Y. 1996) ....... 26

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ............................................... 66, 69

*United States v. Gomes*, 387 F.3d 157 (2d Cir. 2004) .................................................... 25

*Van Dinh v. Reno*, 197 F.3d 427 (10th Cir. 1999) ........................................................ 33

*Vega v. Lantz*, No. 04-1215, 2009 WL 3157586 (D. Conn. Sept. 25, 2009) ................................ 50

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ................ 63, 69

*Vu v. Meese*, 755 F. Supp. 1375 (E.D. Va. 1991) ......................................................... 18

*Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479 (E.D. Wis. 1993) .................................... 18

*Warney v. Monroe County*, 587 F.3d 113 (2d Cir. 2009) .................................................... 4

*Webster v. Moquin*, 175 F. Supp. 2d 315 (D. Conn. 2001) ................................................. 45

*Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974) ....................................................... 54

*Williamson v. Sena*, No. 04-537, 2006 WL 130829011 (D.N.M. Mar. 28, 2006), *aff'd*, 230 Fed. App'x 815 (10th Cir. 2007) ........................................................................... 46

*Wilson v. City of Norwich*, 507 F. Supp. 2d 199 (D. Conn. 2007) ........................................ 56

*Xiao Ji Chen v. Dep't of Justice*, 471 F.3d 315 (2d Cir. 2006) .......................................... 24

viii

**Statutes**

28 U.S.C. § 2241 ............................................................................................. 39

8 U.S.C. § 1101 ................................................................................................. 1

8 U.S.C. § 1222 ............................................................................................... 38

8 U.S.C. § 1226 ........................................................................... 33, 34, 38, 42

8 U.S.C. § 1229 ............................................................................................... 38

8 U.S.C. § 1252 ....................................................................................... passim

8 U.S.C. § 1357 ............................................................................................... 69

Conn. Gen. Stat. § 52-59 ................................................................................ 13

**Rules**

Fed. R. Civ. P. 12(b) ........................................................................ 2, 3, 12, 67

Fed. R. Civ. P. 4 ............................................................................................. 12

Fed. R. Civ. P. 8 ............................................................................................. 47

**Regulations**

8 C.F.R. § 1003.1 ........................................................................................... 39

8 C.F.R. § 1003.16 ......................................................................................... 39

8 C.F.R. § 1003.19 ......................................................................................... 39

8 C.F.R. § 1236.1 ........................................................................................... 39

## INTRODUCTION

This action arises from efforts of the United States Immigration and Customs Enforcement ("ICE") to remove illegal aliens from the United States, including aliens who have committed crimes and those who have disregarded formal orders of removal.   Pursuant to national enforcement initiatives authorized by Congress, ICE conducted an operation in the New Haven, Connecticut, area on June 6, 2007, to apprehend illegal aliens identified as residing in that area. Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, ICE agents may arrest without a warrant any person they have reason to believe is in the country illegally, regardless of whether that person is the target of an enforcement operation or someone encountered in the course of executing an operation.

Plaintiffs are eleven individuals who lived in or near New Haven, Connecticut, on June 6, 2007.   Plaintiffs do not claim in this lawsuit that they were at that time United States citizens or otherwise lawfully present in the United States.   Indeed, all eleven Plaintiffs are currently in removal proceedings.   Plaintiffs allege in their amended complaint that nineteen ICE employees – ranging from the most senior, Presidentially appointed Assistant Secretary of ICE, to line ICE agents who enforce the nation's immigration laws – violated Plaintiffs' constitutional rights by conducting or supervising the June 6, 2007, operation.   According to Plaintiffs, all of the Defendants except Walter Wilkowski either: (1) entered Plaintiffs' residences without a warrant or consent and then allegedly unlawfully questioned and arrested Plaintiffs in violation of the Fourth and Fifth Amendments; or (2) are personally liable for the foregoing alleged conduct under the Fourth and Fifth Amendments by virtue of their supervisory responsibility over ICE employees (First and Third Claims for Relief).   In addition to these claims, Plaintiffs also assert that, through

1

the same alleged conduct, Defendants Richard McCaffrey, James Brown, Ronald Preble, Stephen Riccardi, Edgar Vasquez, Michelle Vetrano-Antuna, Brian Geary, David Hamilton, George Lewis, Derek Moore, David Ostrobinski, David Reilly, Wilfredo Rodriguez and Wilfred Valentin, violated Plaintiffs' equal protection rights (Second Claim for Relief).   Finally, Plaintiffs allege that four Defendants – George Sullivan, Richard McCaffrey, Michelle Vetrano-Antuna, and Walter Wilkowski – violated the Tenth Amendment by allegedly plotting to frustrate local New Haven policies that benefitted immigrants (Fourth Claim for Relief).   Plaintiffs have sued all twenty individual Defendants in their individual capacities under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), and therefore seek money damages from the personal assets of these Defendants.

As set forth in the body of this motion, all of Plaintiffs' claims against each individual-capacity defendant must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and/or (6).   Plaintiffs' claims are defective under Rule 12(b)(1) and/or (2) for multiple reasons.   First, Plaintiffs' two claims against Defendants Julie Myers, John Torres, Bruce Chadbourne, and Jim Martin (First and Third Claims for Relief) should be dismissed because the Court lacks personal jurisdiction over each Defendant.   These four high-level supervisory officials do not have sufficient contacts with Connecticut in their personal capacities to permit the exercise of jurisdiction over them under Connecticut's long-arm statute or consistent with due process.

Second, all four of Plaintiffs' *Bivens* claims should be dismissed in their entirety because the INA deprives this Court of subject-matter jurisdiction over the claims.   More specifically, 8 U.S.C. section 1252(b)(9) prevents the Court from adjudicating any of Plaintiffs' claims against

2

the individual Defendants.   In addition, section 1252(g) bars Plaintiffs' First, Second, and Third Claims for Relief against all Defendants.   And, section 1252(a)(2)(B)(ii) bars judicial review of the claims against Defendants Myers, Torres, Chadbourne, Martin and Sullivan alleged in the First and Third Claims for Relief.

Third, all four of Plaintiffs' claims should be dismissed in their entirety because special factors counsel against the Court recognizing a *Bivens* remedy for these claims.

Fourth, all claims brought by Plaintiffs Paredes-Mendez, Serrano-Mendez, Solana-Yangua, Velasquez and Yangua-Calva are foreclosed by *Heck v. Humphrey*.

Finally, Plaintiffs' Tenth Amendment claim asserted only against Defendants Sullivan, McCaffrey, Vetrano-Antuna, and Wilkowski must be dismissed because Plaintiffs lack standing to bring the claim.

Likewise, Plaintiffs' claims are defective under Rule 12(b)(6) for multiple reasons.   First, the doctrine of qualified immunity bars Plaintiffs' Tenth Amendment claim against Defendants Sullivan, McCaffrey, Vetrano-Antuna, and Wilkowski.   Plaintiffs have not alleged any cognizable violation of the Tenth Amendment at all, let alone a violation of Plaintiffs' clearly established Tenth Amendment rights.

Second, qualified immunity bars Plaintiffs' Fourth Amendment claim against Defendants Myers, Torres, Chadbourne, Martin, and Sullivan because Plaintiffs have not alleged the personal participation of these Defendants in the alleged unlawful conduct as required to hold them personally liable for it.   Plaintiffs' Fourth Amendment claim against Defendants Riccardi and Vasquez also must be dismissed because the complaint acknowledges that they were not personally involved in the challenged conduct.

3

Third, Plaintiffs' purported Fifth Amendment due process claim brought against all Defendants aside from Wilkowski should be dismissed because it is legally cognizable, if at all, only as a Fourth Amendment claim.

Finally, Plaintiffs' equal protection claim against Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez and Valentin should be dismissed because it fails to allege that any Defendant acted with a discriminatory purpose, as the law requires.   And, all of the Defendants are in any event entitled to qualified immunity as to this claim.

### PLAINTIFFS' ALLEGATIONS AND THEIR REMOVAL PROCEEDINGS[1]

The Plaintiffs are Latinos who live in the New Haven area, none of whom claim to be United States citizens or otherwise lawfully present in the United States.   *See generally* Third Am. Compl., Dkt. No. 46 ("TAC") ¶¶ 22-32.   Plaintiffs were all arrested during an ICE enforcement operation conducted in New Haven on June 6, 2007.   TAC ¶ 5.   The operation was conducted as part of ICE's National Fugitive Operations Program ("NFOP"), which is designed to apprehend and remove fugitive aliens from the United States.   *Id.* ¶ 11; *see also* OIG Report 07-34, *An Assessment of the United States Immigration and Customs Enforcement's Fugitive Operations Teams* (March 2007) at 1 (attached as Ex. A).[2]   Plaintiffs contend that a multitude of ICE employees – from line agents based in Connecticut to the most senior ICE official in

---

[1] For purposes of this motion to dismiss only, the Defendants accept as true all well-pleaded, non-conclusory allegations in Plaintiffs' complaint.   *See Warney v. Monroe County*, 587 F.3d 113, 116 (2d Cir. 2009).

[2] Because Plaintiffs reference the OIG report in their complaint, *see* ¶ 307, the report may be considered in ruling on this motion to dismiss without converting the motion into one for summary judgment.   *See Indiaweekly.com, LLC v. Nehaflix.com, Inc*., 596 F. Supp. 2d 497, 501 (D. Conn. 2009).

Washington, D.C. – are liable for the constitutional violations alleged in the complaint.   TAC ¶¶ 33-52, 321-76.

Plaintiffs assert four distinct constitutional violations.   *Id.* ¶¶ 321-76.   Plaintiffs first claim that on June 6, 2007, Connecticut-based ICE agents violated Plaintiffs' Fourth Amendment rights by entering the residences where Plaintiffs were staying without warrants or consent.   *Id.* ¶ 1.   Plaintiffs allege that every single Defendant except Walter Wilkowski is liable for this purported violation.   *Id.* ¶¶ 321-42.   Plaintiffs next allege that ICE agents violated their Fifth Amendment rights by targeting them based on their "race, ethnicity, and/or perceived national origin."   *Id.* at ¶ 344.   This claim is asserted against only the Connecticut-based ICE agents who were at their residences during the June 6 enforcement operation.   *Id.* ¶¶ 343-46.   Plaintiffs' third claim alleges that every single Defendant except Wilkowski violated the Plaintiffs' Fifth Amendment rights to substantive due process by allegedly entering residences without a warrant or consent and arresting Plaintiffs without probable cause.   *Id.* ¶¶ 347-50.   Finally, Plaintiffs allege that four Connecticut-based ICE agents violated the Tenth Amendment by "intentionally interfering with and plotting to frustrate local New Haven policies that created a safe and open environment for immigrant residents."   *Id.* ¶ 370.   Plaintiffs' specific allegations are outlined further below, as is the current status of each Plaintiff's removal proceedings.

## I.   Allegations Concerning the June 6, 2007 Enforcement Operation and Federal "Retaliation" Against New Haven.

Plaintiffs allege that on the morning of June 6, 2007, the Hartford Fugitive Operations Team ("HARFOT") comprised of Connecticut-based ICE agents, along with other federal agents and state officers, entered residences without search warrants or consent to enter.   *Id.* ¶ 56. Plaintiffs allege that Defendant McCaffrey prepared the Operational Plan for the June 6

enforcement operation.   *Id.* ¶ 233.   They also allege that McCaffrey prepared a "target list" of fugitive aliens suspected to be in New Haven and that he supervised the enforcement action.   *Id.* ¶¶ 58, 233-34.   McCaffrey "divided the ICE Raid Officers into four teams ('ICE Raid Teams'), each led by one of the HARFOT defendants."   *Id.* ¶ 59.   Only three teams were involved in arresting Plaintiffs, but all four teams participated in the processing and detention of Plaintiffs. *Id.*

Plaintiffs allege that "ICE Team #1" was led by Defendant Vetrano-Antuna and consisted of Defendants McCaffrey, Hamilton, Valentin and John Does 1-3.   *Id.* ¶ 60.   ICE Team #1 allegedly arrested certain Plaintiffs at homes located on Peck Street and Barnes Avenue.   *Id.* Plaintiffs allege that Defendant Preble led "ICE Team #2," consisting of Defendants Reilly, Moore, Geary and John Does 4-6.   *Id.* ¶ 6.   ICE Team #2 allegedly arrested several Plaintiffs at homes located on Fillmore Street and Warren Place.   *Id.*   Plaintiffs allege that Defendant Brown led "ICE Team #3," consisting of Defendants Ostrobinski, Lewis, Rodriguez and John Does 7-8, and that Defendants Riccardi and Vasquez were the co-leaders of "ICE Team #4," which included John Does 9-10.   *Id.* ¶¶ 62-63.   Team #4 allegedly did not arrest any Plaintiffs, but it participated in processing Plaintiffs.   *Id.* ¶ 59.   Plaintiffs contend that the "target list," prepared by McCaffrey, contained outdated and erroneous leads and was used "as a pretext for entering homes without search warrants or consent and seizing residents without cause or suspicion."   *Id.* ¶¶ 64-65.   Plaintiffs do not allege, however, that the plan prepared by McCaffrey authorized agents to enter homes without consent.

Additionally, Plaintiffs allege that Defendants McCaffrey, Vetrano-Antuna, Wilkowski and Sullivan targeted New Haven in an effort to "punish the City and its residents for lawful

6

municipal public safety policies" which aimed to integrate all residents, including Latino immigrants.  *Id.* ¶¶ 193, 397.   Plaintiffs allege that from March to June 2007, Defendant Wilkowski and attorneys at the Connecticut U.S. Attorney's Office worked together in an effort to prevent the adoption of the Elm City Resident Card program.  *Id.* ¶¶ 216-231.   It is Plaintiffs' contention that federal officials in Connecticut conducted the June 6 operation in retaliation for New Haven's adoption of the Elm City Resident Card program.  *Id.* ¶¶ 232-252.

## II.    Allegations Against Supervisory ICE Defendants Located in Boston and Connecticut (Defendants Chadbourne, Martin & Sullivan).

Plaintiffs make various allegations against supervisors located in Connecticut and Boston. Although Plaintiffs do not allege that George Sullivan, Assistant Field Office Director for the ICE sub-office in Hartford, was present during the June 6, 2007 enforcement operation, they allege in a conclusory fashion that he "personally participated" in planning the operation and "directly supervised" the operation.  *Id.* ¶ 37.   Plaintiffs also allege in a conclusory fashion that ICE supervisors in Boston were involved, although to an even lesser degree than Sullivan.  *Compare, e.g., id.* ¶¶ 35-37.   Plaintiffs allege that Bruce Chadbourne, Field Director for ICE's regional office in Boston, is responsible for "training and supervision" of ICE employees in the Boston region, which includes Connecticut, and that he is also responsible for "policies and practices" in the region.  *Id*. ¶ 35.   Plaintiffs make a similar allegation against Jim Martin, the Deputy Field Director for the Boston region.  *Id.* ¶ 36 ("Martin has supervisory responsibility for all of the ICE Defendants in the Boston region.")   Plaintiffs do not allege that either Chadbourne or Martin was present in New Haven on June 6, 2007.   Rather, they allege that McCaffrey submitted the Operational Plan to Martin, and that Chadbourne "personally reviewed and approved" the plan. *Id.* ¶¶ 239, 242.   Plaintiffs do not allege that Martin personally reviewed the Operational Plan, nor

7

do they allege that Martin or Chadbourne met with any Connecticut officials to plan the operation. *See id*. ¶ 397.   Plaintiffs nevertheless allege, without offering any specifics, that Martin and Chadbourne, as well as Sullivan, were aware of "outdated and erroneous" information in the target list prepared by McCaffrey.   *Id.* ¶ 65.

As to any connection between the supervisors and Plaintiffs' alleged injuries, Plaintiffs claim that Chadbourne, Martin and Sullivan "failed to create and implement an adequate training program for the HARFOT Defendants" and that their failure to do so "caused Plaintiffs' injuries." *Id.* ¶¶ 309, 336, 362.   They also allege that these Defendants' failure "to adequately supervise the operation . . . caused Plaintiffs' constitutional injuries."   *Id.* ¶ 320, 337, 363.

