UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------------------------- X

EDUARDO DIAZ-BERNAL, FLORENTE
BARANDA-BARRETO, EDILBERTO CEDEÑO-TRUJILLO,
WASHINGTON COLALA-PEÑARRETA,
JULIO SERGIO PAREDES-MENDEZ,
CRISTOBAL SERRANO-MENDEZ,
JOSE SOLANO-YANGUA, SILVINO TRUJILLO-MIRAFUENTES,
GERARDO TRUJILLO-MORELLANO,
EDINSON YANGUA-CALVA, and
AMILCAR SOTO-VELASQUEZ,
Plaintiffs,
v.
JULIE MYERS, Former Assistant Secretary of
Homeland Security for Immigration and Customs
Enforcement, JOHN TORRES, Former
Director, ICE Office of Detention and Removal
Operations, BRUCE CHADBOURNE,
Field Office Director, ICE DRO Boston, JIM
MARTIN, Deputy Field Office Director, ICE DRO,
GEORGE SULLIVAN, Assistant Field Office
Director, ICE DRO, WALTER WILKOWSKI,
Resident Agent in Charge, ICE Office of
Investigations, New Haven, CT, RICHARD
MCCAFFREY, ICE Hartford Fugitive Operations
Team Supervisory Detention and
Deportation Officer, HARFOT Agents JAMES
BROWN, RONALD PREBLE, STEPHEN
RICCARDI, MICHELLE VETRANO-ANTUNA,
and GEORGE LEWIS, ICE Agents BRIAN GEARY,
DAVID HAMILTON, DEREK MOORE, DAVID
OSTROBINSKI, DAVID REILLY, WILFREDO
RODRIGUEZ, WILFRED VALENTIN, EDGAR
VASQUEZ, JOHN DOES 1-10, and the UNITED
STATES,
Defendants.

-------------------------------------------------------------------------------- X

: Case No. 3:09-CV-
: 1734 (SRU)
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

# MEMORANDUM OF LAW IN OPPOSITION TO UNITED STATES' RENEWED PARTIAL MOTION TO DISMISS

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT .................................................................... 1

STATEMENT OF FACTS ............................................................................. 4

    A.   The Parties............................................................................................. 4

    B.   The NFOP Quota System...................................................................... 6

    C.   The NFOP Quota Raids Contributed To Common Law And
         Constitutional Violations ...................................................................... 6

    D.   The Supervisory Defendants' Negligent Hiring, Training, And
         Supervision........................................................................................... 7

    E.   The Fair Haven Retaliatory Raids....................................................... 10

RELEVANT LEGAL STANDARD.............................................................. 13

ARGUMENT ................................................................................................. 15

I.     THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY
      BECAUSE THE FACTS UNDERLYING PLAINTIFFS' STATE LAW
      TORT CLAIMS ALSO ESTABLISH CONSTITUTIONAL VIOLATIONS  15

II.    IN ANY EVENT, THE GOVERNMENT'S DISCRETIONARY
      FUNCTION ARGUMENTS FAIL THE TWO-PRONG TEST OF
      GAUBERT ............................................................................................ 18

    A.   The Supervisory Defendants' Negligent Hiring, Training, And Supervisory
         Conduct Was Not Discretionary ...................................................... 18

         1.   The Supervisory Defendants' Negligent Hiring, Training, And
              Supervision Of The Fair Haven Raid Officers Is Not
              Discretionary Because It Violated DHS Regulations........................... 19

         2.   The Supervisory Defendants' Conduct Was Not Discretionary
              Because It Violated Mandatory NFOP Policies ..................................... 20

             a.  Formal Agency Policy Statements Circumscribe A Federal
                Employees' Discretion .......................................................... 20

**TABLE OF CONTENTS**
(continued)

Page

b. The Supervisory Defendants' Negligent Hiring, Training, And Supervision Of The Fair Haven Raids Was Not Discretionary Because It Violated The Detention, And Deportation Officers' Field Manual ...................................................................................... 26

c. The Supervisory Defendants' Negligent Supervision Of The Fair Haven Raids Was Not Discretionary Because It Violated Mandatory NFOP Policy ..................................................................... 29

B. The Challenged Actions Are Not Grounded In Policy ................................... 30

1. The United States Fails To Articulate Clear Policies That The Negligent Hiring, Supervision, And Training Decisions Were Meant To Further................................................................................. 31

2. The Discretionary Function Exception Does Not Bar Claims That Government Officials Carried Out Established Policies Negligently ............................................................................................ 33

3. The Supervisory Defendants' Actions Are Not Grounded In Policy Because They Encouraged The Violations of Several Federal Statutes And DHS Regulations................................................. 36

CONCLUSION ............................................................................................................. 39

# TABLE OF AUTHORITIES

## Rules and Statutes

5 U.S.C. § 4103 .................................................................................................... 22

5 U.S.C. § 4118(c) ............................................................................................... 22

8 U.S.C. § 1357 .................................................................................................... 37

8 U.S.C. § 1357(a)(2) .......................................................................................... 7

28 U.S.C. §§ 1346 ............................................................................................... 4

28 U.S.C. § 1346(b)(1) ........................................................................................ 13

28 U.S.C. § 2671 ................................................................................................. 4

28 U.S.C. § 2680(a) ............................................................................................ 13

8 C.F.R. § 287.1(g) .................................................................................. 8, 19, 22, 24

8 C.F.R. § 287.5 ............................................................................. passim

8 C.F.R. § 287.8 ............................................................................. passim

8 C.F.R. § 287.3 ................................................................................................. 13

8 C.F.R. § 287.3(a) ............................................................................................. 38

8 C.F.R. § 287.3(c) ............................................................................................. 38

8 C.F.R.§ 287.8(c)(i) .......................................................................................... 37

8 C.F.R.§ 287.8(c)(ii) ......................................................................................... 37

8 C.F.R. § 287.8(c)(2)(iii)(A) ............................................................................ 37

8 C.F.R. § 287.8(c)(2)(iii)(B) ............................................................................ 37

8 C.F.R. § 287.8(c)(2)(vii) ................................................................................. 37

## Cases

Alinsky v. United States,
156 F. Supp. 2d 908 (N.D. Ill. 2001) ........................................................... 27, 32, 33

*Andrulonis v. United States,*
952 F.2d 652 (2d Cir. 1991) ........................................................................... passim

*Appley Bros. v. United States,*
164 F.3d 1164 (8th Cir. 1999) ........................................................................... 27

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009).......................................................................................... 15

*ATSI Commc'ns v. Shaar Fund Ltd.,*
493 F.3d 87 (2d Cir. 2007) ................................................................................ 15

*Aslakson v. United States,*
790 F.2d 688, (8th Cir. 1986) ........................................................................... 28

*Bagner v. United States,*
428 F. Supp. 2d 101 (N.D.N.Y. 2006).................................................20-21, 24, 29

*Berkovitz v. United States,*
486 U.S. 531 (1988) ......................................................................................... 14, 19

*Boykin v. KeyCorp.,*
521 F.3d 202 (2d Cir. 2008) .............................................................................. 15

*Brown v. United States,*
661 F. Supp. 2d 341 (E.D.N.Y. 2009).............................................................. 35

*Caban v. United States,*
671 F.2d 1230 (2d Cir. 1982) ......................................................................... 20, 34

*Callahan v. United States,*
329 F. Supp. 2d 404 (S.D.N.Y. 2004) ............................................................... 21

*Caraballo v. United States,*
830 F.2d 19 (2d Cir. 1987) ......................................................................... 21, 29, 34

*Carboniero v. United States,*
211 F.3d 714 (3d Cir. 2000) ............................................................................. 14

*Chi Yuan Chen v. Gonzales,*
224 F. App'x 116 (2d Cir. 2007)....................................................................... 38

*Coulthurst v. United States,*
214 F.3d 106 (2d Cir. 2000) .......................................................................... 30, 32

*Cuoco v. United States,*
No. 98-cv-9009, 2003 U.S. Dist. LEXIS 16615 (S.D.N.Y. Sept. 22, 2003) ....... 18

Denson v. United States,
574 F.3d 1318 (11th Cir. 2009) ........................................................................... 15, 18

Dickerson v. United States,
875 F.2d 1577 (11th Cir. 1989) ........................................................................... 21

Elbert v. Conn. Yankee Council,
CV010456879S, 2004 Conn. Super. LEXIS 1924 (Conn. Super. Ct. July 16, 2004) ........ 17

El-Badrawi v. Dep't of Homeland Sec.,
579 F. Supp. 2d 249 (D. Conn. 2008)................................................................... 15-16

Gonzalez v. United States,
690 F. Supp. 251 (S.D.N.Y. 1988) ...................................................................... 31-32

Gooden v. U.S. Dep't of the Interior,
339 F. Supp. 2d 1072 (D.N.D. 2004) .................................................................... 21

Irving v. United States,
162 F.3d 154 (1st Cir. 1998)................................................................................. 22, 24

King v. United States,
491 F. Supp. 2d 286 (D. Conn. 2007)............................................................14, 15, 30, 31

Lemke v. City of Port Jervis,
991 F. Supp. 261 (S.D.N.Y. 1998) ...................................................................... 21, 34

Li v. Aponte,
05-cv-6237, 2008 U.S. Dist. LEXIS 74725 (S.D.N.Y. Sept. 15, 2008) ............................ 18

Limone v. United States,
271 F. Supp. 2d 345 (D. Mass. 2003)............................................................... 16, 17, 18

Limone v. United States,
497 F. Supp. 2d 143 (D. Mass. 2007).................................................................... 20

Lunney v. United States,
319 F.3d 550 (2d Cir. 2003) ............................................................................... 15

Malik v. Meissner,
82 F.3d 560 (2d Cir. 1996) ................................................................................ 15

Martin v. United States,
971 F. Supp. 827 (S.D.N.Y. 1997) ...................................................................... 34

Medina v. United States,
259 F.3d 220 (4th Cir. 2001) ......................................................................13-14, 15, 20

Meuse v. Freeh,
421 F. Supp. 2d 365 (D. Mass. 2006)................................................................................. 18

Morton v. Ruiz,
415 U.S. 199 (1974) ............................................................................................................ 22

Myers & Myers, Inc. v. United States,
527 F.2d 1252 (2d Cir. 1975) ........................................................................................ 13, 15

Nat'l Union Fire Ins. v. United States,
115 F.3d 1415 (9th Cir. 1997).......................................................................................... 14

Nurse v. United States,
226 F.3d 996 (9th Cir. 2000) ............................................................................................ 20

Rajah v. Mukasey,
544 F.3d 427 (2d Cir. 2008) ............................................................................................. 37

Rodriguez v. United States,
542 F.3d 704 (9th Cir. 2008) ............................................................................................ 37

Saint-Guillen v. United States,
657 F. Supp. 2d 376 (S.D.N.Y. 2009) ........................................................................... 18, 27

Salter v. United States,
853 F. Supp. 389 (M.D. Ala. 1994)................................................................................... 20

Seda v. Maxim Healthcare Servs., CV075010811,
2008 Conn. Super. LEXIS 916 (Conn. Super. Ct. Apr. 8, 2008) ...................................... 17, 36

Seguro v. Cummiskey,
844 A.2d 224 (Conn. App. Ct. 2004) ............................................................................ 17, 36

Singh v. Mukasey,
553 F.2d 207 (2d Cir. 2009) ............................................................................................. 38

Singh v. U.S. Dep't of Justice,
461 F.3d 290 (2d Cir. 2006) ............................................................................................. 22

