# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| DIAZ-BERNAL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | )   3:09-cv-1734 (SRU) |
| MYERS, et al., | ) |
| | ) |
| Defendants. | ) |

_____ )

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INDIVIDUAL-CAPACITY[1] FEDERAL DEFENDANTS' MOTION TO DISMISS

ORAL ARGUMENT REQUESTED

---

[1] Defendants Julie Myers, John Torres, Bruce Chadbourne, Jim Martin, George Sullivan, Walter Wilkowski, Richard McCaffrey, James Brown, Ronald Preble, Stephen Riccardi, Michelle Vetrano-Antuna, George Lewis, Brian Geary, David Hamilton, Derek Moore, David Ostrobinski, David Reilly, Wilfredo Rodriguez, Wilfred Valentin, Edgar Vasquez, and John Does 1-10. Unless otherwise indicated, "Individual-Capacity Defendants" and "Defendants" are used interchangeably.

i

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

FACTS AND PROCEEDINGS ................................................................................... 4

ARGUMENT ............................................................................................................... 7

I.  THE INA DOES NOT BAR THIS COURT'S SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS REGARDING THEIR UNCONSTITUTIONAL ARRESTS AND DETENTION. ................................................................................................. 7

   A.  8 U.S.C. § 1252(b)(9) Does Not Bar Jurisdiction over Plaintiffs' Claims Arising From Their Unconstitutional Arrest and Detention, Because Those Damages Claims Do Not Challenge a Removal Order and Cannot Be Brought in Removal Proceedings. .................... 9

     1.  The Plain Text of § 1252(b)(9) Applies Only to Judicial Review of Final Orders of Removal and Not to Damages Claims. ............................................................................. 10

     2.  The Overall Structure of § 1252 Suggests That Congress Did Not Intend To Preclude This Court's Jurisdiction Over Damages Actions. ............................................................ 12

     3.  The Statutory Development of § 1252(b)(9) Indicates Congress' Intent To Preserve Damages Actions in the Immigration Context. .............................................................. 13

     4.  Plaintiffs' Damages Claims Are Not Subject to the Judicial Review Scheme of § 1252(b)(9) Because Plaintiffs Did Not, and Could Not, Bring Those Damages Claims as Part of Their Removal Proceedings. .................................................................................. 14

   B.  Plaintiffs' Claims Are Not Subject to the Administrative Exhaustion Requirement of § 1252(d)(1). .......................................................................................................................... 17

   C.  No Other INA Provision Precludes Judicial Review of Plaintiffs' Constitutional Challenges to Defendants' Actions. ...................................................................................... 18

     1.  8 U.S.C. § 1252(g) Does Not Bar Jurisdiction over Plaintiffs' Constitutional Challenges to Defendants' Actions. .................................................................................. 19

     2.  8 U.S.C. § 1252(a)(2)(B)(ii) Does Not Bar Jurisdiction over Plaintiffs' Constitutional Challenges to Senior ICE Officials' Actions. ................................................................. 22

II.  THE DOCTRINE OF HECK V. HUMPHREY DOES NOT PRECLUDE PLAINTIFFS FROM SEEKING REDRESS FOR UNCONSTITUTIONAL DEPRIVATION OF LIBERTY. 24

III.  NO ALTERNATIVE REMEDIES OR OTHER "SPECIAL FACTORS" BAR PLAINTIFFS' BIVENS CAUSE OF ACTION. .................................................................... 26

   A.  The INA's Regulatory Scheme Does Not Preclude a Bivens Remedy. ...................... 28

   B.  Bivens Suits Are Available To Challenge Unconstitutional Misconduct in Fields over Which Congress Has Plenary Power. ................................................................................... 31

IV.  PLAINTIFFS HAVE SUFFICIENTLY PLEADED FOURTH AMENDMENT CLAIMS AGAINST SUPERVISORY DEFENDANTS MYERS, TORRES, CHADBOURNE, MARTIN, AND SULLIVAN. .................................................................. 35

A.   Plaintiffs Have Sufficiently Pleaded That the Supervisory Defendants Were Grossly Negligent in Their Supervision of the Raid Officers and Exhibited Deliberate Indifference to Plaintiffs' Fourth Amendment Rights.................................................................. 37

B.   Plaintiffs Have Sufficiently Pleaded That the Supervisory Defendants Created and Allowed the Continuance of a Policy Under Which Unconstitutional Practices Occurred.. 43

V.   SUPERVISORY DEFENDANTS MYERS, TORRES, CHADBOURNE, MARTIN, AND SULLIVAN ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' FOURTH AMENDMENT CLAIMS. .................................................................................. 48

VI.   PLAINTIFFS' EQUAL PROTECTIONS CLAIMS ARE SUFFICIENTLY PLEADED AND DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON SUCH CLAIMS. .................................................................................................................... 49

A.   Plaintiffs' Allegations Demonstrate Sufficient Discriminatory Intent. ...................... 50

B.   Defendants Are Not Entitled to Qualified Immunity on the Equal Protection Claims. 52

VII.   THE ARREST QUOTAS AND RETALIATORY NATURE OF THE FAIR HAVEN RAIDS VIOLATE DUE PROCESS........................................................................... 57

VIII.   THIS COURT HAS PERSONAL JURISDICTION OVER INDIVIDUAL-CAPACITY DEFENDANTS MYERS, TORRES, CHADBOURNE, AND MARTIN. ......... 62

A.   The Connecticut Long-Arm Statute Confers Personal Jurisdiction over Defendants Myers, Torres, Chadbourne, and Martin.............................................................. 62

1.   Defendants Myers, Torres, Chadbourne, and Martin Transacted Business in Connecticut, Satisfying § 52-59b(a)(1)................................................................. 63

2.   The Court Has Personal Jurisdiction Under § 52-59b(a)(2), Because Defendants' Agents Committed Tortious Acts Within Connecticut.................................................. 65

3.   This Court Has Personal Jurisdiction Under § 52-59b(a)(3). .................................. 67

4.   This Court Has Personal Jurisdiction Under § 52-59b(a)(5). .................................. 68

B.   This Court's Exercise of Personal Jurisdiction Comports With Due Process Requirements. .................................................................................................. 69

1.   Defendants Myers, Torres, Chadbourne, and Martin Have Sufficient Minimum Contacts with Connecticut To Satisfy Due Process Concerns........................................ 69

2.   This Court's Exercise of Personal Jurisdiction is Reasonable................................. 73

CONCLUSION.................................................................................................. 74

## INTRODUCTION

On June 6, 2007, Immigration and Customs Enforcement ("ICE") agents broke into Plaintiffs' homes in Fair Haven without search warrants or consent, subjected Plaintiffs to questioning and harassment, and arrested Plaintiffs solely because of their Latino appearance. Purporting to arrest "fugitive aliens" as part of a program described to Congress as prioritizing dangerous criminal fugitives, ICE agents went door to door and seized Plaintiffs—non-dangerous, non-criminal, non-fugitives, none of whom appeared on ICE's target list—rousing them from their sleep, pulling them from their showers, and arresting them in front of their children. Directed and authorized by senior-level ICE officials to target New Haven in retaliation for the city's adoption of the Elm City Resident Card program, ICE agents conducted the raids in a racially discriminatory manner. Senior ICE officials knew or had reason to know that the raids would result in constitutional violations yet authorized them nonetheless.

Seeking redress, Plaintiffs have brought this suit under the Constitution and the Federal Tort Claims Act ("FTCA") for compensatory and declaratory relief. The Individual-Capacity Defendants, sued under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, have moved to dismiss all of Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1), (2), and/or (6). At base, Defendants claim that unlike nearly every other federal law enforcement official, including agents of the Federal Bureau of Investigation and the Drug Enforcement Administration, ICE agents are uniquely immune to suit for their gross violations of Plaintiffs' constitutional rights—even where, as here, the violations include the very sort of illegal search and seizure claims specifically approved by the Supreme Court in the Bivens decision itself.

Because Defendants cannot avoid liability for egregious constitutional violations, this

1

Court should not dismiss Plaintiffs' claims for the following reasons. First, the Immigration and Nationality Act ("INA") does not bar this Court's subject-matter jurisdiction over Plaintiffs' claims, because the exclusive avenue for judicial review that Defendants invoke refers only to judicial review of a removal order and <u>not</u> to judicial adjudication of an independent action for damages, including <u>Bivens</u> claims. <u>Bivens</u> claims are distinct from constitutional arguments made in removal proceedings, and the INA does not provide for jurisdiction over such claims, rendering the INA's so-called exclusive review scheme inapposite. Additionally, because Plaintiffs do not challenge the lawful discretionary decisions of the Secretary of the Department of Homeland Security or the Secretary's actions to commence proceedings, adjudicate cases, and execute removal orders, Defendants' argument that Plaintiffs' arrest and detention were discretionary and therefore are barred from any judicial review also fails.

Second, the doctrine of <u>Heck v. Humphrey</u> does not preclude any of the Plaintiffs who brought constitutional claims in their removal proceedings from seeking redress for those violations, because the <u>Heck</u> doctrine does not apply to any of the Plaintiffs' <u>Bivens</u> claims. <u>Heck</u> does not preclude review when the plaintiff lacks a habeas corpus remedy. Since Plaintiffs lack the option to pursue habeas relief, as they are not currently in ICE custody, <u>Heck</u> does not bar their <u>Bivens</u> claims.

Third, no alternative remedies or "special factors" bar Plaintiffs' Bivens cause of action. The INA's regulatory scheme does not preclude a <u>Bivens</u> remedy while, contrary to what Defendants argue, <u>Bivens</u> suits are available to challenge unconstitutional misconduct in fields over which Congress has plenary power. Barring <u>Bivens</u> relief in this context would provide immigration officers with broad and sweeping immunity from suit for even the most egregious misconduct.

Last year, in a similar suit alleging <u>Bivens</u> claims against ICE agents for Fourth Amendment and other violations arising out of the arrest of day-laborers in Danbury, Connecticut, Judge Robert Chatigny rejected identical arguments advanced by many of the very same Defendants in this case. Specifically, Judge Chatigny refused to dismiss <u>Bivens</u> claims against ICE agents on the very same INA bar, "special factors," and <u>Heck v. Humphrey</u> arguments made on this motion.

Fourth, Defendants are not entitled to qualified immunity. Under the pleading standards articulated in <u>Colon v. Coughlin</u>, and consistent with <u>Ashcroft v. Iqbal</u>, Plaintiffs adequately and sufficiently pleaded constitutional violations of clearly established rights by the Individual-Capacity Defendants. Additionally, contrary to Defendants' argument, Plaintiffs' equal protection allegations demonstrate sufficient discriminatory intent, precluding qualified immunity on Plaintiffs' equal protection claims. Lastly, the arrest quotas and retaliatory nature of the Fair Haven Raids ("the Raids") violate due process.

Last, contrary to what Defendants argue, this Court may exercise personal jurisdiction over Defendants Myers, Torres, Chadbourne, and Martin under the Connecticut long-arm statute, and exercising jurisdiction comports with due process. At a minimum, Plaintiffs should be allowed jurisdictional discovery with respect to Plaintiffs' non-frivolous argument that personal jurisdiction is proper over these Defendants.

For these reasons, and those stated in this Memorandum, the Court should deny the Individual-Capacity Defendants' Motion to Dismiss.[2]

---

[2] Plaintiffs recognize that private party standing for Tenth Amendment claims is foreclosed in the Second Circuit, TAC ¶ 376; <u>Brooklyn Legal Serv. Corp. v. Legal Servs. Corp.</u>, 462 F. 3d 219, 234-36 (2d Cir. 2006), and do not object to dismissal of this claim on that basis. <u>See also</u> Pls.' Mem. in Opp'n to Def. United States of America's Renewed Mot. to Dismiss in Part at 12-14 [ECF No. 63].

## FACTS AND PROCEEDINGS

The Raids

Just after dawn on June 6, 2007, Defendant ICE Raid Officers[3] swept into the predominantly Latino neighborhood of Fair Haven, burst into Plaintiffs' private residences without search warrants or consent, and accosted Plaintiffs in the midst of their morning routines. Third Am. Compl. ("TAC") [ECF No. 46] ¶ 1. Without cause or reasonable suspicion, Defendant ICE agents interrogated and arrested residents, including Plaintiffs, based on their skin color and physical appearance—in some cases in front of their families and young children. Id. ¶ 3.

Within three hours, Defendant ICE agents arrested and detained twenty-nine residents, including Plaintiffs, forcing them out of their homes and into federal custody, where they remained for days, and in some cases, weeks. Id. ¶ 4. Federal immigration authorities had not previously determined that most of those they arrested were in violation of immigration law, and the agents who stormed through Fair Haven had no reason to believe that those they arrested lacked immigration status. Id.

The Plan To Retaliate

The raids on Plaintiffs' homes were not a product of routine immigration enforcement, but rather of Defendants' deliberate choice to retaliate against the City of New Haven ("the City") for adopting the Elm City Resident Card program. TAC ¶¶ 7-10. One of several public safety policies proposed in response to threats faced by New Haven's Latino residents, the Elm City Resident Card would make it easier for immigrants to open bank accounts and store their money in a secure place rather than on their person. The program would also allow all residents

---

[3] "Raid Officers" refers to Defendants McCaffrey, Brown, Preble, Riccardi, Vazquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Valentin, and John Does 1-10.

to access local libraries, parks, and public beaches, so that families could participate more fully in the life of the community. Id. ¶¶ 200-204.

As the City's proposal gained traction and national media attention, federal officials initiated racially charged internal discussions, expressing alarm that "Yale is loading up the Amistad with illegal aliens and sailing them to freedom," id. ¶ 227, and that "New Haven is becoming a sanctuary city." Id. ¶ 218. In conjunction with the U.S. Attorney's Office for the District of Connecticut, Defendant ICE agents devised a scheme to infringe upon and frustrate the adoption of the Elm City Resident Card program. See id. ¶¶ 219-231. Meanwhile, in the Hartford ICE Office, Defendant McCaffrey drafted a written plan ("Operational Plan") detailing the proposed execution of a Fugitive Operations Team ("FOT") action to raid New Haven-area homes, and compiled a "target list" of alleged fugitives in New Haven. Id. ¶ 233. Defendant McCaffrey submitted the Operational Plan to Defendants Sullivan, Martin, and Chadbourne at the Hartford and Boston regional Detention and Removal Operations ("DRO") office for approval, as well as to Defendant Torres and other supervisory officials at the national DRO Headquarters. Id. ¶¶ 239-241. Additionally, a memorandum informing Defendant Myers of the upcoming June 6th Raids was sent to her and Defendant Torres. Id. ¶¶ 313-316. Defendants Chadbourne and Torres personally reviewed and approved the Operational Plan. Id. ¶¶ 242-243.

After receiving approval from the Supervisory Defendants[4] for the Operational Plan, the Hartford FOT ("HARFOT") then enlisted members from other federal and local agencies to join in on what they declared would be "a fun time." Id. ¶ 245. On June 6, 2007, a mere thirty-six hours after the New Haven Board of Aldermen voted to approve the Elm City Resident Card program, Defendants invaded Plaintiffs' homes. Id. ¶¶ 249-251.

---

[4] "Supervisory Defendants" includes Defendants Myers, Torres, Chadbourne, Martin, and Sullivan.

The National Fugitive Operations Program

The Defendants who planned, coordinated, led, and directly participated in the Raids did so as part of ICE's National Fugitive Operations Program ("NFOP"), a widely criticized program authorized to identify, locate, apprehend, and remove dangerous fugitive aliens from the United States. TAC ¶ 253. In or about January 2006, Defendant Torres, then Acting Director of DRO, instituted a new quota system, requiring each FOT to make one thousand arrests per year, and eliminated any incentive for FOTs to concentrate on apprehending the dangerous criminal fugitives for which Congress had originally funded the NFOP. Id. ¶¶ 260-261. Defendant Torres, with the approval and encouragement of Defendant Myers, later amended the policy to allow "collateral" arrests—bystanders who were neither fugitives nor criminals but who were encountered by FOTs while allegedly searching for actual fugitives—to count towards the annual arrest quota. Id. ¶¶ 266, 270. As senior ICE Defendants pressured FOTs, including the HARFOT, to meet quotas, Supervisory Defendants failed to match that pressure with the training and supervision required to do so lawfully. See id. ¶¶ 14, 283, 300-304. Although they were aware of the gross and obvious inadequacies of the FOT training program, the Supervisory Defendants neglected to change the training policies or to implement the training reforms recommended by the Office of the Inspector General. Id. ¶ 308.

Defendants Torres and Myers's quota policy directly caused extensive arrests of bystanders and widespread constitutional violations as FOTs across the country, inadequately trained and under pressure to meet quotas that could be satisfied in large part by arresting non-fugitives, raided homes, awakened families in their beds, and unlawfully entered homes in plainclothes. Id. ¶¶ 274-275. The pattern of widespread constitutional violations, which included warrantless home invasions, racial profiling, coercive questioning, arresting individuals without

probable cause, detaining individuals without reasonable suspicion, and denying detainees access

to counsel and telephones, garnered increasing public criticism. Id. ¶ 280. This criticism, which

included numerous national media reports, lawsuits against Defendants Myers and Torres and

other senior ICE personnel, and specific communications and warnings issued by members of

Congress and advocacy groups, put Defendants Myers and Torres on notice of the widespread

pattern of unconstitutional conduct by their subordinates. Id. ¶ 281.

Despite knowing that the quota system, coupled with inadequate FOT training and

supervision, was causing widespread and continuing constitutional violations by FOTs

throughout the country, senior-level Defendants nevertheless authorized the Raids. Id. ¶¶ 15, 17.

ICE officials supervising the planning and execution of the Raids knew or should have known

that inadequate supervision and training would result in constitutional violations in the raids on

Plaintiffs' homes, but they did nothing to correct the problems. Id. ¶ 18.

Procedural History

Plaintiffs filed amended complaints on February 28, 2010, Am. Compl. [ECF No. 15],

May 21, 2010, 2d Am. Compl. [ECF No. 43], and June 4, 2010, TAC [ECF No. 46], seeking

relief for harms caused by senior ICE personnel who supervised the Raids, ICE officers who

planned the Raids, and ICE agents who executed the operation. On June 17, 2010, the

Individual-Capacity Defendants filed the instant Motion to Dismiss [hereinafter "MTD"] [ECF

No. 51].

## **ARGUMENT**

### I. THE INA DOES NOT BAR THIS COURT'S SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS REGARDING THEIR UNCONSTITUTIONAL ARRESTS AND DETENTION.

Defendants assert that this Court lacks subject-matter jurisdiction over constitutional

claims that Plaintiffs brought or could have brought in their removal proceedings, arguing that the exclusive avenue for judicial review is a petition for review of a final order of removal filed in the court of appeals. See MTD at 24-28. Defendants also contend that their actions with regard to Plaintiffs' arrest and detention were discretionary, and therefore are completely barred from judicial review. See MTD at 28-32. These are radical arguments that would insulate immigration agents and officials, alone among federal law enforcement agents, from judicial review of their unconstitutional uses of force and racial profiling. Only last year, Judge Chatigny rejected identical arguments made by several ICE agents, who are also defendants in this case, when he denied their motion to dismiss Bivens claims arising from the arrest of a group of day-laborers in Danbury, Connecticut. See Tr. of Mots. Hr'g, Mar. 10, 2009, Barrera v. Boughton, No. 3:07-01436 (D. Conn. filed Sept. 26, 2007) [ECF No. 167] (attached as Ahmad Decl., Ex. A). He expressed, "[i]t may be that the action of a[n] . . . ICE agent in confronting somebody and seizing them is not action taken to remove the person within the meaning of the statutes. If and to the extent that happened here, then a claim based on that activity would not be barred. [The court] would have jurisdiction to entertain that claim." Id. Also, Defendants' arguments should be rejected in light of "the strong presumption in favor of judicial review of administrative action," INS v. St. Cyr, 533 U.S. 289, 298 (2001), as well as "'the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the [alleged] alien.'" Id. at 320 (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987). This Court should do the same as Judge Chatigny in Barrera and deny Defendants' motion to dismiss.

　　　　Defendants' first argument fails because the exclusive avenue for judicial review that Defendants invoke—the INA—refers only to judicial review of a removal order, not to judicial adjudication of an independent action for damages. Defendants' second argument should also be

rejected because Plaintiffs do not challenge the lawful discretionary decisions of the Secretary of DHS or the Secretary's actions to commence proceedings, adjudicate cases, and execute removal orders. Rather, Plaintiffs challenge their unconstitutional arrest and detention by ICE officials, actions that are beyond the scope of Defendants' discretionary authority. Therefore, the INA does not preclude judicial review of Plaintiffs' constitutional claims.