## III.   Allegations Against Senior ICE Officials Located In Washington, D.C. (Defendants Myers & Torres).

Plaintiffs also attempt to allege the involvement of two former high-level ICE officials, ICE Assistant Secretary Julie Myers, who was appointed by the President, and former ICE Office of Detention and Removal ("DRO") Director John Torres.   Both Myers and Torres were located in Washington, D.C., at the time of the June 6, 2007, operation.   *See id.* ¶¶ 240, 269; Ex. A, OIG Report at 54 & 56 (listing Washington, D.C., addresses for Myers and Torres).   Plaintiffs make several allegations against Defendants Myers and Torres regarding their administration of the National Fugitive Operations Program ("NFOP").   *See, e.g.,* TAC ¶¶ 12-13, 257, 260-71, 277-78, 284-286, 308-309.   In particular, Plaintiffs allege that in January 2006, Torres implemented a "quota" system that "required" Fugitive Operations Teams ("FOTs"), which carry out enforcement operations under the NFOP, to arrest 1,000 fugitive aliens per year.   *Id.* ¶ 260. They also allege that Torres created a "priority system for targeting fugitives" and that he directed "FOTs to focus on arresting dangerous and/or criminal fugitives, with the lowest priority on

non-criminal fugitives." *Id.* ¶ 262.   Additionally, starting in September 2006, Torres permitted

the arrest of non-fugitives "encountered by FOTs while allegedly searching for actual fugitives" to

count toward their annual "quota." *Id.* ¶ 266.[3]   Plaintiffs allege on information and belief that

Defendant Myers approved the policy decisions made by Torres.   *Id.* ¶ 270.

Plaintiffs make several conclusory allegations that "[t]he policy decisions" made by Torres

and Myers "caused widespread constitutional violations," and that the violations were foreseeable

to Myers and Torres.   *See, e.g., id.* ¶¶ 275, 278, 283-84.   Although Plaintiffs allege there was

extensive "public criticism" of the NFOP, *id.* ¶¶ 280-81, 294, they do not identify any criticism

that occurred prior to June 6, 2007, nor do they provide any specifics concerning the purported

criticism – no dates, times, or places.   Indeed, Plaintiffs do not identify a single instance of

unconstitutional conduct by FOTs that occurred prior to June 6, 2007.   Only one allegation in the

entire complaint comes close to identifying a specific criticism of the quota system, but that

criticism occurred *two years* after the June 6, 2007, enforcement operation.   *See id.* ¶ 296.

Nonetheless, Plaintiffs contend that Myers and Torres "knew about . . . widespread constitutional

violations long before the New Haven raids." *Id.* ¶ 298.

Plaintiffs allege that a March 2007 OIG report recommended changes to the training

program for FOTs, but Myers, Torres, and other Defendants "neglected to change the training

policies to prevent further constitutional violations or to implement the training reforms

recommended." *Id.* ¶¶ 307-308.   Plaintiffs' insinuation that the OIG report concluded that better

training would prevent constitutional violations has no foundation, as the report says nothing about

---

[3] Although Plaintiffs allege that "Torres' changes to FOT policy operated in direct contravention of the NFOP's congressional mandate," *id.* ¶ 268, the complaint contains no reference to any statute at all, much less any specific statutory provision contradicted by Torres' policy decisions.

constitutional violations or training to prevent such violations.   *See* Ex. A at 29-31.   Moreover,

Plaintiffs' allegation that Myers failed to "implement [the recommended] training reforms" is

belied by the OIG report, which contains a memo from Myers stating that ICE concurred in the

recommendations and would attempt to make changes.   *Id.* at 52-53.

Only a few allegations against Myers and Torres specifically refer to the June 6, 2007,

operation.   Plaintiffs allege that Torres "reviewed and approved" the Operational Plan prepared

by McCaffrey.   *See* TAC ¶ 242.   No similar allegation is made against Myers, although Plaintiffs

allege on information and belief that a "note" prepared on June 5, 2007, was sent to Myers

advising her of the operation.   *Id.* ¶¶ 315-316.

Based on these allegations, Plaintiffs contend that the policy decisions made by Myers and

Torres concerning the NFOP violated Plaintiffs' Fourth and Fifth Amendment rights.   *Id.* ¶¶

327-34, 353-60.   They also allege that Myers' and Torres' failure to adequately supervise the

Connecticut-based ICE agents and their failure to implement adequate training programs likewise

violated Plaintiffs' Fourth and Fifth Amendment rights.   *Id.* ¶¶ 335-342, 361-68.

## IV.   Plaintiffs' Removal Proceedings

The government brought removal proceedings against all Plaintiffs after the June 6, 2007

operation.   *See* Exs. B-L.   (decisions entered by the immigration judge in Plaintiffs' removal

proceedings).[4]   Every Plaintiff, except Colala-Peñarreta, filed motions to suppress and terminate

removal proceedings based on the same alleged constitutional violations asserted in this action.

*See* Exs. B-L at 2.   The motions filed by Plaintiffs Baranda-Barreto, Cedeño-Trujillo,

---

[4] This Court may take judicial notice of decisions by an administrative agency and consider those
decisions on a motion to dismiss without converting the motion into one for summary judgment.
*See Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192, 197 (D. Conn. 2006);
*Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 696 (S.D.N.Y. 2002).

Diaz-Bernal, Trujilla-Mirafuentes, and Trujillo-Morellano were granted, and the immigration judge terminated the proceedings against them on June 1, 2, and September 4, 2009.   *See* Ex. B (Baranda-Barreto) at 28-29; Ex. C (Cedeño-Trujillo) at 30-31; Ex. E (Diaz-Bernal) at 31-32; Ex. I (Trujilla-Mirafuentes) at 30-31; and Ex. J (Trujillo-Morellano) at 30-31.   The government has filed appeals with the Board of Immigration Appeals ("BIA") in each of these cases.   See Ex. M-Q.   The motions filed by Plaintiffs Paredes-Mendez, Serrano-Mendez, Solana-Yangua, Velasquez and Yangua-Calva were denied on April 2 and May 1, 2009.   *See* Ex. F (Parades-Mendez) at 31; Ex. G, (Serrano-Mendez) at 31; Ex. H (Solano-Yangua) at 29; Ex. L (Yangua-Calva) at 30; Ex. K (Velasquez) at 31.   Each of these Plaintiffs has filed appeals with the BIA.   *See* Exs. R-V.   Plaintiff Colala-Peñarreta did not raise any constitutional issues in his removal proceedings, but argued instead that his removal should be cancelled under 8 U.S.C. § 1229b(b)(1).   *See* Ex. D at 2.   The immigration judge found that Plaintiff Colala-Peñarreta could not satisfy the statute's family hardship requirement.   *Id.* at 10.   Colala-Peñarreta appealed to the BIA, and that body upheld the immigration judge's decision on March 31, 2010.   *See* Ex. W. Colala-Peñarreta filed a petition with the Second Circuit on April 30, 2010.   *See* Ex. X.

## ARGUMENT

**I.    The Claims Against Defendants Myers, Torres, Chadbourne, and Martin Should Be Dismissed Because The Court Lacks Personal Jurisdiction Over These Defendants.[5]**

Plaintiffs' claims against Defendants Myers, Torres, Chadbourne and Martin should be dismissed under Fed. R. Civ. P. 12(b)(2) because Plaintiffs have not made a *prima facie* showing that these Defendants are subject to personal jurisdiction in this forum.    Plaintiffs do not allege that any of these Defendants was present at the ICE enforcement action conducted in New Haven.    Nor do they allege that any of the Defendants lives or works in Connecticut.    Rather, Plaintiffs premise jurisdiction over these non-resident Defendants solely on their alleged supervisory responsibilities.    *See* TAC ¶¶ 325-26, 351-52.    As to Myers and Torres, who at the relevant time served in senior positions at ICE headquarters in Washington, D.C.,[6]  Plaintiffs seek to hold them personally liable in this forum based upon their general oversight of the NFOP, the program under which the Connecticut-based Defendants allegedly conducted the enforcement operation at issue.    Regarding Chadbourne and Martin, who are based in ICE's Boston Field Office, Plaintiffs seek to hold them liable simply because the office where they work has supervisory responsibility over the Connecticut sub-office.

---

[5] The claims against defendant Rodriguez should also be dismissed for lack of personal jurisdiction because Plaintiffs have not served Rodriguez with a summons and complaint.   Proper service of process is required for a court to exercise personal jurisdiction over a defendant.   *See Davis v. Mara*, 587 F. Supp. 2d 422, 425 (D. Conn. 2008) (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)).   Under Rule 4, a plaintiff must personally serve a federal employee sued in his or her individual capacity.   *See* Fed. R. Civ. P. 4(i)(3).   Should Plaintiffs timely serve Rodriguez in accordance with Rule 4, he will properly be subject to personal jurisdiction in this court.

[6]  *See* Ex. A, OIG Report at 54 & 56 (listing Washington D.C. addresses for Myers and Torres); *see also* TAC ¶¶ 240, 269 (Torres was located at "ICE Headquarters in Washington, D.C." and "reported directly" to Myers).

A plaintiff bears the burden of making a *prima facie* showing that defendants are subject to personal jurisdiction in the forum.   *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). In a case that presents a federal question arising under the Constitution, a court may not exercise personal jurisdiction over a non-resident defendant unless (1) jurisdiction is authorized by the state's long-arm statute, and (2) the exercise of jurisdiction comports with due process.   *See Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 81 (2d Cir. 2004).   Plaintiffs cannot satisfy either requirement here.   Connecticut's long-arm statute does not authorize jurisdiction because Plaintiffs do not allege that Connecticut-based ICE agents were acting on behalf of the Defendants in their individual capacities.   Due process is not satisfied because Plaintiffs do not allege that the Defendants "expressly aimed" their allegedly tortious conduct at Connecticut.

### A.    Connecticut's Long-Arm Statute Does Not Authorize the Exercise of Jurisdiction Over Defendants Myers, Torres, Chadbourne or Martin.

Although Plaintiffs' complaint does not reference Connecticut's long-arm statute, the complaint's headings and allegations make plain that jurisdiction over the non-resident ICE officials is premised on their alleged supervisory responsibilities over Connecticut-based ICE employees. *See* TAC at 50, 55 and ¶¶ 325, 351.   Accordingly, the only relevant provision of Connecticut's long-arm statute is Section (a)(2), which authorizes jurisdiction over a non-resident "who . . . through an agent:    . . . commits a tortious act within the state . . . ." Conn. Gen. Stat. § 52-59b(a)(2).   But the Second Circuit's holding in *Green v. McCall*, 710 F.2d 29 (2d Cir. 1983), which interpreted Section (a)(2) in the *Bivens* context, precludes the exercise of jurisdiction over the non-resident officials.

In *Green*, the Second Circuit held that section (a)(2) of Connecticut's long-arm statute does not permit a court to exercise jurisdiction over an out-of-state federal official, sued in his

13

individual capacity, based on conduct by government employees within Connecticut who are supervised by the official.   *See* 710 F.2d at 32-33.   The plaintiffs alleged that members of the United States Parole Commission "instructed" hearing examiners in Connecticut to follow certain procedures that the federal district court in Connecticut had ruled violated due process. *See id.* at 30-32, 33-34.   The Second Circuit drew a distinction between federal employees in the forum acting as agents of a non-resident superior in his official capacity as opposed to his individual capacity.   *Id.* at 32-34.   Based on this distinction, the court held that section (a)(2) did not provide for jurisdiction over the Commissioners "in their individual capacities on the basis of tortious acts of agents within Connecticut unless the agents represented the defendants in their individual, as contrasted with their official, capacities."   *Id.* at 33.   Despite evidence that Commissioners instructed hearing examiners to follow procedures "contrary" to district court rulings, the Commissioners were not subject to jurisdiction because there was "no basis for inferring that they benefitted, or sought to benefit, in their individual capacities rather than their official capacities."   *Id.* at 32, 34.   The court also rejected the argument that deterring unconstitutional conduct justifies finding personal jurisdiction when it otherwise would not exist:

> We agree that it is not in the interest of the government or the public to have their goals pursued in an unconstitutional manner; but this does not mean either that in proceeding in such a manner an official is pursuing his own individual interests, or that the exercise of in personam jurisdiction can be inferred simply from the potential for personal liability.

*Id.* (internal citation omitted).

Courts have relied on *Green* in holding that an identical provision in New York's long-arm statute does not provide for jurisdiction over senior federal officials whose challenged conduct occurred outside the forum, absent evidence that in-state federal employees acted on

14

behalf of the officials in their individual capacities.   *See Kronisch v. United States*, No. 83 Civ.
2458, 1997 WL 907994, at *18 (S.D.N.Y. Apr. 14, 1997), *aff'd in part and rev'd in part on other
grounds* 150 F.3d 112 (2d Cir. 1998) (no jurisdiction over CIA Assistant Deputy Director
allegedly "involved in planning, devising, and executing the drug programs" at issue that were
"set into operation in Washington, D.C. and New York, New York."); *Lee v. Carson*, 645 F.
Supp. 1430, 1433-34 (S.D.N.Y. 1986) (no jurisdiction over Director of the Federal Bureau of
Prisons whose alleged "negligence, gross negligence, and deliberate indifference" resulted in the
plaintiff's injuries); *see also Barrett v. United States*, 646 F. Supp. 1345, 1351-52 (S.D.N.Y.
1986) (relying on *Green* in holding that senior legal advisors in the government who allegedly
conspired "with persons who took actions in New York to cover-up the Army's involvement" in
the plaintiff's death were not subject to jurisdiction because they would not benefit personally
from the alleged cover-up).[7]

Based on *Green* and its progeny, Plaintiffs have failed to allege facts sufficient to make a
*prima facie* showing that Myers, Torres, Chadbourne and Martin are covered by Connecticut's
long-arm statute.   As the bold headings in Plaintiffs' complaint make plain, it is only through
the actions of ICE agents in Connecticut that Plaintiffs seek to exercise jurisdiction over the four
out-of-state Defendants.   *See* TAC at 50 and 55 (listing the four senior ICE Defendants as
"Liable for Subordinate ICE Raid Officers'" alleged constitutional violations).   Plaintiffs offer
no other rationale for this Court to exercise jurisdiction over the four Defendants under
Connecticut's long-arm statute, and indeed there is none, as the entirety of the allegations against

---

[7]  Because Connecticut's long-arm statute is modeled on New York's statute, Connecticut courts
often look to cases interpreting New York's statute for guidance.   *See Savin v. Ranier*, 898 F.2d
304, 306 (2d Cir. 1990).

those Defendants focus on official decisions made by them outside the forum. *See, e.g.,* ¶¶ 257-71, 286-88 (outlining alleged decisions concerning national policies made by Torres and Myers); ¶¶ 35-36, 311 (Chadbourne and Martin, who are located in Boston, "reviewed and approved the Operational Plan").   Importantly, there is no suggestion that the ICE agents who conducted the operation at issue were acting on behalf of the Defendants in anything other than their official capacity.   Without any allegation even suggesting that the Connecticut-based ICE agents were acting on behalf of the senior ICE Defendants in their *individual capacity*, Plaintiffs have not satisfied their burden of showing that Connecticut's long-arm statue permits this Court to exercise personal jurisdiction over Defendants Myers, Torres, Chadbourne and Martin.

      **B.**     **Plaintiffs Have Not Alleged That Defendants Myers, Torres, Chadbourne or Martin Expressly Aimed Conduct at Connecticut, As Required For the Exercise of Personal Jurisdiction Consistent With Due Process.**

      Whatever Connecticut law requires, Plaintiffs still must show that the exercise of personal jurisdiction comports with the Constitution's due process requirement.   *Barclay v. Hughes*, 462 F. Supp. 2d 314, 316 (D. Conn. 2006) (citing *Savin*, 898 F.2d at 306).   Due process requires that a defendant have "minimum contacts" with the forum.   *Chaiken v. VV Publishing Corp.*, 119 F.3d 1018, 1027 (2d Cir. 1997).   The minimum contacts inquiry tests "whether a defendant's contacts with a forum are such that the defendant should reasonably anticipate being haled into court there." *Barclay*, 462 F. Supp. 2d at 316.   A plaintiff may satisfy the minimum contacts requirement by invoking either "general jurisdiction" or "specific jurisdiction."   *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001).  General jurisdiction requires "continuous and systematic" contacts with the forum and may be exercised "when the cause of action does not arise from the defendant's contacts with the

16

forum state."   *U.S. Titan, Inc.*, 241 F.3d at 152.   Where the claim "arises out of, or relates to, the

defendant's contacts with the forum," specific jurisdiction may be exercised.   *Id.*

As Plaintiffs have not alleged that any of the senior ICE officials have "continuous and

systematic contacts" with Connecticut that would subject them to the general jurisdiction of

Connecticut courts, Plaintiffs are attempting to satisfy the minimum contacts requirement under

a specific jurisdiction theory.   Specific jurisdiction is not present unless a defendant has

"'purposefully availed' itself of the privilege of doing business in the forum and could foresee

being 'haled into court' there."   *Id.*   To satisfy the purposeful availment standard, a plaintiff must

make a *prima facie* showing that a defendant "'expressly aimed'" the allegedly tortious actions

"at the forum state."   *In Re Terrorist Attacks*, 538 F.3d 71, 93 (2d Cir. 2008) (quoting *Calder v.