Thames Shipyard & Repair Co. v. United States,
350 F.3d 247 (1st Cir. 2003)............................................................................................. 15

Triestman v. Fed. Bureau of Prisons,
470 F.3d 471 (2d Cir. 2006) ......................................................................................... passim

United Cook Inlet Drift Assoc. v. Trinidad Corp. (In re The Glacier Bay),
71 F.3d 1447 (9th Cir. 1995).............................................................................................. 21

United States ex rel. Accardi v. Shaughnessy,
347 U.S. 260 (1954) ........................................................................................................ 21

United States Fid. & Guar. Co. v. United States,
837 F.2d 116 (3d Cir. 1988) ........................................................................................... 20

United States v. Gaubert,
499 U.S. 315 (1991) ..................................................................................................... passim

United States v. Karathanos,
531 F.2d 26 (2d Cir. 1976), cert. denied, 428 U.S. 910 (1976).......................................... 37

United States v. Sanchez,
635 F.2d 47 (2d Cir. 1980) .............................................................................................. 37

Vickers v. United States,
228 F.3d 944 (9th Cir. 2000) ........................................................................................... 27

Wormley v. United States,
601 F. Supp. 2d 27 (D.D.C. 2009)................................................................................. 17-18

Wright v. United States,
866 F. Supp. 804 (S.D.N.Y. 1994) ................................................................................... 35

Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi,
215 F.3d 247 (2d Cir. 2000) ............................................................................................. 8

## Other Authorities

Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and
Procedure, § 3658.1 (3d ed. 2010)................................................................................. 14-15

Plaintiffs Eduardo Diaz-Bernal, Florente Baranda-Barreto, Edilberto Cedeño-Trujillo, Washington Colala-Peñarreta, Julio Sergio Paredes-Mendez, Cristobal Serrano-Mendez, Jose Solano-Yangua, Silvino Trujillo-Mirafuentes, Gerardo Trujillo-Morellano, Edinson Yangua-Calva, and Amilcar Soto Velasquez ("Plaintiffs"), by their undersigned attorneys, respectfully submit this memorandum of law in opposition to the United States' ("United States" or "Government") Renewed Partial Motion to Dismiss (the "Motion"), addressing solely to the Federal Torts Claims Act claims against the United States based on the state law torts of negligent training and supervision against the Supervisory Defendants (as defined herein).[1]

## PRELIMINARY STATEMENT

On June 6, 2007, defendants, employees of the United States Government, broke into Plaintiffs' residences in Fair Haven without a warrant or consent, based on fugitive lists they knew to be erroneous, subjected Plaintiffs to questioning and harassment, and arrested Plaintiffs for no reason other than because they looked Latino. These facts, and others pleaded in the Complaint, establish flagrant violations of Plaintiffs' constitutional rights and of federal law. Even more egregious is that such violations were carried out as retaliation for the City of New Haven's choice to issue ID cards to city residents without regard to immigration status.

The Federal Tort Claims Act ("FTCA") provides a clear remedy against the United States for such gross abuses. Under the FTCA, the United States is liable for the acts of its employees if such acts would constitute the basis for state law tort claims. This Motion concerns Plaintiffs' claims of FTCA liability for the state law torts of negligent supervision, training, and hiring, committed by certain Immigration and Customs Enforcement officials ("ICE") in their role as overseers of the agents who conducted the Fair Haven retaliatory raids.

---

[1]     In addition to this Motion, the United States has filed a Renewed Motion to Dismiss In Part, ECF No. 52, to which Plaintiffs have filed their opposition, ECF No. 63. The individual defendants have also filed a Motion to Dismiss, ECF No. 51, to which Plaintiffs' response is due on September 21, 2010.

1

The Government does not dispute that Plaintiffs sufficiently allege Connecticut law tort claims for negligent supervision, training and hiring. Instead, the United States rests this Motion on the argument that the acts at issue are protected by the "discretionary function exception" to FTCA liability, which protects certain acts by federal employees. This argument misses the mark in several ways.

As a threshold matter, when the acts that form the basis of FTCA claims also give rise to the causes of action that sufficiently allege constitutional violations, as the alleged acts undeniably do here, the discretionary function exception simply does not apply. It is a fundamental principle, time and again recognized by the courts, that federal agents do not hold within their discretion the ability to decide to violate the United States Constitution. Yet the United States has lost sight of this important principle. Instead, it relies on an improper reading of the two-part test of United States v. Gaubert, 499 U.S. 315 (1991), by which the Supreme Court analyzes the applicability of the discretionary function exception to specific acts, to assert that their actions are shielded from review simply because they are a matter of the agency's "discretion." Even if such analysis were applicable here (and it is not), under Gaubert, the discretionary function applies only to acts that (a) are within the proper grant of authority the federal official enjoys and involve an element of choice, and (b) involve policy decisions. Defendants' acts utterly fail to satisfy either of these two prongs.

First, under Gaubert and the case law following it, acts fail the first prong by definition if they are committed in violation of federal laws, regulations, or mandatory internal agency policy statements, as was the case with respect to the defendants' actions. The United States' reliance on Congress' and the Department of Homeland Security's ("DHS") grant of authority to ICE to enforce immigration laws is besides the point; in this action Plaintiffs

challenge neither ICE's authority to lawfully enforce the immigration laws, nor the legality of any regulation ICE may have issued pursuant to its delegated powers. Plaintiffs instead allege that the ICE supervisors had no discretion to violate such regulations and policies by failing to require certain individual defendants to attend mandatory training programs, failing to update training programs despite knowing their short-comings, and allowing agents whom they knew were certain to commit constitutional violations to join the Fair Haven raids.

To satisfy the second Gaubert prong, the Government must state specifically what policy considerations are implicated when an official carries out a challenged action. The Government's failure to articulate any such policy beyond the ipse dixit that training and hiring always implicate policy decisions is fatal to its argument. Moreover, courts have routinely held that it can never be a permissible federal policy to violate the law, or to implement policies ignoring a known risk that another will be harmed by the official's conduct. Because Plaintiffs have sufficiently alleged that the supervisory defendants knew that the raid officers had violated and would continue to violate constitutional rights, the challenged acts fail the second prong.

The FTCA exists to protect against the very sort of misconduct at issue here – including that which stems from the negligent supervision and training of federal officials. The Government invites the Court to rely on the discretionary function exception to "insulate virtually all actions by a government agent from liability." Andrulonis v. United States, 952 F.2d 652, 655 (2d Cir. 1991). Of course, such would be the proverbial exception to swallow the rule, rendering the FTCA ineffective as a mechanism to hold government agents accountable for their illegal decisions. Such an approach has been, and should be, rejected.

For these reasons, and those stated in this memorandum, the Court should deny the Government's motion to dismiss.

3

## STATEMENT OF FACTS

### A.    The Parties

Plaintiffs Eduardo Diaz-Bernal, Florente Baranda-Barreto, Edilberto Cedeño-

Trujillo, Washington Colala-Peñarreta, Julio Sergio Paredes-Mendez, Cristobal Serrano-Mendez,

Jose Solano-Yangua, Silvino Trujillo-Mirafuentes, Gerardo Trujillo-Morellano, Edinson

Yangua-Calva, and Amilcar Soto Velasquez reside in Fair Haven, a predominantly Latino

neighborhood in the City of New Haven.  Plaintiffs are all of Latino race and ethnicity and were

arrested and unlawfully detained by approximately twenty ICE agents (the "Raid Officers")[2] on

June 6, 2007.  See Third Amended Complaint dated June 4, 2010 ("Compl.") ¶¶ 22-32.

Plaintiffs seek relief against the United States under the FTCA, 28 U.S.C.

§§ 1346, 2671 et seq., for, inter alia, the torts of negligent training and supervision committed by

six individual defendants (the "Supervisory Defendants"), all of whom had supervisory

capacities and responsibilities within ICE over the officers who conducted the retaliatory raids

and arrests of June 6 during the time of the events in question.[3]  Id. ¶¶ 401-409.

Supervisory Defendant Julie Myers was the Assistant Secretary of Homeland

Security for ICE at all relevant times.  She was responsible for the implementation of the

policies, practices and/or customs of ICE and ICE's National Fugitive Operations Program,

("NFOP").  Id. ¶ 33.  She was also personally advised that New Haven had approved the

Mayor's plan for a municipal identification card the day before the raid occurred.  Id. ¶¶ 314,

---

[2]     The Raid Officer defendants include, specifically, defendants Brown, Preble, Riccardi, Vetrano-Antuna, Lewis, Geary, Hamilton, Moore, Ostrobinski, Reilly, Rodriguez, Valentin, Vasquez, John Does 1-10, and defendant McCaffrey.

[3]     Plaintiffs also allege that the individual Raid Officers who conducted the New Haven raids, including Supervisory Defendant McCaffrey, violated the Fourth Amendment to the United States Constitution, the equal protection and due process guarantees of the Fifth Amendment, as well as committed several common law torts. Plaintiffs seek FTCA relief against the United States for these common law torts.  Compl. ¶¶ 33-55, 377-409.  The constitutional tort claims are the subject of a separate Motion to Dismiss, ECF No. 51.

4

316. Supervisory Defendant John Torres was the Director or Acting Director of the ICE office of Detention and Removal Operations ("DRO"), the main ICE branch in charge of field enforcement. He had responsibility and the power of approval for the implementation of all fugitive operations and created the policy, practice and/or custom which Fugitive Operations Teams ("FOTs") conducted their raids. Id. ¶ 34.

Supervisory Defendant Bruce Chadbourne was the Field Office Director for the Boston, Massachusetts regional DRO Field Office, which manages the Hartford, Connecticut sub-office. Id. ¶ 35. He was the federal official charged with the ultimate responsibility of training and supervising all Raid Officers in the Boston region, which includes Connecticut, and for the administration and implementation of the regional office's policies, practices and customs. Id. Supervisory Defendant Jim Martin was the Deputy Field Office Director for the Boston regional DRO Field Office, which governs the Hartford sub-office. Id. ¶ 36. He had supervisory responsibility for all the ICE defendants in the Boston region. Id.

Supervisory Defendant George Sullivan was the Assistant Field Office Director for the Hartford DRO sub-office and was responsible for supervising all of the ICE defendants in the Hartford office. Id. ¶ 37. Supervisory Defendant Sullivan was Operational Supervisor for the Fair Haven raids, where he both personally participated in planning the raids and directly supervised the execution of the operation. Id. Supervisory Defendant Richard McCaffrey was the Supervisory Detention and Deportation Officer of the Hartford FOT ("HARFOT") and was responsible for carrying out HARFOT immigration law enforcement operations and the policies, practices, and/or customs of the NFOP in Connecticut. Id. ¶ 39. As the on-site supervisor in the Fair Haven raids, he was responsible for monitoring and advising subordinate ICE agents in the

5

field and coordinating with local law enforcement agencies.  Id.  He also directly took part in the Fair Haven raids and the arrest, processing, and detention of Plaintiffs.  Id.

### B.    The NFOP Quota System

The defendants who planned, coordinated, led and directly participated in the raids on June 6, 2007 did so as part of the NFOP, a widely criticized program authorized by Congress to remove dangerous criminal fugitives from the United States.  Id. ¶ 253.  Prior to 2006, NFOP enforcement policy directed that at least seventy-five percent of total yearly arrests by each FOT had to consist of fugitives with criminal convictions; NFOP policy instructed that FOTs should aim to arrest 125 criminal fugitives per year.  Id. ¶¶ 258-259.  Pre-2006 NFOP enforcement policy did not allow non-fugitive, non-criminal status violators to count toward these annual fugitive arrest quotas.  Id. ¶ 258.