### A. 8 U.S.C. § 1252(b)(9) Does Not Bar Jurisdiction over Plaintiffs' Claims Arising From Their Unconstitutional Arrest and Detention, Because Those Damages Claims Do Not Challenge a Removal Order and Cannot Be Brought in Removal Proceedings.

Defendants argue that 8 U.S.C. § 1252(b)(9) bars this Court's subject-matter jurisdiction over Plaintiffs' damages claims arising from their unconstitutional arrests and detention because  requires such claims "to be reviewed only by the courts of appeals." MTD at 24. Plaintiffs' Bivens claims are not subject to this so-called exclusive judicial review scheme of the INA because nothing in the text, structure, purpose, or history of § 1252 indicates that Congress intended to exclude ICE agents from ordinary judicial scrutiny and bar this Court's jurisdiction over Plaintiffs' Bivens claims.[5] Plaintiffs' Bivens claims were not, and cannot be, brought as part of their removal proceedings; these claims are distinct, independent, and do not challenge the government's action to remove Plaintiffs from the United States. Therefore, this Court's jurisdiction is not barred by § 1252(b)(9).[6]

---

[5] Jurisdictional statutes should not be read to preclude review of constitutional claims absent the most explicit of directives from Congress. See, e.g., Demore v. Kim, 538 U.S. 510, 517 (2003); St. Cyr, 533 U.S. at 299.

[6] In addition to their arguments regarding § 1252(b)(9), Defendants argue in passing that "section 1252(a)(2)(D), read in conjunction with the other provisions of § 1252 that limit jurisdiction, make it plain that only a court of appeals may rule on Plaintiffs' constitutional claims[.]" MTD at 23. Neither the text of § 1252(a)(2)(D) nor the case law that Defendants cite supports such a proposition. The text of § 1252(a)(2)(D) does not require that all of Plaintiffs' constitutional claims be brought as part of the petition for review process. Instead, it only expresses that nothing "in any other provision of this chapter (other than this section) . . . shall be construed as precluding review of constitutional claims." 8 U.S.C. § 1252(a)(2)(D) (emphasis added). Defendants cite Ajlani v. Chertoff, 545 F.3d 229, 235 (2d Cir. 2008), to support their claim that only a court of appeals may review constitutional claims. Defendants misread the holding in Ajlani, which precluded only a district court's "jurisdiction to review

### 1. The Plain Text of § 1252(b)(9) Applies Only to Judicial Review of Final Orders of Removal and Not to Damages Claims.

Defendants maintain that under 8 U.S.C. § 1252 (b)(9),[7] Plaintiffs can challenge their unconstitutional and tortious arrests and detention only by filing a petition for review of their removal orders in the court of appeals. See MTD at 24. Yet § 1252(b)(9) bars this Court's jurisdiction to review only final orders of removal. The Supreme Court has explained that the "purpose [of § 1252(b)(9)] is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals, but it applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" St. Cyr, 533 U.S. at 313 (citing § 1252(b)). See also El Badrawi v. DHS, 579 F. Supp. 2d 249, 271-72 (D. Conn. 2008). Thus, St. Cyr, a "criminal alien" barred from filing a petition for review under § 1252(a)(1), brought a habeas petition to seek judicial review. The Court observed that, "by its own terms, [§ 1252(b)(9)] does not bar habeas jurisdiction over removal orders not subject to judicial review under § 1252(a)(1)." St. Cyr, 533 U.S. at 313.  See also Calcano-Martinez v. INS, 232 F.3d 328, 336 (2d Cir. 2000), aff'd, 533 U.S. 348 (2001) (same); Liang v. INS, 206 F.3d 308, 316-19 (3d Cir. 2000) (same); Madu v. U.S. Att'y Gen., 470 F.3d 1362, 1367 (11th Cir. 2006) (finding § 1252(b)(9) inapplicable where habeas petitioner challenged existence, rather than sought review, of removal order).

Similarly, Plaintiffs here do not seek review of their removal orders under § 1252(a)(1); rather, they bring an independent action for damages, pursuant to general federal question

---

Ajlani's constitutional challenges to his removal proceedings." 545 F.3d at 235 (emphasis added). Plaintiffs here do not challenge their removal proceedings.

[7] The text of § 1252(b)(9) provides:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus . . . or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

jurisdiction, 28 U.S.C. § 1331, to compensate for their unconstitutional arrests and detention. Because § 1252(b)(9), by its terms, applies only to the review procedures detailed in § 1252(a)(1), § 1252(b)(9) does not preclude Plaintiffs' suit here. Defendants consistently cite authority that does not speak to this Court's jurisdiction over Plaintiffs' <u>Bivens</u> claims, but rather bars this Court's jurisdiction to review Plaintiffs' removal proceedings or potential orders of removal.[8] <u>See, e.g.</u>, MTD at 23-24 (quoting <u>Xiao Ji Chen v. Dep't of Justice</u>, 471 F.3d 315, 324 n.3 (2d Cir. 2006)) ("Those jurisdictional provisions 'limit all aliens to one bite of the apple . . . [and thereby] streamline what the Congress saw as uncertain and piecemeal <u>review of orders of removal</u>.'") (emphasis added); MTD at 23 (quoting <u>Kucana v. Holder</u>, 130 S. Ct. 827, 838 (2010) ("Congress [has] amended the INA aggressively to expedite <u>the removal</u> of aliens . . . .") (emphasis added).

Moreover, the titles of § 1252 delimit the scope of § 1252(b)(9)'s application and confirm that Congress addressed the statute exclusively to review of removal orders, not damages actions. The titles of § 1252 and its relevant subparts read:

> **§ 1252. Judicial review of orders of removal**
> [. . . .]
> **(b) Requirements for review of orders of removal**
> With respect to review of an order of removal under subsection (a)(1) of this section, the following requirements apply:
> [. . . .]
> **(9) Consolidation of questions for judicial review**

A clear reading of the title and subtitles of § 1252, from which § 1252(b)(9) as well as § 1252(a)(2)(B)(ii) and § 1252(g) are drawn, reveals that § 1252(b)(9) regulates only judicial review <u>of removal orders</u>. See <u>Flores-Miramontes v. INS</u>, 212 F.3d 1133, 1139 (9th Cir. 2000)

---

[8] Defendants acknowledge that Plaintiffs are parties to ongoing removal proceedings in which appeals are pending. <u>See</u> MTD at 26 n.15. On September 15, 2010, the Court of Appeals for the Second Circuit dismissed Plaintiff Colala-Peñarreta's petition for review.

("The provision itself is titled 'consolidation of questions for judicial review,' and is properly

termed a 'zipper clause.' However, what it 'zips' are requests for review of various kinds of

agency action which are heard by means of petitions for 'judicial review.'"). Reading §

1252(b)(9) to bar review of constitutional tort actions would be inconsistent with its plain text,

the meaning of which is confirmed by the statutory titles.[9] See Cardoza-Fonseca, 480 U.S. at 431

(reading plain meaning of words as used in INA as a whole).

### 2. The Overall Structure of § 1252 Suggests That Congress Did Not Intend To Preclude This Court's Jurisdiction Over Damages Actions.

Section 1252 expressly eliminates judicial review in numerous categories of immigration

cases, indicating that Congress intended to preclude specific matters, and not others, from

judicial review. See 8 U.S.C. § 1252(a)(2)(C) (a final removal order against an alien deportable

under most of the crime-related deportation grounds—except for a single crime of moral

turpitude—shall not be subject to review by any court); 8 U.S.C. § 1252(a)(2)(B) (barring

judicial review of major categories of discretionary decisions as well as other actions—except

for asylum grants—specifically committed to the discretion of the Attorney General). FTCA and

Bivens actions are not among the express bars that Congress chose to include in § 1252.[10]

Section 1252 also includes express limitations on the relief non-citizens may seek.[11]

---

[9] Furthermore, to the extent any ambiguity exists, 8 U.S.C. § 1252(b)(9) should be construed as having no bearing on Plaintiffs' suit here. See INS v. Nat'l Ctr. for Immigrants' Rights, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."); see also Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotation marks omitted); Porter v. Nussle, 534 U.S. 516, 527 (2002) ("The PLRA exhaustion provision is captioned 'Suits by prisoners,' . . . this unqualified heading scarcely aids the argument that Congress meant to bi-sect the universe of prisoner suits.").

[10] Similarly, the Anti-Terrorism and Effective Death Penalty Act eliminated judicial review for many noncitizens deportable because of criminal convictions. See Pub. L. No. 104-132 § 440(a), 110 Stat. 1214, 1276 (amending INA § 106(a)(10)).

[11] In particular, 8 U.S.C. § 1252(f) restricts the jurisdiction of courts to enjoin the operation of the provisions of the Act dealing with entry and inadmissibility, id. § 1252(f)(1), and bars any court from enjoining the removal of

If Congress had so intended, it could have included express bars to damages actions. Under the principle of expressio unius, the inclusion in § 1252 of express bars to both review and relief implies that Congress intended not to preclude independent Bivens and FTCA suits of the kind Plaintiffs bring here. See Guo v. U.S. Dep't of Justice, 422 F.3d 61, 64 (2d Cir. 2005).

### 3. The Statutory Development of § 1252(b)(9) Indicates Congress' Intent To Preserve Damages Actions in the Immigration Context.

The predecessor of § 1252, former 8 U.S.C. § 1105a, similarly entitled "Judicial review of orders of deportation and exclusion," made a petition for review in the court of appeals under the Hobbs Act the "sole and exclusive" avenue for judicial review of deportation orders. 8 U.S.C. § 1105a (1994). Significantly, nothing in the former § 1105a indicated an intention to preclude Bivens or FTCA challenges to immigration arrests and detentions, and no court issued a precedential decision construing the former § 1105a to preclude such an action. Indeed, prior to the 1996 laws that substituted § 1252 for § 1105a, numerous courts adjudicated Bivens and FTCA actions brought against immigration officials. See, e.g., Guerra v. Sutton, 783 F.2d 1371 (9th Cir. 1986); Ramirez v. Webb, 719 F. Supp. 610 (W.D. Mich. 1989); Sanchez v. Rowe, 651 F. Supp. 571 (N.D. Tex. 1986). In other words, under the former § 1105a, immigration agents enjoyed no greater immunity from Bivens liability than other federal law enforcement officials. Defendants cite no text or legislative history reflecting express congressional intent to divest courts of their longstanding jurisdiction to adjudicate Bivens claims against immigration agents; therefore, this Court should not depart from precedent under the prior statute.[12] See Chisom v.

---

any non-citizen pursuant to a final order unless the non-citizen shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law. Id. § 1252(f)(2).

[12] As the Supreme Court has explained, even in reviewing immigration proceedings, courts interpreted § 1105a(1) "to be inapplicable to various decisions and actions leading up to or consequent upon final orders of deportation, and relied on other jurisdictional statutes to permit review." Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 485 (1999). Responding to these various carve-outs for, e.g., stays of deportation, the

Roemer, 501 U.S. 380, 396 n.23 (1991) ("In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration that a watchdog did not bark in the night") (internal citation omitted); see also Calif. Pub. Emps.' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 105 (2d Cir. 2004) ("Because Congress did not manifest an intent to alter preexisting law when it amended the 1933 Act in 1998, we cannot resolve the statutory conflict by focusing on [the 1998 amendment].").

### 4. Plaintiffs' Damages Claims Are Not Subject to the Judicial Review Scheme of § 1252(b)(9) Because Plaintiffs Did Not, and Could Not, Bring Those Damages Claims as Part of Their Removal Proceedings.

Defendants posit that the "test" for whether a claim is subject to the INA's exclusive judicial review scheme depends on whether that claim "could and should have been raised in an administrative proceeding or at least in a court of appeals." MTD at 25 (quoting Merritt v. Shuttle, 245 F.3d 182, 192 (2d Cir. 2001) (internal quotations omitted)). However, Plaintiffs did not, and could not, bring their Bivens claims in their removal proceedings; the INA does not provide jurisdiction in removal proceedings over damages claims that are independent from challenges to one's removability, and Defendants do not allege otherwise.

Defendants assert that Plaintiffs brought claims in their removal proceedings "identical to the constitutional claims raised here," and therefore "Section 1252(b)(9) precludes this Court from exercising jurisdiction over those claims." MTD at 26-27. Defendants misconstrue the nature of Plaintiffs' instant claims. Bivens claims are a unique type of claim that are "(by definition) a claim for money damages," Palanco v. DEA, 158 F.3d 647, 652 (2d Cir. 1998),

---

executions of removal orders, and the commencement of deportation proceedings, see id. (citing cases), the new § 1252(g) shielded these specific discretionary acts from judicial review. See id. at 485-86 (citing provisions). The absence of any express limitations on damages action in § 1252 demonstrates that Congress did not mean to preclude them.

which distinguishes them from the constitutional arguments Plaintiffs raised in their removal

proceedings.[13]

Plaintiffs could not have brought their <u>Bivens</u> claims in their removal proceedings

because the authority of the immigration courts in the removal process is limited to determining

the inadmissibility or deportability of an alleged non-citizen and does not extend to damages

claims. <u>Cf.</u> 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for

deciding the inadmissibility or deportability of an alien."); 8 U.S.C. § 1229a(c)(1)(A) ("At the

conclusion of the proceeding the immigration judge shall decide whether an alien is removable

from the United States."); <u>Aguilar v. ICE</u>, 510 F.3d 1, 11 (1st Cir. 2007) ("[R]emoval

proceedings are confined to determining whether a particular alien should be deported.") (citing

8 U.S.C. § 1229a(c)(1)(A)).

Courts have held that where claims cannot be addressed in the administrative removal

process and are independent from a challenge to a removal order, § 1252(b)(9) does not bar a

district court's jurisdiction. <u>See</u> <u>El Badrawi v. DHS</u>, 579 F. Supp. 2d 249, 272 (D. Conn. 2008)

(quoting <u>Aguilar</u>, 510 F.3d at 11) ("We . . . read the words 'arising from' in Section 1252(b)(9)

to exclude claims that are independent of, or wholly collateral to, the removal process. Among

others, claims that cannot effectively be handled through the available administrative process fall

within that purview."); <u>Aguilar</u>, 510 F.3d at 11 ("There is no reason to believe that section

1252(b)(9)'s exception for independent claims is restricted to those related to detention. . . . After

---

[13] Defendants acknowledge that the purpose of a Fourth Amendment argument in a removal proceeding is to suppress evidence based on an egregious constitutional violation. <u>See</u> MTD at 23 n.12. While most Plaintiffs made such an argument in their removal proceedings, those arguments are separate and distinct from Plaintiffs' Fourth Amendment <u>Bivens</u> claim, which is unrelated to the exclusion of evidence or the termination of removal. <u>See</u> TAC ¶ 342.

all, section 1252(b)(9) is a judicial channeling provision, not a claim-barring one.").[14] Plaintiffs'

Bivens claims cannot be addressed in the administrative removal process because, as discussed

above, they cannot be brought there. In some cases where there is no ability to pursue a claim in

the removal process, courts have held they have jurisdiction to decide Bivens claims. See

Argueta v. ICE, No. 08-1652, 2009 WL 1307236, at *14 (D.N.J. May 7, 2009) ("[Plaintiff's]

constitutional claims could not be brought before an immigration court because he does not seek

to challenge his removability. . . . Therefore, because [plaintiff's] claims are outside the ambit of

the administrative process, they are independent and excepted claims in accordance with the

plain language of § 1252(b)(9)."), appeal docketed, No. 10-1479 (3d Cir. Feb. 25, 2010); but see

Arias v. ICE, No. 07-1959, 2008 WL 1827604, at *6 (D. Minn. April 23, 2008) (holding that §

1252(b)(9) precludes jurisdiction over removable aliens' Bivens claims). As in Argueta,

Plaintiffs' Bivens claims do not seek to contest any underlying order of removal and cannot be

brought in administrative removal proceedings; consequently, § 1252(b)(9) presents no obstacle

to this Court's jurisdiction.

 To support their proposition that § 1252(b)(9) bars jurisdiction over constitutional claims

that could have and should have been pursued in removal proceedings, Defendants erroneously

posit that "[t]his Court reached precisely that holding in El-Badrawi." MTD at 27. Although the

court in El Badrawi dismissed the plaintiff's Bivens claims, it did not decide the question of

whether such claims were barred by the jurisdictional provisions of the INA. See El Badrawi,

579 F. Supp. 2d 263. In fact, the court expressed "doubt[] that the INA's remedial scheme

---

[14] In Arar v. Ashcroft, 414 F. Supp. 2d 250, 268 (E.D.N.Y. 2006), vacated en banc, 585 F.3d 559 (2d Cir. 2009), the court reasoned that "§ 1252(b)(9) has no application because, in fact, [plaintiff] does not contest the underlying removal order as such. Rather, he alleges a conspiracy by defendants to detain him without formal charges and to render him to Syria for interrogation under torture." This authority is still persuasive because the Court of Appeals for the Second Circuit, rehearing en banc, did not decide the question of the INA's jurisdiction bar because it dismissed the claims for other reasons. See Arar, 585 F.3d at 571.

provides adequate remedies to foreclose a <u>Bivens</u> claim in this context." <u>Id.</u> The quote on which

Defendants rely is from a section of the <u>El Badrawi</u> opinion that deals with the FTCA. MTD at

27. Just before the passage Defendants quote, the court noted that with its "understanding of

Section 1252(b)(9), it becomes clear that th[e] court <u>has</u> jurisdiction over [plaintiff's] FTCA

claims for his arrest and initial detention. Through these claims, [plaintiff] is seeking to be

remedied for damages inflicted on him before he ever had the chance to utilize the administrative

process." <u>El Badrawi</u>, 579 F. Supp. 2d at 272 (emphasis added). Like El Badrawi, Plaintiffs seek

a remedy for harms that Defendants inflicted on them prior to the initiation of the administrative

removal process. Based on the logic that "El Badrawi could not have obtained relief for his

initial arrest and detention in removal proceedings," <u>id.</u> at 272 n.23, Plaintiffs' <u>Bivens</u> claims are

not barred by § 1252(b)(9).[15]

## B. Plaintiffs' Claims Are Not Subject to the Administrative Exhaustion Requirement of § 1252(d)(1).

In passing, Defendants argue that § 1252(d)(1), read together with § 1252(b)(9), requires

Plaintiffs to administratively exhaust their claims and then seek judicial review in a court of

appeals pursuant to the INA's judicial review process. <u>See</u> MTD at 24-25. In fact, like §

1252(b)(9), § 1252(d)(1) does not apply to Plaintiffs' damages claims because, by its own terms,

it only relates to "[r]eview of final orders." <u>See</u> 8 U.S.C. § 1252(d)(1) (providing that "[a] court

may review <u>a final order of removal</u> only if the alien has exhausted all administrative remedies

available to the alien as of right") (emphasis added). In this context, "administrative remedies"

refers to the administrative review available in removal proceedings that non-citizens must

---

[15] Defendants acknowledge in a footnote that "[c]onsistent with Second Circuit law, the Court in <u>El-Badrawi</u> held that Section 1252(b)(9) did not bar claims that could not be addressed as part of the administrative process." MTD at 27 n.17 (internal quotation marks omitted). It is this logic from <u>El Badrawi</u> that applies to Plaintiffs' claims, and not the representation of the holding that Defendants assert in the body of their brief.

exhaust before petitioning for review in the court of appeals.