Jones*, 465 U.S. 783, 789 (1984)); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d

204, 208 (2d Cir. 2003) (citing *Calder* for the proposition that personal jurisdiction does not lie

unless the defendant was "a primary participant in intentional wrongdoing – albeit

extraterritorially – expressly directed at [the] forum.").[8]   Plaintiffs' allegations fail to make the

requisite *prima facie* showing.   As explained below, senior federal officials do not "expressly

aim" their conduct at a forum simply by fulfilling their national or regional oversight

responsibilities.   In addition, Plaintiffs premise specific jurisdiction over the Defendants based

on their *failure* to act, but a failure to act cannot satisfy the purposeful availment standard.

When a senior government official is "not alleged to have been directly and actively

involved in activities in the forum state, many courts have refused to exercise personal jurisdiction

---

[8]  Due process also requires that the exercise of jurisdiction be reasonable. *See Barclay*, 462 F. Supp. 2d at 316. The Court need not reach this prong of the due process analysis because Plaintiffs cannot satisfy the initial minimum contacts requirement.

over them." *Wag-Aero*, *Inc. v. United States*, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993); *see also Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) (supervision over a federal agency, "the reach of which extends into every state," does not support personal jurisdiction in an individual capacity suit).   Consistent with this rule, numerous courts have held specific jurisdiction may not be exercised over federal officials based on the adoption and implementation of a national policy.   *See, e.g., Moss v. U.S. Secret Service*, No. 06-3045, 2007 WL 2915608, at *18-19 (D. Or. Oct. 7, 2007), *rev'd in part, dismissed in part on other grounds*, *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009); *Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1301-02 (N.D. Ga. 2007); *Rank v. Hamm*, 2007 WL 894565, at *11-13 (S.D.W.Va. Mar. 21, 2007); *McCabe v. Basham*, 450 F. Supp. 2d 916, 924-27 (N.D. Iowa 2006); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. Va. 1991).   As one court observed, "'[i]f a federal agency head could be sued personally in any district within his or her official authority merely for supervising acts of subordinates . . . the minimum contacts requirement would be rendered meaningless.'" *McCabe*, 450 F. Supp. 2d at 926 (quoting *Wag-Aero*, 837 F. Supp. at 1486.); *see also Doe v. American Nat'l Red Cross*, 112 F.3d 1048, 1050-51 (9th Cir. 1997) (dismissing FDA official working in Washington, D.C. sued on constitutional claim due to lack of contacts with forum).[9]

Consistent with the rule that senior agency officials are not subject to personal jurisdiction based on implementing and administering national policies, numerous courts have also held that agency officials with supervisory responsibilities over particular regions are not

---

[9]  Defendants are aware of only one court that has ignored this significant body of case law. *See Argueta v. ICE*, No. 08-1652, 2009 WL 1307236, *19-21 (D.N.J. May 7, 2009)   (exercising personal jurisdiction over Myers and Torres).   That lone district court case is not binding here and in any event is currently on appeal.   *See Argueta v. ICE*, No. 10-1479 (3d Cir.) (appeal docketed Feb. 25, 2010).

subject to jurisdiction in every state that falls within their supervisory purview.   *See Hill v. Pugh*, 75 Fed. App'x 715, 719 (10th Cir. 2003) (no jurisdiction over Bureau of Prisons ("BOP") Regional Director for responsibility over prison operations in the forum); *Johnson v. Rardin*, 952 F.2d 1401, 1992 WL 9019, at *1 (10th Cir. Jan. 17, 1992) (no jurisdiction over BOP Regional Counsel for reviewing inmate's appeals and occasionally advising prison staff members in forum state); *Randall v. Pettiford,* No. 08-3594, 2010 WL 1072164, *3 (D.S.C. Feb 22, 2010) (no jurisdiction over BOP officials who handled plaintiff's appeals from their offices outside the forum); *Durham v. Lappin*, No. 05-cv-1282, 2006 WL 2724091, *5 (D. Colo. Sept. 21, 2006) (no jurisdiction over BOP regional and national officials for responding to plaintiff's grievances).

All of Plaintiffs' allegations against the non-resident Defendants concern their supervisory responsibilities as agency officials.   For Myers, who served as the highest-ranking, Presidentially appointed official within ICE, and Torres, a former director of ICE's Office of Detention and Removal Operations, Plaintiffs challenge their oversight of a national policy. *See* TAC ¶¶ 12, 253-320.   The vast majority of Plaintiffs' allegations against Myers and Torres concern their administration of the NFOP.   *See id*. ¶¶ 258-74, 284, 307-09, 335-36, 361-62. As to the few allegations concerning the June 6, 2007, enforcement operation, Plaintiffs simply allege that Myers may have received a note on June 5, 2007, advising her of the operation.   *Id*. ¶ 315-16.   Plaintiffs allege that Torres, from his office in Washington, D.C., "reviewed and approved the Operational Plan prepared by Defendant McCaffrey."   *Id*. ¶¶ 240, 242, 311. Plaintiffs do not allege that Myers reviewed or approved the plan.   They also do not allege that Myers or Torres knew that the "target list" of homes where the Connecticut-based ICE agents would conduct the operation contained "outdated" information.   *Id*. ¶¶ 64-65.   And  Plaintiffs

19

do not allege that Myers or Torres "joined with" various federal and local law enforcement officials "to plan and execute" the operation. *Id.* ¶ 397.   Most significantly, there are no allegations that Myers or Torres *personally* has a substantial connection with Connecticut.

Regarding Chadbourne and Martin, who are located in Boston, Plaintiffs allege that Chadbourne "reviewed and approved the Operational Plan." *Id.* ¶¶ 239, 242.   They allege that the plan was submitted to Martin, but they do not allege that Martin reviewed or approved the plan. *Id.*   Importantly for these two Defendants, Plaintiffs do not allege that they met with Connecticut-based ICE officials or any federal or local law enforcement officials to "plan and execute" the operation.[10]   *Id.* ¶ 397.   And there are no allegations that Chadbourne or Martin *personally* has a substantial connection with Connecticut.

At bottom, Plaintiffs do not allege that any of the non-resident ICE officials "expressly aimed" tortious conduct at Connecticut.   *In Re Terrorist Attacks*, 538 F.3d at 93.   In fact, the allegations concerning management and implementation of a national policy undercuts the showing that Plaintiffs must make, because a national policy, by definition, cannot be expressly targeted at Connecticut.   *See McCabe*, 450 F. Supp. 2d at 926.   The mere fact that Myers and Torres oversaw the administration of a national policy as part of their responsibilities in Washington, D.C., cannot subject them to jurisdiction in this forum.   Likewise, the mere fact that Chadbourne and Martin had supervisory responsibilities – even in regard to the New Haven operation – over the Hartford sub-office is insufficient to confer personal jurisdiction. Exercising jurisdiction over them on the alleged facts would be improper.

---

[10] Even though they do not allege that Chadbourne or Martin met with officials in Connecticut to plan the operation, Plaintiffs baldly assert that Chadbourne and Martin were aware that the "target list" prepared by McCaffrey contained "outdated" information.   *Id.* ¶ 65.

20

An additional reason there is no jurisdiction over the non-forum Defendants is because Plaintiffs have premised jurisdiction on a *failure* to act.[11]   The Supreme Court recognized long ago that an overt act is required for due process to permit the exercise of personal jurisdiction:

> [I]t is essential in each case that there be *some act* by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added).    Based on this reasoning, several courts have held that a failure to act does not satisfy the minimum contacts requirement. *See, e.g., Carty v. Beech Aircraft Corp*, 679 F.2d 1051, 1061 (3d Cir. 1982) (exercising jurisdiction based on a failure to act "would dangerously trench upon the constitutional prohibition against assertion of jurisdiction where the defendant has not purposefully availed itself of the privilege of conducting activity within the forum"); *Clebda v. H.E. Fortna and Brother, Inc.*, 609 F.2d 1022, 1023-24 (1st Cir. 1979) ("a failure to act" is insufficient; "there still must be some form of submission to the state," citing *Hanson*); *Nat'l Union Fire Ins. Co. v. Am. Eurocopter Corp.*, No. CV 09-136, 2009 WL 2849130, *7 (D. Haw. Aug. 26, 2009); *Pettengill v. Curtis*, 584 F. Supp. 2d 348, 357-58 (D. Mass. 2008); *cf. Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1259 n.16 (S.D.N.Y. 1984) ("we hesitate to premise the exercise of jurisdiction on a failure to act" citing the concerns expressed in *Carty* and *Clebda*).

The decision in *Pettengill* is particularly relevant.   The plaintiff premised jurisdiction over executives of the Boy Scouts of America who resided outside the forum on allegations that

---

[11] *See, e.g.,* TAC ¶¶ 298 ("Myers and Torres failed to act"); 308 ("Myers, Torres, Chadbourne [and] Martin . . neglected to change the training policies"); 309 ("Defendants' failure to create an adequate training program caused Plaintiffs' injuries") 320 ("Myers, Torres, Chadbourne [and] Martin . . . fail[ed] to adequately supervise the operation, and that failure caused Plaintiffs' constitutional injuries").

they "had actual knowledge of [sexual] abuse problems in general and at least one incident in [the forum]" but failed to take corrective actions.   *Id.* at 345-56.   Like the Plaintiffs here, the plaintiff in *Pettengill* alleged that the defendants failed "to put policies in place to prevent [sexual abuse]" or "did so negligently," and these failures led to plaintiff's injuries.   *Id.* at 354. The court held that it could not exercise personal jurisdiction over the defendants because their only contacts with the forum were "omissions relating to their policymaking roles at BSA and correspondence with scoutmasters in [the forum] regarding abuse allegations unrelated to [the perpetrator]." *Id.* at 358-59.   In remarks that apply equally to this case, the court observed that transforming "a failure to act that was directed at nowhere in particular into a purposeful availment of the laws of one specific state" would make the defendants "subject to personal jurisdiction everywhere," and thus "eviscerate the minimum contacts test for satisfying the requirements of due process."   *Id.* at 358-59.   At bottom, Plaintiffs fault the non-resident ICE officials for *failing* to expressly aim conduct at Connecticut.   Due process does not permit the exercise of jurisdiction based on such allegations.

## II.   The INA Prohibits Subject Matter Jurisdiction Over Constitutional Claims That Plaintiffs Brought, or Could Have Brought, in Their Removal Proceedings.

The INA limits judicial review of immigration proceedings in three ways material to this case.   First, the INA consolidates in the federal courts of appeals all legal and factual questions arising from actions taken to remove an alien. *See* 8 U.S.C. § 1252(b)(9).   Second, the INA precludes challenges to decisions and actions to commence removal proceedings, adjudicate cases, or execute removal orders.   *See* 8 U.S.C. § 1252(g).   Third, the INA divests courts of jurisdiction to entertain challenges to discretionary decisions by the Secretary of Homeland Security concerning the apprehension of aliens.   *See* U.S.C. § 1252(a)(2)(B)(ii).   This does not

mean there is no forum for Plaintiffs to pursue their claims.   Because all eleven Plaintiffs are in

removal proceedings, they are able to use procedures available to them under the INA and relevant

case law to raise constitutional arguments in those proceedings.   *See* 8 U.S.C. § 1252(a)(2)(D);

*Pinto-Montoya v. Mukasey*, 540 F.3d 126 (2d Cir. 2009).   But section 1252(a)(2)(D), read in

conjunction with the other provisions in section 1252 that limit jurisdiction, makes plain that

only a court of appeals may rule on Plaintiffs' constitutional claims; this Court has no

jurisdiction to do so.   *See Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d Cir. 2008) ("jurisdiction to

review [constitutional] claims is vested exclusively with the courts of appeals and can be

exercised only after the alien has exhausted administrative remedies") (citing § 1252(a)(2)(D)).[12]

As the Supreme Court has explained, the "theme of the [INA's]" jurisdictional provisions

is to "protect[] the Executive's discretion from the courts."   *Reno v. American-Arab

Anti-Discrimination Committee*, 525 U.S. 471, 486 (1999) ("*AADC*"); *see also Kucana v.

Holder*, 130 S. Ct. 827, 838 (2010) ("Congress [has] amended the INA aggressively to expedite

removal of aliens lacking a legal basis to remain in the United States.").   Accordingly, lower

courts are to construe the INA's jurisdictional provisions "'with precision and with fidelity to the

terms by which Congress has expressed its wishes.'" *Kucana*, 130 S. Ct. at 840 (quoting *Cheng

Fan Kwok v. INS*, 392 U.S. 206, 212 (1968)).   Those jurisdictional provisions "'limit all aliens

to one bite of the apple ... [and thereby] streamline what the Congress saw as uncertain and

piecemeal review of orders of removal.'"   *Xiao Ji Chen v. Dep't of Justice*, 471 F.3d 315, 324

---

[12] To ensure that removal proceedings are fundamentally fair consistent with due process, the
Second Circuit has adopted a rule that permits an alien to argue for the exclusion of evidence in
those proceedings based on an "egregious" and "fundamentally unfair" constitutional violation, or
a violation that undermines the "reliability of the evidence in dispute."   *Pinto-Montoya*, 540 F.3d
at 130-31 (discussing and citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984)); *see
also Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234-35 (2d Cir. 2006).

n.3 (2d Cir. 2006) (quoting *Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005).   As

applied to this case, the INA divests this Court of jurisdiction to hear Claims for Relief One

through Four, which all allege constitutional violations.

> **A.**   **Section 1252(b)(9) Limits Plaintiffs to Pursuing Their Constitutional Claims in Their Immigration Proceedings and in the Court Of Appeals, Thus Precluding Jurisdiction in This Court.**

The INA streamlines judicial review by requiring all legal and factual questions arising

from actions taken to remove an alien to be reviewed *only* by the courts of appeals.   *See* 8 U.S.C.

§ 1252(b)(9).   The Supreme Court has described section 1252(b)(9) as an "unmistakable 'zipper'

clause" because it consolidates all judicial review in a single place.   *AADC*, 525 U.S. at 475.

Specifically, this section states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus ... or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).   Because judicial review is limited to courts of appeals, "other challenges"

may no longer be "brought pursuant to a federal court's federal question . . . jurisdiction under 28

U.S.C. § 1331."   *Calcano-Martinez v. INS*, 232 F.3d 328, 340 (2d Cir. 2000).

The "zipper clause" dovetails with the Act's exhaustion requirement, which requires an

alien to "exhaust[] all administrative remedies available to the alien as of right," 8 U.S.C.

§ 1252(d)(1), before presenting claims to a court of appeals.   A court of appeals lacks jurisdiction

over non-exhausted claims.   *See* 8 U.S.C. § 1252(d)(1); *see also McCarthy v. Madigan*, 503 U.S.

140, 144 (1992), *superseded on other grounds*, 42 U.S.C. § 1997(e); *Ajlani*, 545 F.3d at 235 ("it

would be premature" for a circuit court to review constitutional claims brought by an alien

whose removal proceedings are pending).   Together, the "zipper clause" and the exhaustion

requirement map out the exclusive path for all challenges to actions taken to remove an alien.[13]

When she served as a Judge on the Second Circuit, Justice Sotomayor set forth the standard

for determining whether a provision that vests appellate courts with exclusive jurisdiction to

review administrative proceedings precludes district court jurisdiction.   In *Merritt v. Shuttle*,

Sotomayor reviewed and synthesized Supreme Court and Second Circuit caselaw on the question

and stated that an exclusive review statute "preclude[s] district courts from deciding issues that

'could and should have been' raised in an administrative proceeding or at least in a court of

appeals, not merely those that were actually considered and necessarily decided in the

administrative proceeding."   245 F.3d 182, 192 (2d Cir. 2001) (citing *City of Tacoma v.

Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958)). The Second Circuit recently observed that this

standard applies to the INA.   *See Arar v. Ashcroft*, 532 F.3d 157, 170 (2d Cir. 2008), *vacated and

superseded en banc*, 585 F.3d 559 (2d Cir. 2009) (the "test" for determining whether a statute

vesting exclusive jurisdiction with the courts of appeals "precludes a district court from hearing a

claim" is whether "the claim 'could and should have been' presented to and decided by a court of

appeals," citing *Merritt*).[14]   This Court has also recognized that whether a claim could have been

---

[13]   Because "[c]ourts are required to strictly enforce statutory exhaustion requirements," the
Second Circuit requires an alien to exhaust constitutional arguments in administrative
proceedings.   *Theodoropoulos v. INS*, 358 F.3d 162, 172-73 (2d Cir. 2004).   The only possible
exception is where "there is no possibility of receiving any type of relief" through exhaustion in
the administrative process.   *Id.* at 173.

[14]   Although the *Arar* panel decision was vacated when the Second Circuit ordered rehearing *en
banc*, the vacated opinion still retains persuasive authority. *See United States v. Gomes*, 387 F.3d
157, 160 (2d Cir. 2004) (following "persuasive reasoning" of vacated and remanded circuit
opinion); *In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 83 (E.D.N.Y. 2005)
(adopting analysis of circuit opinion that was vacated on the grant of a rehearing petition,
observing that the vacatur "does not deprive [the opinion's] reasoning of its persuasive power");

brought in removal proceedings determines the applicability of Section 1252(b)(9).   *See*

*El-Badrawi v. DHS*, 579 F. Supp. 2d 249, 272 (D. Conn. 2008) (§ 1252(b)(9) does "not . . . apply

to claims that could never be brought during removal proceedings").

All eleven Plaintiffs are parties to removal proceedings, and in those proceedings

challenged the government's authority to remove them from the United States.   Ten of the eleven

Plaintiffs raised Fourth, Fifth and Tenth Amendment claims in those proceedings identical to the

constitutional claims raised here.   *See* Exs. B-C & E-L at 2-3.   Five of the Plaintiffs –

Baranda-Barreto, Cedeño-Trujillo, Diaz-Bernal, Trujillo-Mirafuentes, and Trujillo-Morellano –

prevailed on their Fourth Amendment claim, and the immigration court terminated the removal

proceedings against those five Plaintiffs.   *See* Exs. B at 28-29; C at 31; E at 31-32; I at 30-31; J at

30-31.   The government has appealed those rulings to the BIA.[15]   *See* Exs. M-Q.   The five

Plaintiffs who lost their constitutional challenges in the immigration court – Paredes-Mendez,

Serrano-Mendez, Solana-Yangua, Valasquez, and Yangua-Calva – have appealed their decisions

to the BIA.   *See* Exs. R-V.   Plaintiff Colala-Peñarreta chose not to raise constitutional claims in

his removal proceedings, although the decisions by the immigration judge and BIA are still subject

to review by the Second Circuit.[16]

---

*United Nat'l Ins. Co. v. Waterfront N.Y. Realty, Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996)
(circuit court decision "not vacated on the merits" retains "strong persuasive authority").

[15]  Because the five Plaintiffs are still in removal proceedings, the Defendants do not concede that
the Plaintiffs proved in their removal proceedings constitutional violations sufficient to warrant
termination of those proceedings.

[16]  Colala-Peñarreta argued against removal based on family hardship, but the immigration court
rejected this argument and the BIA has upheld the immigration court's ruling.   *See* Ex. W.
Colala-Peñarreta filed a petition for review with the Second Circuit on April 30, 2010. *See* Ex. X.

On these facts, where the constitutional claims Plaintiffs are pressing in this action "'could and should have been' raised in [the removal] proceeding[s]," *Merritt,* 245 F.3d at 192, the exclusive jurisdiction provision at Section 1252(b)(9) precludes this Court from exercising jurisdiction over those claims.   This Court reached precisely that holding in *El-Badrawi*, when it held that a deported alien could not pursue the portion of his FTCA claim challenging his detention where "the administrative process . . . enable[d] El-Badrawi to obtain some relief from his detention."   579 F. Supp. 2d at 272.[17]   The First Circuit reached a similar conclusion in *Aguilar v. ICE*, 510 F.3d 1, 18 (1st Cir. 2007), holding that Section 1252(b)(9) precluded district court jurisdiction over constitutional claims brought by aliens in removal proceedings because the claims could be "adequately addressed and effectively vindicated before an immigration judge," and in turn before "the BIA and then by the court of appeals."   In *Arias v. ICE*, No. 07-1959, 2008 WL 1827604 (D. Minn. Apr. 23, 2008), a *Bivens* case with factual allegations remarkably similar to those here, the court reached a similar result.   The plaintiffs in *Arias* alleged that ICE agents "forcibly entered" their homes, and "conducted warrantless, non-consensual searches." *Id.* at *3.   As in this case, the plaintiffs sued both the ICE agents who arrested them and senior ICE officials Julie Myers, John Torres, and a field office director.   *Id.* at *2.   The court held that section 1252(b)(9) barred all claims brought by plaintiffs who were parties to removal proceedings, because their constitutional claims could have been raised in those proceedings, and district court interference was contrary to congressional intent:

> The Court finds that § 1252(b)(9) bars [plaintiffs' constitutional] claims because
> they directly "arise from an action taken or proceeding brought to remove an alien

---

[17]  Consistent with Second Circuit law, the Court in *El-Badrawi* held that Section 1252(b)(9) did not bar claims that could not be addressed as part of the "administrative process."   579 F. Supp. 2d at 272.

> from the United States." . . .   Plaintiffs' claims are common in removal
> proceedings and could directly impact Plaintiffs' immigration status.
> "Ultimately, allowing aliens to ignore the channeling provisions of section
> 1252(b)(9) and bring these claims directly in the district court would result in
> precisely the type of fragmented litigation that Congress sought to forbid."

*Arias*, 2008 WL 1827604, at * 6 (quoting *Aguilar*, 510 F.3d at 13-14).[18]   Section 1252(b)(9)

precludes Plaintiffs from pursuing their constitutional claims in this Court.

**B.      Section 1252(g) Bars Plaintiffs' First, Second and Third Claims For Relief,
         Which Challenge Government Decisions To "Commence Proceedings."**

        In addition to consolidating review through the "zipper clause," Congress has also

precluded district courts from entertaining claims arising from actions to commence removal

proceedings, adjudicate cases, or execute a removal order:

> Except as provided in this section and notwithstanding any other provision of
> law[,] ... no court shall have jurisdiction to hear any cause or claim by or on
> behalf of any alien arising from the decision or action by the Attorney General to
> commence proceedings, adjudicate cases, or execute removal orders against any
> alien under [8 U.S.C. §§ 1101-1537].

8 U.S.C. § 1252(g).[19]   Although the Supreme Court in *AADC* concluded that Section 1252(g)

should be read narrowly, the Court expressly held that the section encompasses "three discrete

---

[18]  The fact that Plaintiffs in this case, like the alien plaintiffs in *Aguilar* and *Arias*, were parties
to removal proceedings and had an opportunity to seek redress for alleged unconstitutional
conduct distinguishes this case from *Argueta v. ICE*, No. 08-1652, 2009 WL 1307236 (D.N.J.
May 7, 2009).   The alien plaintiff in *Argueta* "[did] not seek to challenge his removability,"
thus Section 1252(9)(b) did not bar the alien plaintiffs' *Bivens* claim because "[plaintiff's]
constitutional claims could not be brought before an immigration court."   *Id.* at *14.   The
different facts of this case, where Plaintiffs have had an opportunity to raise their constitutional
claims before an immigration judge, are not subject to the reasoning in *Argueta* (which, again, is
on appeal).

[19]  Section 1252(g)'s reference to the "Attorney General" is properly understood as referring to
the Secretary of the Department of Homeland Security, as the Homeland Security Act of 2002
transferred authority to carry out "immigration enforcement functions" from the former
Immigration and Naturalization Service within the Department of Justice to DHS.   6 U.S.C. §
202(3); *see also Ali v. Mukasey*, 524 F.3d 145, 150 (2d Cir. 2008).

28

events" – decisions or actions to "commence proceedings, adjudicate cases, or execute removal

orders." *AADC*, 525 U.S. at 482.   As long as the challenged conduct falls within one of these

discrete areas, Section 1252(g) bars a claim, even if the claim alleges that the government

unconstitutionally targeted a particular class of persons for removal.   *AADC*, 525 U.S. at 491.

Accordingly, courts have interpreted Section 1252(g) to bar challenges to DHS programs aimed at

particular classes of aliens.   *See Ali v. Gonzales*, 502 F.3d 659, 665 (7th Cir. 2007) (constitutional

challenge to DHS program that "caused [alien] to come to the attention of DHS" barred by §

1252(g)), *abrogated in part on other grounds as recognized in Juarez v. Holder*, 599 F.3d 560 (7th

Cir. 2010); *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006) (same); *Daud v. Gonzales*, 207

Fed. App'x 194, 202-203 (3d Cir. 2006) (§ 1252(g) precluded constitutional challenge to DHS

program that resulted in order of removal).   The Second Circuit has held that section 1252(g) bars

district court jurisdiction over constitutional claims brought by an alien who is in removal

proceedings, even where the proceedings did not commence until after the alien filed suit.   *See

Ajlani*, 545 F.3d at 235.   Similarly, Section 1252(g) bars a challenge to a decision by DHS to

place an alien in removal proceedings even where the alien "came to the attention of DHS"

through inadvertence.   *Ali v. Mukasey*, 524 F. 3d 145, 150 (2d Cir. 2008).

   At a minimum, Section 1252(g) bars Plaintiffs' Second Claim for Relief, which alleges

an equal protection violation.    Like the petitioners in *AADC, Ali v. Gonzales*, *Hadayat*, and

*Doud*, Plaintiffs' equal protection claim attempts to allege selective enforcement based on

Plaintiffs' "race, ethnicity and/or perceived national origin."   TAC ¶ 344.   And like the

petitioners in those cases, Plaintiffs here were all served with a Notice to Appear and the

government prosecuted removal proceedings against them.   *See* Exs. B-L.   On these facts,

section 1252(g) bars Plaintiffs' equal protection claim.   *See AADC*, 525 U.S. at 489-91; *Ali v. Gonzales*, 502 F.3d at 665; *Hadayat*, 458 F.3d at 665; *Daud*, 207 Fed. App'x at 201-03.

Plaintiffs' First and Third Claims for Relief are also barred by section 1252(g).   As already explained, all eleven Plaintiffs are either currently in removal proceedings or have filed a petition challenging removal with the Second Circuit.   There can be no question that Plaintiffs' constitutional claims "arise from" an "action" by DHS to "commence proceedings" against aliens in the country unlawfully.   In their complaint, Plaintiffs allege that the ICE agents who "directly participated in the raid did so as part of" a national "program" (the NFOP) initiated by ICE to "identify, locate, apprehend and remove" fugitive criminal aliens from the United States. TAC ¶ 253.   Plaintiffs allege that Defendant Chadbourne "reviewed and approved" the operational plan prepared by Defendant McCaffrey for apprehending aliens as part of the NFOP. TAC ¶¶ 233, 311.   In their allegations against Defendants Myers and Torres, Plaintiffs challenge alleged decisions made by these officials concerning the NFOP.   *See, e.g.,* TAC ¶¶ 11-12, 260-62, 269-70.   Finally, Plaintiffs allege that even though they did not fit within the category of alien targeted by the NFOP, they were still arrested.   *See* TAC ¶ 261.

Because Plaintiffs allege that they were apprehended as part of a program to initiate removal proceedings against aliens present in the country unlawfully, and in fact removal proceedings were initiated against every Plaintiff, section 1252(g) bars Plaintiffs' constitutional claims.   Key factors in determining that section 1252(g) applies are an alien's unlawful presence in the country and the initiation of removal proceedings against the alien.   *See AADC*, 525 U.S. at 488 ("[A]n alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense to his deportation."); *Ajlani*, 545 F.3d at 235 (§ 1252(g) barred

30

constitutional challenge to removal proceedings even though the proceedings were initiated after

lawsuit was filed because "jurisdiction to review [constitutional] claims is vested exclusively in

the courts of appeals and can be exercised only after the alien has exhausted administrative

remedies").   Where an alien is placed in removal proceedings, a claim that the government

program which led to that placement is unconstitutional fails to overcome the section 1252(g) bar.

*See Ali*, 502 F.3d at 665; *Hadayat*, 458 F.3d at 665; *Daud*, 207 Fed. App'x at 201-03.[20]

Likewise, courts confronted with *Bivens* claims brought by aliens placed in removal proceedings

have held that section 1252(g) barred the claims.   *See Sissoko v. Rocha*, 509 F.3d 947, 951 (9th

Cir. 2007) (§ 1252(g) barred an alien's *Bivens* action for false arrest); *Humphries v. Various*

*Federal USINS Employees*, 164 F.3d 936, 942, 945 (5th Cir. 1999) (dismissing First Amendment

claim based on § 1252(g)).[21]   Finally, in *Arias*, which involved allegations similar to this case,

the court held that section 1252(g) barred Fourth Amendment claims alleging warrantless,

non-consent searches where aliens were ultimately removed.   2008 WL 1827604, at *7-8. *But*

*see El-Badrawi*, 579 F. Supp. 2d at 266-67 (common law tort claims relating to arrest and

---

[20]  The decision in *Argueta* is in tension with the decisions in *Ali, Hadayat* and *Daud*.   The
court there held that section 1252(g) did not bar a *Bivens* claim challenging a search and arrest,
even though the alien plaintiff was arrested as part of a program to commence removal
proceedings against aliens in the country unlawfully.   2009 WL 1307236, at *16-17.   The
court reasoned that "the decision to commence proceedings against [plaintiff] arose from his
arrest, rather than that his arrest arose from a decision to commence proceedings."  *Id.* at 16.
But this reasoning would require a different result in *Ali, Hadayat* and *Daud*, as the program
challenged in those cases enabled DHS to initiate removal proceedings *after* aliens registered
with the program.   In that regard, the petitioners in those cases and the Plaintiffs here (and the
alien plaintiff in *Argueta* are similarly situated – DHS had no knowledge of any of these aliens at
the time DHS created or implemented the challenged program that ultimately led to removal
proceedings.

[21]  In both *Sissoko* and *Humphries*, the courts stressed that alternative avenues were available for
pressing constitutional claims.   *See Sissoko*, 509 F.3d at 950; *Humphries*, 164 F.3d at 945.

detention not barred by 1252(g)).

**C.    Section 1252(a)(2)(B)(ii) Bars Judicial Review of Plaintiffs' Claims Challenging Decisions by Senior ICE Officials Concerning the NFOP and Training and Supervision Related to That Program.**

Finally, Congress has also barred judicial review of discretionary decisions authorized

under the Act but unrelated to removal proceedings:

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision or actions is made in removal proceedings, no court shall have jurisdiction to review—
> * * *
> any . . . decision or action of the Attorney General or Secretary of Homeland Security the authority for which is specified under this subchapter [8 U.S.C. §§ 1151-1381] to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).   For this section to preclude judicial review, two requirements must

be met.   First, there must be a provision in INA sections 1151-1381 that commits the decision or

action at issue to the discretion of the Attorney General or Secretary.   *Kucana*, 130 S. Ct. at 831.

Second, there cannot be any ambiguity that the relevant statutory provision commits the issue to

the discretion of the Attorney General or Secretary.   *Ruiz v. Mukasey*, 552 F.3d 269, 275 (2d Cir.

2009) ("the important question" is whether the text of the subchapter in which the relevant

provisions appear specify that the decision is in the Attorney General's discretion, through

language such as "'in the discretion of the Attorney General'").   If these two requirements are

satisfied, then section 1252(a)(2)(B)(ii) bars review of that discretionary decision.   This is true

even for claims that challenge the discretionary decision on constitutional grounds, because the

sweeping language of the section's introduction – "Notwithstanding any other provision of law

(statutory or nonstatutory)" – includes the Constitution.   *See Elgharib v. Napolitano*, 600 F.3d

597, 602-605 (6th Cir. 2010) ("a natural reading of 'any other provision of law (statutory or

nonstatutory)' includes the U.S. Constitution"); *cf. Kucana*, 130 S. Ct. at 832 n.1 ("The

introductory clause [to § 1252(a)(2)(B)(ii)] . . . informs that once the scope of the bar is

determined, jurisdiction is precluded regardless of what any *other* provision or source of law might

say.") (emphasis in original); *Van Dinh v. Reno*, 197 F.3d 427, 433-34 (10th Cir. 1999) (prior

version of § 1252(a)(2)(b)(ii) barred *Bivens* challenge to discretionary decision).