In or around January 2006, Supervisory Defendant Torres, then-Acting Director of DRO, instituted a new quota system, requiring each seven-member FOT to make one thousand fugitive arrests per year.  Id. ¶ 260.  Supervisory Defendant Torres also eliminated the prior seventy-five percent target for criminal fugitives, thus removing any incentive for FOTs to concentrate on locating and apprehending the dangerous criminal fugitives for which Congress had funded the NFOP.  Id. ¶ 261.  Later, Torres again amended the quota system to allow up to five hundred "collateral" arrests – arrests of bystanders who were neither fugitives nor criminals but who were encountered by FOTs while allegedly searching for actual fugitives – to count towards the annual one thousand arrests quota.  Id. ¶¶ 262, 266-267

### C.    The NFOP Quota Raids Contributed To Common Law And Constitutional Violations

Together, Torres and Myers implemented a system which encouraged FOTs to conduct raids that violated the Fourth and Fifth Amendments in order to meet their quotas by

6

arresting non-fugitives, raiding homes, awakening families in their beds, and unlawfully entering homes in plain clothes, without search warrants or consent. Id. ¶¶ 275-77. These actions were in direct violation of the federal statute that authorizes immigration officers to arrest a person without a warrant only if the officer has probable cause to believe that the person has violated United States immigration law. See 8 U.S.C. § 1357(a)(2).

Supervisory Defendants Torres and Myers knew or should have known that their FOT policies would inevitably lead to pervasive common law and constitutional violations against innocent bystanders. Compl. ¶ 278. Criticism of the FOT raids under the new quota system was widespread and well documented through numerous national media reports, specific communications and warnings issued by members of Congress, and lawsuits against Supervisory Defendants Myers, Torres, and other senior ICE personnel. Id. ¶ 281. Further, ICE's Office of Professional Responsibility ("OPR"), which reports to the Assistant Secretary of ICE, had been aware of widespread misconduct among immigration officers for years. Id. ¶ 282. Yet, despite all of the indications that the quota system was causing FOTs to violate individuals' constitutional rights, Supervisory Defendant Myers continued to publicize, and laud as "successful," the department's dramatic increase in immigration arrests since the creation of the NFOP, and by implication its quota system. Id. ¶ 284. The constitutional violations committed by FOTs as a result of Supervisory Defendants Myers and Torres' policies were so widespread as to constitute their constructive acquiescence in their roles as supervisors of and policymakers for the NFOP. Id. ¶ 299.

### D.    The Supervisory Defendants' Negligent Hiring, Training, And Supervision

Because of the public outcry over prior unconstitutional FOT operations across the country, by the time of the Fair Haven raids in 2007, the Supervisory Defendants, including

7

Myers, Torres, Chadbourne, Martin and Sullivan, knew of the likelihood that improperly supervised FOTs would commit constitutional violations. Id. ¶ 294. Yet they did not change their policies, nor did they take steps to ensure that the field officers or anyone else below them were adequately trained or supervised to avoid constitutional violations.

For example, one egregious error the Supervisory Defendants allowed to continue was that at least three of fifteen Raid Officers, all working under their supervision, had not completed the Immigration Officer Basic Training Course or the Immigration Detention Enforcement Officer Basic Training Program. See Tenreiro Decl. Ex. A (FOIA Document, ICE 3.009954-56) ("Training and Class Year Completed"), at 3.[4]  These officers' participation in the Fair Haven raids, without having completing basic immigration law enforcement training, violates federal regulations that explicitly require immigration officers to have successfully completed such mandatory training to perform their enumerated duties. See 8 C.F.R. §§ 287.1(g), 287.5, 287.8.

In addition, the FOT training program was woefully inadequate to prevent FOT officers from engaging in frequent and egregious constitutional violations during residential enforcement and other operations. Compl. ¶ 300. Nor did the training program sufficiently instruct agents in how to conduct residential raids or make other arrests without violating constitutional rights. Id. The Supervisory Defendants' failure to provide adequate training violated ICE's stated policy that "supervisors will ensure officers will receive all training, equipment, and leadership necessary to safely and effectively conduct fugitive operations." See Tenreiro Decl. Ex. B (U.S. Dep't of Homeland Sec., Bureau of Immigration and Customs

---

[4]     On a motion to dismiss for lack of subject matter jurisdiction, a court may refer to evidence outside the pleadings to resolve jurisdictional facts. See Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).

Enforcement, DDFM Mem. from Director Anthony S. Tangeman, dated Aug. 25, 2003)

("Tangeman Memo"), at 3-4. The FOT training program consisted of a one-time, three-week

class for new FOT members, which focused on teaching participants how to use the FOT

database system and perform other administrative tasks. Compl. ¶ 301. Although purportedly

mandatory, many FOT members never attended. Id. ¶ 302. The NFOP provided no national

refresher course or in-service training at any time to inform agents of new legal developments or

ensure their understanding of lawful enforcement tactics. Id. ¶ 303. This inadequate training

increased the risk that FOT members would engage in unconstitutional actions. Id. ¶ 304.

      The Office of the Inspector General ("OIG") reviewed the FOT training program

in early 2007 and concluded that it was insufficient, as many officers had never attended it and

no national refresher course was offered. Id. ¶ 306. In March 2007, four months before the Fair

Haven raids, the OIG submitted a report to Supervisory Defendants Torres and Myers and others

that warned that the training program was inadequate and offered numerous recommendations

for improvements. Id. ¶ 307; see also Tenreiro Decl. Ex. C (U.S. Dep't of Homeland Sec.,

Office of Inspector General, "An Assessment of United States Immigration and Customs

Enforcement's Fugitive Operations Teams" (Mar. 2, 2007)) ("OIG Report"), at 29-38. Again,

the Supervisory Defendants neglected to change the training policies to prevent further

constitutional violations. Compl. ¶ 308.[5]

---

[5]     By contrast, in December 2009, Assistant Secretary of ICE John Morton, obviously aware of the problems that officers' lack of training and supervision had caused, revised the FOT program and directed that each FOT member receive training specifically on residential enforcement and the Fourth Amendment twice each year. Morton also eliminated the quota system and refocused the priorities of arrests to criminality. See Tenreiro Decl. Ex. D (U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement, NFOP Mem. from Assistant Secretary John Morton, dated Dec. 8, 2009).

### E. The Fair Haven Retaliatory Raids

ICE officials were aware of and kept apprised of developments concerning the Elm City Resident Card Program that granted New Haven residents a municipal identification card regardless of their immigration status. Id. ¶¶ 9-10, 232. In response to the likely passage of the program and other policies meant to integrate immigrants into the New Haven community, ICE officials in the Hartford office planned a raid in the area. Id. On April 6, 2007, during the peak of national media attention on New Haven's policies, Supervisory Defendant McCaffrey began drafting a written plan ("Operational Plan") detailing the proposed execution of an FOT action to raid New Haven-area homes and compiling a "target list" of alleged fugitives in New Haven. Id. ¶ 233.

On April 20, 2007, Supervisory Defendant McCaffrey submitted the plan to supervisory officials, including defendants Sullivan, Martin, Chadbourne, and Torres, at the Hartford and Boston regional DRO offices and to ICE headquarters in Washington D.C. for approval. Id. ¶¶ 239-240. Senior ICE personnel, including Supervisory Defendants Chadbourne and Torres, personally reviewed and approved the Operational Plan. Id. ¶¶ 242-243. Supervisory Defendants McCaffrey and Sullivan also prepared a memorandum called an "A/S Note," the term used for a memorandum submitted to the Assistant Secretary, id. ¶ 313, which Sullivan then forwarded to Supervisory Defendants Myers, Torres, Chadbourne, and Martin. Id. ¶¶ 315-316. In light of the numerous media and internal investigations indicating a high risk of constitutional violations in the course of FOT raids, the Supervisory Defendants knew that HARFOT demanded close supervision and careful planning to avoid violating constitutional rights. Id. ¶¶ 317-318. Further, they knew that the current supervisory structure was inadequate as their subordinates were likely to commit constitutional violations without adequate

supervision. Id. ¶ 319. They acted with deliberate indifference to an obvious need for closer supervision of the Operational Plan and the execution of the Fair Haven raids and did nothing to prevent or correct this harm. See id. ¶ 310. Despite this knowledge, on or about May 4, 2007 Supervisory Defendants Chadbourne and Torres authorized the Fair Haven raids. Id. ¶ 241.

On the evening of June 4, 2007, the New Haven Board of Aldermen voted overwhelmingly to accept foundation funds to support the Elm City Resident Card Program. Id. ¶¶ 249-250. On June 6, 2007, just 36 hours after the vote had taken place, defendants invaded Plaintiffs' homes. Id. ¶ 251.[6]

Before conducting the raid on Fair Haven, Supervisory Defendants violated ICE official policy and practice by failing to cooperate with local (i.e. New Haven) law enforcement to plan and conduct the raid. Id. ¶ 247.[7] Instead, HARFOT engaged in a broad outreach to enlist the help of other federal and state agencies, including the Connecticut State Police. Id. ¶ 244.[8]

The FOTs' well-known unconstitutional practices, described above, were nowhere demonstrated more clearly than during the Fair Haven raids.

The FOT used a "target list" as a pretext for entering homes without search warrants or consent and seizing residents without cause or suspicion. See id. ¶ 64. During those raids, HARFOT, other ICE agents, and federal and state officers, armed with only vague information taken from databases riddled with errors, violated mandatory regulations by bursting into homes and bedrooms with neither a warrant, nor consent, nor probable cause. Id. ¶¶ 56,

---

[6]    Later that day, in its first official statement regarding the raid, ICE made plain its retaliatory intent, declaring through spokesperson Marc Raimondi, "There is truly no safe haven for fugitive aliens." Id. ¶ 252.

[7]    In a subsequent internal investigation conducted by ICE, Supervisory Defendant McCaffrey acknowledged that he had failed to notify the New Haven Police Department in advance of the raid, as required by ICE policies and procedures. Id. ¶ 248.

[8]    Raid Officer defendant Vetrano-Antuna invited Connecticut State Police Officer Carmine Verno to join the raid by saying that it "should be a fun time!!" Id. ¶ 245.

237. See 8 C.F.R. §§ 287.5, 287.8; Tenreiro Decl. Ex. E (U.S. Dep't of Justice, Immigration and

Naturalization Service, "The Law of Arrest, Search, and Seizure for Immigration Officers"

(Jan. 1993)) ("M-69"), at 1 ("The methods that the INS uses to enforce the immigration laws

enacted by Congress must conform to constitutional and statutory limitations as well as INS

regulations").[9]  The target list contained grossly outdated and erroneous leads and, consequently,

did not include even one of the Plaintiffs as a pre-selected "target" of the raid. Compl. ¶ 65.

Instead, each of the Plaintiffs was subjected to the raid merely because he happened to inhabit a

house that was once allegedly associated with another person's name in the NFOP databases,

leading to the predictable result that raid officers barged into Plaintiffs' homes shouting the

names of individuals who no longer lived there. Id. ¶¶ 64-65. HARFOT supervisors including

Supervisory Defendants Chadbourne, Sullivan, Martin, and McCaffrey knew that the list had

been prepared without sufficient investigation, verification, or surveillance but, nevertheless,

authorized the home raids. Id. Supervisory Defendant McCaffrey was directly responsible for

organizing and supervising the four teams of ICE and other Federal, State and local agents that

performed the raids on June 6, 2007. Id. ¶¶ 58-59.