Nothing in the statute requires exhaustion of the same administrative procedures in a damages action, which does not seek review of a final order of removal, but rather challenges the legality of arrest and detention. Not surprisingly, no court has applied § 1252(d)(1)'s exhaustion requirements to damages actions challenging the misconduct of immigration agents. Cf. Gonzalez v. O'Connell, 355 F.3d 1010, 1016 (7th Cir. 2004) (holding that § 1252(d)(1) "does not cover challenges to preliminary custody or bond determinations, which are quite distinct from final order[s] of removal, [nor does it cover] habeas petitions . . . brought under 28 U.S.C. § 2241") (internal citation omitted); Grant v. Zemski, 54 F. Supp. 2d 437, 441 n.5 (E.D. Pa. 1999) (refusing to apply § 1252(d)(1) to habeas challenge to detention).[16]

### C. No Other INA Provision Precludes Judicial Review of Plaintiffs' Constitutional Challenges to Defendants' Actions.

Defendants also argue that certain of their actions are immune from all judicial review whatsoever—namely, the decision to "commence proceedings," MTD at 28 (quoting 8 U.S.C. § 1252(g)), and the "discretion to arrest and detain an alien pending a decision on whether the alien is removable." MTD at 32 (construing 8 U.S.C. § 1252(a)(2)(B)(ii)). These arguments share a

---

[16] Tellingly, as with § 1252(b)(9), the historical development of § 1252(d)(1) indicates its inapplicability here. Section 1252(d)(1) reflects the language of former 8 U.S.C. § 1105a(c) (1994), which had required the exhaustion of "the administrative remedies available to [the alien] as of right" before seeking review of a final order of deportation or exclusion. 8 U.S.C. § 1105a(c) (1994). As with § 1252(d)(1), no court applied the former § 1105a(10)(c) to require administrative exhaustion in the context of damages actions. It is doubtful that in carrying over the extant statutory exhaustion requirement, Congress would have imposed a new requirement on Bivens actions sub silentio. See Chisom v. Roemer, 501 U.S. 380, 396 (1991). Even worse, Defendants' argument for "exhaustion" here would threaten to deny Plaintiffs a cause of action under Bivens. In Connecticut, plaintiffs must file Bivens actions within three years of the incident in question. See Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); see also Chin v. Bowen, 833 F.2d 21, 23-24 (2d Cir. 1987) (applying state statute of limitations to Bivens claims). Given the significant length of immigration proceedings as complex as Plaintiffs', if the government were correct that Plaintiffs must "exhaust" under § 1252(d)(1) before seeking damages under Bivens, many plaintiffs would find their damages claims time-barred. See McCarthy v. Madigan, 503 U.S. 140, 146-47 (1992) ("[R]equiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result . . . from an unreasonable or indefinite timeframe for administrative action.").

common flaw—if accepted, they would bar judicial review of unconstitutional government action. As the Supreme Court has repeatedly stated, because preclusion of judicial review of unconstitutional actions would itself raise serious constitutional concerns, statutes should not be construed to have that effect unless Congress has unequivocally and expressly barred review of constitutional claims. "'[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.'" Demore v. Kim, 538 U.S. 510, 517 (2003) (quoting Webster v. Doe, 486 U.S. 592, 603 (1988)). None of the provisions that Defendants cite even mention constitutional claims, much less expressly preclude judicial review thereof. In this respect, none of these provisions bar judicial review of Plaintiffs' claims.

### 1.  8 U.S.C. § 1252(g) Does Not Bar Jurisdiction over Plaintiffs' Constitutional Challenges to Defendants' Actions.

Defendants argue that this Court lacks jurisdiction over Plaintiffs' claims because 8 U.S.C. § 1252(g) precludes judicial review of "claims arising from actions to commence removal proceedings." MTD at 28. The constitutional harms that Plaintiffs suffered at the hands of Defendants, which give rise to this action, predate the commencement of removal proceedings against Plaintiffs. Therefore, it is illogical that Plaintiffs' claims regarding those harms could arise from the subsequent decision to commence removal proceedings against them. Yet Defendants contend that § 1252(g): (1) bars Plaintiffs' Fourth Amendment and due process claims, because the NFOP constitutes a discretionary decision to commence removal proceedings, and (2) bars Plaintiffs' equal protection claim, because it is based on "selective enforcement." See MTD at 29-30. First, the Supreme Court has rejected any such broad reading of § 1252(g), interpreting it narrowly to apply "only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or

execute removal orders'"—all essentially "challenges to the Attorney General's exercise of prosecutorial discretion." Reno v. Am.-Arab Anti-Discrimination Comm. [hereinafter "AADC"], 525 U.S. 471, 482, 485 n.9 (1999) (quoting § 1252(g)) (emphasis added); see also id. at 482 ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."); Calcano-Martinez v. INS, 232 F.3d 328, 339 n.5 (2d Cir. 2000) (noting that, in AADC, "[t]he Supreme Court . . . held that [§ 1252(g)] applies in a very narrow class of cases"). A government program such as the NFOP does not fall within the definitions of these three discrete terms, and because Plaintiffs' claims are limited to their arrest and detention, they do not implicate the three categories of government conduct–commencement of proceedings, adjudication of cases, or execution of removal orders–addressed in § 1252(g).

Defendants imply that the NFOP constitutes the commencement of removal proceedings, and therefore that § 1252(g) bars any of Plaintiffs' constitutional claims that arise from that program. See MTD at 30-31. Defendants' assertion that immigration proceedings commence with a government program such as the NFOP belies both regulatory text and case law. ICE's decisions to "commence proceedings" occur upon the government's filing of a charging document, called a "Notice to Appear" ("NTA"), in the proper immigration court. See 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by [DHS].") (emphasis added); Ajlani v. Chertoff, 545 F.3d 229, 232 (2d Cir. 2008) ("[T]he government formally commenced removal proceedings . . . by filing a notice to appear with the immigration court."). Plaintiffs challenge the discriminatory animus that led to their unconstitutional arrest and detention, not the government's subsequent decision or action to issue an NTA. Because the Supreme Court has

20

expressed that § 1252(g) applies narrowly to decisions or actions to commence proceedings, adjudicate cases, or execute removal orders, it is implausible that these "three discrete events along the road to deportation," 525 U.S. at 482, encompass the NFOP or the arrest and detention of each Plaintiff in particular.

Plaintiffs' claims could not have arisen from any decision or action to commence proceedings against them because ICE filed NTAs against Plaintiffs days, and in one case, months after their arrest and detention. See ECF No. 51, Exs. B-L. The reasoning in Argueta supports this logic: "the decision to commence proceedings against [plaintiff] arose from his arrest, rather than that his arrest arose from a decision to commence proceedings," and therefore plaintiff's claims were not barred by § 1252(g). Argueta v. ICE, No. 08-1652, 2009 WL 1307236, at *16 (D.N.J. May 7, 2009); see also Humphries v. Various Fed. USINS Emps., 164 F.3d 936, 944 (5th Cir. 1999) ("[It] would defy logic [to hold] that a claim for relief somehow 'aris[es] from' decisions and actions accomplished only after the injury allegedly occurred."). Nevertheless, Defendants argue that § 1252(g) bars this Court's jurisdiction even when the removal proceedings commenced after a plaintiff made his claims. See MTD at 30 (citing Ajlani, 545 F.3d at 235). Defendants misconstrue Ajlani, as its reasoning only applies to "constitutional challenges to . . . removal proceedings." Id. (emphasis added). Plaintiffs here do not challenge their removal proceedings, and therefore Ajlani is inapposite.

Defendants are mistaken in their contention that because Plaintiffs allege they were discriminated against based on race, ethnicity, and/or perceived national origin, and because they were subsequently "all served with a Notice to Appear and the government prosecuted removal proceedings against them . . . . [o]n these facts, section 1252(g) bars Plaintiffs' equal protection claim." MTD at 29-30. To support this proposition, Defendants cite Ali, Hadayat, and Daud,

MTD at 30, all of which involve equal protection challenges to the National Security Entry-Exit Registration System ("NSEERS") program that required nationals from certain countries to register with the Immigration and Naturalization Service ("INS"). See Iqbal Ali v. Gonzalez, 502 F.3d 659, 665 (7th Cir. 2007); Hadayat v. Gonzalez, 458 F.3d 659, 664-65 (7th Cir. 2006); Daud v. Gonzalez, 207 F. App'x 194, 201-03 (3d Cir. 2006). The nationality-based classification in the NSEERS program is authorized by Congress under 8 U.S.C. § 1305. See Daud, 207 F. App'x at 202. ICE's mandate under the NFOP is to target fugitive aliens for arrest and removal, see TAC ¶ 253, and Congress has not authorized ICE to use race, ethnicity or perceived national origin as part of the NFOP. Therefore, Plaintiffs' equal protection claims are distinguishable from those in Ali, Hadayat, and Daud in that they challenge ICE's discriminatory actions based on race, ethnicity, and/or perceived national origin, and not an express congressional delegation of authority to classify by national origin, as is the case with NSEERS. Put otherwise, Plaintiffs' claims arise from "the discriminatory animus that motivated and underlay the actions" of Defendants "which resulted in [ICE's] decision to commence removal proceedings" against Plaintiffs, and not the decision to commence those proceedings itself. Kwai Fun Wong v. United States, 373 F.3d 952, 964 (9th Cir. 2004) (quoting with approval appellant's brief in noting that § 1252(g) does not bar review of actions occurring prior to the decision to commence proceedings) (emphasis in original).

### 2. 8 U.S.C. § 1252(a)(2)(B)(ii) Does Not Bar Jurisdiction over Plaintiffs' Constitutional Challenges to Senior ICE Officials' Actions.

Defendants Myers, Torres, Chadbourne, Sullivan, and Martin are similarly mistaken in contending that 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review of Plaintiffs' claims regarding their arrest and detention. These particular Defendants claim that the power to arrest and detain

aliens is subject to the discretion of the Secretary of DHS and is thereby shielded from all

judicial review. See MTD at 33. Plaintiffs argue, however, that Defendants were acting beyond

their discretion, ultra vires, by violating the Constitution. Moreover, this provision only applies

to claims arising from removal proceedings, and therefore does not apply to Plaintiffs' claims.

As in Zadvydas v. Davis, Plaintiffs do "not seek review of the Attorney General's

exercise of discretion; rather, [they] challenge the extent of the Attorney General's authority . . . .

[which] is not a matter of discretion." 533 U.S. 678, 688 (2001).[17] Defendants have no discretion

to violate the Constitution. Therefore, these provisions do not bar jurisdiction over Plaintiffs'

constitutional challenges to their arrest and detention. See Kwai Fun Wong, 373 F.3d at 963

(claims of constitutional violations are not barred by § 1252(a)(2)(B)(ii)); El Badrawi v. DHS,

579 F. Supp. 2d 249, 268 (D. Conn. 2008) ("Because ICE officials do not have discretion to

violate the constitution [§ 1252(a)(2)(B)(ii)] will not bar El Badrawi's claims based on

unconstitutional conduct by these officials."); cf. Berkovitz v. United States, 486 U.S. 531, 536

(1988) (noting that conduct that violates the law is not discretionary).

Defendants argue that despite the constitutional nature of Plaintiffs' claims, they are

barred by § 1252(a)(2)(B)(ii) because they challenge senior ICE officials' discretionary authority

regarding "the scope and administration of the NFOP" and the "training and supervision related

to that program." MTD at 34-35 (citing, inter alia, Hatami v. Chertoff, 467 F. Supp. 2d 637, 640-

41 (E.D. Va. 2006); Elgharib v. Napolitano, 600 F.3d 597, 602-05 (6th Cir. 2010)). Both Hatami

---

[17] See also Bezmen v. Ashcroft, 245 F. Supp. 2d 446, 448 (D. Conn. 2003) (exercising jurisdiction because petitioner does "not seek review of the Attorney General's exercise of discretion; rather, he challenges the extent of the Attorney General's authority [under the stay provision]. And the extent of the authority is not a matter of discretion.") (citation omitted); Oliva v. INS, No. 98-6526, 1999 WL 61818, at *2-3 (S.D.N.Y. Feb. 10, 1999) (holding 8 U.S.C. § 1226(e) could not be relied on to bar jurisdiction where continued custody of the petitioner was alleged to be in violation of the Constitution or laws of the United States); Abdul v. McElroy, No. 98-2460, 1999 WL 58678, at *2 (S.D.N.Y. Feb. 4, 1999) (same).

and Elgharib are inapposite. In Hatami, the plaintiff brought a constitutional challenge to an immigration judge's "bond decision and the adequacy of the procedures used in reaching that decision." 467 F. Supp. 2d at 639. The court narrowly held that § 1252(a)(2)(B)(ii) bars a district court's jurisdiction "[a]s long as the challenge is to the form of a bond hearing." Id. at 640. Plaintiffs here do not challenge an IJ's bond decision or the administrative removal process, and therefore the narrow holding in Hatami does not bar Plaintiffs' Bivens claims.[18]

Further, these provisions apply only to claims arising from removal proceedings, and therefore do not apply to Plaintiffs' independent challenge to their unconstitutional arrests and detention. See Talwar v. INS, No. 00-1166, 2001 WL 767018, at *3-5 (S.D.N.Y. July 9, 2001) (jurisdiction not barred since § 1252(a)(2)(B) is limited to the context of removal proceedings).

## II.   THE DOCTRINE OF HECK V. HUMPHREY DOES NOT PRECLUDE PLAINTIFFS FROM SEEKING REDRESS FOR UNCONSTITUTIONAL DEPRIVATION OF LIBERTY.

Defendants assert that the doctrine of Heck v. Humphrey, 512 U.S. 477 (1994), bars judicial review of the actions of those Plaintiffs who brought constitutional claims in their removal proceedings which were denied by the IJ and are now on appeal.[19] MTD at 35-36. Under Heck, an action which, if proven, would "necessarily imply" the invalidity of an underlying conviction or sentence is not cognizable under 42 U.S.C. § 1983 unless that conviction or sentence is first invalidated either on appeal or through habeas corpus. Heck, 512

---

[18] Unlike in the instant case, the petitioner in Elgharib sought to challenge a final order of removal in a district court. See 600 F.3d at 605. Additionally, Elgharib's holding does not support Defendants' proposition because it was not based on § 1252(a)(2)(B)(ii), but rather on "the jurisdictional bars in 8 U.S.C. § 1252(a)(5) and (g)." Id. at 607. In fact, the court in Elgharib noted that Sixth Circuit precedent would support a district court's jurisdiction where a constitutional claim was brought challenging the "petitioner's arrest and detention, and . . . the petition did not address the merits of the underlying order of removal." Id. at 605-06 (citing Kellici v. Gonzales, 472 F.3d 416, 419-20 (6th Cir. 2006)). Under this logic, Plaintiffs' claims in the instant case fall within the jurisdiction of this Court, because they do not contest an underlying order of removal but rather challenge the constitutionality of their arrest and detention.

[19] Specifically, Defendants refer to Plaintiffs Paredes-Mendez, Serrano-Mendez, Solano-Yangua, Velasquez, and Yangua-Calva.

U.S. at 486-87; see also Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995) (extending Heck to Bivens actions). This doctrine, however, does not apply to any of the Plaintiffs' Bivens claims, because the Second Circuit has clearly held that Heck does not preclude review when the plaintiff does not have a habeas corpus remedy.[20] See Leather v. Eyck, 180 F.3d 420, 423-24 (2d Cir. 1999).

In Leather, the Second Circuit held that where a defendant convicted of a crime was not or was no longer confined, and thus did not have a habeas corpus remedy, a § 1983 suit for damages was not barred—even where the defendant had not previously had his conviction invalidated or called into question on direct appeal or by writ of habeas corpus. Id. at 423-24 (citing Jenkins v. Haubert, 179 F.3d 19, 21 (2d Cir. 1999)). To require a plaintiff to first pursue such relief, Leather explains, would be equivalent to reading an exhaustion requirement into § 1983—a position which the Supreme Court expressly rejected in Patsy v. Bd. of Regents, 457 U.S. 496 (1982). See Leather, 180 F.3d at 424. Likewise, because Plaintiffs lack the option to pursue habeas relief (as they are currently not in ICE custody), Heck does not bar their Bivens claims.[21]   See also Huang v. Johnson, 251 F.3d 65, 75 (2d Cir. 2001) (holding that Heck does not

---

[20] Also, Plaintiffs simply seek redress for constitutional injuries; they are not detained and so are not challenging detention, nor are any challenging removal orders. The relevant legal standards require "widespread" or "egregious" violations in order to suppress evidence in the immigration context. See INS v. Lopez-Mendoza, 468 U.S. 1032, 1050 (1984) (holding that the exclusionary rule generally does not apply in the immigration context but carving out exceptions for its application). In the present action, Plaintiffs do not seek to suppress evidence obtained in violation of the Fourth Amendment, but to obtain legal redress for such violations under Bivens. The Lopez-Mendoza "widespread" and "egregious" standards are inapposite to Bivens analysis. Because the exclusionary rule standards are specific to—and heightened in—the immigration context, Plaintiffs' success on their constitutional claims here would not "necessarily imply the invalidity" of the IJ's findings. Heck, 512 U.S. at 487.

[21] The cases cited by Defendants are clearly distinguishable from the instant case. In three, Cohen v. Clemens, 321 F. App'x 739 (10th Cir. 2009), Kulakov v. INS, No. 06-0754, 2007 WL 1360728 (W.D.N.Y. May 7, 2007), and Calix-Chavarria v. Gonzalez, No. 06-0820, 2006 WL 1751783 (M.D. Pa. June 22, 2006), plaintiffs were in ICE custody when filing their Bivens claims and therefore had the option to pursue habeas relief. The court in the fourth case, Argueta v. ICE, No. 08-1652, 2009 WL 1307236, at *12 n.10 (D.N.J. May 7, 2009), warned, in dicta, that some may "institute [civil rights] cases in order to avert deportation." No Plaintiffs here, however, seek to challenge removal orders with the instant action, nor would this action necessarily impede deportation.

25

bar § 1983 claim by out-of-custody convict seeking to establish unconstitutionality of conviction or confinement that had not previously been overturned); Jenkins, 179 F.3d at 24-26 (noting that majority of Supreme Court would likely hold that § 1983 action may be viable, even if jurisdictional predicate articulated in Heck was not satisfied, where federal habeas corpus is no longer available because plaintiff is no longer in custody); Dallas v. Goldberg, 143 F. Supp. 2d 312, 323 (S.D.N.Y. 2001) (elaborating Jenkins rationale).

Judge Hall recently ruled that Heck does not bar Bivens claims in the immigration context, when brought by a plaintiff who is not detained. In El Badrawi, 579 F. Supp. 2d 249 (D. Conn. 2008), El Badrawi, who, like Plaintiffs, was no longer being detained, brought a Bivens action challenging his unconstitutional arrest and detention by immigration officials. Judge Hall assumed that Heck applies in the immigration context, but found Heck inapplicable when habeas corpus relief is unavailable. 579 F. Supp. 2d at 273-74 (denying Bivens relief on other grounds). Judge Chatigny has also rejected the same argument in a Bivens action brought by persons during the pendency of removal proceedings. Tr. of Mots. Hr'g, Barrera at 32-33, 95 (Ahmad Decl., Ex. A) (denying motion to dismiss and rejecting reasoning that Bivens claims brought by non-detained plaintiffs challenging their unconstitutional arrest and detention by immigration officials cannot proceed at the same time as plaintiffs' removal proceedings).

## III.   NO ALTERNATIVE REMEDIES OR OTHER "SPECIAL FACTORS" BAR PLAINTIFFS' BIVENS CAUSE OF ACTION.

Defendants argue that this Court should dismiss Plaintiffs' Bivens action because the INA's regulatory scheme and the political branches' plenary power over immigration are "special factors" counseling against Bivens relief. MTD at 36-43. The availability of Bivens remedies has been the norm in the immigration context, however, not the exception. Accepting

Defendants' argument that individuals arrested and detained by immigration officers in violation of the Constitution should be barred from Bivens relief would not only mark an unprecedented departure from longstanding and accepted legal principles, but hand immigration officers broad and sweeping immunity from suit—immunity covering even the most egregious misconduct.

Plaintiffs' claims easily fall within the scope of Bivens's "core holding," namely, that money damages may be sought from "federal officers who abuse their constitutional authority," Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 67 (2001), especially in the Fourth Amendment context that was at issue in the Bivens decision itself. Like Bivens himself, Plaintiffs were deprived of their liberty by an unconstitutional seizure. And, like Bivens, they have no remedy for the harm they have already suffered other than money damages. See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395 (1971) ("Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."). Moreover, since Bivens was decided, courts have, without hesitation, accepted and adjudicated Bivens actions against immigration officers in cases similar to the instant case. See, e.g., Martinez-Aguero v. Gonzales, 459 F.3d 618 (5th Cir. 2006); Papa v. United States, 281 F.3d 1004 (9th Cir. 2002); Franco-de Jerez v. Burgos, 876 F.2d 1038 (1st Cir. 1989); Velasquez v. Senko, 813 F.2d 1509 (9th Cir. 1987); Guerra v. Sutton, 783 F.2d 1371 (9th Cir. 1986); Jasinski v. Adams, 781 F.2d 843 (11th Cir. 1986).