        8 U.S.C. section 1226, titled "Apprehension and detention of aliens," grants to the

Secretary discretion to arrest and detain an alien pending a decision on whether the alien is

removable.   Subsection (a) states that "an alien *may* be arrested and detained pending a decision

on whether the alien is to be removed."   8 U.S.C. § 1226(a) (emphasis added).[22]   The Supreme

Court recently recognized that the use of the term "may" in describing a power granted to the

Secretary under the INA is a congressional grant of discretion.   *Kucana*, 130 S. Ct. at 836 n.13

(interpreting § 1252(a)(2)(b)(ii)).   But to dispel any doubt over the Secretary's discretionary

authority to implement section 1226, Congress included the following sentence at the end of the

section: "The Attorney General's discretionary judgment regarding the application of this section

shall not be subject to review."   8 U.S.C. § 1226(e).   There can be no question, then, that 8 U.S.C.

section 1226 provides the Secretary with the discretion necessary for section 1252(a)(2)(b)(ii) to

preclude judicial review of decisions made pursuant to that section.   In other words, section

1252(a)(2)(b)(ii) precludes judicial review of "any decision or action" by the Secretary concerning

the arrest and detention of aliens who may be subject to removal, even where the decision or action

at issue is unconnected to a "judgment, decision, or action made in removal proceedings."   *See*

---

[22]   An immigration officer has the statutory authority to arrest an alien, without a warrant, where
the officer has "reason to believe that the alien" is in the United States unlawfully and the alien
"is likely to escape before a warrant can be obtained."   8 U.S.C. § 1357(a)(2).

*Hatami v. Chertoff*, 467 F. Supp. 2d 637, 640 (E.D. Va. 2006) (§ 1252(a)(2)(B)(ii) "makes pellucidly clear that courts are precluded from reviewing *any discretionary* decision of the Attorney General") (emphasis in original).

Most of Plaintiffs' allegations focus on administration of the NFOP by current and former senior ICE officials.    As Plaintiffs explain in their complaint, the NFOP is a national ICE program specifically designed to arrest and detain certain aliens in the country unlawfully. *See* TAC ¶ 11.    Plaintiffs' apparent theory is that they never would have been arrested had senior ICE officials not altered the program's "quota" requirements.    *See id.* ¶ 15.    Plaintiffs challenge two sets of decisions by senior ICE officials that section 1226(a) commits to the Secretary's discretion.    First, Plaintiffs challenge decisions by Defendants Myers and Torres regarding the scope and administration of the NFOP.    *See, e.g.,* TAC ¶¶ 11-12, 260-62, 269-70, 327-34, 353-60.    Second, Plaintiffs challenge decisions by senior ICE officials Myers, Torres, Chadbourne, Martin and Sullivan regarding implementation of the NFOP, specifically training and supervision related to the program.    *See id.* ¶¶ 307-08, 335-42, 361-68.

As the NFOP concerns the arrest and detention of aliens in the country unlawfully, the decisions Plaintiffs challenge regarding NFOP administration and implementation are committed by section 1226(a) to the discretion of the Secretary.    Those decisions are not subject to judicial review, even on allegations of unconstitutional conduct.    *See Hatami*, 467 F. Supp. 2d at 640-41 (E.D. Va. 2006) (constitutional challenge to bond hearing procedures that are discretionary under § 1226 precluded by § 1252(a)(2)(b)(ii)); *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) ("the *manner* in which [the Attorney General's] discretionary judgment is exercised" concerning parole under § 1226, including "whether the procedural apparatus supplied satisfies .

34

. . constitutional constraints" is not subject to review under 1226(e)); *Elgharib*, 600 F.3d at

602-05.[23]

### III.    The Rule Articulated in *Heck v. Humphrey* Precludes The Plaintiffs Who Lost Their Motion to Suppress in Removal Proceedings from Pursuing a Collateral Attack on Those Proceedings in This Action.

Apart from the INA's jurisdictional provisions, the constitutional claims brought by those

Plaintiffs who did not prevail on their motion to suppress in removal proceedings are barred by the

rule set forth of *Heck v. Humphrey*, 512 U.S. 477 (1994).[24]   Under this rule, a plaintiff may not

bring a constitutional tort action challenging the legality of his conviction or confinement unless

the conviction or sentence has been invalidated.   *See Heck*, 512 U.S. at 487; *see also Tavarez v.

Reno*, 54 F.3d 109, 110 (2d Cir. 1995) (affirming dismissal of a suit for false arrest, false

imprisonment, and malicious prosecution under *Heck* because the plaintiff "ha[d] not

demonstrated that his conviction had been invalidated in any manner").   In *Heck*, the Supreme

Court explained that tort actions are not appropriate vehicles to challenge a conviction or

confinement, and it directed courts to "consider whether a judgment in favor of the plaintiff would

necessarily imply the invalidity of his conviction or sentence."   512 U.S. at 487.   "If it would, the

complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence

has already been invalidated."   *Id.*   This court in *El-Badrawi* assumed that the rule articulated in

*Heck* applies to immigration proceedings.   *See* 579 F. Supp. at 273-74.   Other courts have also

---

[23]   Because the INA does not expressly provide the Secretary with discretion on how to enter a residence where unlawful aliens are suspected to reside, the Defendants do not contend that section 1252(a)(2)(B)(ii) bars Plaintiffs' claims against the Defendants who actually executed the operation.   Rather, the section bars only the claims against the Defendants allegedly responsible for formulating and implementing policy – Meyers, Torres, Chadbourne, Sullivan and Martin.

[24]   Those Plaintiffs are Paredes-Mendez, Serrano-Mendez, Solana-Yangua, Valasquez and Yangua-Calva.

applied *Heck* to immigration proceedings.   *See Cohen v. Clemens*, 321 Fed. App'x 739, 741-42 (10th Cir. 2009); *Calix-Chavarria v. Gonzalez*, Civil No. 06-0820, 2006 WL 1751783, at *2 (M.D. Pa. June 22, 2006); *Kulakov v. INS*, No. 06-0754, 2007 WL 1360728, at *1 (W.D.N.Y. May 7, 2007); *cf. Argueta*, 2009 WL 1307236, at *12 n.10 (courts "must be mindful that immigrants may institute [civil rights] cases in order to avert deportation . . . . such issues may be resolved in accordance with the timing of when a complaint is filed," citing *Heck v. Humphrey*).

If the Plaintiffs who pressed constitutional claims in their removal proceedings and lost were to prevail on their *Bivens* claims here, it would imply the invalidity of rulings already entered by an immigration judge that those Plaintiffs are removable.   The immigration judge held that those Plaintiffs had failed to show an equal protection violation or a Fourth Amendment violation. *See* Exs. F at 30-31; G at 30-31; H at 28-29; K at 29-30.   They are now pursuing the same claims in this Court.   Therefore, under *Heck v. Humphrey*, the Plaintiffs still in removal proceedings who lost their constitutional arguments in those proceedings cannot challenge the legality of their arrest and detention in this action.[25]

## IV.   The INA's Statutory Scheme and the Political Branches' Plenary Authority Over Immigration Are Special Factors That Counsel Against Implying a *Bivens* Remedy.

Even if this Court has jurisdiction over Plaintiffs' constitutional claims, the Court should refrain from implying a damages remedy under *Bivens*.   As the Supreme Court recently recognized, a *Bivens* remedy "is not an automatic entitlement" and "in most instances [the Court has] found a *Bivens* remedy unjustified." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).   In both

---

[25] Should the BIA reverse the immigration court's rulings terminating removal proceedings for plaintiffs Baranda-Barreto, Cedeño-Trujillo, Diaz-Bernal, Trujillo-Mirafuentes, or Trujillo-Morellano, then the constitutional claims brought by those plaintiffs would also be barred by *Heck*.

*Bivens* and subsequent decisions, the Supreme Court has made clear that federal courts have no freewheeling authority to imply a damages remedy any time a plaintiff can show a violation of the Constitution by a federal officer.   *See Bivens*, 403 U.S. at 396; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67-68 (2001).   In fact, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants."   *Malesko*, 534 U.S. at 68; *see also Wilkie*, 551 U.S. at 537 (refusing to extend *Bivens* liability); *Schweiker v. Chilicky*, 487 U.S. 412, 421-25 (1988) ("[o]ur more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts").

In *Wilkie*, the Supreme Court explained that a *Bivens* remedy should only be inferred if (1) there is no "alternative, existing process for protecting" the constitutional interest at issue, and (2) if there are no special factors counseling hesitation against a judicially created remedy.   551 U.S. at 550.   In this case, the INA provides an alternative, existing process to protect Plaintiffs' constitutional interests.   In addition, the political branches' plenary power over immigration is another special factor counseling hesitation.   These mutually reinforcing special factors counsel against implying a *Bivens* remedy in this case.

**A.    The INA's Comprehensive Scheme, Which Includes An Avenue to Protect Constitutional Rights, Counsels Against Recognizing a *Bivens* Remedy.**

The presence of a deliberately crafted statutory scheme is a "special factor" that precludes a *Bivens* remedy because it demonstrates that Congress has not intended to allow a private right of action for damages.   *Schweiker*, 487 U.S.at 421-25.   A key consideration is whether recognizing a *Bivens* remedy would implicate "policy questions in an area that ha[s] received careful attention from Congress."   *Id.* at 423.   A comprehensive statutory scheme in "an area in which Congress has developed considerable familiarity," *Benzman v. Whitman*, 523

F.3d 119, 126 (2d Cir. 2008), "suggests that Congress has provided what it considers adequate remedial mechanisms for [addressing] constitutional violations," and recognizing a *Bivens* remedy would not be appropriate.   *Schweiker*, 487 U.S. at 423; *see also Dotson v. Griesa*, 398 F.3d 156, 166-67 (2d Cir. 2005).   Importantly, the fact that Congress has not provided "'complete relief'" for a *Bivens* plaintiff, *i.e.*, the statutory scheme does not provide for a "remedy in damages" for injuries suffered, is not determinative.   *Schweiker*, 487 U.S. at 425.

In this case, Plaintiffs' arrest, detention and subsequent removal proceedings are governed by the INA, which the Supreme Court has characterized as "the comprehensive federal statutory scheme for regulation of immigration and naturalization."   *De Canas v. Bica*, 424 U.S. 351, 353 (1976).   As this Court has recognized, there is no question that immigration policy "has received an inordinate amount of attention from Congress." *El-Badrawi*, 579 F. Supp. 2d at 264.[26]   The INA provides that an alien may be arrested and detained pending a decision on whether the alien is to be removed.   *See* 8 U.S.C. §1226(a).   For aliens subject to removal proceedings, the INA contains detailed provisions governing those proceedings, including procedural safeguards.   *See* 8 U.S.C. §§ 1229, 1229a, 1229b.   The INA also details specific procedures for detention as well as requirements for relief from detention.   *See*, *e.g.*, 8 U.S.C. §§ 1222, 1225(b)(1)(B)(iii)(IV), 1226, 1231.   Particularly pertinent to this case, aliens may raise constitutional challenges in their removal proceedings and on a petition for review in a court of

---

[26]   Congress has passed significant immigration reform legislation twice in the last fifteen years. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 made "significant changes to the immigration laws," *Aguilar de Polanco v. U.S. Dept. of Justice*, 398 F.3d 199, 201 (2d Cir. 2005), including "amend[ing] the INA aggressively to expedite removal of aliens lacking a legal basis to remain in the United States," *Kucana*, 130 S. Ct. at 838.   In 2005, Congress passed the REAL ID Act of 2005, which amended sections of the INA governing "asylum . . . protection from removal . . . [and] judicial review."   *Id.* at 839.

appeals.   *See* 8 U.S.C. §§ 1252(a)(2)(D), 1252(b)(9).[27]

In addition to the statutory and regulatory rules governing removal proceedings, Congress has limited judicial review of immigration decisions except as expressly provided in the INA. *See* §§ 1252(b)(9), 1252(g), 1252(a)(2)(B)(ii).   The INA provides a "sole and exclusive" means for judicial review of constitutional claims arising from immigration enforcement operations: a petition filed in the appropriate court of appeals.   8 U.S.C. § 1252(a)(2)(D) & (a)(5).   The extension of a *Bivens* remedy cannot be squared with that legislative judgment.

In *El-Badrawi*, this Court expressed its "doubt[] that the INA's remedial scheme provides adequate remedies to foreclose a *Bivens* claim in" the factual "context" presented by that case. 579 F. Supp. 2d at 263.   Setting aside the factual differences between this case and *El-Badrawi* (all Plaintiffs here challenged their removability in administrative proceedings, while el-Badrawi agreed to voluntary departure), the statement in *El-Badrawi* concerning "adequate remedies" suggests that a statutory scheme must provide complete redress for constitutional violations, presumably in the form of damages, a proposition the Supreme Court squarely rejected in *Schweiker.   See* 487 U.S. at 425 (refusing to imply a *Bivens* remedy despite the fact that certain injuries "must now go unredressed").   But even under the standard articulated in *El-Badrawi*, the Plaintiffs had an opportunity to press their constitutional claims in removal proceedings and

---

[27] The INA and its regulations contain a host of safeguards which allow aliens to litigate claimed violations of their constitutional rights: the right to seek review of an initial bond determination, *see* 8 C.F.R. § 1236.1 (d); the right to challenge that determination in an adversarial evidentiary proceeding before an immigration judge with the ability to present evidence and to be represented by counsel, *see* 8 C.F.R. §§ 1003.19 (d) & 1003.16; and the right to seek review of the Immigration Judge's bond decision by the Board of Immigration Appeals, *see* 8 C.F.R. § 1003.1 (b)(7).   An alien may also seek a writ of *habeas corpus* challenging his detention, with a right of further review in the Courts of Appeals.   *See* 28 U.S.C. § 2241; *Demore v. Kim*, 538 U.S. 510, 516-17 (2003).

five of them have obtained favorable rulings.   *See* Exs. B, C, E, I & J.   The **f**ive Plaintiffs who

lost their constitutional claims before the immigration judge will be able to raise those claims

again to the BIA and on any petition for review filed in the Second Circuit.   *See* 8 U.S.C. §

1252(a)(2)(D).[28]   The "context" of this case is therefore distinguishable from *El-Badrawi*.

The safeguards in the INA as well as the provisions limiting judicial review show "that

Congress expected the Judiciary to stay its *Bivens* hand" when confronted with a case like this one.

*Wilkie*, 551 U.S. at 554.   Where Congress delineates specific remedial mechanisms within a

statutory scheme, "federal courts will generally not attempt to supplement the relief afforded by

that statute through other actions, including those implied under *Bivens*."   *Dotson*, 398 F.3d at

160 (finding that a comprehensive remedial scheme precluded a *Bivens* remedy); s*ee also Hudson*

*Valley Black Press v. IRS*, 409 F.3d 106, 113 (2d Cir. 2005).   Because the INA is the type of

comprehensive statutory scheme courts have found to be a special factor counseling hesitation, the

Court should not infer a *Bivens* remedy here, especially as Plaintiffs have had the opportunity

within the congressional scheme to vindicate alleged constitutional violations.

### B.    The Political Branches' Plenary Power Over Immigration Also Counsels Against Recognizing a *Bivens* Remedy.

In *Wilkie*, the Supreme Court stated that in addition to considering whether an alternative

statutory process exists for protecting the interests at issue, courts also must be mindful that "a

*Bivens* remedy is a subject of judgment: 'the federal courts must make the kind of remedial

determination that is appropriate for a common-law tribunal, paying particular heed, however, to

any special factors counselling hesitation before authorizing a new kind of federal litigation.'"

---

[28]   That Plaintiff Colala-Peñarreta chose not to press constitutional claims in his removal
proceedings does not change the analysis.

551 U.S. at 550, *quoting Bush v. Lucas*, 462 U.S. 367, 378 (1983).   One special factor that counsels against implying a *Bivens* remedy is when Congress has plenary power over the subject matter for which a *Bivens* remedy is sought.   *See Chappell v. Wallace*, 462 U.S. 296, 298 (1983) (Congress' plenary power over military matters counseled against implying a *Bivens* remedy).