Following the raids, the Raid Officers, under the direct watch of Supervisory

Defendant McCaffrey and others, failed to inform any Plaintiff of his rights. Id. ¶ 176. No

defendant explained why he or she was in each Plaintiff's apartment or why he or she was

seizing each Plaintiff. Id. ¶ 177. While interviewing Plaintiffs, Raid Officers handed each

Plaintiff forms in English, which Plaintiffs could not read, and did not translate the forms into

---

[9]     The INS "Law of Arrest, Search, and Seizure" document serves to notify immigration officers as to the
limits of their legal authority. See Ex. E (M-69), at 1 (explaining that the document "outlines the statutory and
constitutional boundaries of an INS officer's authority" and "is intended for daily use of INS officers").  The
document remains an authoritative statement within ICE of restrictions on officers' conduct, as the DDFM instructs
that "[o]fficers will review the M-69 (*Law of Arrest and Seizure*) concerning their authority as Immigration
Officers." Ex. B (Tangeman Memo.), at 2.

Spanish, despite the fact Spanish is the primary language of each Plaintiff. Id. ¶¶ 182-183.
These practices were in direct violation of the regulation mandating that an alien arrested without
a warrant will be advised of the reasons for his or her arrest and the right to be represented at no
expense to the Government. See 8 C.F.R. § 287.3. Plaintiffs were subsequently arrested without
warrant or probable cause and for no reason other than they appeared to be Latino.

### RELEVANT LEGAL STANDARD

Through the FTCA Congress waived the sovereign immunity of the United States
for certain tortious acts of its employees, including, as undisputedly alleged here, for harms
"caused by the negligent or wrongful act or omission of any employee of the Government while
acting within the scope of his office or employment, under circumstances where the United
States, if a private person, would be liable to the claimant in accordance with the law of the place
where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

This general waiver of immunity is circumscribed by certain enumerated
exceptions. Among those, the Government here relies on the so-called "discretionary function
exception," which abrogates the waiver of immunity for "[a]ny claim based upon an act or
omission of an employee of the Government, exercising due care, in the execution of a statute or
regulation, whether or not such statute or regulation be valid, or based upon the exercise or
performance or the failure to exercise or perform a discretionary function or duty on the part of a
federal agency or an employee of the Government, whether or not the discretion involved be
abused." 28 U.S.C. § 2680(a).

As the Second Circuit and other courts have recognized for decades, "[i]t is, of
course, a tautology that a federal official cannot have discretion to behave unconstitutionally."
Myers & Myers, Inc. v. United States, 527 F.2d 1252, 1261 (2d Cir. 1975); see also Medina v.

13

United States, 259 F.3d 220, 225 (4th Cir. 2001) ("[f]ederal officials do not possess discretion to violate constitutional rights or federal statutes") (citations omitted). Thus, when the state law torts that form the predicate for FTCA liability arise out of acts that give rise to constitutional violations, there is no place for the discretionary function inquiry.

It is not necessary to analyze the discretion function exception where (as here), the alleged acts also give rise to constitutional liability. However, should a court engage in such analysis, it would apply a two-prong inquiry. First, the court must determine if the challenged conduct "[i]nvolve[d] an element of judgment or choice," as the exception "covers only acts that are discretionary in nature." Gaubert, 499 U.S. at 322-23 (citations omitted); see also Berkovitz v. United States, 486 U.S. 531, 536 (1988). If conduct is circumscribed by internal policies or federal law or regulations, an official's choice to act outside such proscription is by definition not discretionary. See, e.g., Gaubert, 499 U.S. at 322-23. Second, if the conduct does involve an element of judgment or choice, then the court must determine if the conduct is "based on considerations of public policy." Berkovitz, 486 U.S. at 537. It is well recognized that the "purpose of the exception [is] to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy." Id; see also King v. United States, 491 F. Supp. 2d 286, 296 (D. Conn. 2007). Thus, only actions of "Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected." Gaubert, 499 U.S. at 323.

It is defendants who bear the burden of demonstrating that the discretionary function exception applies. See, e.g., King, 491 F. Supp. 2d at 296; Carboniero v. United States, 211 F.3d 714, 756 n.5 (3d Cir. 2000); Nat'l Union Fire Ins. v. United States, 115 F.3d 1415, 1417 (9th Cir. 1997); Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal

14

Practice and Procedure § 3658.1 (3d ed. 2010) (collecting cases).[10] Defendants cannot insulate themselves from liability by merely stating in conclusory fashion that their conduct is discretionary and policy-based, as the Government has done here.

Under the familiar standard, the Court must accept all allegations in the Complaint as true, see ATSI Communications v. Shaar Fund Limited, 493 F.3d 87, 98 (2d Cir. 2007), and dismissal is not appropriate where, as here, the complaint provides sufficient factual allegations such that the claims made are plausible. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009); Boykin v. KeyCorp., 521 F.3d 202, 213 (2d Cir. 2008).

**ARGUMENT**

**I.    THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY BECAUSE THE FACTS UNDERLYING PLAINTIFFS' STATE LAW TORT CLAIMS ALSO ESTABLISH CONSTITUTIONAL VIOLATIONS**

A long line of FTCA cases makes clear that the discretionary function exception does not apply where the challenged conduct gives rise to constitutional violations. Simply put, state law torts arising out of actions that are alleged to violate the Constitution do not fall within the exception because conduct that violates the Constitution is never discretionary. See Myers & Myers, Inc., 527 F.2d at 1261; see also Denson v. United States, 574 F.3d 1318, 1336-37 n.55 (11th Cir. 2009) (explaining why this conclusion is implicit in Supreme Court precedent); Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 254 (1st Cir. 2003) ("courts have read the Supreme Court's discretionary function cases as denying protection to actions that are unauthorized because they are unconstitutional"); Medina, 259 F.3d at 225; El-Badrawi v. Dep't of Homeland Sec., 579 F. Supp. 2d 249, 275 (D. Conn. 2008) ("Government agents never have

---

[10]    The Government's citation to Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) and Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996) is irrelevant as those cases relate to different statutes. Moreover, the Government conveniently ignores King, a case decided by a court in this district stating unequivocally that the burden of establishing the applicability of the discretionary function exception is on the Government. King, 491 F. Supp. 2d at 296.

15

the discretion to violate the Constitution"); Limone v. United States, 271 F. Supp. 2d 345, 355 (D. Mass. 2003) ("[o]bviously, conduct cannot be 'discretionary' if it violates the constitution") (citations omitted).

Applying these principles, in El-Badrawi, Judge Janet Hall denied a motion to dismiss FTCA claims where the torts alleged to have been committed by federal employees related to conduct that violated the Constitution. The plaintiff in El-Badrawi brought an FTCA suit against the United States based on the state law torts of false arrest and false imprisonment, as well as intentional infliction of emotional distress. El-Badrawi, 579 F. Supp. 2d at 264-65. Noting that the elements of false arrest and false imprisonment torts under Connecticut law (the basis of the FTCA claims against the United States) were essentially identical to those needed to allege a Fourth Amendment violation (the basis of the constitutional claims against the officers), Judge Hall held that the discretionary function exception did not bar plaintiff's FTCA claims premised on false arrest and imprisonment. See id. at 267-69, 275. With respect to the claims of intentional infliction of emotional distress and abuse of process, torts without a constitutional-tort analog, she reasoned that because the claims for such torts also "arise out of [plaintiff's] arrest," those claims were not jurisdictionally barred if the arrest itself was unconstitutional. Id. at 269 (emphasis added).

The nature of the FTCA pleadings in El-Badrawi is indistinguishable from the FTCA allegations here. Here, Plaintiffs have brought allegations of constitutional torts against the Raid Officers, for violations of the Fourth and Fifth Amendment in connection with the unlawful entries and warrantless and unconstitutional arrests at issue in this case, see, e.g., Compl. ¶¶ 69-173, 322-24, 348-49, as well as allegations of constitutional violations against the Supervisory Defendants based on their failure to implement or follow mandatory supervisory and

16

training programs that they knew would avoid the pattern of widespread violations. See id. ¶¶ 253-320, 325-42, 351-68.[11] Those allegations, if proven, will undeniably give rise to liability for violation of the Constitution against the Raid Officers as well as the Supervisory Defendants. Those same acts also form the basis for the state law negligent hiring, training, and supervision claims against the Supervisory Defendants.[12] In other words, as alleged in the Complaint, see id., the state law tort claims that form the basis for the FTCA claims "arise out of" the Raid Officers' unconstitutional acts of illegally entering Plaintiffs' homes and illegally arresting them, because those very acts form the basis for the negligent training or supervision claims under Connecticut law.[13] See also Limone, 271 F. Supp. 2d at 355-57 (denying United States' motion to dismiss FTCA claims of, inter alia, negligent supervision of employees, where underlying conduct alleged was sufficient to establish, if proven, constitutional violations); Wormley v. United States, 601 F. Supp. 2d 27, 42 (D.D.C. 2009) (citing Thames and Medina and denying United States motion to dismiss FTCA claims based on common law torts that related to "investigatory, supervisory [and] training responsibilities" of the federal defendants where

---

[11] The Government has not challenged the sufficiency of these allegations in this Motion, but has done so in a separate Motion to Dismiss filed by the individual defendants, ECF No. 51. As will be shown in Plaintiffs' opposition, due on September 21, 2010, such challenge is baseless.

[12] Under Connecticut law, the torts of negligent hiring, retention, training and supervision have overlapping elements and are thus generally alleged in tandem. See, e.g., Elbert v. Conn. Yankee Council, CV010456879S, 2004 Conn. Super. LEXIS 1924, at *38 (Conn. Super. Ct. July 16, 2004). The crux of the allegations in this case focuses on the Supervisory Defendants' negligent training and supervision.

[13] In other words, once Plaintiffs establish at trial the facts underlying the constitutional claims against the Raid Officers, they will have already shown key elements of the state law tort claims against the Supervisory Defendants – causation and damages. Under Connecticut law, the elements of the tort of negligent supervision, in addition to causation and damages, are that the defendant owed the plaintiff a duty to supervise the defendant's subordinate, that the defendant failed to prevent a foreseeable risk of harm caused by the subordinate, and that imposing liability would be consistent with underlying tort law principles. See Seguro v. Cummiskey, 844 A.2d 224, 229 (Conn. App. Ct. 2004). Negligent training claims are generally alleged with negligent supervision and their elements are not distinguished. See, e.g., Seda v. Maxim Healthcare Servs., CV075010811, 2008 Conn. Super. LEXIS 916, at **6-11 (Conn. Super. Ct. Apr. 8, 2008). The common ingredient in the claims is the requirement that the injury alleged was objectively foreseeable. See Elbert, 2004 Conn. Super. LEXIS 1924, at *38.

plaintiff had alleged that supervised and trained employees had violated her Fourth and Fifth Amendment rights).[14]  The Government's Motion should be denied on this basis alone.[15]

## II.   IN ANY EVENT, THE GOVERNMENT'S DISCRETIONARY FUNCTION ARGUMENTS FAIL THE TWO-PRONG TEST OF GAUBERT

For the reasons stated above, it is not necessary for this Court to engage in an analysis of whether the discretionary function applies to Supervisory Defendants' conduct under the two-prong test established in Berkovitz and Gaubert.  However, even applying that test, the Government has utterly failed to establish that its actions are shielded by the discretionary function exception.