Indeed, a Bivens action remains available to Plaintiffs unless "defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective," or there are "special factors counseling hesitation in the absence of affirmative action by Congress." Carlson v. Green, 446 U.S. 14, 18 (1980) (emphasis in original). Congress has not provided an alternative

remedial scheme in the INA, nor is there any evidence that Congress sought to preclude damages actions against immigration officials who violate the constitutional rights of individuals by arresting and detaining them without probable cause or on the basis of race, nationality, and/or perceived national origin. Defendants simply do not explain why ICE agents, alone among federal, state, and local law enforcement officers, should receive immunity from ordinary liability for constitutional violations.

### A.  The INA's Regulatory Scheme Does Not Preclude a <u>Bivens</u> Remedy.

According to Defendants, because constitutional considerations may figure into various stages of removal proceedings, <u>Bivens</u> actions are precluded. Defendants describe the wide-ranging control of the INA over immigration, citing provisions regulating arrest, detention, and removal proceedings, MTD at 38-39, and argue that the INA includes "an avenue to protect constitutional rights," MTD at 37, through direct constitutional challenges to removal proceedings. These provisions are not enough; <u>Bivens</u> has been found to be precluded only where Congress has created a meaningful alternative remedy for the violations alleged.

Defendants rely on <u>Schweiker v. Chilicky</u>, 487 U.S. 412 (1988), to support the notion that the INA's regulatory scheme bars a <u>Bivens</u> remedy here. <u>See</u> MTD at 37-38. There, <u>Bivens</u> relief was denied to social security disability recipients who claimed due process violations because of the existence of "elaborate administrative remedies." 487 U.S. at 424. This scheme involved multiple layers of review culminating in federal court review that encompassed constitutional claims. <u>Id.</u> at 424. Through this system, aggrieved individuals secured retroactive reinstatement of their wrongfully terminated benefits. <u>See id.</u> at 417. Thus, Congress "ha[d] not failed to provide meaningful safeguards or remedies for the rights" of those in the plaintiffs' position. <u>Id.</u> at 425. The Court explained, "[w]hen the design of a government program suggests

28

that Congress has provided what it considers <u>adequate</u> remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional <u>Bivens</u> remedies." <u>Id.</u> at 423 (emphasis added). The Court declined to allow <u>Bivens</u> relief in <u>Schweiker</u> not because there was just any regulatory scheme in place, but because of the particular regulatory scheme in question, a scheme that allowed for addressing and remedying the injury suffered.

Likewise, in <u>Bush v. Lucas</u>, 462 U.S. 367 (1983), <u>Bivens</u> relief was denied to a federal employee claiming violation of his First Amendment rights, because of "comprehensive . . . provisions <u>giving meaningful remedies</u>." <u>Id.</u> at 368 (emphasis added). In <u>Bush</u>, the Court concluded that federal civil servants were "protected by an elaborate, comprehensive scheme that encompasse[d] substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed." <u>Id.</u> at 385. Constitutional challenges, including the plaintiff's First Amendment claim that he was unlawfully disciplined for publicly criticizing the agency employing him, were "fully cognizable within th[at] system," a system which "provide[d] meaningful remedies" such as reinstatement with retroactive seniority and full back pay. <u>Id.</u> at 386, <u>see id.</u> at 386 n.29, 388. The statutes at issue in both <u>Bush</u> and <u>Schweiker</u> provided meaningfully remedial measures. The plaintiffs' core injury in those cases—whether it was termination of employment or the loss of benefits—was properly remedied through the alternative statutory scheme, and so <u>Bivens</u> actions were precluded.

In contrast to the above-mentioned cases, nowhere in the many provisions of the INA is there any similar remedial provision that would provide an adequate substitute for <u>Bivens</u> relief. Unlike the retroactive aspects of the statutes in <u>Schweiker</u> and <u>Bush</u>, the INA does not in any

29

way provide a remedy for the core deprivation of liberty that has already taken place. Here, Plaintiffs' core injury is not the institution of removal proceedings, but rather, their unconstitutional search, seizure, and detention. A challenge to—or even termination of—removal proceedings does not address those injuries.

Tellingly, Defendants fail to identify anything that is remedial about the INA's regulatory scheme. While Defendants cite to case law that requires satisfactorily remedial mechanisms in order for Bivens actions to be precluded, MTD at 37-40, not once do they offer any theory for how the INA could be interpreted as a remedial statute. Indeed, the INA contains "nothing of a remedial nature." Cesar v. Achim, 542 F. Supp. 2d 897, 900 (E.D. Wis. 2008).

Courts have repeatedly held that the INA's regulatory scheme is not a special factor precluding Bivens claims for constitutional violations by federal immigration officials, pointing specifically to its non-remedial nature. See Turkmen v. Ashcroft, No. 02-2307, 2006 WL 1662663, at *29 (E.D.N.Y. June 14, 2006) ("Although . . . the INA provides a comprehensive regulatory scheme for managing the flow of immigrants in and out of the country, it is by no means a comprehensive remedial scheme for constitutional violations that occur incident to the administration of that regulatory scheme."), aff'd in part, vacated in part and remanded by 589 F.3d 542 (2d Cir. 2009); Cesar v. Achim, 542 F. Supp. 2d at 900 (the INA contains "nothing of a remedial nature, much less an intricate and carefully crafted remedial scheme") (internal quotation marks and citation omitted); Khorrami v. Rolince, 493 F. Supp. 2d 1061, 1074 (N.D. Ill. 2007) ("While [the INA] is comprehensive in terms of regulating the in-flow and outflow of aliens, it is not comprehensive in terms of providing a remedy for [constitutional violations].").

Judge Hall recently expressed "doubts that the INA's remedial scheme provides adequate remedies to foreclose a Bivens claim." El Badrawi v. DHS, 579 F. Supp. 2d 249, 263 (D. Conn.

2008). Defendants argue that the fact that El Badrawi had accepted voluntary departure and left the country and therefore, unlike Plaintiffs, was no longer in removal proceedings distinguishes El Badrawi. This argument skirts the issue and in no way counters Judge Hall's "doubts" about the remedial nature of the INA. That El Badrawi accepted voluntary departure does not address the fact that he could have brought Fourth Amendment claims as a challenge to his deportation; his acceptance of voluntary departure is therefore hardly grounds for distinguishing his case or Judge Hall's "doubts."[22]

### B. Bivens Suits Are Available To Challenge Unconstitutional Misconduct in Fields over Which Congress Has Plenary Power.

Defendants also argue that Congress' plenary power over immigration constitutes a "special factor" counseling against the recognition of a Bivens remedy here. See MTD at 40-43. Yet no court has held that Bivens suits are uniformly unavailable in fields over which Congress has plenary power. In fact, courts have found Bivens available in many such areas. For example, in Goldstein v. Moatz, 364 F.3d 205 (4th Cir. 2004), the Fourth Circuit found that Patent and Trademark Office officials were not absolutely immune to Bivens suits, notwithstanding Congress' long-established plenary power over patents.[23] Despite Congress' failure to establish a damages remedy for constitutional violations, the court allowed the claim after acknowledging that Bivens actions lie entirely outside of the law established by Congress to govern the field. Id. at 210 n.8. See also Wilkinson v. United States, 440 F.3d 970 (8th Cir. 2006) (noting availability

---

[22] Judge Hall ultimately denied Bivens relief to El Badrawi, but explicitly noted that, "the court is not concluding that the immigration context alone constitutes a sufficient reason for the court to stay its [Bivens] hand. Instead, it is the combination of the immigration context and the national security concerns motivating El Badrawi's arrest and subsequent detention that drives the court's conclusion that, under controlling precedent, 'special factors' preclude a Bivens remedy." El Badrawi, 579 F. Supp. 2d at 264. Defendants do not claim that national security concerns are present here.

[23] See also McClurg v. Kingsland, 42 U.S. (1 How.) 202, 206 (1843) ("[T]he powers of Congress to legislate upon the subject of patents is plenary by the terms of the Constitution.").

of <u>Bivens</u> actions against officials of the Bureau of Indian Affairs); <u>Mace v. Skinner</u>, 34 F.3d 854

(9th Cir. 1994) (allowing <u>Bivens</u> claim against officials of the Federal Aviation Administration);

<u>Brown v. United States</u>, 742 F.2d 1498 (D.C. Cir. 1984) (en banc) (allowing a <u>Bivens</u> suit

against District of Columbia officials where the incident predated the inclusion of such claims

under 42 U.S.C. § 1983).[24]

     Unlike these numerous areas where <u>Bivens</u> is allowed, the unique bar on <u>Bivens</u> claims

by active members of the armed forces hinges upon the general absence of the judiciary from

military affairs. <u>Chappell v. Wallace</u>, 462 U.S. 296, 300 (1983); <u>see also</u> <u>Rostker v. Goldberg</u>,

453 U.S. 57, 64-65 (1981) ("The case arises in the context of Congress' authority over national

defense and military affairs, and perhaps in no other area has the Court accorded Congress

greater deference."); <u>Schlesinger v. Councilman</u>, 420 U.S. 738, 746 (1975) (noting the presence

of a parallel system of competent courts to protect members of the military). Thus <u>Chappell</u>

emphasized "the necessarily <u>unique</u> structure of the military establishment" and "the <u>unique</u>

relationship between the government and military personnel." 462 U.S. at 299, 301 (emphasis

added).

     However, unlike in the military context, the Article III judiciary is deeply involved in

modern immigration matters. <u>See, e.g.</u>, <u>Kucana v. Holder</u>, 130 S. Ct. 827, 839 (2010) (noting

"the presumption favoring judicial review of administrative action" in immigration context).

Indeed, the courts of appeals have taken on an increased role in this field, as recent executive

branch action "has fallen below the minimum standards of legal justice." <u>Benslimane v.</u>

---

[24] The Supreme Court has recognized Congress' plenary power over these areas. <u>See</u> <u>South Dakota v. Yankton</u>
<u>Sioux Tribe</u>, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs."); <u>Or. Waste Sys.,</u>
<u>Inc. v. Dep't of Envtl. Quality</u>, 511 U.S. 93, 98 (1994) ("The Framers granted Congress plenary authority over
interstate commerce."); <u>United States v. Lopez</u>, 514 U.S. 549, 589 n.3 (1995) ("Congress has plenary power over the
District of Columbia and the territories.").

Gonzales, 430 F.3d 828, 830 (7th Cir. 2005); see also Ba v. Gonzales, 228 F. App'x 7, 11 (2d

Cir. 2007) (noting that the IJ's "demeanor and remarks 'erode the appearance of fairness and call

into question the results of the proceeding'" and recommending that the BIA "closely

reexamine[] all of his cases that are still on appeal") (quoting Islam v. Gonzales, 469 F.3d 53, 56

(2d Cir. 2006). Gross misconduct during recent immigration raids not only in New Haven but

around the country confirm the critical importance of officer accountability and seriously

undermine any claim of absolute immunity for ICE agents, arguing strongly for the availability

of Bivens actions to both remedy and deter official misconduct.[25]

   In this respect, the importance of the availability of Bivens in the immigration

enforcement context is particularly significant. As is well-settled, a primary purpose of Bivens is

to "deter individual federal officers . . . from committing constitutional violations." Corr. Servs.

Corp. v. Malesko, 534 U.S. 61, 70 (2001); see also FDIC v. Meyer, 510 U.S. 471, 485 (1994).

The same deterrence rationale holds with even greater force in the immigration context, where

the exclusionary rule generally does not apply in removal proceedings. See INS v. Lopez-

Mendoza, 468 U.S. 1032, 1046 (1984) (limiting application of exclusionary rule to instances of

---

[25] See, e.g., Nina Bernstein, Raids Were a Shambles, Nassau Complains to U.S., N.Y. Times, Oct. 3, 2007
(describing a raid in New York State in which federal immigration agents "wearing cowboy hats and brandishing
shotguns and automatic weapons" mistakenly drew their guns on local police, U.S. citizens, and other legal
residents); Jennifer Medina, Arrests of 31 in U.S. Sweep Bring Fear to New Haven, N.Y. Times, June 7, 2007
(describing dragnet-style raid in which "immigration officials knocked on their doors and demanded to speak with
every adult in the house, then asked for identification" as well as giving preferential treatment to the mothers—but
not the fathers—of children); Monica Rhor, Kids Left Behind in Immigration Raids, Associated Press, Mar. 11,
2007 (describing the arrest of a woman who was still nursing her baby, the separation of the mother from the baby,
and the subsequent hospitalization of the baby for dehydration); Bess Chiu et al., Constitution on ICE: A Report on
Immigration Home Raid Operations (2009); Randy Capps et al., Paying the Price: The Impact of Immigration Raids
on America's Children (2007). See also Complaint, Argueta v. Myers, 08-1652 (D.N.J. filed Apr. 3, 2008) (suit over
home raids); Complaint, Nat'l Lawyers Guild v. Chertoff, No. 08-01000 (C.D. Cal. filed Feb. 14, 2008) (challenging
denial of access to counsel following factory raid in Van Nuys); Complaint, Aguilar v. ICE, 07-08224 (S.D.N.Y.
filed Sept. 20, 2007) (class action suit over home raids); Complaint, United Food & Commercial Workers Int'l
Union v. Chertoff, No. 07-00188 (N.D. Tex. filed Sept. 12, 2007) (class action suit arising from meat packing raids);
Complaint, Reyes v. Alcantar, No. 07-02271 (N.D. Cal. filed Apr. 26, 2007) (suit by U.S. citizen boy over home
raid); Complaint, Arias v. ICE, No. 07-01959 (D. Minn. filed Apr. 19, 2007) (class action suit over home raids).

"egregious violations" because applying the exclusionary rule to immigration proceedings "is unlikely to provide significant, much less substantial, additional deterrence" of actions that violate the Fourth Amendment) (quoting United States v. Janis, 428 U.S. 433, 458 (1976)).

Defendants urge this Court to limit both remedies for and deterrence of serious unconstitutional conduct on the part of immigration officers, arguing that allowing Plaintiffs' Bivens claims to proceed would "unnecessarily enmesh the Court in difficult public policy issues." MTD at 41. According to Defendants, this Court would thereby "invade the realm of federal immigration policy." Id. Judicial assessment of the constitutionality of particular immigration enforcement actions does not unduly interfere with federal immigration policy, however. Given the availability of qualified immunity for some law enforcement officers and Congress' decision not to eliminate liability for constitutional torts, judicial review of these constitutional claims would not reshape policy. Rather, it would simply confirm that ICE agents, no less than other federal law enforcement agents, may be held personally liable for gross misconduct, while helping to ensure that all persons' rights are respected throughout the immigration process.[26]

Defendants argue that if Plaintiffs' Bivens claims were allowed to proceed, "[t]his Court would be required to review the factual findings and legal conclusions that the immigration judge made in Plaintiffs' removal proceedings," MTD at 42, and conclude by asserting that "Plaintiffs seek to make this Court a de facto court of review over their removal proceedings." Id. at 43. Judge Chatigny rejected this argument when made by some of the same ICE agents. Tr. of Mots.

---

[26] Notably, adjudication of constitutional claims relating to pending criminal investigations sometimes creates interference in the analogous field of criminal law enforcement, but nevertheless such claims are allowed to proceed. See Regan v. Sullivan, 557 F.2d 300, 303 (2d Cir. 1977).

Hr'g, <u>Barrera</u> at 18-21, 95 (Ahmad Decl., Ex. A). Defendants' overblown rhetoric notwithstanding, this Court would in no way be conducting any review of Plaintiffs' administrative removal proceedings.  Plaintiffs brought constitutional claims in their removal proceedings as a defense against deportation. Such defensive action can only possibly bring relief from deportation and not remediation, just as the defensive assertion of Fourth Amendment violations in the criminal context is not understood to provide a remedy for those violations but only possible relief from conviction.  Constitutional claims are present both in Plaintiffs' removal and civil rights proceedings, but that is where the similarities end. Those claims play different roles toward differing ends, requiring different legal standards and analysis. <u>See</u> <u>supra</u> Section II.

The central question posed in Plaintiffs' complaint—whether the New Haven raids, the entry into their homes without warrants or consent, and their arrest and detention were lawful—requires only the application of law to their unconstitutional maltreatment by federal officials. Such assessments are routinely conducted by courts when the claims involve other federal law enforcement officials, and serve critical deterrence and remedial functions. To do so here would not hamper federal policy; to fail to do so would be to confer an absolute immunity for the gravest official misconduct.

## IV.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED FOURTH AMENDMENT CLAIMS AGAINST SUPERVISORY DEFENDANTS MYERS, TORRES, CHADBOURNE, MARTIN, AND SULLIVAN.

Plaintiffs have sufficiently pleaded that Defendants Myers, Torres, Chadbourne, Martin, and Sullivan (the "Supervisory Defendants"), were personally involved in the violation of

Plaintiffs' Fourth Amendment rights.[27] A supervisor is liable under <u>Bivens</u> for the torts of a subordinate if the supervisor has "sufficient personal involvement with the alleged violation." <u>D'Olimpio v. Crisafi</u>, No. 09-7283, 2010 WL 2428128, at *4 (S.D.N.Y. June 15, 2010). There are "five bases for showing that a supervisory defendant had sufficient personal involvement," <u>id.</u>, of which three are relevant here:

> (1) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (2) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (3) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

<u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995). In addition, Plaintiffs must demonstrate an "affirmative causal link between the supervisor's inaction and [their] injury" <u>Poe v. Leonard</u>, 282 F.3d 123, 140 (2d Cir. 2002)); <u>see also</u> <u>Rahman v. Fischer</u>, No. 08-4368, 2010 WL 1063835, at *1 (S.D.N.Y. Mar. 22, 2010) (explaining that "a pleading of personal involvement and proximate causation" does <u>not</u> rest on the doctrine of <u>respondeat superior</u>); <u>Thomas v. Ashcroft</u>, 470 F. 3d 491, 496-97 (2d Cir. 2006) (same). Here, Plaintiffs have asserted that the Supervisory Defendants were <u>personally involved</u> with the violations of Plaintiffs' Fourth Amendment rights, as per <u>Colon</u>, and that their conduct resulted in the underlying constitutional violations.[28]

---

[27] Notably, Defendants attack the sufficiency only of Plaintiffs' Fourth Amendment pleadings in connection with the supervisory liability claims, but do not challenge the sufficiency of the pleadings regarding the Raid Officers' unlawful entries into Plaintiffs' homes, or the unlawful arrests and detention of Plaintiffs.

[28] Defendants misconstrue <u>Iqbal</u>'s impact on the scope of supervisory liability for <u>Bivens</u> claims, relying on the opinions of just one court in the Southern District of New York to support their theory that some of the <u>Colon</u> theories of supervisory liability were abrogated by <u>Iqbal</u>. (Defendants fail to specify exactly which of the five prongs they believe survive.). MTD at 48-50, 50 n.30 (citing <u>Bellamy v. Mt. Vernon Hosp.</u>, No. 07-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (Scheindlin, J.); <u>Newton v. City of New York</u>, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) (Scheindlin, J.); <u>Spears v. Hugles</u>, No. 08-4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009) (Scheindlin, J.)). Although the Second Circuit has not yet explicitly addressed <u>Iqbal</u>'s effect, if any, on <u>Colon</u>'s analysis, <u>see</u> <u>Qasem v. Toro</u>, No. 09-8361, 2010 WL 3156031, at *3 (S.D.N.Y. Aug. 10, 2010), several courts in this Circuit have disagreed with Judge Scheindlin and concluded that <u>Iqbal</u>'s reasoning regarding supervisors' personal involvement is limited to the Equal Protection context where the underlying constitutional violation requires that

Specifically, Plaintiffs allege that the Supervisory Defendants: (i) were grossly negligent in supervising their subordinates; (ii) were deliberately indifferent to Plaintiffs' rights; and (iii) instituted and allowed the continuance of policies under which they know unconstitutional practices occurred. Colon, 58 F.3d at 873.[29]

### A. Plaintiffs Have Sufficiently Pleaded That the Supervisory Defendants Were Grossly Negligent in Their Supervision of the Raid Officers and Exhibited Deliberate Indifference to Plaintiffs' Fourth Amendment Rights

Supervisory liability is established where "an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (citation omitted); Colon, 58 F.3d at 873 (such liability accords with Colon's fourth and fifth theories of liability). Under the gross negligence theory, a supervisor is liable for Fourth Amendment violations committed

---

each defendant acted with discriminatory purpose see, e.g., id. at *4 (Stein, J.); Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) (Peck, J.) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon may still apply.") (citation omitted); D'Olimpio, 2010 WL 2428128, at *5; Jackson v. Goord, 664 F. Supp. 2d 307, 324 (S.D.N.Y. 2009) (Daniels, J.); see also Argueta, 2010 WL 398839, at *5-6 (holding that the conclusion that Iqbal "entirely did away with supervisory liability under all circumstances" is suspect and that plaintiffs' pleadings of violations of their Fourth Amendment rights should be analyzed under the appropriate Fourth Amendment standards that do not require proof of discriminatory purpose; Swain v. Doe, No. 3:04-1020, 2009 WL 3151183, at *5 (D. Conn. Sept. 24, 2009) (Underhill, J.) (applying the five factor Colon test for supervisory liability post-Iqbal). Iqbal's conclusion that "mere knowledge" of unconstitutional conduct is not sufficient to establish supervisory liability is therefore entirely premised on the requirements of an invidious discrimination claim. This conclusion is thus inapplicable where, as here, the supervisory liability claims are connected to violations of Fourth Amendment and Due Process rights, which require no showing of intent. In addition, the Second Circuit applied Colon's theory of liability more than a year after Iqbal, finding in Scott v. Fisher that "[a] supervisory official may be liable [. . . not only] because he or she created a policy or custom under which unconstitutional practices occurred, [but also because he or she] allowed such a policy or custom to continue." No. 09-1451, 2010 WL 2991085, at *7 (2d Cir. Aug. 11, 2010) (citation omitted) (alteration in original).