"Courts 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"   *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)).   Because Congress has plenary power over immigration matters, and the Executive Branch is charged with implementing the nation's immigration laws, federal courts must afford substantial deference to the political branches on immigration issues.   *See INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (deference on immigration matters is "especially appropriate" because "officials 'exercise especially sensitive political functions that implicate questions of foreign relations'") (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988).   Just as in *Chappell*, where Congress failed to provide a damages remedy when it legislated in military matters, "[a]ny action to provide a judicial response by way of such a remedy would be plainly inconsistent with Congress' authority in this field."   *Chappell*, 462 U.S. at 304.

Recognizing a *Bivens* claim in the context of this case would also unnecessarily enmesh the Court in difficult public policy issues.   *See Bush*, 462 U.S. at 388 (no *Bivens* remedy where Congress has created an "elaborate" system "with careful attention to conflicting policy considerations").   The INA is a unique federal law that encompasses an intricate and carefully crafted regulatory scheme while balancing many competing policy considerations.   Recognizing a *Bivens* remedy would require this Court to invade the realm of federal immigration policy

41

normally reserved to Congress.   All eleven Plaintiffs were "arrested . . . pending a decision on whether [each] alien [was] to be removed from the United States."   8 U.S.C. § 1226(a).   The United States brought removal proceedings against all eleven Plaintiffs, triggering the extensive rules set forth in the INA governing removal proceedings.   Five Plaintiffs convinced an immigration judge to terminate the removal proceedings against them based on the very same Fourth Amendment claim they are pressing in this case.   *See* Exs. B at 2, 28-29; C at 2, 31; E at 2, 31; I at 2, 30-31; J at 2, 30-31.   Five Plaintiffs failed to convince that same immigration judge to terminate their removal proceedings based on the same Fourth, Fifth and Tenth Amendment claims they are pressing in this action.   *See* Exs. F at 2, 27-30; G at 2, 27-30, 31; H at 2, 25-29; K at 2, 25-29, 30, L at 2-3, 26-30.   For whatever reason, the eleventh Plaintiff (Colala-Peñarreta) chose not to pursue constitutional claims in his immigration proceedings, though he could have, and nonetheless seeks to do so in this court.   *See* Ex. D at 2.   Implying a *Bivens* remedy would enmesh this court in pending removal proceedings in numerous ways that Congress sought to avoid.   This Court would be required to review the factual findings and legal conclusions that the immigration judge made in Plaintiffs' removal proceedings.   Indeed, the BIA is currently reviewing those same issues.   Not only could determinations of this Court be at odds with those of the immigration judge, they could also ultimately be at odds with the Board of Immigration Appeals and even the Second Circuit.   Multitudinous judicial review that could lead to contradictory rulings would upend the carefully crafted congressional scheme.   Even if this Court were to agree with the immigration judge, the BIA and the Second Circuit on some of the constitutional questions, such agreement would still offend congressional intent because Congress vested immigration judges and courts of appeals with the authority to decide constitutional issues.

42

This statutory structure streamlines decision-making in the immigration field by limiting who holds decision-making authority, which in turn fosters the congressional goal of efficiency in removal proceedings.   *See Kucana*, 130 S. Ct. at 838 (identifying "expedit[ious] removal of aliens [who] lack[] a legal basis to remain in the United States" as a congressional policy).   In essence, Plaintiffs seek to make this Court a *de facto* court of review over their removal proceedings, despite Congress' decision that district courts have no role to play in removal proceedings.

These considerations make plain why staying "the *Bivens* hand" makes sense.   Congress consolidated challenges to removal proceedings under the INA to avoid a patchwork body of interpretive law produced by different courts in different types of proceedings.   *Cf. Bush,* 462 U.S. at 378.   Any damages remedy for immigration-related claims by aliens should come through further legislation, not judicial intervention.   *See Wilkie*, 551 U.S. at 562.   This Court should not create a new *Bivens* remedy, and all of Plaintiffs' constitutional claims should be dismissed.

**V.     Plaintiffs Lack Standing to Bring Their Purported Tenth Amendment Claim.**

Plaintiffs allege that Defendants Sullivan, McCaffrey, Vetrano-Antuna and Wilkowski violated the Tenth Amendment "by intentionally interfering with and plotting to frustrate local New Haven policies that created a safe and open environment for immigrant residents."   *See* TAC ¶ 370.   According to Plaintiffs, the Elm City Resident Card program fulfilled a core local government function of "[p]rotecting public welfare," which "is a traditional police power reserved to the states" by the Tenth Amendment.   *Id.* ¶ 371.   Plaintiffs further claim that their interest in preventing interference with "matters of local sovereignty is aligned with the City of New Haven's interest," and thus Plaintiffs suffered damages as a result of Defendants' alleged unconstitutional conduct.   *Id.* ¶¶ 374-75.

43

Plaintiffs cannot sustain their purported Tenth Amendment claim because they lack standing to bring it.   As the Supreme Court and Second Circuit have made clear, the Tenth Amendment protects only states, not private parties.   *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118 (1939) (group of litigants counting no states or state officers among them lacked standing to raise Tenth Amendment claim); *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 234-36 (2d Cir. 2006) ("requisite representation by the states or their officers is notably absent" and thus Tenth Amendment claim should have been dismissed for lack of standing).   Here, Plaintiffs are not states or otherwise proper litigants of the purported Tenth Amendment claim, and Plaintiffs themselves concede as much.   *See* TAC ¶ 376.   For this reason, Plaintiffs have no standing to pursue their purported Tenth Amendment claim, and it should be dismissed.   *See Brooklyn Legal Servs.,* 462 F.3d at 234-36.

## VI.   Qualified Immunity Bars Plaintiffs' Claims Against the Individual Defendants.

### A.   The Qualified Immunity Standard.

Government officials are immune from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The scope of qualified immunity is broad, and it protects 'all but the plainly incompetent or those who knowingly violate the law.'"   *Martel v. Town of South Windsor*, 562 F. Supp. 2d 353, 359 (D. Conn. 2008) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).   In this manner, "qualified immunity serves important practical purposes in our system.   It shields government officials from liability for their performance of discretionary actions and offers them the benefit of avoiding costly, time-consuming and, ultimately unsuccessful litigation."   *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002).   Importantly, qualified immunity ensures that government officials can "act

44

decisively without the intimidation that would result if good-faith errors in judgment were later to subject them to liability for damages."   *Laverne v. Corning*, 522 F.2d 1144, 1149 (2d Cir. 1975).

In the Second Circuit, the qualified immunity analysis is a three-step inquiry, examining (1) whether the plaintiff has alleged a violation of a constitutional right; (2) whether the right was clearly established at the time of the conduct; and (3) whether – if the right was clearly established – the defendant's actions were objectively reasonable.   *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003).   It is the plaintiff's burden to establish that qualified immunity does not apply, *Webster v. Moquin*, 175 F. Supp. 2d 315, 324 (D. Conn. 2001), and the defendant is entitled to dismissal "if plaintiff is unable to establish any of these three steps."   *Harhay*, 323 F.3d at 211.   Because qualified immunity provides "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly … stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).   Unless a plaintiff alleges a violation of clearly established law, "a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."   *Mitchell*, 472 U.S. at 526.

### B.   Qualified Immunity Bars Plaintiffs' Tenth Amendment Claim Against Defendants Sullivan, McCaffrey, Vetrano-Antuna and Wilkowski.

Not only does the Court lack jurisdiction over Plaintiffs' purported Tenth Amendment *Bivens* claim, *see supra* Sec. V., the claim is also barred by qualified immunity.   The complaint identifies no conduct by any Defendant that violates any clearly established right under the Tenth Amendment.   *See Harhay*, 323 F.3d at 211-12.   To begin with, we are aware of no cases that

extend the *Bivens* remedy to a Tenth Amendment claim,[29] and Plaintiffs concede as much, *see* TAC ¶ 376.   Indeed, Plaintiffs acknowledge that they have not alleged a violation of the Tenth Amendment "at all," *see Harhay*, 323 F.3d at 211-12, *Siegert v. Gilley,* 500 U.S. 226, 232 (1991), unless the Court in this case changes "existing law" or establishes "new law."   TAC ¶ 376.

Against this backdrop, Plaintiffs could not have alleged – and did not allege – that any Defendant violated "clearly established" Tenth Amendment law.   *Harhay*, 323 F.3d at 211-12; *see Saucier v. Katz*, 533 U.S. 194, 201 (2001).   As noted above – and again, as acknowledged in the complaint, TAC ¶ 376 – the Second Circuit has found that private parties lack standing to bring Tenth Amendment claims, *Brooklyn Legal Servs. Corp*, 462 F.3d at 234-36, and no plaintiff apparently has ever asserted a cognizable Tenth Amendment *Bivens* claim, *see supra* n.28.   In such circumstances, no reasonable ICE official in the Defendants' shoes could conclude that the actions alleged nonetheless somehow violated the Tenth Amendment.   *See Harlow*, 457 U.S. at 818 (qualified immunity applies where challenged "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"); *see also Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("in the light of pre-existing law the unlawfulness must be apparent").   For all of these reasons, Defendants Sullivan, McCaffrey, Vetrano-Antuna and Wilkowski are entitled to qualified immunity as to Plaintiffs' purported Tenth Amendment claim.

---

[29] *See, e.g., O'Vadka v. Blum*, No. 06-698, 2007 WL 1550429, at *14 (N.D. Ind. May 24, 2007) (even if plaintiffs had properly pled Tenth Amendment *Bivens* claim, court "could not grant relief based upon same because the *Bivens* remedy has not been extended to supposed violations of this amendment"); *Williamson v. Sena*, No. 04-537, 2006 WL 1308290, at *10-11 (D.N.M. Mar. 28, 2006), *aff'd*, 230 Fed. App'x 815 (10th Cir. 2007) (finding no authority supporting "the existence of [a] *Bivens* cause[ ] of action under the . . . Tenth Amendment[ ]" and dismissing purported Tenth Amendment claim).

**C.     Qualified Immunity Bars Plaintiffs' Fourth Amendment Claims Against Supervisory Defendants Myers, Torres, Chadbourne, Martin, and Sullivan.**

Plaintiffs have asserted claims against supervisory Defendants Myers, Torres, Chadbourne, Martin, and Sullivan ("Supervisory Defendants") on the theory that those Defendants "are liable for [the] subordinate ICE raid officers' Fourth Amendment violations."   TAC p. 48. As discussed more fully below, this attempt by Plaintiffs to hold the Supervisory Defendants personally liable on a theory of *respondeat superior* is squarely foreclosed by *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).   Therefore, qualified immunity bars Plaintiffs' claims against the Supervisory Defendants.

**1.     Applicable Pleading Standard When Suing Supervisors.**

The familiar standard for complaints under Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a).   In *Iqbal*, the Supreme Court clarified the Rule 8 pleading standard in three important respects.   First, the Court reaffirmed the principle that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Conclusory allegations – which the Court variously identified as "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" – are insufficient to survive a defendant's motion to dismiss.   *Id.* (citing *Twombly*, 550 U.S. at 577) (quotation marks omitted).

Second, the Court clarified the "plausibility" standard that it previously announced in *Twombly*.   Under the plausibility test, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"   *Id.* (quoting *Twombly*,

550 U.S. at 570).   The plausibility test is not satisfied if the complaint alleges facts that are

"merely consistent with" or allow room for the "possibility" that the defendant acted unlawfully.

*Twombly*, 550 U.S. at 557.   Rather, "[a] claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged."   *Iqbal*, 129 S. Ct. at 1949.   In other words, to survive a motion to

dismiss, the complaint must contain enough factual content, "to raise a right to relief above the

speculative level."   *Twombly*, 550 U.S. at 555.

      Finally, the Court rejected the notion that "a claim just shy of a plausible entitlement to

relief" should be allowed to proceed in the hopes that groundless claims will "be weeded out early

in the discovery process through careful case management."   *Iqbal*, 129 S. Ct. at 1953 (quotation

marks omitted).   Importantly, the Court explained that this view was fundamentally at odds with

the qualified immunity doctrine's "basic thrust of … free[ing] officials from the concerns of

litigation, including 'avoidance of disruptive discovery.'"   *Id.* (quoting *Siegert*, 500 U.S. at 236).

If a complaint fails to allege facts sufficient to state a non-conclusory, plausible claim for relief, the

plaintiff "is not entitled to discovery, cabined or otherwise."   *Id.* at 1954.

      In addition to clarifying the pleading standard under Rule 8, *Iqbal* examined the necessary

elements for pleading a constitutional tort claim against supervisory defendants.   The Supreme

Court declared that "Government officials may not be held liable for the unconstitutional conduct

of their subordinates under a theory of *respondeat superior*."   *Id.* at 1948.   In clear and

unequivocal language, the Court explained that "[i]n a § 1983 suit or a *Bivens* action – where

masters do not answer for the torts of their servants – the term 'supervisory liability' is a

misnomer.   Absent vicarious liability, each Government official, his or her title notwithstanding,

is only liable for his or her own misconduct."   *Id.* at 1949.   As a result, to state a *Bivens* claim, "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution."   *Id.* (emphasis added).   The Court rejected the view that "a supervisor's mere knowledge of his subordinate's" misconduct establishes that the *supervisor* violated the plaintiff's constitutional rights.   *Id.*   "[P]urpose rather than knowledge is required to impose *Bivens* liability on … an official charged with violations arising from his or her superintendent responsibilities."   *Id.*

> **2.     The Complaint Fails to Allege a Plausible, Non-Conclusory Fourth Amendment Claim Against the Supervisory Defendants.**

In the Second Circuit, showing the personal involvement of a supervisory defendant in a constitutional violation has traditionally required evidence that the defendant:   (1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of the violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the plaintiff's rights by failing to act on information indicating that

unconstitutional acts were occurring.   *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[30]   In

this case, Plaintiffs do not allege that any Supervisory Defendant directly participated in the

residential searches and seizures that occurred in New Haven on June 6, 2007.   Plaintiffs do not

allege that the Supervisory Defendants unlawfully entered their homes, nor do they allege that the

Supervisory Defendants ordered the ICE Agents to do so.   Instead, Plaintiffs base their Fourth

Amendment claim against the Supervisory Defendants on the third, fourth, and fifth categories of

supervisory liability in *Colon*.   *See* TAC ¶¶ 326-42.   Even assuming these categories survive

*Iqbal* as passive theories of liability – and it does not appear that they do – the facts alleged in the

complaint nonetheless fail to state a violation of clearly established Fourth Amendment law by the

Supervisory Defendants.

> **a.   The Complaint fails to allege a plausible claim that Myers or Torres created or allowed the continuance of a policy under which unconstitutional practices occurred.**

With regard to Plaintiffs' "policy" theory, the complaint alleges that: (1) Myers, as the

Assistant Secretary of Homeland Security for ICE, and Torres, as Director of the ICE office of

---

[30] Several courts in this Circuit have held that *Iqbal's* standard for evaluating personal involvement "abrogate[d] several categories of supervisory liability enumerated by the Second Circuit in *Colon*."   *Bellamy v. Mt. Vernon Hosp.*, No. 07-1801, 2009 WL 1835939, at *6 (S.D.N.Y. July 16, 2009); *see also Newton v. City of New York*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[Pa]ssive failure to train claims … have not survived the Supreme Court's recent decision in *Iqbal*."); *Spear v. Hugles*, No. 08-4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009) ("[O]nly the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal*.").   Although this Court has not resolved the question, it has observed that "[t]he *Colon* factors have recently been thrown into some doubt by" *Iqbal*.   *Vega v. Lantz*, No. 04-1215, 2009 WL 3157586, at *4 n.12 (D. Conn. Sept. 25, 2009).   This Court should follow the *Bellamy* line of cases, which recognize that "*Iqbal'* s 'active conduct' standard only imposes liability on a supervisor … if that supervisor actively had a hand in the alleged constitutional violation." *Bellamy*, 2009 WL 1835939, at *6.   This Motion nevertheless analyzes each pertinent theory of liability, as they all fail to state a plausible Fourth Amendment claim against the Supervisory Defendants.

DRO, were responsible for promulgating the policies of the NFOP, TAC ¶ 327; (2) Myers and Torres created a policy "under which FOTs were required to make one thousand arrests a year" and which permitted collateral arrests "to count towards that quota," *id.* ¶ 328; (3) Torres "personally crafted" the quota policy, and Myers "approved, promoted, and encouraged it," *id.* ¶ 329; (4) the "quota system … put immense pressure on FOTs to meet their annual numbers," which resulted in "widespread constitutional violations," *id.* ¶ 330; (5) Myers are Torres "wanted" FOTs to meet arrest goals regardless of whether probable cause or consent was established, *id.* ¶ 331; and (6) Myers and Torres allowed this "policy" to continue despite their actual knowledge of widespread constitutional violations, *id.* ¶¶ 332-34.