### A.   The Supervisory Defendants' Negligent Hiring, Training, And Supervisory Conduct Was Not Discretionary

The first question under the Berkovitz/Gaubert two-prong test is whether the challenged conduct was discretionary, i.e. whether it involved an element of judgment or choice.

---

[14]     The Government ignores this line of cases and instead relies on Li v. Aponte, 05-cv-6237, 2008 U.S. Dist. LEXIS 74725 (S.D.N.Y. Sept. 15, 2008), Saint-Guillen v. United States, 657 F. Supp. 2d 376 (S.D.N.Y. 2009), and Cuoco v. United States, No. 98-cv-9009, 2003 U.S. Dist. LEXIS 16615 (S.D.N.Y. Sept. 22, 2003).  None of the plaintiffs in those cases clearly alleged that the acts which were part of the state-law torts underpinning the FTCA claims also established a cognizable constitutional claim.  In Li, for example, the plaintiff brought FTCA claims based on the torts of false arrest and imprisonment, assault and battery, malicious prosecution, intentional infliction of emotional distress, and negligent hiring, training and supervision.  Li, 2008 U.S. Dist. LEXIS 74725, at **15-32. By contrast, the relevant constitutional claims against the individual defendant in Li were limited to excessive force, and malicious prosecution.  Id. at **33-37.  The Li plaintiff also alleged the constitutional tort of false arrest but that claim was dismissed on the grounds that probable cause to arrest is an absolute defense.  Id. at **15-20.

[15]     In Denson, the Eleventh Circuit eloquently explained this line of reasoning by analyzing the relationship between Bivens and FTCA claims, as well as the discretionary function exception in the context of allegedly unconstitutional acts.  Bivens and FTCA claims are co-extensive causes of action and "necessarily arise from the same wrongful acts or omissions of a government official." Denson, 574 F.3d at 1336.  Thus, if a plaintiff establishes a Bivens claim against a federal official the discretionary function exception is not available to the United States for an FTCA claim predicated on the same conduct.  Id. at 1337 (citing Medina, 259 F.3d at 225).  Of course, a claim under § 1346(b) must be based not on a constitutional violation, but on sufficient facts to state a claim under state law torts.  To be clear, Plaintiffs' FTCA claim at issue in this Motion is a claim against the United States based on the state law torts of its employees.  Those torts, however, relate to conduct that itself violates the Constitution.  See generally Limone, 271 F. Supp. 2d at 355 n.10 (denying motion to dismiss based on discretionary function exception where plaintiffs had alleged that the conduct which served as predicate for FTCA liability was also alleged to violate the Constitution).  Cf. Meuse v. Freeh, 421 F. Supp. 2d 365, 370 n.5 (D. Mass. 2006) (noting that negligent supervision claims against state defendant "was premised on the existence of some underlying constitutional harm" by the employees defendant supervised under 42 U.S.C. § 1983).

See Gaubert, 499 U.S. at 322; Berkovitz, 486 U.S. at 536.  A decision does not involve choice "if

a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee

to follow,' because 'the employee has no rightful option but to adhere to the directive.'"

Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).  Thus, if an "employee violates

[a] mandatory regulation, there will be no shelter from liability because there is no room for

choice and the action will be contrary to policy."  Id. at 524.  A well-pled allegation that federal

officers have violated a mandatory statute, regulation, or policy forecloses the discretionary

function exception.  See, e.g., Gaubert, 499 U.S. at 324; Berkovitz, 48 U.S. at 536.

        Contrary to the United States' claims of unbounded discretion, the authority of its

agents is prudently limited by federal statutes, as well as by mandatory policies of the

Department of Homeland Security ("DHS") and ICE prescribing conduct that the Supervisory

Defendants were required to follow.  The Supervisory Defendants' hiring, training, and

supervision of the Fair Haven Raid Officers egregiously violated these mandates, and thus are

not protected by the discretionary function exception.

        1.     **The Supervisory Defendants' Negligent Hiring, Training, And**
                **Supervision Of The Fair Haven Raid Officers Is Not Discretionary**
                **Because It Violated DHS Regulations**

        With respect to Plaintiffs' negligent training and supervision claims, the

Government's training and supervision of its officers was not discretionary, because it was

circumscribed by specific, mandatory regulations that the Supervisory Defendants failed to

implement or follow.  Mandatory regulations promulgated by the DHS predicate raid officers'

authority to engage in law enforcement activities on their completion of one of several

enumerated basic training programs.  See 8 C.F.R. § 287.1(g).  Immigration officers must

complete this training in order to use non-deadly force, make arrests, carry firearms, and conduct

19

searches. See id. §§ 287.5, 287.8. Contrary to the Government's mistaken assertion, see Def.'s

Br. at 10, Plaintiffs have alleged and can show that at least Raid Officers Moore, Preble, and

Riccardi, and maybe others, had not completed the required training programs at the time the

Supervisory Defendants selected and permitted them to participate in the Fair Haven raids. See

Tenreiro Decl. Ex. A ("Training Class and Year Completed"). The Supervisory Defendants'

failure to ensure that the Raid Officers had received this required basic training thus

unequivocally violated mandatory DHS regulations. See Caban v. United States, 671 F.2d 1230,

1233 (2d Cir. 1982) (holding INS agents had no discretion to violate regulations and reversing

dismissal of FTCA claims); Salter v. United States, 853 F. Supp. 389, 393 (M.D. Ala. 1994)

(denying discretionary function exception where agency failed to adequately train employees);

see also Limone v. United States, 497 F. Supp. 2d 143, 203 (D. Mass. 2007) ("No government

actor has 'discretion' to violate . . . regulations or rules that bind them"); Medina, 259 F.3d at

225; Nurse v. United States, 226 F.3d 996, 1000 (9th Cir. 2000); United States Fid. & Guar. Co.

v. United States, 837 F.2d 116, 120 (3d Cir. 1988).

> 2.  **The Supervisory Defendants' Conduct Was Not Discretionary
>     Because It Violated Mandatory NFOP Policies**
>
>> a.  *Formal Agency Policy Statements Circumscribe A Federal Employees'
>>     Discretion*

It is well established that a federal employee's conduct fails the first prong of

Gaubert not only when it violates federal law or regulations, but also when it violates the

internally established policies and directives of a federal agency. See Gaubert, 499 U.S. at 332;

see also Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-77 (2d Cir. 2006) (considering

whether prison official violated internally adopted Bureau of Prisons Program Statement);

Bagner v. United States, 428 F. Supp. 2d 101, 110-13 (N.D.N.Y. 2006) (holding United States

had no discretion to violate internally-adopted Army Corps Of Engineers manual); Lemke v. City of Port Jervis, 991 F. Supp. 261, 275 (S.D.N.Y. 1998) (denying exception to negligent inspection conducted according to agency policy); United Cook Inlet Drift Assoc. v. Trinidad Corp. (In re The Glacier Bay), 71 F.3d 1447, 1452 (9th Cir. 1995) (National Ocean and Atmospheric Administration required to adhere to internal guidelines for cartography).[16]

The United States, however, ignores that clear line of cases. Instead, to avoid the clear import of its own policies, and rather than defend its employees' failure to adhere to them, the United States asks the Court to shield it from liability on the pretense that its agents are not required to follow "informal" agency policies when issued by individuals it deems "low[]-level." Def.'s Br. 9-12. However, the cases cited above make clear that a rule or policy need not be adopted by statute or regulation promulgated by Congress to be "mandatory." See, e.g., Triestman, 470 F.3d at 472-77 (considering Bureau of Prison's "program statement" governing availability of guard supervision to determine whether actions were discretionary). Undoubtedly, federal agencies are given the discretion to adopt internal policies that mandate particular conduct for their officers, and Plaintiffs challenge neither the validity of such regulations nor the Supervisory Defendants' decision to implement them. Once the policy is adopted, however, neither the agency nor its employees have the discretion to ignore this directive. Bagner, 428 F. Supp. 2d at 110-11.[17]

---

[16]     See also Callahan v. United States, 329 F. Supp. 2d 404, 408 (S.D.N.Y. 2004) (considering U.S. Marshals Service's internal policy statements); Gooden v. U.S. Dep't of the Interior, 339 F. Supp. 2d 1072, 1079 (D.N.D. 2004) (denying exception where agency training decisions violated internal policies); Dickerson v. United States, 875 F.2d 1577, 1581 (11th Cir. 1989) (affirming district court finding that letter expressing internal policy is sufficient to "specifically prescribe[] a course of action for [an employee] to follow" and refusing to dismiss FTCA claims based on discretionary function exception); Caraballo v. United States, 830 F.2d 19, 22 (2d Cir. 1987) (finding that, having taken discretionary decision to patrol, government still "had a non-discretionary duty to carry [patrol] out in a non-negligent manner").

[17]     In United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267 (1954), the Supreme Court explained that although a federal agency had discretion to decide whether to issue regulations to govern its conduct, it had no

The United States' relies on <u>Irving v. United States</u> for the proposition that if an agency enjoys a broad delegation of authority, its internal mandatory guidelines need not be followed. <u>Irving</u> does not stand for that proposition. First, as the Government recognizes, <u>see</u> Def.'s Br. at 11-12, the First Circuit rested its holding in <u>Irving</u> on the observation that the agency's internal regulations mirrored the breadth of discretion in the enabling legislation; <u>i.e.,</u> the agency's internal policy statements did nothing to narrow this discretion. <u>See Irving v. United States</u>, 162 F.2d 154, 165 (1st Cir. 1998). In contrast, the statutes, regulations, and policies governing the training of the Raid Officers exhibit a progressive narrowing of the agency's discretion: he enabling legislation grants DHS authority to establish training programs, <u>see</u> 5 U.S.C. §§ 4103, 4118(c), the regulations predicate officers' authority upon the completion of specified training programs, <u>see</u> 8 C.F.R. §§ 287.1(g), 287.5, 287.8, and internal policy charges the Supervisory Defendants with ensuring that raid officers' complete training, and that such training remain adequate to accomplish specific purposes, <u>see, e.g.,</u> Ex. B (Tangeman Memo), at 3-5; Tenreiro Decl. Ex. F (U.S. Dep't of Homeland Sec., Immigration Customs Enforcement Academy, "Fugitive Operations Training Course Description, Student Requirements and Equipment List"), at 2.

Second, this misreading of <u>Irving</u> unmasks the crux of the Government's argument: because the delegation of authority to ICE to enforce the immigration laws grants "complete and limitless discretion," (or "unambiguous and virtually unlimited discretion"),

---

discretion to ignore those regulations once they were in place. Thus, it held the Board of Immigration Appeals was not permitted to exercise its own discretion in a manner contrary to existing federal regulations. Then, in <u>Morton v. Ruiz</u>, 415 U.S. 199, 230-38 (1974), a unanimous Supreme Court extended the <u>Accardi</u> principle to the internal procedures and policies of federal agencies, holding that the Bureau of Indian Affairs could not act pursuant to criteria it had failed to publish, in violation of an internal Manual that required it to do so. In <u>Singh v. U.S. Dep't of Justice</u>, 461 F.3d 290, 296-97 (2d Cir. 2006), the Second Circuit applied the <u>Accardi-Morton</u> line of cases to actions by the Board of Immigration Appeals and ICE, holding that failure to follow their own established procedures was reversible error.