[29] These assertions concerning the Supervisory Defendants' personal involvement in the deprivation of Plaintiffs' constitutional rights consist of "factual allegations" – not merely "labels and conclusions" – and are "enough to raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 577 (2007). The Second Circuit has "reject[ed] [the] contention that Twombly and Iqbal require the pleading of specific evidence or extra facts beyond what is needed to make the claims plausible." Arista Records LLC v. Doe 3, 604 F.3d 110, 120-21 (2d Cir. 2010); Austen v. Catterton Partners V, LP, No. 3:09-1257, 2010 WL 625389, at *2 (D. Conn. Feb. 17, 2010) ("Context, good judgment and common sense mattered long before the Supreme Court decided Twombly and Iqbal, and they remain significant in deciding Rule 12(b)(6) motions even after those decisions.").

by subordinates if the supervisors "knew or should have known of a substantial risk that constitutional rights would be violated due to their lack of supervision, that the officials consciously disregarded the risk by failing to adequately supervise, and that such a disregard caused a constitutional violation committed by subordinates." Beatty v. Davidson, No. 06-5715, 2010 WL 1407311, at *10 (W.D.N.Y. Mar. 31, 2010). The deliberate indifference theory, while closely related to gross negligence on the facts of most cases, including this one, requires a slightly different showing: that "the need for more or better supervision was obvious and that [the] official made no meaningful attempt to forestall or prevent the unconstitutional conduct." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (citation omitted); see also Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 255 (2d Cir. 2001) (same factual allegations are relevant to showing personal involvement through gross negligence in supervising a subordinate and deliberate indifference to others' rights "by failing to act on information that unconstitutional acts were occurring").[30] The obvious need for supervision may "be demonstrated through proof of repeated complaints of civil rights violations" and "deliberate indifference may be inferred if [such] complaints are followed by no meaningful attempt . . . to investigate or to forestall further incidents." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

Plaintiffs' Third Amended Complaint sufficiently pleads both of these theories of

---

[30] The Second Circuit has interpreted the deliberate indifference standard to encompass situations where plaintiffs adequately allege (i) failure to supervise, and (ii) failure to train, in circumstances where such failure would constitute deliberate indifference to the constitutional rights of persons that the supervisor's subordinates will encounter. See Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 128-29 (2d Cir. 2004); Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006) (where subordinates "so often violate constitutional rights that the need for further training must have been plainly obvious to the [supervisors], deliberate indifference will be found.") (citation omitted); see also Gashi v. County of Westchester, No. 02-6934, 2005 WL 195517 (S.D.N.Y. Jan. 27, 2005) (applying municipal liability deliberate indifference standard to determine supervisory liability of municipal official).

supervisory liability.[31]  First, the Third Amended Complaint alleges that the Supervisory

Defendants had notice of their subordinates' Fourth Amendment violations involving home

entries without consent and unconstitutional searches and detentions, "long before the New

Haven raid." TAC ¶¶ 276-280, 298, 318-319, 333-334. Such knowledge is established through

"increasing public criticism" that the NFOP was leading to a "pattern of widespread

constitutional violations." TAC ¶ 280. In particular, Plaintiffs allege that the Supervisory

Defendants were put on notice through "numerous media reports,[32] lawsuits against Defendants

Myers and Torres and other senior ICE personnel,[33] and specific communications and warnings

issued by members of Congress and advocacy groups." Id. ¶¶ 282, 290, 332.[34] Based on this

---

[31] Defendants mistakenly assert that Plaintiffs must "allege facts showing how or why it is plausible that Myers and Torres intended to violate Plaintiffs' constitutional rights." MTD at 51. This argument is premised on Defendants' mistaken reading of Iqbal. As discussed supra note 28, the requirement of "intent" or "purpose" should be limited to the equal protection context. Colon factors 4 and 5 survive Iqbal because they do not require "intent" or "purpose."

[32] Defendants argue that Plaintiffs' reliance on media reports, lawsuits and public criticism is unspecified and inadequate. Further, Defendants assert that "there is no allegation in the complaint of any specific report or lawsuit that put Myers and Torres on notice of a constitutional violation." MTD at 51-52. Although a laundry list of such reports is not required at the pleadings stage, many are available that document in detail the unconstitutional conduct of ICE agents prior to the Fair Haven Raids. See, e.g., Shannon Prather, Immigration Raids, Arrests Trigger Lawsuits, St. Paul Pioneer Press (Minn.), Apr. 19, 2007 (ICE agents, wearing bulletproof vests and armed with guns, pushed their way into homes and terrified children); Tad Walch, Suit targets immigration raid, Desert Morning News (Salt Lake City), July 22, 2004 (detailing a lawsuit against ICE agents who "engaged in unconstitutional practices when they detained all 150 Champion Safe employees for an hour and then arrested 107 of them" without probable cause); Carol Rose & Christopher Ott, Inhumane raid was just one of many, Boston Globe, Mar. 26, 2007 (commenting that "[w]e'll see more people's rights trampled, and more families torn apart by ICE's race to deport in order to meet [the Department of Homeland Security's] staggering goal"); Rood Lee, Stop 'aggressive' raids, advocates plead, The Des Moines Register, Dec. 16, 2006 (lawyers and advocates for immigrants accused ICE agents of violating immigrants' due process rights in a raid). Although newspaper articles are generally considered hearsay, see Barnes Found. v. Township of Lower Merion, 242 F.3d 151, 163 n.8 (3d Cir.2000), in this case the articles show the Individual Federal Defendants had notice of the controversy. As such, the articles are used during the pleading stage only to show notification. Argueta, 2010 WL 398839, at *4 n.4.

[33] For example, the following lawsuits were filed prior to the New Haven Raids, which alleged a pattern of constitutional abuses by ICE agents: Arias v. ICE, No. 07-01959 (D. Minn. filed Apr. 19, 2007); Reyes v. Alcantar, No. 08-02271 (N.D. Cal., filed Apr. 26, 2007); Mancha v. ICE, No. 06-12650 (N.D. Ga. filed Nov. 1, 2006). See also DACORIM v. DHS, No. 3:06-1992 (D. Conn. filed Dec. 14, 2006) (in Freedom of Information Act suit, alleging ICE agents "knowingly and willingly participated in a campaign by the Mayor and Police Department of Danbury, Connecticut to target and harass immigrant and Latino communities") [ECF No. 1].

[34] Plaintiffs have also sufficiently pleaded that the Supervisory Defendants had prior knowledge of the inadequacy of ICE's training program through "internal investigations and external criticisms." TAC ¶ 362. In particular, Plaintiffs point to a report issued in March 2007 by the Office of the Inspector General that noted the

notice, the need for better supervision and training was obvious before and at the time of the

Raids. See Vann, 72 F.3d at 1049.

Indeed, courts have held that references to media reports provide notice to a supervisor

sufficient to allege the requisite pleading of knowledge. Meriwether, 879 F.2d at 1048; Argueta,

2010 WL 398839, at *9 (holding that ICE supervisory personnel, including Defendants Myers

and Torres, had notice based on numerous newspaper articles and noting "based upon [the

court's] experience and common sense, each Individual Federal Defendant most likely received

and read news clips regularly"); Doe v. Barrett, No. 3:01-519, 2006 WL 3741825, at *9 (D.

Conn. Dec. 19, 2006) (holding that "[p]laintiff is not restricted to demonstrating formal, direct

communications with [d]efendants [to establish notice]"). Likewise, courts have held that service

of a complaint naming a supervisor as a defendant is sufficient to show the supervisor's actual

knowledge of allegations made therein. White-Ruiz v. City of New York, No. 93-7233, 1996

WL 603983, at *13 (S.D.N.Y. Oct. 22, 1996).[35]

Second, Plaintiffs have asserted with specificity that the Supervisory Defendants, despite

such notice and knowledge, consciously disregarded the risk that constitutional rights would be

violated during the Raids and "made no meaningful attempt to forestall or prevent the

unconstitutional conduct" by either instituting necessary training or increasing their supervision.

---

training program was "insufficient, as many officers had never attended it and ICE offered no national refresher course." Id. ¶ 306.

[35] Defendants attempt to lessen the force of Plaintiffs' pleadings regarding notice by citing two cases, Mateo v. Fischer, No. 08-7779, 2010 WL 431229, at *4 (S.D.N.Y. Feb. 8, 2010) and Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997), for the proposition that "receipt of letters or grievances, by itself, does not amount to personal involvement." MTD at 52. However, both cases involved a single letter of grievance regarding one prisoner's circumstances, and courts routinely note that prison superintendents typically receive thousands of letters each year regarding individual prisoner complaints, which are generally forwarded onto the appropriate personnel to handle. See Amaker v. Goord, No. 98-3634, 2002 WL 523371, at *16 (S.D.N.Y. Mar. 29, 2002). Here, by contrast, the numerous media reports and lawsuits demonstrate that the Supervisory Defendants had actual or at the very least constructive knowledge prior to the Fair Haven Raids beyond the level of thousands of generic complaints from disgruntled prisoners. TAC ¶¶ 282, 290, 332.

Amnesty, 361 F.3d at 127.[36] To the contrary, Defendant Myers touted the effectiveness of such raids, thereby encouraging the known violations to continue. See TAC ¶¶ 287, 292. In this respect, Plaintiffs specifically allege the personal involvement of the Supervisory Defendants and their lack of any action to prevent constitutional violations, as follows:

- Defendants Torres and Chadbourne personally authorized the Raids, and reviewed and approved the Operational Plan. TAC ¶¶ 239-242.[37] Defendant Sullivan was the Operational Supervisor of the Raids and directly supervised the execution of the Raids. Id. ¶ 37.

- Defendants Myers, Torres, Chadbourne, Martin, and Sullivan had actual knowledge of the Raids before their implementation and received an "A/S Note" (Assistant Secretary Note), which Defendant Sullivan prepared, prior to the commencement of the Raids. Id. ¶¶ 313-316; 318.

- The Supervisory Defendants knew that the HARFOT would conduct residential raids armed only with an administrative warrant. These Defendants knew that an administrative warrant does not fulfill the probable cause requirement that officers need either a judicial warrant or consent to enter homes. Id. ¶ 331. The Supervisory Defendants were aware of previous unconstitutional practices in residential raid situations under the same quota regime, including Fourth Amendment violations, and of substantial risk that constitutional violations would be committed. Id. ¶¶ 318-319; 276-280. Supervisory Defendants knew that officers under their supervision would implement raids under pressure to make arrests – even bystander arrests – to meet the annual quota, and that this type of operation demanded close supervision. TAC ¶¶ 275, 294, 317.

- The Supervisory Defendants failed to adequately or more closely supervise their subordinates, resulting in Fourth Amendment violations of Plaintiffs' rights in the Raids – violations that Defendants do not dispute. Id. ¶¶ 318; 340.

- The Supervisory Defendants took no action to implement an adequate training program or to ensure appropriate supervision of the Raid Officers. Id. ¶¶ 294; 309; 336-339.

---

[36] Defendants erroneously suggest that Plaintiffs need to plead that the "ICE Agents . . . were inexperienced" or that the "Operation Plan allegedly reviewed by Chadbourne and Torres authorized unlawful entry." MTD at 57. Defendants insist that such pleadings are "critical, given the lack of any facts supporting a plausible claim that the Supervisory Defendants were on prior notice of Fourth Amendment violations." Id. However, as discussed supra, Plaintiffs have exactly pleaded that the supervisors were "on prior notice of Fourth Amendment violations," and have included unusually detailed pleadings to the level of individual email exchanges amongst particular defendants, by date and content – all before having taken any discovery in this case.

[37] Defendants Martin and Sullivan also received the Operation Plan for review and approval. TAC ¶ 239.

These and other allegations demonstrate that Plaintiffs have adequately pleaded gross negligence and deliberate indifference by alleging that Supervisory Defendants failed to act in the face of known problems. Further, Plaintiffs identify several weaknesses in the NFOP training program that the Supervisory Defendants were responsible for implementing and updating, which resulted in the Raid Officers' unconstitutional conduct.[38] Plaintiffs have alleged that the NFOP training program was woefully inadequate, did not sufficiently instruct ICE raid officers in "how to conduct residential raids," and failed adequately to prepare the Raid Officers to abide by the Fourth Amendment in residential raid situations, focusing instead on teaching raid officers to perform administrative tasks. TAC ¶¶ 300-309. Plaintiffs also cite the Office of the Inspector General Report, which examined the training of the FOT raid officers and, only months before the Raids that are the subject of this action, concluded that there were deficiencies in the training regimen, such as the absence of a national refresher course to update officers on new legal compliance developments, and that the Supervisory Defendants failed to respond to such warnings. Id. ¶¶ 306-307. Plaintiffs thus identify the lack of training on compliance with the Fourth Amendment in residential raid situations as the specific deficiency in the raid officers' training regimen, and that such a lack of training is closely correlated to the ultimate injury:

---

[38] Although Plaintiffs have alleged specific deficiencies in the NFOP training program, the Second Circuit has held that in the context of a motion to dismiss, a plaintiff need only plead that failure to train caused the constitutional violation. Amnesty, 361 F.3d at 130 n. 10. Defendants cite to Carey v. Maloney, 480 F. Supp. 2d 548 (D. Conn. 2007) and Birdsall v. City of Hartford, 249 F. Supp. 2d 163 (D. Conn. 2003) for the proposition that Plaintiffs must allege "that there is a specific deficiency . . . in the training program . . . and that it actually caused the constitutional violation." MTD at 58. Carey and Birdsall are concerned solely with the standard on a motion for summary judgment. Carey, 480 F. Supp. 2d 548; Birdsall, 249 F. Supp. 2d 163. The standard applicable to determine whether claim based on failure to train survives a motion to dismiss is different. Amnesty, 361 F.3d at n 10; see also Bd. of Cnty Comm'rs v. Brown, 520 U.S. 397, 409 (1997) ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that [supervisors'] decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the [supervisors'] choice – namely, a violation of a specific constitutional or statutory right.").

violation of Plaintiffs' Fourth Amendment rights.[39]

Third, Plaintiffs have also alleged, as required, that the Supervisory Defendants' inaction proximately resulted in the underlying constitutional violation. See Poe v. Leonard, 282 F.3d 123, 139 (2d Cir. 2002). Defendant Torres, with Defendant Myers's approval, dramatically increased the arrest quotas and allowed bystanders to count towards those goals, which led ICE agents to systematically engage in Fourth Amendment abuses. TAC ¶¶ 271-284. The Supervisory Defendants, as discussed supra, were aware that their subordinate Raid Officers were operating under pressure to meet this quota and that Fourth Amendment violations of the type Plaintiffs have suffered had become widespread since the institution of the quota policy. Despite such knowledge, Defendant Myers publicly lauded the achievements and successes of the NFOP, thereby further encouraging the ICE agents' unconstitutional conduct, and failed to revise or even so much as review their training programs to ensure that such pressure to meet quotas did not result in unconstitutional conduct. Id. ¶¶ 287, 292. If the Supervisory Defendants had not ignored their supervisory duties, but instead provided adequate training or closer supervision, Plaintiffs would not have been subject to unlawful arrest and detention. Id. ¶¶ 309, 319, 326, 329, 332.

### B. Plaintiffs Have Sufficiently Pleaded That the Supervisory Defendants Created and Allowed the Continuance of a Policy Under Which Unconstitutional Practices Occurred.

Supervisory liability under Bivens may also be established on the basis that the Supervisory Defendants "created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873; Brock

---

[39] Notably, months after this lawsuit was filed, ICE announced new guidelines mandating that FOT agents be trained twice each year specifically on Fourth Amendment requirements in residential enforcement. U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement, NFOP Memo. from Asst. Sec'y John Morton, Dec. 8, 2009 [ECF No. 76-2 at 72-75].

v. Wright, 315 F.3d 158 (2d Cir. 2003) (vacating in part order granting summary judgment on behalf of supervisory defendant and finding that supervisory liability may lie "where unconstitutional acts are the result of a policy promulgated by the defendant"); McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (affirming denial of Rule 12(b)(6) motion to dismiss claims against superintendents with "responsibility for enforcing or allowing the continuation" of the policies resulting in deprivation of plaintiff's constitutional rights).[40]

In the instant case, Plaintiffs have sufficiently pleaded that the Supervisory Defendants had authority over policies that resulted in – and that they knew would result in – violations of Plaintiffs' constitutional rights. Plaintiffs specifically allege that:

- Although the NFOP was funded by Congress to target dangerous fugitive aliens with criminal convictions, Defendant Torres, in his capacity as Acting Director of the DRO, in January 2006 "instituted a new quota system, requiring each seven-member FOT to make one thousand fugitive arrests per year" and eliminated the prior requirement that at least seventy-five percent of total yearly arrests be arrests of fugitives with criminal convictions – a policy that increased the pressure on FOTs to make arrests of fugitive aliens while simultaneously eliminating incentives for such arrests to be targeted to the criminal fugitive population. TAC ¶¶ 259-263; 328-330.

- Upon becoming Director of the DRO and its chief policymaker, Defendant Torres not only allowed the continuance of the January 2006 policy, but was responsible for amending the January 2006 policy in September 2006 to allow up to five hundred so-called "collateral" or bystander arrests to count toward the one thousand arrests-per-year quota. Id. ¶¶ 264-268. Defendant Torres's amendment to the quota policy actively encouraged and provided positive incentives for FOTs to make non-fugitive non-criminal arrests, such as those of Plaintiffs in this case. Id. ¶¶ 274-277.

---

[40] See also White-Ruiz, 1996 WL 603983, at *12 (supervisor may be held liable "if he approved and tolerated a custom or usage within the [d]epartment which led to the alleged misconduct"); Padilla v. Yoo, 633 F. Supp. 2d 1005, 1034 (N.D. Cal. 2009) (finding that plaintiff "has alleged sufficient facts to satisfy the requirement that [the defendant, who was a Deputy Attorney General at the time of plaintiff's detention] set in motion a series of events that resulted in the deprivation of [plaintiff's] constitutional rights" and "created a legal construct designed to justify the use of [the allegedly unlawful] interrogation methods"). Under this theory of liability, Plaintiffs sufficiently allege the required causal link between the violation and their injury by establishing the violation itself. See D'Olimpio, 2010 WL 2428128, at *6 (S.D.N.Y. 2010) (holding that the allegations, contained in Inspector General's report, that defendants failed to "act on information indicating unconstitutional practices were occurring and were grossly negligent in failing to supervise subordinates" and "were otherwise deliberately indifferent to suspects' rights" demonstrated an affirmative causal link between the supervisors' inaction and plaintiff's injury).

- Defendant Myers approved the January 2006 and September 2006 changes to the quota policy. Id. ¶¶ 269-270; 274; 328-330. Defendants Myers and Torres oversaw the dramatic increase in non-criminal non-fugitive arrests by ICE agents. Id. ¶¶ 271-274.

- The public criticism, media attention, and lawsuits against senior ICE officers that followed Defendants Torres and Myers' adoption of these policies highlighted ICE officers' lack of comportment with the requirements of the Fourth Amendment. Id. ¶¶ 271-274; 294.

- Defendants Chadbourne, Martin, and Sullivan were responsible for implementing fugitive operations, including Operation Return to Sender, in Connecticut. Id. ¶¶ 36-38; 286.