Under *Iqbal*, the analysis of Plaintiffs' supervisory liability claim begins "by identifying the allegations in the complaint that are not entitled to the assumption of truth."   *Iqbal*, 129 S. Ct. at 1951; *see also Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir. 1987) ("[A] complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim").   The allegation that Myers and Torres "wanted" FOTs to make arrests irrespective of Plaintiffs' constitutional rights is a "bare assertion" devoid of any factual support in the complaint.   *Iqbal*, 129. S. Ct. at 1951.   Nowhere does the complaint allege facts showing how or why it is plausible that Myers or Torres intended to violate Plaintiffs' constitutional rights.

Similarly, the assertion that Myers and Torres allowed the "quota" system to continue despite actual knowledge of alleged constitutional violations is not entitled to be assumed true. The complaint contains only vague references to "public criticism" of the NFOP, including unspecified "media reports" and "lawsuits" against government officials.   TAC ¶¶ 280-81.   First,

courts have held that "the receipt of letters or grievances, by itself, does not amount to personal involvement" in a constitutional violation.  *Mateo v. Fischer*, No. 08 Civ. 7779, 2010 WL 431229, at *4 (S.D.N.Y. Feb. 8, 2010) (collecting cases); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (letters complaining of due process violation failed to establish supervisory personal involvement).   Moreover, the naked assertion that Myers and Torres had actual knowledge of "widespread constitutional violations" is nothing more than a recitation of the legal standard for personal participation in a constitutional tort claim.   Indeed, this allegation is very similar to the allegations the Court rejected in *Iqbal*.  *See Iqbal*, 129 S. Ct. at 1951 (rejecting bald allegations that senior officials "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to harsh conditions of confinement as a matter of policy").   Thus, without "some further factual enhancement," Plaintiffs' conclusory allegations are insufficient to hold Myers or Torres personally liable for their subordinate's alleged constitutional violations.  *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

Furthermore, there is no allegation in the complaint of any specific report or lawsuit that put Myers or Torres on notice of a constitutional violation.   Indeed, the Defendants could not have been on notice unless the reports or lawsuits appeared prior to June 6, 2007.   Without factual allegations regarding the timing of the alleged reports or lawsuits, there is no factual support for the assertion that Myers and Torres had actual knowledge of constitutional violations prior to June

6, 2007.[31]

After excising the "bare assertions" that are not entitled to the assumption of truth, *Iqbal* next requires an analysis of whether the remaining factual allegations "plausibly suggest an entitlement to relief." *Iqbal*, 129 S. Ct. at 1951. *Iqbal's* "plausibility" standard compels dismissal of the policy-based claim against Myers and Torres because the complaint is devoid of any facts linking the policy of establishing arrest goals to the alleged illegal actions that took place at Plaintiffs' homes. The law is well-established that a complaint cannot state a claim for supervisory liability if it fails to allege an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy" at issue. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *see also Poe v. Leonard*, 282 F.3d 123, 140 (2002) (plaintiff must demonstrate "an affirmative causal link" between the supervisor's conduct and the plaintiff's injury); *Spencer v. City of Stamford*, No. 06-1209, 2007 WL 1186042, at *2 (D. Conn. Apr. 19, 2007) (dismissing complaint that "d[id] not allege an affirmative causal link between any action by [supervisory defendant] and [plaintiff's] claimed injuries").

For example, in *Al-Jundi v. Rockefeller*, 885 F.2d 1060 (2d Cir. 1989), inmates brought a class action suit against New York Governor Nelson Rockefeller, seeking damages based on his role in quelling the 1971 Attica prison riot. *Id.* at 1061. The complaint alleged that the Governor's decision to retake the prison by force resulted in violations of the inmate's rights to equal protection, due process, and protection from cruel and unusual punishment. *Id.* at 1064.

---

[31] In fact, the only specific allegation regarding "criticism" of the quota policy is the allegation that ICE Assistant Secretary John Morton, on August 17, 2009, stated that a quota system "was 'not a good way to go about' enforcement." TAC ¶ 296. As this comment was made more than two years *after* the June 2007 operation, it could not have put Myers and Torres on notice of anything. In any event, whether or not arrest quotas are the best way to enforce immigration law in no way suggests that Myers or Torres were aware of any constitutional infirmity.

The Second Circuit affirmed the dismissal of the action on grounds that the plaintiffs failed to establish an affirmative link between the Governor's order to retake the prison and the violent acts that took place during the operation.   The Court reasoned that:

> Rockefeller's role in the entire affair was limited to his ratification of … decisions to abandon negotiations, order the state police to formulate a plan to regain control of the prison, and approve commencement of the actual retaking.   Such "involvement" simply is not sufficiently related to the alleged unlawful conduct.   *See Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974) (plaintiff must allege that defendant authorized the particular conduct said to be unlawful).   Rockefeller did not engage in or authorize any of the brutalities alleged.

*Id.* at 1065-66.

Also instructive is the Eleventh Circuit's decision in *Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003), which involved a *Bivens* action against former Attorney General Janet Reno and other officials for their alleged involvement in the operation to seize Elian Gonzalez from the home of his relatives in Miami.   The plaintiffs alleged that the defendants ordered a "paramilitary raid" on their residence in violation of the Fourth Amendment.   *Id.* at 1235.   The Court observed that "[s]upervisory liability under *Bivens* occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation."   *Id.* at 1234.   The requisite causal connection was lacking from the complaint.

> Plaintiffs … do not allege any facts to suggest that the defendants did anything more than personally direct and cause the execution of valid search and arrest warrants.   Plaintiffs state that there is a causal connection between these defendants' acts and the excessive force used by the agents on the scene, but they do not allege any facts to support this causal connection.   Plaintiffs do not allege that these defendants directed the agents on the scene to spray the house with gas, break down the door with a battering ram, point guns at the

54

occupants, or damage property.

*Id.* at 1235-36.   Thus, the Eleventh Circuit concluded that "it would be unreasonable to draw from the alleged facts the inference that the supervisory defendants directed the agents on the scene to engage in the unconstitutional activity with which they are charged."   *Id.*

The reasoning in *Al-Jundi* and *Gonzalez* applies with full force in this case.   Plaintiffs do not contend that the policy of setting arrest goals *itself* violated their constitutional rights.   This is hardly surprising, for there is nothing inappropriate, let alone *unconstitutional* about enforcing immigration law, increasing arrest goals, or tabulating "collateral" arrests.   *See Jackson v. District of Columbia*, 672 F. Supp. 22, 26 (D.D.C. 1987) (arrest quota was not facially unconstitutional absent evidence that police officers were expected to achieve goals at the expense of the constitutional rights of arrestees).   Plaintiffs do not allege that this policy required, or even authorized, ICE Agents to enter private residences without a warrant or consent; nor do Plaintiffs allege that the policy authorized ICE Agents to arrest individuals without probable cause or detain them without reasonable suspicion.   Plaintiffs contend that the arrest goals put "pressure" on agents to meet their annual numbers.   TAC ¶ 330.   However, there is nothing inherently wrong – much less unconstitutional – with a policy that sets productivity goals.   The notion that ICE Agents *en masse* responded to this "pressure" by systematically flouting the constitutional rights of New Haven residents is *precisely* the type of factually unsupported and speculative claim that does not satisfy the Rule 8 pleading standard.   *See Twombly*, 550 U.S. at 555 (claim must allege enough factual content "to raise a right to relief above the speculative level").   The complaint fails to allege facts showing a causal link between the arrest goals and the unlawful activities that allegedly took place at their homes.   Thus, Plaintiffs fail to allege a plausible Fourth Amendment

claim against Myers and Torres based upon the policy of maintaining "arrest quotas."

### b. The Complaint fails to allege a plausible claim that the Supervisory Defendants were grossly negligent in supervising the subordinate ICE Agents.

"[S]upervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act."[32]   *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir.1989).   The Second Circuit has "often equated gross negligence with recklessness," involving

> the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.

*Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 353 (D. Conn. 2007) (citing *Poe*, 282 F.3d at 140 (internal quotation marks and alterations omitted).   On the other hand, to establish deliberate indifference, the plaintiff must show "that 'the need for more or better supervision . . . was obvious,' but that defendant made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct."   *Wilson v. City of Norwich*, 507 F. Supp. 2d 199, 208 (D. Conn. 2007) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004).

In support of their gross negligence theory, Plaintiffs allege that the Supervisory Defendants: (1) "egregiously failed to supervise" the ICE Agents despite "the obvious need for close supervision … due to the inexperience" of the ICE Agents in conducting "residential raids,"

---

[32] As noted above, courts have seriously questioned whether, after *Iqbal*, supervisory liability can be predicated upon a passive "failure to act" theory.   *James v. Bauet*, No. 09-609, 2009 WL 3817458, at *4 (S.D.N.Y. Nov. 11, 2009) ("This type of claim, based upon an alleged failure to act, is foreclosed by *Iqbal*."); *see also Iqbal*, 1937 S. Ct. at 1949 ("[P]urpose rather than knowledge is required to impose *Bivens* liability on … an official charged with violations arising from his or her superintendent responsibilities.").   The individual defendants do *not* concede that this is a permissible theory of recovery against individual-capacity supervisory officials.

TAC ¶ 339; and (2) "knew to a moral certainty" that the ICE Agents "would confront this residential raid situation" where "without careful supervision, Fourth Amendment violations were likely to occur," but nevertheless "failed to adequately supervise the enforcement operation" *Id.* ¶¶ 340-41.

The complaint does not contain any facts to support Plaintiffs' claim that the Supervisory Defendants acted "in conscious disregard" of a serious risk to Plaintiffs' rights.   Rather, Plaintiffs' gross negligence allegations amount to little more than a collection of legalese, naked assertions, and parroting of the legal standard for supervisory liability – all of which *Twombly* and *Iqbal* clearly reject as insufficient to state a claim.   *See Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555).   The complaint is devoid of any factual allegations that would support Plaintiffs' contention that ICE Agents – either across the board or in this particular operation – were inexperienced; nor do Plaintiffs allege facts indicating how or why the purported need for more or better supervision was "obvious."   Importantly, there is no allegation that the Operational Plan allegedly reviewed by Chadbourne and Torres authorized unlawful entry into Plaintiffs' homes.   This is critical, given the lack of any facts supporting a plausible claim that the Supervisory Defendants were on prior notice of Fourth Amendment violations. Accordingly, Plaintiffs' gross negligence theory fails to support the application of supervisory liability in this case.   *See Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (dismissing failure-to-supervise claim that "lack[ed] any hint that [the defendant] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights").

c.    **The Complaint fails to allege a plausible claim that the Supervisory Defendants exhibited deliberate indifference to the Plaintiffs' constitutional rights.[33]**

Plaintiffs' deliberate indifference theory centers on allegations regarding the purported "inadequacy" of the NFOP training program.   Plaintiffs allege that: (1) "the NFOP training program was woefully inadequate to prevent FOT officers from engaging in frequent and egregious constitutional violations," TAC ¶ 300; (2) the program did not "sufficiently" guide agents "in how to conduct residential raids" without violating constitutional rights, *id.*; (3) the training "consisted of a one-time, three-week class for new FOT members" and no "national refresher course" was provided, *id.* ¶ 301; (4) many FOT members never attended the NFOP training; and (5) the Office of the Inspector General ("OIG") reviewed the training program in early 2007 and "warned that the training program was inadequate and must be changed," *id.*¶¶ 306-07.   On the basis of these allegations, Plaintiffs claim that the Supervisory Defendants failed to implement an adequate training program despite knowledge of the programs "inadequacies." *Id.* ¶ 336.

Here, again, Plaintiffs fail to allege a causal link between any deficiency in the NFOP training program and the unlawful conduct that allegedly occurred at Plaintiffs' residences. Plaintiffs must allege and prove "that there is 'a specific deficiency in the … training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional violation.'"   *Carey v. Maloney*, 480 F. Supp. 2d 548, 565 (D. Conn. 2007) (quoting *Amnesty America*, 361 F.3d at 129 (internal quotation omitted)); *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 173 (D. Conn. 2003) (same).   In particular, Plaintiffs fail to identify any aspect of

---

[33] Again, "passive failure to train claims … have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal*."   *Newton*, 640 F. Supp. 2d at 448 (footnote omitted).

the training that required, encouraged, or authorized warrantless and nonconsensual home invasions.   Finally, the one specific allegation in the complaint regarding purported inadequacies in training – the allegation that OIG "warned" in early 2007 that the training program was inadequate and provided "numerous" recommendations for improvement – is undermined by OIG's actual written report.   OIG made the following pertinent observations regarding the NFOP training program:

- The program "provides team members basic tools to locate and apprehend fugitive aliens and introduces participants to standard procedures involving fugitive operations."   Ex. A, OIG Report at 29.

- Due to the recent staffing of many FOTs, "not all team members have attended the training program."   *Id.* at 30.

- An FOT team member must complete basic law enforcement training before the officer can participate in fugitive operations.   *Id.*

- FOTs are encouraged to seek refresher training on the local level, but "there is no national refresher course for the Fugitive Operations Teams."   *Id.*

OIG's *sole* recommendation regarding these observations was that ICE "consider establishing a fugitive operations refresher course."   *Id.* at 32.   The Assessment notes that ICE "concur[red]" in this recommendation, and that the agency had already begun reviewing existing training materials to develop a curriculum for the refresher course.   *Id.* at 52.   In stark contrast to Plaintiffs' allegations, the OIG Report contains no "warning" regarding the training program. Nor does the report lodge any criticisms about the alleged failure to train on constitutional issues, which Plaintiffs imply the report includes.   *See* TAC ¶ 308.

**D.      Qualified Immunity Bars Plaintiffs' Fourth Amendment Claims Against Defendants Riccardi and Vasquez.**

Plaintiffs purport to assert a Fourth Amendment claim against all of the Connecticut-based ICE Agents for the alleged warrantless and nonconsensual entries into Plaintiffs' homes and the alleged arrests of Plaintiffs without probable cause.  *See* TAC ¶¶ 322-24.  The complaint, however, fails to allege that certain ICE Agents participated in the alleged residential "raids."  In particular, Plaintiffs allege that one FOT – "ICE Team #4" – did not search or make arrests at the residence of any Plaintiff in this action.  *See id.* ¶¶ 59, 63. (alleging that ICE Team #4 "made arrests at homes of persons *who are not Plaintiffs in this Complaint*") (emphasis added).  The complaint alleges that Defendants Riccardi and Vasquez were members of ICE Team #4.  *Id.* ¶¶ 63.  It is axiomatic that Plaintiffs cannot assert a Fourth Amendment claim against agents who the complaint itself concedes did not participate in the allegedly unlawful search and seizure activity. *See Thomas*, 470 F.3d at 496 (plaintiff in a *Bivens* action must allege that the individual defendant was personally involved in the constitutional violation).  As Plaintiffs fail to allege a Fourth Amendment violation against them, Defendants Riccardi and Vasquez are entitled to qualified immunity on Plaintiffs' First Claim for Relief.  *See Harhay*, 323 F.3d at 211.

**E.      Qualified Immunity Bars Plaintiffs' Due Process Claims Because They Are Properly Analyzed Under the Fourth Amendment.**

Plaintiffs assert a substantive due process claim in their Third Claim for Relief, alleging that "[t]he retaliation motivating this raid, reprehensible disregard for basic protections of law, and violative invasion of private spaces constitutes an abuse of state authority that shocks the conscience and offends even the most minimal standards of acceptable official behavior."  TAC ¶ 349.  To state a substantive due process violation, Plaintiffs must allege facts demonstrating "that the government action was so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience." *Benzman*, 523 F.3d at 126 (quotation marks omitted).   This standard requires "conduct intended to injure in some way unjustifiable by any government interest."   *Id.* at 127.