Def.'s Br. at 12, 15, the Government argues, it is free to ignore its internal, discretion-limiting

policies. This argument, if accepted, would render the discretionary function exception

practically limitless and the FTCA waiver meaningless. It would mean that whenever Congress

has delegated broad-based authority to a federal agency (virtually always) the agency would be

free to ignore other lower-level rules even if they clearly limit an agent's discretion, and would

be subject to suit only when there is no broad delegating regulation (practically never). Such

sweeping argument is nonsensical – nothing in the FTCA or Gaubert indicates that agents are

free to disregard mandatory agency directives based on a claim that Congress had granted broad

authority. Certainly, nothing in Second Circuit precedent – which requires compliance with

internal policy statements – turns on the breadth of the statutory grant of discretion. See

Triestman, 470 F.3d at 474-77.

        Worse, the Government's reading of Irving is predicated on a nonsensical

proposition. The Government's entire argument that "informal" policy statements are irrelevant

rests on the existence of a document delegating authority to the ICE Office of Training and

Development ("OTD") over the supervision of training programs. That document, however, has

an effective date of August 27, 2007, more than two months after the Fair Haven raids of June

2007. See Tenreiro Decl. Ex. G (U.S. Immigration and Customs Enforcement Directive No. 8-

1.0, Unified Training Strategy and Functions of the Office of Training and Development, issued

Aug. 27, 2007). An August 2007 directive cannot determine the question of which policy

pronouncements are entitled to mandatory weight in June of 2007. Unfortunately for the

Government, it has been unable to set forth any timely directive that is contrary to the clear

directives established as part of ICE's official field manual through memoranda in 2003 and

2004, see Ex. B (Tangeman Memo); Tenreiro Decl. Ex. H (U.S. Dep't of Homeland Sec.,

23

Immigration and Customs Enforcement, DDFM Mem. from Acting Director Victor X. Cerda, dated Dec. 10, 2004) ("Cerda Memo"), discussed in detail below.[18]

Finally, as <u>Gaubert</u> recognizes and as the Second Circuit has held, when, as here, an agency chooses to control certain officers through regulations while governing other officers through internal policies, both mandates also must be consulted to determine whether the officer's conduct was permitted. See <u>Gaubert</u>, 499 U.S. at 324 (requiring examination of internal policies where "an agency . . . rel[ies] on internal guidelines rather than on published regulations"); <u>Bagner</u>, 428 F. Supp. at 107 ("Governmental policy may be 'expressed or implied by statute, regulation or agency guidelines,' both internal and published") (quoting <u>Gaubert</u>, 499 U.S. at 324). Here, DHS has chosen to control the actions of low-level immigration officers through regulations while governing the Supervisory Defendants through internally adopted policies. <u>Compare</u> 8 C.F.R. §§ 287.1(g), 287.5, 287.8 (prescribing conduct for raid officers) <u>with</u> Tenreiro Decl. Ex. I (U.S. Dep't of Homeland Sec. Border and Transp. Sec. Directorate Immigration and Customs Enforcement Office of Detention and Removal, DETENTION AND DEPORTATION OFFICERS' FIELD MANUAL (2002)) ("DDFM") (prescribing conduct for supervisors). <u>Irving</u> itself recognized that this distinction makes no difference – both directives must be followed. See <u>Irving</u>, 162 F.3d at 165 (acknowledging that policies must be consulted where "regulations define the conduct of a regional official but not of a subordinate . . . .").

---

[18]     Of course, reliance on the delegation of authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement, see Def.'s Br. Ex. 1, is insufficient. As the Government's brief itself recognizes, <u>Irving</u> applies only when regulations at issue "squarely addressed the challenged conduct." Def.'s Br. at 11. Here, the delegation of authority does not speak to training programs for field officers or to a superior's duties in supervising, recruiting, or training such officers. Moreover, even the untimely Directive establishing the OTD, Ex. G, specifically limits OTD authority to ensure that "all training is provided in a manner consistent with DHS, ICE, and/or Program Office policy," <u>id.</u> at Clause 7.3, of which the DDFM Memos are a part. In other words, even if the OTD directive had been applicable at the time of the Fair Haven raids, which it was not, it still by its own terms mandates compliance with broader DHS and ICE policy. Despite the Government's protestations to the contrary, the Supervisory Defendants were required to abide by these mandatory directives.

24

In any event, the Government overplays its hand in arguing that certain policy

statements upon which Plaintiffs rely are "informal" or that they were issued by "low-level"

individuals. The two documents at issue, one an August 2003 memorandum by Anthony

Tangeman, the Director of the ICE Office of Detention and Removal, see Ex. B (Tangeman

Memo), the other a December 2004 memorandum by Victor X. Cerda, the Acting Director of

such office, see Ex. H (Cerda Memo),[19] were both issued as a part of the "official" Detention and

Deportation Officers' Field Manual of ICE's predecessor. See Tenreiro Decl. Ex. I (DDFM).

The DDFM specifically states that it is "intended to be used in concert with several other

references" including the Immigration and Naturalization Act and Title 8 of the Code of Federal

Regulations. Id. The DDFM further contemplates that its contents will be "updated . . .

incorporating new policies or procedures which may have been implemented through cables or

memoranda to field offices." Id. Indeed, the then-director of the DRO, Supervisory Defendant

Torres, recognized the importance of the DDFM and reminded all DRO Field Office Directors in

March 2006 that the manual "is the only approved source of DRO policy and procedures."

Tenreiro Decl. Ex. J (U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement,

DDFM Mem. from Acting Director John P. Torres, dated Mar. 27, 2006), at 1 (emphasis added).

Accordingly, the Tangeman Memo is, on its terms, a change to Chapter 19, section 2 of the

DDFM, and the Cerda Memo is, likewise, a change to section 16 of that chapter. In light of this,

it is puzzling that the Government calls the memoranda, issued by the highest officers in the ICE

branch responsible for field enforcement of the immigration laws, and promulgated in

accordance with the procedures of ICE's "official" field manual, "informal" and "low-level." In

reality, these memoranda are identical to the internal manuals that the courts in Triestman,

---

[19]     The two memoranda deal generally with mandatory training requirements related to ground-level
enforcement of immigration laws.

Banger, and other cases relied on to determine whether an agent's actions were discretionary, and lead to the unequivocal conclusion that the Supervisory Defendants' choices were constrained to follow them. Even more puzzling is the Government's bizarre suggestion that ICE officers have discretion to ignore these self-labeled "official" directives.

For these reasons, the Supervisory Defendants' conduct is governed and circumscribed by internal DHS and ICE policy. Because the Supervisory Defendants acted outside of their delegated authority and out of compliance with these governing policies, they cannot avail themselves of the discretionary function exception.

> b. *The Supervisory Defendants' Negligent Hiring, Training, And*
> *Supervision Of The Fair Haven Raids Was Not Discretionary Because*
> *It Violated The Detention And Deportation Officers' Field Manual*

The Supervisory Defendants' breached their supervisory and training duties on a wide scale by violating mandatory NFOP policy which specifically required that the Supervisory Defendants review and update training regimens as well as ensure that the Raid Officers receive adequate training. Chapter 19, Section 2, of the DDFM provides that "supervisors will ensure officers will receive all training, equipment, and leadership necessary to safely and effectively conduct fugitive operations." Ex. B (Tangeman Memo), at 3-4. Chapter 19, Section 16 of the DDFM further stipulates that team supervisors are required to maintain training records and ensure compliance with mandatory training programs. See Ex. H (Cerda Memo). The Supervisory Defendants did no such thing.[20]

---

[20] In particular, Supervisory Defendants McCaffrey and Sullivan directly supervised the raid and oversaw the Fair Haven Raid Officers' violations of federal statutes, regulations, and policies. According to the Operational Plan, the Hartford DRO Sub-Office served as the "primary command post for the duration of" the Fair Haven raids. See Tenreiro Decl. Ex. K (U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement, DETENTION AND REMOVAL OPERATIONS, DRO OPERATION ORDER: OPERATION RETURN TO SENDER (2007)), at 2. Supervisory Defendant Sullivan acted as supervisor of the raids in his capacity as Assistant Field Office Director for the Hartford sub-office.

26

NFOP training materials also state that the Fugitive Operations Training Program provided to members of NFOP raid teams "is being continually reviewed and updated to prepare officers to be able to perform the duties of a law enforcement officer in the field." Ex. F at 1. These internal directives impose a basic duty on the Supervisory Defendants to maintain and update the training received by their subordinates to respond to patterns of illegal and unauthorized conduct. Moreover, the Government concedes that the DDFM requires that "all agents assigned to NFOP teams" attend the Fugitive Operations Training Program, Def.'s Br. at 9. See Ex. H (Cerda Memo). The Supervisory Defendants thus had no discretion not to ensure that the Raid Officers had received adequate training, or not to review or update their training regimens once it became clear to them that the Raid Officers were not properly equipped to perform safe and effective field operations.[21] See Vickers v. United States, 228 F.3d 944, 952 (9th Cir. 2000) (holding that officials had no discretion to withhold a required investigation); Appley Bros. v. United States, 164 F.3d 1164, 1172 (8th Cir. 1999) (same); Alinsky v. United States, 156 F. Supp. 2d 908, 915 (N.D. Ill. 2001) (holding supervisor's failure to train subordinate in manner required by internal regulation was not discretionary).[22] Stated differently, Plaintiffs do not challenge the adequacy of a particular program nor ask the Court to

---

[21]     See Compl. ¶¶ 278-285.

[22]     The list of regulations and policies that the Supervisory Defendants violated clearly puts the claims at issue here outside the scope of the discretionary function exception and of the cases on which the Government relies. See Def.'s Br. at 20 (citing Li, Saint-Gillen, and Cuoco). In all three cases on which the Government purports to rely, there is no indication that plaintiffs had alleged, as Plaintiffs do here, that the challenged actions were contrary to specific policies. Thus, none of those cases concerned the Supreme Court's own limitation to the first prong of Gaubert.

Nor do any of those cases create a per se rule that the torts of negligent hiring, supervision and training are automatically precluded by the discretionary function exception. Saint-Guillen at most states in dicta that the torts are "generally barred," Saint-Guillen, 657 F. Supp. 2d at 387, but the holding in that case actually rests on the insufficiency of plaintiff's allegations. The Saint-Guillen plaintiff recited in one summary paragraph the elements of the torts at issue, without specifying which actions she alleged fell outside the defendants' discretion. That is, of course, a far cry from this case, where Plaintiffs have alleged that the Supervisory Defendants violated numerous regulations and internal policies in their negligent hiring, supervision and training. See also supra, n.13.

27

"second-guess" the desirability of a chosen system. Plaintiffs simply allege that the Supervisory

Defendants, under clear orders to establish a training program that would ensure that raids were

conducted "safely and effectively," and to ensure that raid officers attended such programs,

violated the law when they ignored these requirements.

In fact, similar language in internal agency policy documents as that at issue here

has been held to create mandatory obligations that demand compliance. In Aslakson v. United

States, the Eighth Circuit held that a voluntarily adopted agency rule requiring outdoor electrical

transmission wires to be maintained only "as may be required for safety reasons" imposed a non-

discretionary duty upon the agency to hang the wires at a level that would avoid the risk of

accident. 790 F.2d 688, 690 (8th Cir. 1986). The agency was alerted by an internal review that

the wires were hung too low. Id. Although the agency was not required to hang the wires at any

particular height, the Court held that the agency violated this internal policy when it failed to

respond to the known risk that the wires posed a danger when hung twenty-eight feet above a

lake. Id. at 690-91, 693 ("The policy's mandate is clear; [the agency] must raise its power lines

if they constitute a safety hazard"). Under the Tangeman Memo, the Supervisory Defendants

were likewise required to provide FOT members all training and leadership necessary to "safely

and effectively conduct fugitive operations" and were alerted by an internal report that their

existing mandatory training programs were inadequate to achieve this purpose. See Ex. B

(Tangeman Memo), at 3-4; Tenreiro Decl. Ex. C (OIG Report), at 29-38. The Supervisory

Defendants' failure to mitigate the known risk that the Fair Haven raids could not be conducted

either effectively or safely with the existing training and supervision structures in place

constitutes a failure to comply with mandatory policy.