In light of the above allegations, there should be no doubt that Plaintiffs have adequately and plausibly alleged that the Supervisory Defendants promulgated and allowed the continuance of a policy under which unconstitutional conduct occurred. In Argueta, the court considered similar allegations of unconstitutional practices against some of the very same Defendants regarding an ICE raid that took place in Newark, New Jersey, as part of Operation Return to Sender.[41] Argueta, 2010 WL 398839, at *9. The court found that the Fourth Amendment claims asserted against Defendants Myers, Torres, and other senior ICE personnel, survived defendants' 12(b)(6) motion to dismiss. The plaintiffs in Argueta, like Plaintiffs here, had alleged that:

- Defendants Myers and Torres "directly implemented the specific [Operation Return to Sender] program being challenged," "oversaw an 800% increase in arrests quotas as a direct result of their alleged home raid policies," and "did nothing to investigate or stop the unlawful practices despite being made aware through lawsuits, congressional reports, repeated national media reports and other sources." Id. at *7.

- All the supervisory defendants, including Myers and Torres, were "deliberately indifferent to the risk that ICE officers, lacking clear training and under the pressure of sharply increased quotas, would violate the Fourth Amendment rights of individuals." Id.

These allegations were sufficient for the Argueta court "to conclude that there is a plausible claim against each [supervisory defendant] that their personal involvement, direction and

---

[41] The Argueta court assessed the sufficiency of plaintiffs' pleading in accordance with the principles of Rule 8 as outlined in Iqbal.

knowledge or acquiescence permitted a search of the residence of plaintiffs without consent in violation of the Fourth Amendment." Id. at *8. Indeed, the Argueta court specifically noted that "there is no doubt that Myers and Torres had sufficient knowledge of how the searches had been conducted" as they "worked on these issues everyday." Id.[42]

Here, it is clear that the Supervisory Defendants' promulgation and implementation of a policy, which required each FOT to make one thousand arrests per year, eliminated the requirement that at least 75% of the arrests quota be fugitives with criminal convictions, and instead allowed up to 500 bystander arrests to count towards the fulfillment of that quota, had the effect of creating an environment where raid officers routinely violated Fourth Amendment rights in their attempts to meet such a quota. TAC ¶¶ 259-263; 328-330. Defendants rely on Jackson v. District of Columbia, 672 F. Supp. 22, 26 (D.D.C. 1987), for the proposition that the policy of setting arrest goals is not unconstitutional. MTD at 55. Plaintiffs do not contend that arrest quotas constitute a per se violation of the Fourth Amendment, however. They allege that the Supervisory Defendants had knowledge through extensive media coverage and numerous lawsuits that the policy they promulgated and were responsible for implementing led to unconstitutional conduct, and yet they allowed the policy and the conduct occurring under it to continue. In Jackson, the court decided a motion for summary judgment (not a motion to dismiss), where the only evidence of the supervisors' knowledge of their subordinates' unconstitutional conduct involved newspaper articles, which only reported an increase in arrests and not a pattern of unconstitutional conduct by officers under the arrests quotas, as is the case

---

[42] See also Arias, 2008 WL 1827604, at *9-10 (lawsuit arising out of an ICE residential raid in Minnesota where court held that plaintiffs' allegations to the effect that "U.S. [DHS] officials created and approved operations that willfully . . . disregarded Plaintiffs' Constitutional protections," when coupled with the alleged constitutional violations, were sufficient to state a claim for the personal involvement of Myers and Torres).

here.[43]

Defendants rely on two cases, Al-Jundi v. Rockefeller, 885 F.2d 1060 (2d Cir. 1989) and

Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003), for the proposition that it would be

"unreasonable to draw from the alleged facts the inference that the supervisory defendants

directed agents on the scene to engage in unconstitutional activity." MTD at 55.  In both Al-

Jundi and Gonzalez, however, the challenge was to supervisory conduct during an unusual one-

time occurrence that resulted in constitutional violations, whereas the challenge here is to the

Supervisory Defendants' continuance of an ongoing policy, which knowingly condoned

widespread unconstitutional practices. In Al-Jundi, the court specifically limited its holding to

the context of "a decision to retake . . . [the Attica] prison and rescue hostages held by rioting

inmates who have rejected a negotiated settlement." 885 F.2d at 1067. Similarly in Gonzalez, the

conduct in question was not related to a pattern of unconstitutional conduct, but limited to a

single occurrence. Not surprisingly then, the Eleventh Circuit reasoned that the supervisory

defendants in Gonzalez had "ordered the execution of valid search and arrest warrants with the

expectation that the agents on the scene would execute them in a lawful manner." 325 F.3d at

1236. In the instant case, Defendants Myers and Torres were put on notice of widespread

unconstitutional practices in connection with the NFOP raids well before the Raids at issue here,

and therefore could not have had any such expectation.

---

[43] In addition, the court in Jackson acknowledged the possibility that the quota system would be
unconstitutional if it had "the effect" of "promot[ing] illegal law enforcement practices." 672 F. Supp. at 26. As
detailed numerous times above, Plaintiffs have more than sufficiently alleged that such practices were indeed the
known effect of the new quota system.

**V.   SUPERVISORY DEFENDANTS MYERS, TORRES, CHADBOURNE, MARTIN, AND SULLIVAN ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' FOURTH AMENDMENT CLAIMS.**

Qualified immunity is designed to "strike[] a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." Wyatt v. Cole, 504 U.S. 158, 167 (1992). Consistent with this purpose, the immunity is not available to government officials where, as here, Plaintiffs have sufficiently alleged a violation of a constitutional right, and where that right was "clearly established" at the time of the alleged misconduct. See Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009). The Second Circuit has established a three-part test to determine whether a right is clearly established: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [her] conduct was unlawful." Srinivas v. Picard, 648 F. Supp. 2d 277, 291-92 (D. Conn. 2009) (quoting Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original)). In addition, the Second Circuit has held that "both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established" in order for a supervisor to be held liable. Poe, 282 F.3d at 126.[44]

Supervisory liability under the Colon theories Plaintiffs have set forth was clearly established at the time of the Raids. At the time of the Raids, a supervisor failing to address known and ongoing unconstitutional actions by his employees, by either failing to supervise or train, or allowing a policy under which such conduct occurred to continue, would have

---

[44] The Supreme Court has held that that the constitutional violation alleged need not be "materially similar" or "fundamentally similar" to the facts of previous cases; rather, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

understood based on existing law that his or her conduct was unlawful. See, e.g., Morris v. Eversley, 205 F. Supp. 2d 234, 242 (S.D.N.Y. 2002) (finding that plaintiff had sufficiently alleged supervisory liability based on pleadings that the supervisors knowingly allowed the unconstitutional practices to continue and were grossly negligent in supervising subordinates); Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

To the extent that Defendants seek to suggest that the recent opinion in Iqbal now renders the law on supervisory liability unclear, MTD at 47 – which is not the case, see supra note 28 – that argument has no relevance to the "clearly established" prong of the qualified immunity test, because Iqbal was decided two years after the Raids. The "clearly established" prong involves an examination of whether the law at the time of the alleged violation was clearly established. See Pearson, 129 S. Ct. at 822 ("inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken") (internal quotation marks and citations omitted).[45]

## VI. PLAINTIFFS' EQUAL PROTECTIONS CLAIMS ARE SUFFICIENTLY PLEADED AND DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON SUCH CLAIMS.

Plaintiffs' equal protection claims against Defendants McCaffrey, Brown, Preble, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, and Valentin are sufficiently pleaded under Rule 8, demonstrate the required discriminatory intent, and are not barred by qualified immunity.[46]

---

[45] It was clearly established in 2007 – as it is clearly established today – that supervisory liability applies to the present facts. D'Olimpio, 2010 WL 2428128, at *9 (finding post-Iqbal that qualified immunity did not bar a finding of supervisory liability based on supervisors' personal involvement with a policy under which unconstitutional conduct occurred); Qasem, 2010 WL 3156031, at *4 (denying 12(b)(6) motion post-Iqbal and holding that qualified immunity did not bar a finding of supervisory liability based on supervisors' deliberate indifference).

[46] Defendants Riccardi and Vasquez were co-leaders of ICE Team #4. While they were not involved in the unjustified search and seizure of the Plaintiffs in this action, they later joined the other ICE Raid Teams in the

**A.  Plaintiffs' Allegations Demonstrate Sufficient Discriminatory Intent.**

A plaintiff bringing claims under Bivens for equal protection violations must plead, and

eventually prove, that Defendants acted with discriminatory purpose. Iqbal, 129 S. Ct. 1937,

1948 (2001). In Iqbal, the Supreme Court found that respondent's complaint did not contain any

factual allegation sufficient to plausibly show that the petitioners possessed a "discriminatory

mind," and therefore did not meet the federal pleading standard for an equal protection claim. Id.

at 1952; Boykin v. KeyCorp., 521 F.3d 202, 213 (2d Cir. 2008). By contrast, here Plaintiffs

detail Defendants' planning and execution of an immigration raid carried out with racial animus

against Latinos. Defendants took this "course of action because of, not merely in spite of, [its]

adverse effects upon an identifiable group." Iqbal, 129 S. Ct. at 1948 (quotation marks and

citation omitted).[47] And according to the facts currently known to Plaintiffs – which Plaintiffs

expect will be buttressed by discovery – Defendants carried out that Raids with racial animus at

every step of the way. Plaintiffs' allegations are sufficiently specific to make their equal

protection claims plausible, rendering dismissal inappropriate.

Unlike in Iqbal, where the respondent attempted to show equal protection violations on

the basis of supervisors' adoption of an unconstitutional policy alone, here each of the

Defendants whom Plaintiffs allege have violated their right to equal protection was directly

involved in the Raids. Thus, Plaintiffs specifically allege that the Raids giving rise to equal

---

processing phase, and were personally involved in the violation of Plaintiffs' rights to due process. TAC ¶ 63.
Plaintiffs concede that these two defendants were therefore not involved in the violation of the Plaintiffs' equal
protection and Fourth Amendment rights, and thus withdraw the claims of Equal Protection and Fourth Amendment
Violations as against these two defendants.

[47] In Iqbal, the Supreme Court found that because his allegations were conclusory, and given the legitimate
government interest in public safety following the September 11th attacks, Iqbal failed to demonstrate sufficiently
specific discriminatory intent. Id. at 1951. The Court explicitly distinguished its analysis from a case in which
specific constitutional challenges to an arrest and detention are brought, noting "[i]t is important to recall that
respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC,"
and stating "we express no opinion concerning the sufficiency of respondent's complaint against the defendants who
are not before us [i.e., those who carried out the arrest and detention itself.]" Id. at 1952.

protection violations were <u>conducted</u> with discriminatory intent by each of the other Defendants, including McCaffrey and Vertano-Antuna, through their direct supervision of the Raid Officers at the raid site itself.  TAC ¶¶ 234, 238, 344; <u>see</u> <u>Iqbal</u>, 129 S. Ct. at 1942.

Plaintiffs have alleged specific facts that demonstrate that the Raid Officers who carried out the Raids acted with discriminatory intent. Defendants' conduct in Fair Haven on the morning of June 6, 2007, involved nothing more than traveling door-to-door and apartment-to-apartment in a largely Latino neighborhood and detaining people who merely <u>looked</u> Latino, regardless of whether those persons appeared on the target fugitive list. Plaintiffs further allege that Defendants deviated wholly from their target list and instead sought and arrested individuals simply because they appeared Latino and were nearby. Such racially-based government action is plainly unconstitutional because "the Equal Protection Clause . . . imposes restraint on impermissibly class-based discriminations," <u>United States v. Scopo</u>, 19 F.3d 777, 786 (2d Cir. 1994), and "the Constitution prohibits selective enforcement of the law based on considerations such as race." <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996).

Plaintiffs further allege that the words and actions of the Raid Officers on the day of the Raids aptly demonstrate their discriminatory mind. For example, as Plaintiffs Barranda-Barreto, Trujillo-Morellano, and Trujillo-Morellano were being put into a van by Defendant Raid Officers, Trujillo-Morellano's girlfriend asked where they were going, and a Defendant taunted her, responding that they were going to a concert of famous Mexican singer Juan Gabriel. TAC ¶¶ 126-127. Six armed officers entered Plaintiff Yangua-Calva's home without warrant or consent, asked in Spanish if he recognized a man in a photo; when he answered that he did not, Defendants shoved him onto his couch and arrested him. <u>Id.</u> ¶¶ 131-135. When viewed together with the fact that Defendants ignored their target lists in favor of race-based arrests, these

51

allegations demonstrate that Plaintiffs' race was at the forefront of Defendants' minds as they went door-to-door, making warrantless arrests of people who appeared to be Latino, without reasonable suspicion. In the Second Circuit, "a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure." Brown v. City of Oneonta, 221 F.3d 329, 334 (2d Cir. 2000).

Defendants miss the point in arguing that Plaintiffs' allegations of the retaliatory motive of the Raids as a punishment for New Haven's ID program are somehow incompatible with the allegations of separate, unconstitutional discriminatory conduct of the Raid Officers' conduct during the operation. MTD at 67. Plaintiffs' contention that the Raids were orchestrated and supervised with the intent to retaliate against New Haven for its legislative action neither negates nor diminishes the racial animus demonstrated by the individual Raid Officers in their conduct during the Raids. Indeed, when viewed as a whole, the allegations demonstrate that retaliatory intent against New Haven motivated the planning of the Raids, which targeted a Latino community that would be the principal beneficiary of New Haven's ID program, and that racial animus motivated the conduct of the Raids, in which the Raid Officers sought out, arrested, and detained anyone they viewed as Latino. Not one Plaintiff was named on ICE's target list. This Court can and should find that Plaintiffs' allegations of discriminatory mind easily cross the line from "conceivable" to "plausible."[48]

### B. Defendants Are Not Entitled to Qualified Immunity on the Equal Protection Claims.

Given that, as demonstrated above, Plaintiffs have adequately alleged equal protection

---

[48] Additionally, Plaintiffs have also made a substantiated allegation that people involved with planning a response to the Elm City Resident Card Program used racially-charged comments to reflect their unhappiness with the City's lawful exercise of its municipal powers. See TAC ¶ 227 (quoting e-mail from ICE attorney lamenting that "Yale [was] loading up the Amistad with illegal aliens and sailing them to freedom, while [ICE counsel] openly weeps in Hartford").

violations by Defendants, there is little question that Defendants' conduct is not protected by qualified immunity. It was of course "clearly established" on June 6, 2007, as it has been for decades, that government officials may not discriminate on the basis of race. This basic constitutional right against discrimination or racial animus is not altered or diminished in the context of a stop, arrest, or detention, nor is it negated by the fact that the Defendants were engaging with persons they believed to be immigrants. Where, as here, Defendants conducted an immigration raid that was driven at least in part by racial animus and in its on-the-ground execution carried out with a discriminatory mind, Defendants were in violation of a clearly established right against discrimination on the basis of race. See Iqbal v. Hasty, 490 F.3d 143, 174 (2d Cir. 2007) (holding that well-pleaded allegations of mistreatment based on race, religion, and national origin "state[d] a claim of animus-based discrimination that any 'reasonably competent officer' would understand to have been illegal under prior case law"), rev'd on other grounds sub nom. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999) ("To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender."); Burns v. Citarella, 443 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2006) ("The Second Circuit has long recognized that '. . . enforcement of an otherwise valid [code or] ordinance violates the Constitution . . . if . . . the decision of the particular [governing] body is arbitrary . . . or if the ordinance is applied or enforced with a discriminatory intent or purpose.'" (quoting Brady v. Town of Colchester, 863 F.2d 205, 217 (2d Cir. 1988) (alterations in original)); Jamieson v. Poughkeepsie City Sch. Dist., 195 F. Supp. 2d 457, 471 (S.D.N.Y. 2002) (holding that a government official's decision motivated by racial animus would "violate[] clearly established law of which [that official] should have been aware").

Defendants attempt to complicate this straightforward analysis by arguing that that they were not on notice that their conduct violated Plaintiffs' equal protection rights because they "were authorized to arrest without a warrant persons they encountered and believed to be in the United States in violation of immigration law" and "were permitted to consider ethnic appearance in deciding whether to question a person about his or her immigration status." MTD at 69.  As to the first of these arguments, Defendants were not entitled to enter homes without a warrant or consent, nor to question, detain, and arrest persons without reasonable suspicion or probable cause, on the basis of nothing more than their Latino appearance. As to the second argument, Defendants' reliance on United States v. Brignoni-Ponce, 422 U.S. 873 (1975), is simply wrong. MTD at 65. Defendants contend that in circumstances such as the Raids at issue here, immigration agents may consider ethnic appearance as a factor in determining whether to question a person about his or her immigration status. MTD at 66. This fundamentally mischaracterizes the holding of Brignoni-Ponce and misunderstands the nature of the allegations in this case. In that decision, the Supreme Court held that the Fourth Amendment did not allow a roving patrol near the Mexican border to question occupants of vehicles regarding their immigration status and citizenship where the occupants' apparent Mexican ancestry furnished the only ground or suspicion that the occupants were noncitizens. Brignoni-Ponce, 422 U.S at 885-86. The Court explained that "[e]ven if [the border patrol officers] saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country." Id. at 886. Here, Plaintiffs allege that the Raid Officers detained and arrested persons of Latino descent solely because they "looked" Latino, without any reasonable belief that those persons were fugitive or illegal immigrants. Defendants rely on this case for the

proposition that race can be a factor in determining who to question and seize, when in reality it stands for the contrary – that race alone does not create reasonable suspicion to stop or detain.[49]

Indeed, in the thirty-five years since the Brignoni-Ponce decision, the Supreme Court and the Second Circuit have consistently found that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop. See Whren, 517 U.S. at 810 (referring to race as a "decidedly impermissible factor" on which to exclusively base traffic stop); United States v. Swindle, 407 F.3d 562, 570 (2d Cir. 2005) (noting that race cannot create reasonable suspicion for stop); Brown v. City of Oneonta, 221 F.3d 329, 334 (2d Cir. 2000) (permitting plaintiffs to proceed with Fourth Amendment claims because they were apparently seized on account of race, and "a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure"); United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc) ("Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."). In Swindle, for example, the Second Circuit was asked to determine whether an officer was justified in stopping a defendant while looking for another African-American man reasonably suspected of having committed a crime. The court was "puzzled by the government's assertion that Swindle was a man" sufficiently meeting the description of the fugitive they were seeking, as "[i]t appears the only obvious physical

---

[49] Moreover, while the Court in Brignoni-Ponce held that race could be one of several factors justifying a traffic stop near the border, it explicitly limited even this narrow holding to the reasonableness requirement of the Fourth Amendment in the context of border area stops, where ordinary constitutional protections are significantly diminished. See, e.g., United States v. Martinez-Fuerte, 428 U.S. 543 (1976) (concluding that border-control checkpoints were exempt from usual Fourth Amendment requirement of individualized suspicion); Tabbaa v. Chertoff, 509 F.3d 89 (2d Cir. 2007) (same). In addition, the dicta in Brignoni-Ponce permitting race to be one of many factors in government conduct has been called into question by subsequent case law, with the Supreme Court "ma[king] clear that race may be used by the government only in the most exceptional circumstances." United States v. Ramos, 591 F. Supp. 2d 93, 105 (D. Mass. 2008) (collecting cases); United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc). Accordingly, even the Brignoni holding of "race as one factor of many" does not apply in the context of the residential raids at issue here.

characteristic the men shared was the color of their skin." Swindle, 407 F.3d at 569. The court concluded that "courts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop." Id. at 569-70.[50]

In Montero-Camargo, the Ninth Circuit explained that the demographic data upon which the Supreme Court relied to consider race as one permissible factor in Brignoni-Ponce, is "no longer applied," because "[t]he likelihood that in [that] area in which the majority – or even a substantial part – of the population is Hispanic, any given person of Hispanic ancestry is in fact an alien, let alone an illegal alien, is not high enough to make Hispanic appearance a relevant factor in the reasonable suspicion calculus." Montero-Camargo, 208 F.3d at 1132. Defendants' attempt to use the demography of Fair Haven to justify targeted immigration enforcement in the area, MTD 65-66, is thus inappropriate. Since consideration of Plaintiffs' race alone was impermissible to justify Defendants' conduct in seizing and arresting Plaintiffs not on their target list, their racial animus, especially in light of their racially-motivated commentary, is the only "plausible" motive.[51]

Thus, Defendants' reading of Brignoni-Ponce as permitting race-based stops is patently incorrect. The long line of cases expanding on the Brignoni-Ponce holding, and clarifying that it does not permit officers to use race as a justification or a basis for a stop, were all decided prior to June 2007, such that Defendants' argument that they might have believed their conduct in arresting Latinos based on their race was lawful rings hollow.  Given the clearly defined equal protection law, there is little doubt that a reasonable defendant in the circumstances of the

---

[50] The Second Circuit actually relied on Brignoni-Ponce for the proposition the "apparent Mexican ancestry of car occupants did not justify stop based on suspicion that they were illegal aliens." Swindle, 407 F.3d at 570 (emphasis added).