Although couched in the Fifth Amendment's language of substantive due process, Plaintiffs' Third Claim for Relief arises out of the same basic facts as Plaintiffs' "unlawful arrest" claim under the Fourth Amendment.[34]   The Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), therefore forecloses Plaintiffs' attempt to pursue their Fourth Amendment claims under the rubric of substantive due process.   In *Graham*, the Court declared that where the Fourth Amendment "provides an explicit textual source of constitutional protection" against a particular form of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."   *Id.* at 395.   As a result, *Graham* rejected an attempt to litigate an excessive force claim as a denial of substantive due process.   *Id.*; *see also Albright v. Oliver*, 510 U.S. 266, 274 (1994) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").   In this case, the substantive due process claim is based on nothing more than allegations of unlawful search and seizure.   This claim falls squarely within the protections of the Fourth Amendment, and thus Plaintiffs' "due process" claims are properly analyzed under the Fourth Amendment, not substantive due process.   *Singer v. Fulton County Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) (Fourth Amendment provides the source for a constitutional tort claim premised on a person's arrest);

---

[34] Much like Plaintiffs' Fourth Amendment claim, the "substantive due process" claim alleges that ICE Agents – pursuant to an "arrest quota policy" – entered private residences without a warrant or consent and arrested Plaintiffs without probable cause.   TAC ¶¶ 351-68.   Indeed, the allegations supporting Plaintiffs' Fifth Amendment due process claim against the Supervisory Defendants are nearly identical to the allegations supporting Plaintiffs' Fourth Amendment unlawful arrest claim. *Id.*

*Birdsall*, 249 F. Supp. 2d at 170 (allegations of unlawful arrest should be analyzed within the contours of the Fourth Amendment).[35]   In any event, even if it were proper to analyze Plaintiffs' Third Claim for Relief as a substantive due process claim, the constitutional standard for such a claim is considerably more stringent than the "objective reasonableness" test under the Fourth Amendment.   The "shocks the conscience" standard of substantive due process is "an even higher burden for plaintiffs than the objective reasonableness test," under the Fourth Amendment. *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992).   Plaintiffs cannot meet this elevated standard, as the complaint is devoid of any factual allegations identifying "conduct intended to injure in some way unjustifiable by any government interest." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

> **F.      Qualified Immunity Bars Plaintiffs' Equal Protection Claims Against Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin.**

Plaintiffs' Fifth Amendment equal protection claim against Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin (Second Claim for Relief, TAC ¶¶ 331-34) must be dismissed because the claim is not supported by plausible factual allegations; two of the Defendants did not

---

[35] Plaintiffs also appear to make a half-hearted attempt at asserting a "procedural" due process claim.   *See* TAC ¶ 348 (alleging that Plaintiffs were "civilly arrested, detained without procedural protections, and deprived … of their liberty without due process of law").   Such a claim fails as a matter of law to the extent it is predicated upon Plaintiffs' arrest.   *Clark v. Dowty*, No. 05- 1345, 2007 WL 2022045, at *7 (D. Conn. July 9, 2007) ("Procedural due process claims are not applicable to an individual prior to arrest.").   The purported procedural due process claims also fail because Plaintiffs fail to allege any facts regarding what specific process they were entitled to or how they were denied such process.   Thus, the allegation that Plaintiffs were denied "procedural protections" is nothing more than a "bald assertion[] and conclusion[] of law [which] will not suffice to state a claim."   *See Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001).

personally participate in the alleged improper conduct; and, based on these circumstances and others, each Defendant is entitled to qualified immunity.

### 1.   Plaintiffs Have Not Sufficiently Alleged An Equal Protection Claim Against Any Defendant.

As the Supreme Court and Second Circuit have made clear, a plaintiff suing under *Bivens* for an alleged violation of their equal protection rights "must plead and prove that the defendant acted with discriminatory purpose."  *Iqbal*, 129 S. Ct. at 1948; *see Hayden v. Paterson*, 594 F.3d 150, 162-63 (2d Cir. 2010) ("'[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause'") (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977)).   Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences," but instead "involves . . . undertaking a course of action because of, not merely in spite of, [its] adverse effects upon an identifiable group." *Iqbal*, 129 S. Ct. at 1948 (quotation omitted).   Here, Plaintiffs include in the complaint three groups of allegations that arguably could relate to a purported equal protection claim.   None of these allegations, however, either separately or together, plausibly pleads any Defendant's intent to discriminate against any Plaintiff.

First, the complaint states in a conclusory fashion that the Defendants "stopped, detained, investigated, searched, seized and/or arrested the Plaintiffs, doing so knowingly and intentionally, and motivated by a retaliatory animus against people of the Plaintiffs' race, ethnicity, and/or perceived national origin in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the United States Constitution."   TAC ¶ 344.   Similarly, the complaint states that the Defendants "deprived Plaintiffs of basic due process protections by targeting them for their race, ethnicity, and/or perceived national origin in violation of their right to

Equal Protection under the Fifth Amendment of the United States Constitution."   *Id.* ¶ 345.

As noted *supra*, Supreme Court and Second Circuit decisions hold that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "are not entitled to the assumption of truth."   *Iqbal*, 129 S. Ct. at 1949-51; *see Hayden*, 594 F.3d at 161-62.   While "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations" to survive a motion to dismiss.   *Iqbal*, 129 S. Ct. at 1950.   The "bare assertions" Plaintiffs rely on in paragraphs 344-45 "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and "are not entitled to be assumed true."   *Id.* at 1951 (citation omitted); *see Hayden*, 594 F.3d at 161-62.   Without more, in other words, paragraphs 344-45 fail to state a cognizable equal protection claim.

Second, Plaintiffs make several statements concerning the Defendants' alleged actions toward Plaintiffs supposedly based on their Latino appearance.   Plaintiffs assert generally that "ICE agents" "interrogated and arrested residents [of] . . . Fair Haven, a predominantly Latino neighborhood in the City of New Haven . . . [w]ithout cause or reasonable suspicion . . . based on their skin color and physical appearance."   TAC ¶¶ 1, 3; *id.* ¶ 56 (same, but based on their Latino appearance); *see also id.* ¶ 67 ("Upon information and belief, some of the ICE Raid Teams did not include any Spanish speakers, even though the operation targeted Latino-looking residents in a predominantly Latino neighborhood.").   Plaintiffs also allege that one unidentified Defendant "taunted" a Plaintiff's girlfriend, while arresting the Plaintiff, saying they were "going to a concert by Juan Gabriel, a famous Mexican singer."   *Id.* ¶ 127.   With respect to another Plaintiff, the complaint states that an unidentified Defendant "grabbed" and "handcuffed" him, "[a]cting solely

on the basis of [his] Latino appearance and the fact that he spoke Spanish." *Id.* ¶ 137.   A

different Plaintiff was allegedly questioned and arrested because "[t]he Defendants appeared to

target [him] based on his Latino appearance." *Id.* ¶ 142.

As to this second set of allegations, Plaintiffs arguably mean to imply (though they do not

clearly state) that the alleged conduct of the unidentified Defendants was motivated by Plaintiffs'

"Latino race and ethnicity," *see* TAC ¶¶ 22-31, 344-45, and thus the Defendants discriminated

against the Plaintiffs.   Plaintiffs' factual contentions, however, do not plausibly suggest any such

allegedly impermissible conduct.  *Iqbal*, 129 S. Ct. at 1951-52; *Hayden*, 594 F.3d at 164-69.   To

the contrary, the alleged consideration by these unidentified Defendants of Plaintiffs' Latino

appearance in questioning and detaining them is "not only compatible with, but indeed . . . more

likely explained by, lawful" behavior (which, in any event, is not attributed to any named

Defendant).  *Iqbal*, 129 S. Ct. at 1950; *Hayden,* 594 F.3d at 167-68 ("notwithstanding

discriminatory impact, the legitimate noninvidious purposes of [the] law cannot be missed")

(quotation omitted).

In particular, as the complaint states, New Haven allegedly "has experienced rapid growth

in its new immigrant population" since 2000.   TAC ¶ 194.   Immigrants have arrived "from

Mexico, Guatemala, Jamaica, and Ecuador, among other countries," and one-fifth to one-third of

these new immigrants "reside in Fair Haven, a predominantly Latino neighborhood of New

Haven."  *Id.*   The Connecticut-based ICE Defendants are members of the Hartford fugitive

operations team ("HARFOT"), authorized by Congress to conduct enforcement actions aimed at

apprehending fugitive aliens.[36]   *Id.* ¶¶ 11, 57, 253.   Prior to the New Haven operation, there were

sufficient numbers of outstanding warrants for fugitive aliens at New Haven addresses to support

an enforcement action in the New Haven area.   *Id.* ¶¶ 233-38.   HARFOT compiled a "target list"

of fugitive addresses and used this list to identify where to locate fugitive aliens during the New

Haven operation.   *Id.* ¶¶ 64-65, 233-38.   The complaint confirms that certain Defendants[37] were

engaged in an immigration enforcement operation at the time they entered Plaintiffs' residences

and questioned and detained Plaintiffs and others.   *See, e.g.,* TAC ¶¶ 7-8, 39, 41, 43-51, 57-62.

The complaint does not plausibly suggest what Plaintiffs apparently seek to imply: that the

Defendants went to Plaintiffs' homes for the purpose of singling them out as Latinos and

unlawfully questioning and detaining them on that basis.   Rather, the "more likely" explanation

provided by the complaint is that the Defendants entered the residences to apprehend suspected

fugitive aliens (and indeed, the Defendants arrested a number of aliens, *see, e.g.*, TAC ¶ 4,

including the eleven Plaintiffs now in removal proceedings, *see* Exs. B-K).   *Iqbal*, 129 S. Ct. at

1950; *Hayden*, 594 F.3d at 167-68.   In such circumstances, immigration agents may consider

ethnic appearance as a factor in determining whether to question a person about his or her

immigration status.   *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885-87 (1975).   In

short, the complaint is devoid of factual allegations "sufficient to plausibly suggest [Defendants']

discriminatory state of mind," and Plaintiffs accordingly fail to state an equal protection violation.

*Iqbal*, 129 S. Ct. 1952; *id.* at 1949 ("plausibility standard . . . asks for more than a sheer possibility

that a defendant has acted unlawfully"); *see Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256,

---

[36] A "fugitive alien is someone who has been previously ordered deported, excluded, or removed
but who has not left the country."   TAC ¶ 57; *see also* Ex. A, OIG Report at 1.

[37] *See infra*, § VI.F.2 (some Defendants are not alleged to have participated in Plaintiffs' arrests at
all).

66

279 (1979) (purposeful discrimination requires conduct taken "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *see also* FED. R. CIV. P. 12(b)(6).[38]

Finally, the complaint includes a collection of statements concerning ICE's alleged intent – or the intent of some ICE employees – to "punish" and "retaliat[e]" against the City of New Haven for its efforts to develop and implement "an optional municipal identification card" program, providing government identification to "all city residents, regardless of their national origin or immigration status." TAC ¶¶ 7-11, 193. Plaintiffs allege that employees "at the Hartford ICE Office planned an attack in response to the Elm City Resident Card program and New Haven's other integrative policies," in the form of the New Haven enforcement operation conducted on June 6, 2007. *Id.* ¶ 232, 249-52.

This final set of allegations likewise fails to plead that any Defendant took action toward Plaintiffs for the purpose of discriminating against them. The complaint specifically states that ICE conducted the enforcement action to "punish New Haven" – not the Plaintiffs – and in "retaliation for the City's efforts" establishing an identification program – not as means of retaliating or discriminating against the Plaintiffs. TAC ¶¶ 7-11, 193. Even if, in other words, ICE or any of the individual Defendants intended to "punish New Haven" or viewed the New Haven operation as "an attack in response to" the resident card program, this is simply not the same as participating in the operation for the purpose of discriminating against Plaintiffs.

---

[38] Moreover, to the extent Plaintiffs mean to suggest that their arrests resulted from some sort of unconstitutional selective enforcement of immigration laws, such a contention does not state an equal protection claim. *AADC*, 525 U.S. at 488 ("[a]s a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"); *see also Turkmen v. Ashcroft*, 589 F.3d 542, 550 (2d Cir. 2009) (no equal protection right to be free of selective enforcement of the immigration laws based on national origin, race, or religion).

Plaintiffs' third group of allegations – whether true or false – has no relevance to the equal protection claim against Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin.

### 2. Plaintiffs Have Not Alleged That Defendants Riccardi or Vasquez Were Personally Involved in the Alleged Equal Protection Violation.

Plaintiffs have not alleged that Defendants Riccardi or Vasquez participated in any of the alleged questioning, searches, seizures, detentions, or other activities involving Plaintiffs at their homes.  TAC ¶¶ 59, 63.   In fact, Plaintiffs expressly state that these Defendants had no involvement with Plaintiffs before the "processing phase of the operation."  *Id.*   Thus, even if the second group of allegations, discussed *supra*, could possibly suffice to support Plaintiffs' equal protection claim, those allegations – by Plaintiffs' own admission – do not apply to Defendants Riccardi or Vasquez.[39]   *Id.*   For this additional reason, the equal protection claim against those two Defendants should be dismissed.   *See Thomas*, 470 F.3d at 496 (*Bivens* plaintiff must allege personal involvement of defendant in alleged unconstitutional conduct).

### 3. Defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin Are Entitled to Qualified Immunity as to the Equal Protection Claim.

As discussed above, Plaintiffs have not adequately pled that any Defendant engaged in conduct violating Plaintiffs' equal protection rights.   *See supra* Sec. VI.F.1.-2.   For this reason, the Defendants are entitled to qualified immunity at the first step of qualified immunity analysis.  *See Harhay*, 323 F.3d at 211-12 ("if there is no deprivation of a constitutional right alleged by" the plaintiff, defendant is entitled to qualified immunity), citing *Saucier*, 533 U.S. at 201; *see also see*

---

[39] As discussed *supra*, the first and third sets of allegations provide no factual support for Plaintiffs' Equal Protection claim against any Defendant.

*Siegert,* 500 U.S. at 232.

Even if Plaintiffs' allegations did state a cognizable equal protection claim against some or all of the identified Defendants, the Defendants would nonetheless be entitled to qualified immunity under this Circuit's second and third steps of analysis.   *See Harhay,* 323 F.3d at 211-12. Plaintiffs cannot point to any law, let alone law that was "clearly established" on June 6, 2007, putting the Defendant agents on notice that their alleged conduct somehow violated Plaintiffs' equal protection rights.   *Id.*   Indeed, in June 2007 (as well as before and after that time), the Defendants who participated in the New Haven operation were authorized to arrest without a warrant persons they encountered and believed to be in the United States in violation of immigration law, *see* 8 U.S.C. §1357(a)(2); 8 C.F.R. § 287.5(c)(1).1, and were permitted to consider ethnic appearance in deciding whether to question a person about his or her immigration status, *Brignoni-Ponce*, 422 U.S. at 885-87.   In addition, the law required discriminatory intent for a plaintiff to suffer an equal protection violation.   *See Hayden*, 594 F.3d at 162-63, quoting *Vill. of Arlington Heights,* 429 U.S. at 265.   And, the law did not recognize a claim for selective enforcement based on the circumstances of Plaintiffs' arrests and subsequent removal proceedings.   *AADC*, 525 U.S. at 488.   Accordingly, the Defendants are entitled to qualified immunity under the second and third steps of analysis as well.   *Harhay*, 323, F.3d at 211-12.

## CONCLUSION

For the reasons explained above, all of Plaintiffs' Claims for Relief against all of the individual-capacity Defendants should be dismissed.

69

Dated: June 17, 2010    Respectfully submitted,

            NORA R. DANNEHY
            UNITED STATES ATTORNEY

            DOUGLAS P. MORABITO
            ASSISTANT UNITED STATES ATTORNEY


            TONY WEST
            Assistant Attorney General

            TIMOTHY P. GARREN
            Director, Torts Branch

            MARY H. MASON
            Senior Trial Counsel, Torts Branch

            */s/ Jean M. Cunningham*
            JEAN M. CUNNINGHAM
            Trial Attorney, Torts Branch
            Fed. Bar No. phv01414
            United States Department of Justice
            P.O. Box 7146
            Ben Franklin Station
            Washington, D.C. 20044
            Tel: (202) 616-4164
            Fax: (202) 616-4314
            Jean.Cunningham@usdoj.gov

            Attorneys for Individual-Capacity Federal Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2010, a true and correct copy of the foregoing

**Memorandum of Law in Support of Motion to Dismiss of Individual-Capacity Federal**

**Defendants** was filed electronically and served by mail on anyone unable to accept electronic

filing.   Notice of this filing will be sent by e-mail to all parties by operation of the court's

electronic filing system or by mail to anyone unable to accept electronic filing.   Parties may

access this filing through the court's CM/ECF System.


/s/ Jean M. Cunningham
JEAN M. CUNNINGHAM
Trial Attorney, Torts Branch
Fed. Bar No. phv01414
United States Department of Justice
P.O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-4164
Fax: (202) 616-4314
Jean.Cunningham@usdoj.gov