28

c. *The Supervisory Defendants' Negligent Supervision Of The Fair Haven Raids Was Not Discretionary Because It Violated Mandatory NFOP Policy*

Additionally, the Supervisory Defendants' negligent supervision is not protected by the discretionary function exception because they acted in violation of internal NFOP policy requiring them to notify the local Police Department of ICE's plan to conduct the raids. See Tenreiro Decl. Ex. K (U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement, DETENTION AND REMOVAL OPERATIONS, DRO OPERATIONAL ORDER: OPERATION RETURN TO SENDER (2007)), at 2. The Operational Plan requiring them to do so was drafted by Supervisory Defendant McCaffrey and reviewed and approved by Supervisory Defendants Sullivan, Chadbourne, and Torres. See Tenreiro Decl. Ex. L (Deposition of Richard McCaffrey, Unidad Latina en Accion v. U.S. Dep't of Homeland Sec., No. 3:07-cv-1224 (D. Conn. Feb. 5, 2009)) ("McCaffrey Depo."), at 52-53, 55-56. Importantly, approval of the Operational Plan and authorization of the raid is predicated on the understanding that the Operational Plan would be complied with.[23] Id. at 55-56. Nothing in that provision contemplates that the Supervisory Defendants may choose not to notify the local police; on the contrary, it prescribes a specific course of conduct that the Supervisory Defendants were expected to follow. The Supervisory Defendants thus had no discretion to withhold the required notification from the NHPD.[24] Yet,

---

[23]     Internal correspondence among high-ranking ICE officials, including Supervisory Defendant Torres, confirmed their understanding that the New Haven police would be notified. See Tenreiro Decl. Ex. M (Email from Hugo R. Martinez to Mark T. Lenox, dated May 5, 2007 (8:12 PM EST)). Internal correspondence also indicates that Supervisory Defendants McCaffrey and Torres regarded the Operational Plan as binding. See Tenreiro Decl. Ex. N (Email from John Torres to Timothy S. Robbins, dated June 9, 2007 (9:23 AM EST)); Tenreiro Decl. Ex. O (Email from Richard L. McCaffrey to Scott A. Williams, dated May 9, 2007 (9:28 PM EST)).

[24]     As noted, the Government cannot argue that the mandatory NFOP policy should be disregarded as "informal," given the clear case law that once an internal policy has been adopted by an agency in its discretion, there is simply no discretion to disregard it. See, e.g., Triestman, 470 F.3d at 475; Caraballo, 830 F.2d at 20; Bagner, 428 F. Supp. 2d at 113. Here, the Operational Plan had been fully adopted by the Boston Field Office of DRO as of May 4, 2007. See Ex. M (reporting the formal approval of the Operational Plan). Accordingly the Supervisory Defendants had no discretion to disregard it.

despite this clear and mandatory requirement, the Supervisory Defendants failed to notify the NHPD of the Fair Haven raids. See Compl. ¶¶ 247-48.[25]

## B.   The Challenged Actions Are Not Grounded In Policy

The Government's conduct also fails to qualify under the second Berkovitz-Gaubert prong. This second prong will not be met when an action, even if relegated to the unbounded choice of an agent, is "'not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.'" King v. United States, 491 F. Supp. 2d 286, 297 (D. Conn. 2007) (quoting Gaubert, 499 U.S. at 324-25); Andrulonis v. United States, 952 F.2d 652, 655 (2d Cir. 1991) ("[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish"). A policy of "discretion" in and of itself is not the kind of public-policy judgment that is shielded by the discretionary function exception – i.e., the Government cannot bootstrap its argument that it meets the second Gaubert prong by reciting the arguments it relies on to establish the first. See Coulthurst v. United States, 214 F.3d 106, 110 (2d Cir. 2000) (rejecting characterization that "would effectively shield almost all government negligence from suit, because almost every act involves some modicum of discretion regarding the manner in which one carries it out").[26]

---

[25]   Plaintiffs expect that discovery in this case will reveal even further internal directives that limited the Supervisory Defendants' discretion, but which the Supervisory Defendants violated in connection with the Fair Haven raids. Such discovery is currently the subject of a Motion to Compel pending before this Court, see ECF No. 64, to which the Government has filed an untimely response. See ECF No. .

[26]   Although the Government is entitled to a presumption that acts are grounded in policy if it can show that they conformed to an applicable regulatory regime, see Andrulonis, 952 F.3d at 654, the presumption may be rebutted if the court determines that the acts in question are not susceptible to policy analysis. See Gaubert, at 324-25. In this case the Government is not entitled to the presumption in the first place because Plaintiffs have shown that the alleged acts were not discretionary, for the reasons set forth in Part II.A. In any event, for the reasons set

1. **The United States Fails To Articulate Clear Policies That The Negligent Hiring, Supervision, And Training Decisions Were Meant To Further**

To meet its burden of establishing that the challenged actions were grounded on permissible policy considerations, the United States must at a bare minimum clearly articulate the public policies implicated by the acts at issue. See Andrulonis, 952 F.2d at 655 (foreclosing the discretionary function exception where government failed to show a policy that "required, or even encouraged" the official's negligent decision); King, 491 F. Supp. 2d at 299 (finding Government's decision to allow workers to continue working in a dangerous building was not grounded in policy absent a "clearly defined policy" requiring them to do so).

Here, the United States has not even attempted to show that the flawed supervision decisions at issue are meant to further any particular policy or policy objective. See Def.'s Br. at 16-19. Indeed, it cannot: ICE's supervision and training decisions at issue were in direct contravention to many of ICE's stated policies and foreseeably led to violations of the Constitution. And it is hardly imaginable that ICE had a policy of permitting supervisors to allow ill-trained agents to go into the field, given clear policy statements and regulatory requirements to the contrary. See discussion supra Part II.A.2.

With respect to its training decisions, although the United States refers broadly to generalized policy goals, these references are inadequate to establish that the Supervisory Defendants' decisions were sufficiently grounded in policy. First, the Government cannot rely on policy statements that are so generic that they "'conceivably could go to any decision'" by NFOP officials. King, 491 F. Supp. 2d at 299 (quoting Gotha v. United States, 115 F.3d 176, 181 (3d Cir. 1997)); see Gonzalez v. United States, 690 F. Supp. 251, 256 (S.D.N.Y. 1988)

---

forth herein, such presumption would be easily rebutted because the acts at issue are not susceptible to policy analysis.

31

("[T]he Government cannot escape the liability clearly envisioned by the statute by describing the challenged decision as a 'policy' matter").

Second, the Government is not entitled to rest solely on existence of a regulation governing the conduct at issue to show that the conduct in question was grounded in policy considerations. See Andrulonis, 952 F.2d at 655. The United States argues that it is entitled to a presumption that training policies exercised within the discretion conferred by a regulation "involve[] consideration of the same policies which led to the promulgation of [such] regulation[]," Def.'s Br. at 13 (citing Gaubert, 499 U.S. at 324). Such argument, if taken to a logical conclusion, would effectively collapse the second Gaubert prong into the first and shield from liability any acts that are even remotely related to delegated authority. Fortunately, courts have steadfastly rejected the Government's unabashed attempt to sweep all of the acts and omissions in question "under the rug" of broad agency policy, thereby effectively insulating from liability "virtually all" exercises of discretion by a government agent. Coulthurst, 214 F.3d at 106. Such a sweeping interpretation "would preclude liability for any and all acts arising out of the regulatory programs of federal agencies." Alinsky, 156 F. Supp. 2d at 915.

More fundamentally, the Supreme Court in Gaubert has made explicit that the existence of a regulation governing conduct does not mean that such conduct was pursuant to public policy. Rather, the focus of the inquiry is whether "the nature of the actions taken and ... whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325. Where, as here, Plaintiffs allege that ICE officers knew that the NFOP training program was wholly inadequate to prevent FOT officers from engaging in frequent and egregious constitutional violations during residential raids, Compl. ¶ 300, allowed many FOT members to skip purportedly mandatory

32

training courses and still be selected to perform residential enforcement, id. ¶ 302, and failed to update the training programs as required by ICE's policies, see Ex. G, Plaintiffs' complaint supports a finding that the decisions in question[27] are not the kind that are grounded in the policy of the regulatory regime or susceptible to policy analysis.

In fact, it is "hardly conceivable" that the ICE officers' decision not to act in the face of knowledge of the inadequacy of the existing training programs, and to authorize residential raids by inadequately trained personnel in defiance not only of constitutional norms but of agency guidelines, see discussion supra at pp. 26-30, is grounded in policy considerations. ICE surely does not have "a policy to keep silent about obvious, easily-correctable dangers." Andrulonis, 952 F.2d at 655. The Government's argument essentially boils down to the notion that ICE, once having implemented training policies at their discretion, has made a "policy" decision to avoid any modifications or corrective actions, even after being put on notice of such blatant deficiencies in its program, and regardless of whether such non-action violates mandatory regulations or the U.S. Constitution. This, the law does not countenance.

2.    **The Discretionary Function Exception Does Not Bar Claims That Government Officials Carried Out Established Policies Negligently**

The Government's arguments that the training programs implemented by ICE are "steeped in policy judgments," Def.'s Br. at 14, are also insufficient because ICE supervisors negligently implemented such programs. See Gaubert, 499 U.S. at 323. Unquestionably, Gaubert decided that acts by lower level officials could implicate policy judgments, eschewing

---

[27]    The decision in question, which Plaintiffs challenge in this regard, is the ICE Supervisory Defendants' failure to act to correct and mitigate the risks associated with the inadequate training – and not the decision to design the training programs per se. See Alinsky, 156 F. Supp. 2d at 916 (Certain discretionary hiring decisions fell "outside the discretionary function exception because they are not susceptible to policy analysis;" although agency was conferred with much discretion in establishing the privatization program, the "relevant government action was not the decision to privatize …, but rather the decision to delay the hiring … in the face of an allegedly imminent threat of harm to the … public").

any distinction between high- and low-level actions as controlling the question of whether the

exception applied. Contrary to the Government's construction of "Gaubert's teachings," Def.'s

Br. at 18, however, Gaubert left open the argument that the second prong is not met if an official

carries out its policies negligently. See Gaubert, 499 U.S. at 325 n.7. Thus, after Gaubert, the

Second Circuit recognized a difference between the discretion to promulgate policy objectives

and the administration of an established policy in a negligent manner, the latter of which is not

shielded by the discretionary function exception. See Triestman v. Fed. Bureau of Prisons, 470

F.3d 471, 476 (2d Cir. 2006) (upholding jurisdiction over a claim that the agency "'enforced'

[its] policy inadequately, due to the negligent actions of its employees"); see also Lemke v. City

of Port Jervis, 991 F. Supp. 261, 265 (S.D.N.Y. 1998) (upholding allegations that government

inspector implemented inspection program negligently); Martin v. United States, 971 F. Supp.