[51] Moreover, Defendants' citation and misreading of Brignoni-Ponce implicitly concedes that race was indeed on the mind of the individual Defendants during the Fair Haven Raids.

Defendants who planned and conducted the Raids here "[would] have understood from the existing law that [her] conduct was unlawful.'" <u>Srinivas v. Picard</u>, 648 F. Supp. 2d 277, 291-92 (D. Conn. 2009) (quoting <u>Anderson v. Recore</u>, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original)).

### VII.  THE ARREST QUOTAS AND RETALIATORY NATURE OF THE FAIR HAVEN RAIDS VIOLATE DUE PROCESS.

"The core protection provided by the Due Process Clause is protection against arbitrary government action." <u>Poe v. Leonard</u>, 282 F.3d 123, 139 (2d Cir. 2002). A plaintiff sufficiently states a substantive due process claim if he establishes an "exercise of power without any reasonable justification in the service of a legitimate governmental objective." <u>Id.</u> (citing <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998)). Conduct that "shocks the conscience" will establish liability under this theory. <u>See</u> 523 U.S. at 846.

The Second Circuit has recognized that the test to determine whether alleged conduct meets that standard is "necessarily imprecise," but explained that whether conduct "shocks the conscience depends on the state of mind of the government actor and the context in which [it] was taken." <u>O'Connor v. Pierson</u>, 426 F.3d 187, 203 (2d Cir. 2005). As <u>Country of Sacramento</u> recognized, decisions taken in situations calling for immediate, urgent action will not meet the standard unless they are explicitly intended to cause harm. <u>See id.</u> On the other hand, a mental state of "deliberate indifference" can justify liability under the "shocks the conscience" test if the government's decision to act was not necessitated by urgent situations, <u>id.</u>, or if the government had time to "reflect[]" and "decid[e] what course of action to take." <u>Okin v. Village of Cornwall-on-Hudson Police Dep't</u>, 577 F.3d 415, 432 (2d Cir. 2009). The "deliberate indifference" standard is met if a plaintiff proves that the defendant "deliberately assumed or acquiesced [in]

the risk" of unconstitutional conduct. Pena v. De Prisco, 432 F.3d 98, 114 (2d Cir. 2005)

(quotation marks and citations omitted); see also Pabon v. Wright, 459 F.3d 241, 251 (2d Cir.

2007); Okin, 577 F.3d at 432.[52]

In this case, Plaintiffs have alleged that Defendants instituted a policy of requiring

individual field offices to meet heightened arrest quotas, as well as a policy of meeting these

quotas by conducting aggressive raids with little or no preparation to determine if the targeted

individuals were even undocumented persons, and by allowing bystanders to count towards these

irrational quotas. See TAC ¶¶ 12-15, 258-268. Nothing is more "arbitrary" than a quota for

arrests. Adopting any arbitrary threshold can lead to irrational and capricious behavior: officers

will (as was the case here) arrest individuals at random if pressed to meet a quota, or focus on the

easiest arrests – non-dangerous, non-criminal, non-fugitives, such as Plaintiffs – rather than

devote the resources necessary to locate and apprehend actual fugitives. Such behavior is

illogical and arbitrary.[53] Moreover, the policy was amended to allow bystander arrests to count

toward the quotas – which meant that immigration officers had incentive to arrest any person in

the vicinity of a proper arrestee – despite a lack of probable cause to suspect that such person

may be undocumented. Id. ¶¶ 266-267, 271-274, 289.[54] Such a policy is plainly arbitrary.[55]

---

[52] It is appropriate to analyze the Individual-Capacity Defendants' actions in this case under the "deliberate indifference" test because Defendants cannot seriously contend that establishing arrests quotas or planning out an immigration raid (which in this case occurred over the course of 3 months) constitute anything but a situation in which Defendants had ample time to debate and consider the course of action they would take.

[53] It is telling that DHS has since dropped its arrest quotas. Assistant Secretary John Morton, a high ranking ICE official, acknowledged the arbitrariness of the quota-based arrest system and noted that it led to inefficiencies and frustrated the goals of the organization: "Field offices should not feel such pressure to meet this goal that they lose focus on the priorities and sound use of resources. This goal does not constitute a quota; rather, this goal allows the teams to gauge their productivity. The field should not focus on numbers to the detriment of targeting and arresting the most egregious, violent offenders in their area of responsibility." See TAC ¶ 296; U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement, NFOP Memo. from Asst. Sec'y John Morton, Dec. 8, 2009 [ECF No. 76-2 at 72-75].

[54] These detailed allegations undermine Defendants' reliance on Jackson v. District of Columbia, 672 F. Supp. 22, 26 (D.D.C. 1987) for the proposition that arrest quotas are presumptively constitutional. See MTD at 55. As

In addition, Plaintiffs have alleged (and Defendants never contest) retaliatory motives behind the Raids. They have specifically alleged and documented that high-level individuals at ICE and DHS responded to the Elm City Resident Card program by planning and conducting the Raids, upset that New Haven was enacting a program to help its immigrant residents. See TAC ¶¶ 215-231. They have also alleged that the behavior of several Defendants in preparing for the Raids was egregious: they touted as "fun" an event in which armed federal officers would break into unsuspecting people's homes at early hours, scream at them in a language they did not understand, and detain them without process. See TAC ¶ 245. Moreover, of the approximately 5,500 outstanding ICE warrants in Connecticut, the HARFOT selected a list of 33 allegedly residing in New Haven to target. TAC ¶ 236. These facts, if proven, are more than sufficient to establish that Defendants acted in a raw exercise of power, targeted at politically unpopular and virtually indefensible individuals, in a manner that shocks the contemporary conscience. The Second Circuit has made clear that action that was intended to "injure or spite" another would

---

Defendants recognize, the court in Jackson specifically explained that this holding applied only in the summary judgment context in the absence of any evidence that the police officers were encouraged to initiate arrests absent probable cause. Id. Consistent with Jackson, Plaintiffs have alleged that Defendants Myers and Torres dramatically increased arrests quotas in 2006, and then provided that arrests of innocent bystanders would count towards meeting this greatly increased requirement. At the motion to dismiss stage, all reasonable inferences must be drawn in the Plaintiffs' favor, and these allegations more than support the inference that these changes encouraged unconstitutional arrests. Plaintiffs have also alleged that, after being on notice of unconstitutional arrests conducted under the new quotas, Defendant Myers touted the program's efficiency, another factor that supports the inference that the quotas encouraged unconstitutional arrests. In addition, as noted, see supra note 43, the court in Jackson specifically left open the possibility that the quota system would be unconstitutional if it had "the effect" of "promot[ing] illegal law enforcement practices." Jackson, 672 F. Supp. at 26. As detailed numerous times above, Plaintiffs have more than sufficiently alleged that such practices were indeed the known effect of the new quota system. The dicta in Jackson in fact support Plaintiffs' claims.

[55] Alternatively, Plaintiffs submit that the creation of arbitrary arrest quotas, slanted towards innocent bystander arrests, constitutes not an executive act but a legislative act. Such acts are "properly analyzed first by determining whether [they] impinged on a fundamental right and, if [they] did, by then considering whether [they were] narrowly tailored to serve a compelling governmental interest." United States v. Stein, 495 F. Supp. 2d 390, 412 (S.D.N.Y. 2009). Being free from unlawful searches and arrests is plainly a fundamental right and, for the reasons that they shock the conscience, Defendants' decision to implement arbitrary and capricious arrest policies is not narrowly tailored to serve a compelling interest. Thus, Plaintiffs have sufficiently alleged a substantive due process violation whether the acts at issue are analyzed as legislative or executive in nature.

"plainly support liability in light of County of Sacramento," and that conduct "intended to oppress" violates the Constitution. O'Connor, 426 F.3d at 203-04 (vacating summary judgment grant on question of whether conduct "shocked the conscience" because the question turned on the government actor's state of mind). As alleged, the retaliatory motives behind the Raids easily establish Defendants' intent to spite New Haven and the residents affected by the Elm City Resident Card program – notwithstanding that the ID card program was an entirely lawful exercise of municipal powers. Defendants made such intent painstakingly clear by conducting the Raids just thirty-six hours after the Elm City Resident Card program was enacted, following months of internal email among senior ICE officials in Connecticut and Washington and in the U.S. Attorney's Office in Connecticut revealing plans to discourage the program while masking ICE's role.  See TAC ¶¶ 215-252. Moreover, on the day of the Raids, Defendants revealed their retaliatory motive through the comments of ICE spokesperson Marc Raimondi, who defended the Raids by declaring "there is truly no safe haven for fugitive aliens," and in subsequent e-mails lauding further arrests in New Haven despite withering criticism of the Raids. See id. ¶¶ 251-252, 312. This conduct shocks the conscience.[56]

Plaintiffs have also sufficiently alleged that the Defendants acted with deliberate indifference towards the risk that the combination of arbitrary quotas, which were fulfilled through haphazard raids, and the retaliatory and oppressive reasons for carrying out such raids,

---

[56] In addition to these substantive due process allegations, Plaintiffs assert a procedural due process claim. See TAC ¶ 348; MTD at 62 n.35. Contrary to Defendants' assertion, however, Plaintiffs' allegations are detailed and unchallenged – they allege that Defendants did not apprise Plaintiffs of their legal rights upon arrest, TAC ¶¶ 5, 176, left them handcuffed for several hours inside a van without telling them were they were going, id. ¶ 178, interviewed them without a lawyer present and denied or ignore their requests to make a phone call, id. ¶¶ 179-181, coerced them into signing forms in English despite the fact that the primary language for each Plaintiff is Spanish, id. ¶¶ 182-189, and left them unlawfully detained at a facility in Rhode Island for lengthy periods of time, id. ¶¶ 190, 192. These fact-specific and detailed allegations are much more than "bald assertions" or "conclusions of law," notwithstanding Defendants' statement to the contrary.

would lead to severe constitutional violations. As stated, Plaintiffs allege that the Defendants knew of such risks based on reports from other such raids. Even without this prior precise knowledge that constitutional violations were in fact occurring and had been ongoing for a period of several years, Defendants' deliberate indifference to the risk of constitutional violations occurring during the Raids is demonstrated by the careless way the target lists were compiled, see TAC ¶¶ 232-238, as well as by the retaliatory motive for the Raids.

Finally, nowhere are Defendants' malicious motives clearer than in the manner in which the Raids were ultimately carried out. As Plaintiffs have extensively alleged, the Raid Officers asked questions at gun point, handled minor children roughly, woke people up from their sleep, screamed questions at several Plaintiffs, and shoved and pushed several of Plaintiffs and their family members. See, e.g., TAC ¶¶ 73, 81, 94, 95, 112, 114, 118, 135, 140, 155, 160, 168. After their arrest, Plaintiffs were forced to sign documents in English, which they could not read, and were denied access to lawyers and a telephone for extended periods of time. Id. ¶¶ 174-192. All of these allegations provide even further support to the claim that the Raids were vindictive, spiteful, and arbitrary in nature. [57]

---

[57] Defendants incorrectly characterize Plaintiffs' substantive due process claim as based on Fourth Amendment violations and thus foreclosed by Graham v. Connor, 490 U.S. 386 (1989) and its progeny. See MTD at 60-62. This argument misses the mark because Plaintiffs' due process claims are based on the arbitrary nature of irrational arrest quotas and the retaliatory motives behind the Raids, and not just on the fact of their arrests. Plaintiffs rely in part on the fact that the capricious raids predictably led to unlawful arrests and seizures, but such argument does not transform the due process claim into a Fourth Amendment claim; it simply recognizes that "[t]here is . . . no substantive constitutional right to be free from arbitrary governmental action as such . . . [t]he right, to the extent it exists, is the right to be free of arbitrary government action that infringes a protected right." O'Connor, 426 F.3d at 200 n.6 (emphasis in original). Defendants themselves recognize that the retaliatory nature of the Raids and the quota policies form the crux of Plaintiffs' due process claims. See MTD at 60 & n.34. For these reasons, Defendants' reliance on Graham as well as Albright v. Oliver, 510 U.S. 266 (1994), and Singer v. Fulton Cnty. Sheriff, 63 F.3d 110 (2d Cir. 1995) is wholly beside the point. As Justice Kennedy noted in his concurring opinion in Albright, a court must be careful to analyze under which Amendment a claim is most properly analyzed – including the possibility that the Due Process Clause provides such remedy. See Albright, 510 U.S. at 285-86 (Kennedy, J., concurring).

## VIII.  THIS COURT HAS PERSONAL JURISDICTION OVER INDIVIDUAL-CAPACITY DEFENDANTS MYERS, TORRES, CHADBOURNE, AND MARTIN.

Plaintiffs have pleaded sufficient allegations for this Court to exercise personal jurisdiction over all Defendants, including Defendants Myers, Torres, Chadbourne, and Martin ("Objecting Defendants"). At this stage, Plaintiffs need only establish a prima facie showing that this Court has personal jurisdiction over these Defendants. A. I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79 (2d Cir. 1993). Where, as here, Defendants challenge jurisdiction prior to the completion of discovery, Plaintiffs may defeat Defendants' motion by a good faith pleading of legally sufficient allegations. Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990). At a minimum, Plaintiffs should be allowed limited jurisdictional discovery.[58]

### A.  The Connecticut Long-Arm Statute Confers Personal Jurisdiction over Defendants Myers, Torres, Chadbourne, and Martin.

This Court has jurisdiction over each of the Objecting Defendants under any one of the following four provisions:

> [A] court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) Transacts any business within the state; (2) commits a tortious act within the state . . . (3) commits a tortious act outside the state causing injury to person or property within the state . . . if such person or agent . . . regularly does . . . business, or engages in any other persistent course of conduct . . . in the state . . . or (5) uses a computer . . . or a computer network . . . located within the state.

Conn. Gen. Stat. § 52-59b(a).[59] Personal jurisdiction under any one provision is sufficient.

Vertrue Inc. v. Meshkin, 429 F. Supp. 2d 479, 489 (D. Conn. 2006).

---

[58] Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003) (where claims are not clearly frivolous, plaintiffs are permitted jurisdictional discovery). Cf. In re Publ'n Paper Antitrust Litig., No. 3:04-md-1631, 2005 WL 2175139, at *6-7 (D. Conn. Sept. 7, 2005) (Underhill, J.) (where factual record incomplete, ruling on motion to dismiss for lack of personal jurisdiction deferred until close of discovery).
[59] Defendants erroneously conclude that only §52-59b(a)(2) is relevant. MTD at 13.

### 1. Defendants Myers, Torres, Chadbourne, and Martin Transacted Business in Connecticut, Satisfying § 52-59b(a)(1).

Section 52-59b(a)(1) requires only that a nonresident defendant, such as Defendants here, transact any business in the state to be subject to this Court's personal jurisdiction. Courts have interpreted the language "transacts any business" in the Connecticut statute to encompass any "single purposeful business transaction." Vertrue, 429 F. Supp. 2d at 491; Zartolas v. Nisenfeld, 440 A.2d 179, 181 (Conn. 1981). Federal courts have followed the policy of the Connecticut Supreme Court in interpreting "quite broadly" the statutory phrase "transacts any business." Austen v. Catterton Partners V, LP, -- F. Supp. 2d --, No. 3:09-1257, 2010 WL 3023813, at *11 (D. Conn. Aug. 2, 2010). New York state courts, in construing an analogous provision of the New York long-arm statute, N.Y. C.P.L.R. § 302, have concluded that the transaction does not need to be a "pecuniary transaction[] of a commercial nature," and that there is no requirement of financial gain.[60] See, e.g., Kochenthal v. Kochenthal, 282 N.Y.S. 2d 36, 39-40 (App. Div. 1967). Courts interpreting § 52-59b(a)(1) have held that telephone or electronic communications can constitute the necessary purposeful activity, even if defendants never set foot in the state. Under Par Assocs., L.L.C. v. Wash Depot A., Inc., 793 A.2d 300, 302 (Conn. Super. 2001).

Plaintiffs have alleged facts sufficient to support this Court's jurisdiction over Defendants Myers and Torres under § 52-59(b)(a)(1). Both Defendants intentionally inserted themselves into the forum of Connecticut by affirmatively approving the New Haven, Connecticut Raids. Defendant Torres personally reviewed and approved the Operational Plan for the raid and conveyed his approval to Defendant McCaffrey in Connecticut via electronic communication,

---

[60] Connecticut's long-arm statute was modeled on New York's, and so judicial interpretations of New York's long-arm statute are persuasive in understanding § 52-59b. Nusbaum & Parino, P.C. v. De Colon, 618 F. Supp. 2d 156, 161 n.3 (D. Conn. 2009).

TAC ¶¶ 241-243, 311, and Defendant Myers approved the New Haven raid by allowing it to go forward after her review, TAC ¶ 316. Defendant Myers gave numerous statements to the media lauding the NFOP's practices. TAC ¶¶ 284, 292.

Defendants Chadbourne and Martin similarly are within this Court's jurisdiction. After Defendant McCaffrey submitted the Operational Plan for the New Haven raid to them, Chadbourne and Martin each personally reviewed and approved the Plan. TAC ¶¶ 239, 241, 242, 311. Chadbourne then conveyed their approval to Defendant McCaffrey in Connecticut via email. TAC ¶ 243. Before the Raids commenced, Chadbourne and Martin also reviewed the "A/S Note," prepared by Defendants McCaffrey and Sullivan in Connecticut. TAC ¶ 315.

Defendants Chadbourne and Martin are also subject to personal jurisdiction under § 52-59b(a)(1) because of their frequent, work-related communication with and visits to Connecticut. Chadbourne has not denied and will not deny that in the relevant time period he communicated weekly with Defendant Sullivan (then his subordinate in charge of the Connecticut sub-office) or that he personally visited the Hartford office to meet with Sullivan and other ICE officers two to three times per year in 2006-07. Defendant Martin is similarly responsible for supervising ICE officers in Connecticut, TAC ¶ 36, and has not denied and will not deny that he communicates regularly with the Connecticut sub-office. Such visits and communications are more than sufficient to establish this Court's jurisdiction over Chadbourne and Martin. See Kronisch v. United States, 150 F.3d 112, 130-31 (2d Cir. 1998) (federal agent's visits to New York, "aimed at laying the groundwork" for program giving rise to alleged torts, sufficient for jurisdiction).

In a recent decision, Judge Arterton concluded that the court had personal jurisdiction over Defendant Chadbourne under § 52-59b(a)(1), based on plaintiff's arrest by ICE agents at his Connecticut home. Abner v. DHS, No. 06-308, 2006 WL 1699607, at *5 (D. Conn. June 19,

64

2006). The court explained that "[t]o carry out the business of enforcing the immigration laws in Connecticut, [Defendant Chadbourne] necessarily employs people in Connecticut, spends funds for enforcement and detention in Connecticut, and otherwise transacts business here." Id. The same is true in the instant case, and Judge Arterton's reasoning equally applies to Defendants Myers, Torres, and Martin (who were not sued in Abner).

### 2. The Court Has Personal Jurisdiction Under § 52-59b(a)(2), Because Defendants' Agents Committed Tortious Acts Within Connecticut.

The Objecting Defendants, "through [their] agents" "commit[ed] . . . tortious act[s] within the state" of Connecticut, and are thus subject to this Court's jurisdiction under § 52-59b(a)(2). Defendants' agents entered Plaintiffs' residences in a brazen early morning raid, without warrants or consent, and arrested Plaintiffs without probable cause. TAC ¶¶ 56-192, 232-252. Defendants Myers, Torres, Chadbourne, and Martin were personally involved in these violations, based on their implementation and administration of the NFOP, approval of the Operational Plan, and failure to train or supervise subordinate Connecticut officers adequately. Id. ¶¶ 253-320.