827, 829 (S.D.N.Y. 1997) ("Plaintiff's claim . . . goes not to the adoption of the policy but to its

implementation on the night in question").[28]

      This reasoning applies with even greater force when decisions are taken in

disregard of particularly known risks. Such decisions, by definition, cannot be in furtherance of

---

[28]    In Andrulonis, the Second Circuit reaffirmed this distinction in light of Gaubert, having applied the distinction in its prior decisions. See Caban v. United States, 671 F.2d 1230, 1232-35 (1982); Caraballo, 830 F.2d at 21. In Caban, the Second Circuit found that the activities of the INS agents who detained appellant did not fall within the exception as they were not grounded in policy. Explaining that the principal difficulty for courts in applying the discretionary function exception is that "all federal employees exercise a certain amount of discretion in the discharge of their responsibilities," the Second Circuit held that although the immigration officials were vested with discretion by defining an applicant's entry right in terms of how he "appear(s)" to the immigration officer and whether the officer is "satisfied" with his proof of entitlement to enter, the language of the regulation does not "convert the discharge of prescribed responsibilities into 'decisions which involve a choice between competing policy considerations.'" Caban, 671 F.2d at 1233 (citing Canadian Transp. Co. v. United States, 663 F.2d 1081, 1087 (D.C. Cir. 1980)). The Court thus differentiated between an action contesting the adoption of the regulation, which may have been protected by the discretionary function exception, versus the failure to comply with existing regulations in a competent manner. In line with Caban, in Caraballo, the Second Circuit explained that the discretionary function exception cannot absolve the government of liability from negligent implementation of actions it has decided to undertake. See Caraballo, 830 F.2d at 22 (holding that having decided to patrol recreational area, Park Service is not shielded from liability for accidents resulting from its negligent patrolling).

34

any legitimate policy objective. See Andrulonis, 952 F.2d at 655; Wright v. United States, 866

F. Supp. 804 (S.D.N.Y. 1994). In Andrulonis, a scientist for the Centers for Disease Control

failed to warn about dangerous conditions in a laboratory conducting rabies experiments.

Interpreting the logical application of the second prong of the exception, the Second Circuit

rejected the notion that such reckless behavior could ever be grounded in policy, stating that "it

is hardly conceivable that the [agency] would ever have a policy to keep silent about obvious,

easily-correctable dangers." Andrulonis, 952 F.2d at 655. Likewise in Brown, the Court found

that while the macro-decisions of the Beach authorities to design beach safety procedures was

protected, it would not shield the decision of an employee who "disregard[ed] a substantial risk

of which he as uniquely aware." Brown v. United States, 661 F. Supp. 2d 341, 365 (E.D.N.Y.

2009); see Wright, 866 F. Supp. at 806 (finding that the exception is intended to protect public

policy decisions, but that the "[f]ailure to take any such steps where feasible is negligent and not

within the discretionary function exemption, even though the particular nature of the appropriate

steps is discretionary").

      Here, the Supervisory Defendants' conduct was negligent because they had actual

knowledge of the extraordinary risk that the raids would cause constitutional and common law

violations, and yet allowed the raids to go forward. See Ex. C (OIG Report), at 29-38; Compl. ¶¶

274-299, 309-310, 317-319. In light of these clear risks, the continuation of a practice or pattern

of negligent supervision and training without modification that addresses such risk is not

shielded from liability.

3. **The Supervisory Defendants' Actions Are Not Grounded In Policy Because They Encouraged The Violations Of Several Federal Statutes And DHS Regulations**

The discretionary function exception does not apply to the Supervisory

Defendants' torts for yet another reason: the actions of the Supervisory Defendants, encouraged

and tolerated violations of several federal statutes and DHS regulations. Supervisory Defendants

McCaffrey and Sullivan directly supervised the Raid Officers throughout the entire course of the

raids, Compl. ¶¶ 37, 39, 58, 59, directing and permitting them to take actions that flagrantly

violated federal statutes and regulations. Connecticut law imposes liability upon negligent

supervisors for the foreseeable torts of their subordinates. See Seguro v. Cummiskey, 844 A.2d

224, 229 (Conn. App. Ct. 2004) (holding defendant liable under Connecticut law that imposes

liability on a negligent supervision theory for failure to prevent a known risk of harm to the

plaintiff); Seda v. Maxim Healthcare Servs., CV075010811, 2008 Conn. Super. LEXIS 916, at

\*\*9-10 (Conn. Super. Ct. Apr. 8, 2008) (denying motion to strike plaintiff's negligent

supervision claim because plaintiff's injury was foreseeably caused by "improper training and

supervision" by defendant). The Government thus cannot claim that approval and direct

participation in the Raid Officers' violations are remotely "susceptible to policy analysis."

Supervisory Defendants McCaffrey and Sullivan directed and permitted Plaintiffs

to be arrested without probable cause and their homes to be searched without warrants or

consent. Crucially, Plaintiffs were not included on any list of "targets" that Supervisory

Defendant McCaffrey drew from ICE databases. Compl. ¶¶ 64-65. Instead of confirming the

Plaintiffs' identities before the raid took place, Supervisory Defendants McCaffrey and Sullivan

directed their officers to invade the Plaintiffs' homes without knowing their names and to make

arrests for no apparent reason other than that, for instance, some Plaintiffs could not identify a

36

picture or a person named "Chavez." Id. ¶¶ 69-192. While the entire raid focused heavily on

Plaintiffs' Latino appearances and their residence in an immigrant neighborhood in New Haven,

the mere fact that the Plaintiffs may have appeared to the defendants to be non-U.S. citizens does

not constitute probable cause for their arrest. United States v. Karathanos, 531 F.2d 26, 30 (2d

Cir. 1976). Nothing in these circumstances provided Supervisory Defendants McCaffrey,

Sullivan, and their Raid Officer subordinates with probable cause to establish either of the

conjunctive factors required by the applicable regulations.[29]    See 8 C.F.R. § 287.8(c)(i)-(ii);

Rajah v. Mukasey, 544 F.3d 427, 443-44 (2d Cir. 2008); see also Rodriguez v. United States,

542 F.3d 704, 711-12 (9th Cir. 2008).

       In addition, the Raid Officers were required to identify themselves and notify the

Plaintiffs that they were under arrest. 8 C.F.R. § 287.8(c)(2)(iii)(A)-(B). Contrary to this

binding limitation, Supervisory Defendants McCaffrey and Sullivan ordered and permitted each

of the Plaintiffs to be handcuffed, led out of his home, and taken into ICE custody without

receiving one or both of these required notifications. See Rajah, 544 F.3d at 444 (finding

violation where no notification was given prior to "substantial questioning" by immigration

officers). Further, the officers were prohibited from using "threats" or "coercion" to induce

Plaintiffs to waive their rights or make a statement, a rule the Raid Officers were free to

disregard under their supervisors' negligent watch as they brandished weapons, blocked

entrances and exits, shouted at Plaintiffs in English, seized and destroyed their property, and

misinformed them of their rights in order to obtain access to their homes and intimidate them

---

[29]      Immigration officers are permitted to arrest individuals for immigration law violations without a warrant only if the arresting officer has "reason to believe" that the arrested individual is both (1) present in the United States illegally and (2) that the person is "likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(i)-(ii) (2009); see also 8 U.S.C. § 1357 (2006). The "reason to believe" requires the familiar standard of "probable cause" needed for a criminal arrest. United States v. Sanchez, 635 F.2d 47, 63 (2d Cir. 1980).

into answering questions. See 8 C.F.R. § 287.8(c)(2)(vii); see Singh v. Mukasey, 553 F.2d 207, 215 (2d Cir. 2009); Compl. ¶¶ 69-192.

Defendants' unauthorized conduct continued once Plaintiffs were brought to the DRO Office in Hartford. Compl. ¶¶ 174-192. During the post-arrest examination supervised by Supervisory Defendants McCaffrey and Sullivan, officers were required to inform Plaintiffs of their right to counsel, that they were at risk of removal, and that their statements could be used against them in later proceedings. See 8 C.F.R. § 287.3(c); Singh, 553 F.2d at 215. None of these required notices were timely given. Compl. ¶¶ 174-192. Binding policy statements obliged the Raid Officers to inform the Plaintiffs that the availability of bond or personal recognizance would be determined within hours of their arrest. See Ex. E (M-69), at 5. Defendants did not provide this information. Compl. ¶¶ 174-192. Further, Supervisory Defendants McCaffrey and Sullivan permitted Plaintiffs' examinations to be conducted by the same officers who had arrested them, id. ¶¶ 174-190, contrary to the plain language of the DHS regulation requiring examination by an officer "other than the arresting officer." 8 C.F.R. § 287.3(a); Chi Yuan Chen v. Gonzales, 224 F. App'x 116, 118 (2d Cir. 2007).

Because the United States cannot argue that it furthered any legitimate policy objective by failing to abide by supervisory and training mandates, to allow immigration raids to go forward in knowing violation of the Constitution and federal law, or to stand by and condone flagrant violations of federal law the Government's argument fails the second Gaubert prong as well.

38

## CONCLUSION

For the foregoing reasons, the United States' Renewed Partial Motion to Dismiss

should be denied.

Dated: New York, New York
      August 13, 2010

                Respectfully submitted,

                CLEARY GOTTLIEB STEEN & HAMILTON LLP

                By: _Thomas J. Moloney_
                    Thomas J. Moloney (ct11765)
                    A Member of the Firm

                One Liberty Plaza
                New York, New York 10006
                (212) 225-2000

                JEROME N. FRANK LEGAL SERVICES

                Muneer I. Ahmad, ct28109
                Michael J. Wishnie, ct27221
                Yale Law School
                P.O. Box 209090
                New Haven, Connecticut 06520
                Phone: (203) 432-4800

                Attorneys for Plaintiffs Eduardo Diaz-Bernal,
                Florente Baranda-Barreto, Edilberto Cedeño-
                Trujillo, Washington Colala-Peñarreta, Julio Sergio
                Paredes-Mendez, Cristobal Serrano-Mendez, Jose
                Solano-Yangua, Silvino Trujillo-Mirafuentes,
                Gerardo Trujillo-Morellano, Edinson Yangua-
                Calva, And Amilcar Soto Velasquez

Of Counsel:
    Jennifer Gorskie
    Jorge G. Tenreiro
    Melissa Fernandez
    Hedayat Heikal
    Aliza Hochman

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

DIAZ-BERNAL et al.,                                              x
                                                                 :
                          *Plaintiffs*,                          :
                                                                 :    C.A. No. 3:09-cv-1734 (SRU)
                          v.                                      :
                                                                 :    August 13, 2010
MYERS et al.,                                                    :
                                                                 :
                          *Defendants*.                          :
                                                                 :
                                                                 :
---------------------------------------------------------------- X

## CERTIFICATE OF SERVICE

        I hereby certify that on August 13, 2010, a copy of the foregoing Memorandum of

Law in Opposition to the United States' Renewed Partial Motion to Dismiss, Declaration of

Jorge G. Tenreiro, Esq., in support of Plaintiffs' Memorandum of Law in Opposition to United

States' Renewed Partial Motion to Dismiss, and the exhibits annexed thereto, was filed

electronically and served by mail on anyone unable to accept electronic filing. Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing. Parties may access this filing through the Court's CM/ECF System.


        / s/ Thomas J. Moloney
        Thomas J. Moloney (ct11765)
        CLEARY GOTTLIEB STEEN & HAMILTON LLP
        One Liberty Plaza
        New York, New York, 10006
        Phone: (212) 225-2000
        Fax: (212) 225-3999
        E-mail: tmoloney@cgsh.com