Defendants characterize these detailed allegations as insufficient to support jurisdiction, on the grounds that the Objecting Defendants were not present at the Raids, are not Connecticut persons, and "solely" supervised the Defendants who raided Plaintiffs' homes. MTD at 12-13. Defendants cite Green v. McCall, 710 F.2d 29 (2d Cir. 1983), for the proposition that § 52-59b(a)(2) precludes jurisdiction over non-resident federal officials in the Bivens context. MTD at 13. In Green, nearly thirty years ago, the Second Circuit interpreted § 52-59b(a)(2) not to provide "jurisdiction over defendants in their individual capacities on the basis of tortious acts of agents within Connecticut unless the agents represented the defendants in their individual, as contrasted

with their official, capacities." 710 F.2d at 33.

In the intervening decades since Green, however, New York and Connecticut state courts have issued superseding decisions rejecting Green's interpretation of their state statutes and discrediting its reasoning.[61] Under the "transacting business" prongs of the long-arm statutes, New York and Connecticut courts no longer allow jurisdiction to be defeated on the grounds that a corporate employee's dealings were in a corporate, rather than individual capacity. See, e.g., Under Par Assocs., L.L.C., 793 A.2d at 302-05; Kreutter v. McFadden Oil Corp., 522 N.E.2d 40, 44 (N.Y. 1988); see also Vertrue Inc., 429 F. Supp. 2d at 490-91; Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976, 981-82 (S.D.N.Y. 1992); Kilduff v. Adams, Inc., 593 A.2d 478, 488 (Conn. 1991) ("It is black letter law that an officer of a corporation who commits a tort is personally liable to the victim regardless of whether the corporation itself is liable."). The Kreutter court noted that there was "no basis for development of the jurisdictional doctrine the Second Circuit [previously] attributed to" that prong of the long-arm statute. 522 N.E.2d at 44. Thus, under Conn. Gen. Stat. § 52-59b(a)(1), courts have personal jurisdiction over non-resident corporations to adjudicate the legality of the in-state acts of their corporate agents.

The Second Circuit has now adopted this approach in exercising personal jurisdiction over non-resident government defendants under the "tortious act within the state" prong. Much like Plaintiffs' complaint here, in Arar v. Ashcroft, 532 F.3d 157, 173-75 (2d Cir. 2008), vacated on other grounds, 585 F.3d 559 (2d Cir. 2009) (en banc),[62] the plaintiff's complaint stated the "time frame and place of the acts alleged to have violated [his] rights," id. at 174; alleged that the

---

[61] In fact, Defendants do not cite a single decision since Green by a Connecticut federal or state court that supports their interpretation of § 52-59b(a)(2).

[62] The en banc opinion explicitly affirmed the panel's conclusion that "Arar . . . sufficiently alleged personal jurisdiction over the defendants." 585 F.3d at 567.

violations arose from government policies that could give rise to constitutional violations; and further alleged that defendants "directed, ordered, confirmed, [or] acquiesced" in plaintiff's mistreatment, id. at 175. The court thus concluded that the plaintiff "alleged sufficient facts about the role" the individual-capacity, out-of-state, federal defendants "played in violating [plaintiff's] rights to make a prima facie showing that personal jurisdiction over those defendants exists under New York's long-arm statute." Id.[63]

### 3.   This Court Has Personal Jurisdiction Under § 52-59b(a)(3).

This Court may also exercise jurisdiction over the Objecting Defendants, because they 1) committed tortious activities outside the state, and 2) "regularly [did] business" and/or engaged in a "persistent course of conduct" in Connecticut. § 52-59b(a)(3).

Myers, Torres, Chadbourne, and Martin satisfy the first prong of this provision because they individually committed torts outside the state. They created and implemented the NFOP policies that gave rise to the Fourth Amendment violations that the Raid Officers carried out against Plaintiffs. TAC ¶¶ 325-334. The Objecting Defendants also failed to supervise or adequately train the Raid Officers so as to prevent such violations. TAC ¶¶ 335-342.

The Objecting Defendants meet the second prong of this provision, because they

---

[63] Notably, neither the panel nor the en banc opinion in the Arar case cited Green as a jurisdictional bar. The additional cases cited by Defendants are unhelpful to their cause. MTD at 15. On appeal, the Second Circuit overturned the district court's finding in Kronisch v. United States, No. 83-2458, 1997 WL 907994, at *18 (S.D.N.Y. Apr. 14, 1997), aff'd in part and rev'd in part on other grounds, 150 F.3d 112 (2d Cir. 1998), that it lacked personal jurisdiction over an individual-capacity government defendant under the transacting business prong of the New York long-arm statute. 150 F.3d at 130. The Second Circuit had no occasion to review the district court's invocation of the Green analysis as a bar to personal jurisdiction with respect to another defendant, because the plaintiff's claims against that defendant were time-barred. Id.; Lee v. Carlson, 645 F. Supp. 1430, 1433-34 (S.D.N.Y. 1986), and Barrett v. United States, 646 F. Supp. 1345, 1351-52 (S.D.N.Y. 1986), cited by Defendants, are inapposite because they were decided before the New York and Connecticut courts began in 1988 to reject the Second Circuit's analysis of those states' long-arm statutes.

regularly do business in Connecticut,[64] see supra Section VIII.A.1, and/or engage in a persistent

course of conduct there. § 52-59b(a)(3)(A). "Persistent conduct" is defined broadly and includes

any non-business activities. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d

120, 126-27 (2d Cir. 2002) (Sotomayor, J.). Defendants Chadbourne and Martin are responsible

for supervising ICE officers in Connecticut and communicate with the Connecticut office

weekly; Defendant Chadbourne also will not deny that he personally visits that office two to

three times per year. TAC ¶¶ 35, 36; see supra at Section VIII.A.1.

### 4. This Court Has Personal Jurisdiction Under § 52-59b(a)(5).

Finally, this Court also has personal jurisdiction over Defendants Myers, Torres,

Chadbourne, and Martin under § 52-59b(a)(5) because they "use[d]" a "computer" or "computer

network"[65] in Connecticut. Defendants Chadbourne and Martin have not denied and will not

deny that they had regular e-mail communication with the Connecticut sub-office. Defendant

McCaffrey submitted the Operational Plan for the Raids to Chadbourne, Torres, and Martin, and

Chadbourne, Torres, and other senior ICE officials approved the plan electronically via a

computer network. See TAC ¶¶ 240-243. See also TAC ¶¶ 313-316 (transmission of the A/S

Note). It is "reasonable to infer" that the Objecting Defendants transmitted their approvals

through a Connecticut computer network. See Terrasyn Group, Inc. v. Ladner, No.

HHBCV075004331, 2007 WL 4733115, at *2 n.1 (Conn. Super. Dec. 20, 2007).

To the extent this Court has not concluded that it has personal jurisdiction over any of the

Objecting Defendants under this or any other provision, then at a minimum the Court should

---

[64] Courts have held that the term "business" under § 52-59b(a)(1) and the analogous New York statute should not "be limited to . . . people and corporations engaged in pecuniary gain." Kochenthal v. Kochenthal, 282 N.Y.S. 2d 36, 39-40 (App. Div. 1967). Similarly, § 52-59b(a)(3)(A)'s reference to "business" should not be so limited.

[65] "Computer network" is defined as "a set of related, remotely connected devices and any communications facilities including more than one computer with the capability to transmit data among them through the communications facilities." Conn. Gen. Stat. § 53-451(a)(3).

allow discovery to determine the full and precise scope of these Defendants' activities in Connecticut. See In re Publ'n Paper Antitrust Litig., No. 3:04-md-1631, 2005 WL 2175139, at *6-7 (D. Conn. Sept. 7, 2005) (Underhill, J.).

**B. This Court's Exercise of Personal Jurisdiction Comports With Due Process Requirements.**

Objecting Defendants have sufficient contacts with Connecticut such that the Court's exercise of jurisdiction over them does not offend "traditional notions of fair play and substantial justice." See Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). The Second Circuit conducts a two-pronged analysis to determine whether the exercise of jurisdiction is consistent with this due process standard: (1) whether plaintiffs have satisfactorily alleged facts showing defendants have minimum contacts with the forum state such that they should reasonably expect to be haled into court there; and (2) whether exercise of personal jurisdiction is reasonable under the circumstances of the particular case. See Porina v. Marward Shipping Co., Ltd., 521 F.3d 122, 127 (2d Cir. 2008). Both prongs of the analysis are met here.

### 1. Defendants Myers, Torres, Chadbourne, and Martin Have Sufficient Minimum Contacts with Connecticut To Satisfy Due Process Concerns.

The "constitutional touchstone" of personal jurisdiction is whether a defendant purposefully established minimum contacts in the forum state, see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985), as each Defendant has done here. It is not necessary for a defendant to "*physically* enter the forum State." Id. at 476.[66] Defendants Myers, Torres, Chadbourne, and Martin "purposefully directed" their activities at the state of Connecticut, and the present litigation results from injuries arising out of those activities, thereby meeting the

---

[66] None of the Defendants aver that they have never been to Connecticut.

69

minimum contacts requirement. Id. at 472; accord Screen Tech, Inc v. Carolina Precision
Plastics, LLC, No. 05-975, 2006 WL 197360, at *3 (D. Conn. Jan. 25, 2006).[67]

Contrary to Defendants' contentions, Defendants Myers and Torres's contacts with
Connecticut go far beyond merely administering a national policy. MTD at 20. In fact, Myers
and Torres created the policies of the NFOP that resulted in these constitutional violations, and
they mandated that the Connecticut office apply them. In the years and months leading up to the
New Haven Raids, they modified the policies governing the HARFOT in a way that resulted in
constitutional violations. See TAC ¶¶ 260, 261, 264, 265, 266; see also id. ¶¶ 269, 270, 280.
When Defendant Torres formulated his controversial quota policy less than a year before the
New Haven Raids, he sent a memorandum to recipients including Defendant Sullivan (stationed
at the Hartford sub-office) detailing the new system. Id. ¶ 265. Defendant Myers gave numerous
statements to the media lauding the NFOP's practices. Id. ¶¶ 284, 292.

Moreover, both Defendants Myers and Torres were directly and personally involved in
the planning and implementation of the New Haven Raids in particular, engaging in conduct
tying them firmly to Connecticut before, during, and after the Raids. One year prior to the New
Haven Raids, Defendant Myers unveiled Operation Return to Sender (of which the New Haven
Raids were part) and praised it publicly. Id. ¶¶ 286, 287, 291. When Hartford-based ICE officials
planned the New Haven Raids in 2007, both Myers and Torres personally reviewed plans

---

[67] Defendants assert that personal jurisdiction depends on the "effects test" of Calder v. Jones, 465 U.S. 783
(1984), which they characterize as "expressly aiming tortious conduct" at the forum state. MTD at 17. While the
effects test is one way to meet personal jurisdiction based on a single contact outside the forum state, see Zieper v.
Reno, 111 F. Supp. 2d 484, 491-492 (D.N.J. 2000), and Defendants are subject to personal jurisdiction in
Connecticut under this standard, it is sufficient that they purposefully directed activities at the forum state, and that
Plaintiffs' injuries arose out of those activities. Burger King, 471 U.S. at 472. See Ibrahim v. DHS, 538 F.3d 1250,
1258-59 (9th Cir. 2008) (using similar test to find personal jurisdiction in California over TSA official in
Washington D.C. in Bivens claim, whose only involvement was answering phone call from California and telling
California officials to detain the plaintiff).

concerning the operation, before the Raids were executed. Id. ¶¶ 240, 316. Both Defendants

purposefully directed their conduct at Connecticut by affirmatively approving the New Haven

Raids—Torres personally reviewed and approved the Operational Plan for the Raids, and

conveyed his approval to Defendant McCaffrey in Connecticut, id. ¶¶ 241-243, 311, and Myers

approved the New Haven Raids by allowing it to go forward after her review, id. ¶ 316. Their

decision to approve the Raids despite knowing it was likely to lead to constitutional violations,

and knowing they had failed adequately to train and supervise their agents, caused Plaintiffs'

injuries. Id. ¶¶ 311, 317, 320, 326, 328, 335, 337, 341, 352, 354, 356.

Defendants Chadbourne and Martin carried out and supervised the operation of the NFOP

in the New England region, including the Connecticut sub-office where the HARFOT is located.

Id. ¶¶ 35-36. Chadbourne, moreover, will not deny that he played a key role in developing the

NFOP nationally, based on an early version of the program that he pioneered in Boston. In their

oversight of the Hartford sub-office, Chadbourne and Martin engaged in frequent contacts with

Connecticut. See supra Section VIII.A.1. Moreover, Chadbourne and Martin played a direct and

personal role in the execution of the New Haven Raids that are the subject of this lawsuit, by

approving the operation. See id.

Citing to cases from other circuits, many unpublished, Defendants argue that fulfilling

national or regional oversight responsibilities or implementing a national policy is not sufficient

to establish minimum contacts. MTD at 17. Instead of offering supportive case law,[68]

Defendants cite cases where a senior supervisor had no links to that state other than the fact of

nominally supervising a national program. See McCabe v. Basham, 450 F. Supp. 2d 917, 926

---

[68] Most of Defendants' citations are to unpublished cases or cases found in other circuits. Defendants also cite In re Terrorist Attacks, 538 F.3d 71, 93 (2d Cir. 2008). See MTD at 17-20. This decision was abrogated by the Supreme Court in Samantar v. Yousef, 130 S. Ct. 2278 (2010).

(N.D. Iowa 2006) (plaintiff alleged only "acts of low-level federal, state and/or local government employees" and no personal involvement by senior officials being sued); Moss v. U.S. Secret Serv., No. 06-3045, 2007 WL 2915608 (D. Or. Oct. 7, 2007), rev'd in part, appeal dismissed in part, 572 F.3d 962 (9th Cir. 2009) (complaint fails to allege supervisory non-resident defendant was ever present in state, had any contacts in state, oversaw event in question, was aware that event was going to occur, or participated in planning event); Rank v. Hamm, 2007 WL 894565, at *11-13 (S.D.W. Va. Mar. 21, 2007) (similar allegations). In contrast, each of the Objecting Defendants had a direct role in the day-to-day operations of the HARFOT, and had a personal role in the execution of the New Haven Raids.[69] Their direct involvement with the New Haven Raids caused the constitutional violations suffered by Plaintiffs at the hands of the HARFOT and other ICE agents, and each of the Objecting Defendants was aware of and condoned the Raid Officers' unconstitutional conduct. See Argueta v. ICE, No. 08-1652, 2009 WL 1307236 (D.N.J. May 7, 2009) (finding personal jurisdiction over Myers and Torres in New Jersey based on similar allegations); cf. Al-Kidd v. Gonzales, No. 05-093, 2006 WL 5429570, at *4 (D. Idaho Sept. 27, 2006), aff'd 580 F.3d 949 (9th Cir. 2009) (finding similar allegations against Ashcroft sufficient to withstand motion to dismiss based on lack of personal jurisdiction).

Defendants' argument that personal jurisdiction is asserted solely on the basis of a failure to act is also without merit.[70] See MTD at 21. As detailed above, the Third Amended Complaint

---

[69] The Motion to Dismiss also cites to a number of unpublished cases dealing with personal jurisdiction over Bureau of Prison senior officials regarding inmate appeals in another state. See MTD at 19. In these cases, unlike here, the senior officials had no direct or specific contact with the forum state, and were named merely because of their position as supervisors. See, e.g., Hill v. Pugh, 75 F. App'x 715, 719 (10th Cir. 2010).

[70] As an initial matter, most of the cases Defendants cite are based on failure-to-warn claims in products liability lawsuits, where the plaintiff tried to establish personal jurisdiction merely on a theory that jurisdiction could follow the product, wherever it traveled; moreover, these cases were interpreting various states' long-arm statutes, not due process-based personal jurisdiction. See, e.g., Carty v. Beech Aircraft Corp., 679 F.2d 1051, 1061 (3d Cir. 1982);

cites to a host of purposeful, affirmative conduct on the part of Myers, Torres, Chadbourne, and Martin sufficient to comport with due process. Defendants cite Pettengill v. Curtis, 584 F. Supp. 2d 348, 358-59 (D. Mass. 2008), where national leaders of the Boy Scouts failed to enact national policies preventing child abuse among troop leaders. Because the plaintiffs in that case alleged no conduct specifically aimed at the state of Massachusetts in particular (instead discussing only failure to enact adequate national policies) the court found no personal jurisdiction, noting that "a failure to act that was directed nowhere in particular" did not create a "purposeful availment of the laws of one specific state." Id. at 358-59 (emphasis added). By contrast, here Defendants Myers, Torres, Chadbourne, and Martin engaged in purposeful, direct contact with the state of Connecticut in approving the New Haven Raids, overseeing the operation of and condoning the conduct of the HARFOT, and creating and administering the policies governing the HARFOT, which directly led to the constitutional violations at issue here.

### 2. *This Court's Exercise of Personal Jurisdiction is Reasonable.*

Where, as here, minimum contacts connect non-resident defendants to the forum state, the defendant must put forward a "compelling case" that the exercise of personal jurisdiction is unreasonable in order to defeat personal jurisdiction. Bank Brussels Lambert, 305 F.3d at 129; accord MacCallum v. N. Y. Yankees P'ship, 392 F. Supp. 2d 259, 266 (D. Conn. 2005) (Underhill, J.). Defendants have not even attempted to make such a showing, see MTD at 17 n.8, nor can they, since under the Second Circuit's five-factor reasonableness test, personal jurisdiction should be exercised. See Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996). First, any minimal burden on Objecting Defendants can be mitigated through

---

Clebda v. H.E. Fortna & Brother, Inc., 609 F.2d 1022, 1023-24 (1st Cir. 1979); Nat'l Union Fire Ins. Co. v. Am. Eurocopter Corp., No. 09-136, 2009 WL 2849130, at *7 (D. Haw. Aug. 26, 2009).

remote communications such as telephone, fax, and video conferencing. See John Wiley & Sons, Inc. v. Treeakarabenjakul, No. 09-2108, 2009 WL 1766003, at *8 (S.D.N.Y. June 17, 2009). Transferring the claims against these four Defendants to a different jurisdiction would impose a greater burden on them, because their counsel would then be responsible for multiple cases in several forums located in different federal districts (since all thirty individual-capacity Defendants share the same counsel). Second, Connecticut has a clear interest in adjudicating this case, since the Raids themselves and the resulting violations of Plaintiffs' constitutional rights took place in Connecticut. See Chloe v. Queen Bee of Beverly Hills, LLC, -- F.3d --, No. 09-3361, 2010 WL 3035495, at *11 (2d Cir. Aug. 5, 2010) (noting that a state has a "manifest interest in providing effective means of redress for its residents") (internal quotations omitted). Third, Plaintiffs' interest in obtaining convenient and effective relief is best served by adjudicating the entire case in Connecticut; if some Defendants are severed and transferred to other judicial districts, Plaintiffs would have to travel to multiple locations in order to pursue claims arising from the same event. See id. Fourth, the federal judicial system's interests are best served by adjudicating this case in a single forum, as it arises from a single action and a common nucleus of underlying facts. Finally, Defendants do not assert any social policy that would be eroded by exercising personal jurisdiction over all Defendants in Connecticut. See Bank Brussels Lambert, 305 F.3d at 130. In fact, social policy considerations call for this case to proceed in a unified fashion in Connecticut, in order to safeguard the constitutional rights of Connecticut residents.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Individual-Capacity Defendants' Motion to Dismiss.

74

Dated September 21, 2010
New Haven, Connecticut

BY: _____/s/ _____
Muneer I. Ahmad, Esq., Federal Bar No. ct28109
Michael J. Wishnie, Esq., Federal Bar No. ct27221
Estella Cisneros, Law Student Intern
Jason Glick, Law Student Intern
Alice Hwang, Law Student Intern
Mark Pedulla, Law Student Intern
Rebecca Scholtz, Law Student Intern
Matthew Vogel, Law Student Intern

THE JEROME N. FRANK LEGAL SERVICES
ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

Thomas J. Moloney (ct11765)
Jennifer Gorskie (phv 04154)
Jorge Tenreiro (phv 04153)
Melissa Fernandez
Hedayat Heikal
Aliza Hochman

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Counsel for Plaintiffs*

75

## **CERTIFICATE OF SERVICE**

I herby certify that on September 21, 2010, a copy of the foregoing Memorandum in

Opposition to the Individual-Capacity Defendants' Motion to Dismiss was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.


BY: _____/s/ _____
Muneer I. Ahmad, Esq., Federal Bar No. ct28109

JEROME N. FRANK LEGAL SERVICES
ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800
*Counsel for Plaintiffs*