**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DIAZ-BERNAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | 3:09-cv-1734 (SRU) |
| MYERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF RENEWED EMERGENCY MOTION BY PLAINTIFFS COLALA-PEÑARRETA AND DIAZ-BERNAL FOR TEMPORARY STAY OF REMOVAL OF PLAINTIFF COLALA-PEÑARRETA; AND PLAINTIFF DIAZ-BERNAL'S PETITION FOR WRIT OF HABEAS CORPUS *AD TESTIFICANDUM***

THE JEROME N. FRANK LEGAL
SERVICES ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
Fax: (203) 432-1426

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    I.    MR. COLALA-PEÑARRETA IS A CRUCIAL WITNESS IN THE PENDING CIVIL RIGHTS LITIGATION. ........................................................................................ 2

    II.    IF REMOVED FROM THE UNITED STATES, MR. COLALA-PEÑARRETA WOULD RETURN TO A REGION WITH A SEVERELY LIMITED TELECOMMUNICATIONS INFRASTRUCTURE. ............................................... 3

PROCEDURAL HISTORY ...................................................................................... 7

    III.    THIS COURT IS AUTHORIZED TO ISSUE THE TEMPORARY STAY. .............. 10
        A.    COURTS HAVE JURISDICTION TO DETERMINE THEIR OWN JURISDICTION. ..................................................................................... 11
        B.    THE CONSTITUTIONAL ACCESS-TO-COURTS DOCTRINE EMPOWERS THIS COURT TO ISSUE THE TEMPORARY STAY.................................................. 11
        C.    ARTICLE III EMPOWERS THIS COURT TO ISSUE THE TEMPORARY STAY. 14
        D.    THE ALL WRITS ACT, 28 U.S.C. § 1651, PROVIDES A SEPARATE STATUTORY SOURCE OF AUTHORITY FOR THIS COURT TO ISSUE THE TEMPORARY STAY. ..................................................................... 14

    IV.    THE IMMIGRATION AND NATIONALITY ACT DOES NOT STRIP THIS COURT OF ITS POWER TO GRANT A TEMPORARY STAY........................................... 15
        A.    8 U.S.C. § 1252(F) DOES NOT STRIP THIS COURT OF ITS POWER TO ISSUE A TEMPORARY STAY. ..................................................................... 16
        B.    8 U.S.C. § 1252(G) DOES NOT DIVEST THIS COURT OF ITS POWER TO GRANT A TEMPORARY STAY..................................................................... 17

    V.    THE COURT SHOULD GRANT THE TEMPORARY STAY BECAUSE MOVANTS SATISFY THE SUPREME COURT'S FOUR-FACTOR TEST FOR A STAY OF REMOVAL. ....................................................................................... 21
        A.    THE MOVANTS HAVE DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS. ...................... 21
        B.    THE UNITED STATES' REMOVAL OF MR. COLALA-PEÑARRETA WOULD IRREPARABLY INJURE THE MOVANTS BY THWARTING THEIR ABILITY TO PURSUE THEIR CONSTITUTIONAL CLAIMS............................................... 22
        C.    THE RELIEF THAT MOVANTS REQUEST IS WITHIN THE PUBLIC INTEREST..................................................................................... 30

    VI.    THE COURT SHOULD ISSUE A WRIT OF HABEAS CORPUS AD TESTIFICANDUM TO ICE TO SECURE MR. COLALA-PEÑARRETA'S TESTIMONY AT TRIAL. ....................................................................................... 30
        A.    THE COURT HAS AUTHORITY TO ISSUE THE WRIT IN THIS CASE ............. 30
        B.    THE BALANCE OF THE EQUITIES WEIGHS HEAVILY IN FAVOR OF GRANTING THE WRIT ....................................................................... 35

CONCLUSION ...................................................................................................... 40

# INTRODUCTION

Absent a further order from this Court, Plaintiff Washington Colala-Peñarreta will be required to depart the United States on December 13, 2010, notwithstanding his status as a plaintiff and critical witness in this civil rights case challenging the unconstitutional conduct of Immigration and Customs Enforcement ("ICE") agents and those agents' violation of the common law of Connecticut. If he were to be removed to Ecuador, Mr. Colala-Peñarreta would confront a number of practical obstacles that would effectively eliminate his opportunity to litigate his civil rights claims, and to testify as the most important witness in support of the claims of his housemate and lead plaintiff, Eduardo Diaz-Bernal. Whether he resettles in Puyo, or a more rural region of Ecuador, Mr. Colala-Peñarreta will lack reliable access to basic infrastructure and telecommunications technology that will allow him to maintain privileged communications with his counsel, and to provide testimony at trial in support of his and Mr. Diaz-Bernal's constitutional claims. Mr. Colala-Peñarreta's ability to communicate effectively with counsel is particularly important in light of the fact that Defendants have not yet propounded written discovery on Plaintiffs.

In order to allow Mr. Colala-Peñarreta to meaningfully pursue his claims in this litigation and to serve as the critical witness for Mr. Diaz-Bernal, Mr. Colala-Peñarreta and Mr. Diaz-Bernal hereby move this Court for an emergency order temporarily staying Mr. Colala-Peñarreta's removal until the close of trial in the instant case.[1] In the alternative, the movants request that this Court issue a writ of habeas <u>ad testificandum</u> for the purpose of securing Mr. Colala-Peñarreta's testimony at trial.

---

[1] Mr. Colala-Peñarreta and Mr. Diaz-Bernal previously filed a motion to temporarily stay the removal of Plaintiff Colala-Peñarreta, <u>see</u> ECF No. 105 (Oct. 25, 2010), which this Court denied without prejudice, <u>see</u> ECF No. 109 (Oct. 26, 2010). The movants hereby renew their motion, with a more detailed factual record and additional legal arguments.

A temporary stay of Mr. Colala-Peñarreta's removal by this Court, pending disposition of his meritorious claims in this litigation, is a necessary predicate to the movants' vindication of their legal rights and their ability to hold ICE—the very agency that now intends to remove Mr. Colala-Peñarreta—accountable for its unlawful conduct. The Immigration Judge ("IJ") in Mr. Diaz-Bernal's immigration proceedings has already recognized the importance of Mr. Colala-Peñarreta as a witness to the claims of at least one other Plaintiff in this suit, having noted that Mr. Colala-Peñarreta "provided the <u>crucial</u> testimony regarding the immigration agents' entry into" the shared home of the movants, without a warrant or consent and in egregious violation of the Fourth Amendment. <u>See</u> ECF No. 38-6 at 29 (opinion and order of IJ) (emphasis added).

This Court has the authority to issue orders necessary to protect the integrity of the proceedings before it. That authority includes the power to issue a temporary stay, and the Court should exercise that power in Mr. Colala-Peñarreta's case. This authority stems from several sources, including Article III and the First and Fifth Amendments of the Constitution, as well as the All Writs Act. Each of these sources is a sufficient, independent basis for issuing the requested temporary stay. In the alternative, this Court should exercise its authority to issue a writ of habeas <u>ad testificandum</u>, in order to secure Mr. Colala-Peñarreta's testimony at trial.

## STATEMENT OF FACTS

### I. MR. COLALA-PEÑARRETA IS A CRUCIAL WITNESS IN THE PENDING CIVIL RIGHTS LITIGATION.

Mr. Colala-Peñarreta is a critical witness for his own claims and those of his housemate, Mr. Diaz-Bernal. On the morning of June 6, 2007, ICE agents raided homes in Fair Haven, a Latino neighborhood in New Haven, entering residences without warrants or consent, and arrested and detained Mr. Colala-Peñarreta, Mr. Diaz-Bernal, and other residents (including the rest of the Plaintiffs of this case), in violation of the Constitution. Third Amended Complaint

("TAC") ¶ 1, ECF No. 46. Upon encountering Mr. Colala-Peñarreta outside of his home (which he shared with Mr. Diaz-Bernal), several of the ICE agent Defendants asked for his identification. <u>Id.</u> ¶ 72. When Mr. Colala-Peñarreta indicated that his identification was inside, those Defendants handcuffed him and forced him inside and up the stairs. <u>Id.</u> ¶¶ 70, 72; <u>see generally</u> ECF No. 38-6. At the top of the stairs, those Defendants drew their guns and demanded that Mr. Colala-Peñarreta open his locked residence. <u>Id.</u> ¶ 73. At no time did Mr. Colala-Peñarreta or any other resident give consent for the Defendants to enter his apartment, nor did the Defendants possess a warrant. <u>Id.</u> ¶¶ 74-75. Some of the Defendants proceeded to search Mr. Colala-Peñarreta's home with their guns drawn, while others held him. <u>Id.</u> ¶¶ 77, 84. During their search of the house, the raiding officers found Mr. Diaz-Bernal in the bathroom, wearing only shorts and a shirt. <u>Id.</u> ¶¶ 78-79. Without permitting Mr. Diaz-Bernal to put on pants, two Defendants grabbed his arms, forced him into the kitchen, pulled him to the floor, asked him questions, and handcuffed him. <u>Id.</u> ¶¶ 80-83, 85.

## II.    IF REMOVED FROM THE UNITED STATES, MR. COLALA-PEÑARRETA WOULD RETURN TO A REGION WITH A SEVERELY LIMITED TELECOMMUNICATIONS INFRASTRUCTURE.

If Mr. Colala-Peñarreta is required to depart from the United States on December 13, 2010 and return to Ecuador, he initially would return to Puyo and subsequently would likely be sent to a more rural area of Ecuador. Declaration of Washington Colala-Peñarreta [hereinafter Colala Decl.] ¶ 1. Puyo is the capital of the province of Pastaza in Amazonian Ecuador. Declaration of Norman E. Whitten, Jr., Ph.D. [hereinafter Whitten Decl.] ¶ 1. With a population of approximately 45,000 people, <u>id.</u> ¶ 4, Puyo is often beset by landslides, heavy rain, or flooding. <u>Id.</u> ¶¶ 5, 14; <u>see also</u> Declaration of Robin Fink [hereinafter Fink Decl.] ¶ 15. While the majority of the Pastaza population resides in Puyo city proper, the remainder lives in "tiny

hamlets" in the surrounding rural regions; travel from such rural areas to Puyo often first requires a trip by foot or canoe to reach roads serviced by buses that lead into Puyo. Declaration of Catherine Timura, Ph.D. [hereinafter Timura Decl.] ¶ 5. Mr. Colala-Peñarreta's family home is located in Puyo city proper. Colala Decl. ¶ 1. The family home has an old, unreliable computer and no internet or cellular phone access, and Mr. Colala-Peñarreta does not have the financial resources to pay for either service. Id. ¶¶ 20-21.

Mr. Colala-Peñarreta was trained as a primary school teacher in Ecuador; because he has not worked as a teacher in Ecuador since 1995, he has lost his seniority and would have to re-enter the teaching profession as a new teacher upon his return. Colala Decl. ¶¶ 2-4, 8. Teachers in Ecuador have "little say in where they are posted." Timura Decl. ¶ 6. New teachers must submit an application to their provincial Director of Education, whereupon the Provincial Director of Education decides where to place each teacher according to his credentials and seniority. Colala Decl. ¶ 3; see also Timura Decl. ¶ 6. Re-entering the profession as a new teacher, Mr. Colala-Peñarreta would likely be assigned to teach in a rural community. Colala Decl. ¶ 4, 8. Particularly in a small province like Pastaza, where the competition for jobs may be fierce, see Timura Decl. ¶ 6, new teachers are placed in rural teaching posts, as those jobs are less desirable than the teaching jobs in urban communities. Colala Decl. ¶ 4. Whether he eventually is assigned to work and live in Puyo city proper or in a more remote and rural area, Mr. Colala-Peñarreta will have severely limited access to private and reliable telecommunications technology.

Puyo City Proper

According to Professor Norman Whitten, an anthropologist who has lived for several months in Puyo proper almost every year since 1968, see Whitten Decl. ¶ 5, telephone service in

Puyo is, "at best, unpredictable." Id. ¶ 6. Calling the United States from a home land line is "prohibitively expensive at several dollars per minute." Id. ¶ 8. Even with cellular phones, for which service costs about $0.45 per minute for calls to the United States, service is spotty, and calls are frequently dropped, particularly if there is bad weather. Id. ¶¶ 9-11. Kevin Koenig, who has spent "extensive periods of time working in Puyo" through his employment at a non-profit organization, see Declaration of Kevin Koenig [hereinafter Koenig Decl.] ¶ 3, confirms that "voice calls are dropped frequently[,] [r]arely can a full conversation transpire without interruption" when placing calls over the internet. Koenig Decl. ¶ 7.

Accessing email or videoconferencing from Puyo is even more difficult. Because obtaining internet at a private residence is very expensive, at up to one hundred dollars per month, see Declaration of Michael K. Dorsey [hereinafter Dorsey Decl.] ¶ 9, connections to the internet from private residences are rare. Fink Decl. ¶ 7. According to Robin Fink, a U.S. citizen living in Ecuador and managing a healthcare program focused on the Ecuadorian Amazon, most people in Puyo access the internet from internet cafes. Id. ¶¶ 1, 7. Although there are internet cafes in downtown Puyo, id. ¶ 12, they are small and often crowded, making it difficult to obtain a spot at a computer, see Dorsey Decl. ¶ 7, particularly for long periods of time. Fink Decl. ¶ 11. Internet access in these cafes costs approximately $1 to $2 a minute, Timura Decl. ¶ 9, and the connection is both unreliable and extraordinarily slow. See Whitten Decl. ¶ 12 ("In peak hours, it would take thirty minutes for an email even to be sent."); see also Fink Decl. ¶ 10 (noting that the viruses present on internet cafe computers "make them run much slower and create problems for internet connectivity and download speeds"). Professor Michael Dorsey, an assistant professor at Dartmouth who has conducted research in Puyo approximately twenty to thirty times (most recently in summer of 2008), see Dorsey Decl. ¶¶ 2, 6, attests that it is "nearly impossible

to conduct a reliable, uninterrupted videoconference from internet cafes such as those in Puyo." Id. ¶ 8; see also Koenig Decl. ¶ 5; Colala Decl. ¶ 7. Even at a private residence with broadband internet, videoconferencing calls are frequently dropped. Dorsey Decl. ¶ 9. As a practical matter, videoconferencing technology is not accessible to the general populace. Whitten Decl. ¶ 13.

In addition, even if Mr. Colala-Peñarreta were somehow able to obtain reliable internet access, it is impossible to maintain any privacy of communication in Puyo's internet cafes. See Whitten Decl. ¶ 12; Fink Decl. ¶¶ 12-14; Koenig Decl. ¶ 8 (internet cafes are "one big room with no privacy at all"). Internet cafes in Puyo lack an enclosed space in which to make a video or voice call. Timura Decl. ¶ 11. While there are occasionally small partitions between computer screens, the cafes are small and crowded, so it is easy for staff and other customers to see and overhear conversations. Fink Decl. ¶ 12. These internet cafes may also have facsimile machines, but faxes are sent and received without any assurance of privacy. See Timura Decl. ¶ 12 ("Any incoming faxes could be read and monitored by staff or others at the internet cafes."). Nor are fax machines otherwise available to the public in Puyo; it is "very unlikely" that a private residence would have a facsimile machine. See Timura Decl. ¶ 12. Lastly, even if Mr. Colala-Peñarreta were able to access reliable internet service of any kind, he does not know how to use a computer or the internet. Colala Decl. ¶ 22.

Rural Pastaza and Rural Ecuador

If Mr. Colala-Peñarreta reenters the teaching profession in Puyo, it is likely he would be assigned to teach in a rural community even more remote than Puyo city proper. Colala Decl. ¶ 4; see also Timura Decl. ¶ 5 ("Teachers in Ecuador often have little say in where they are posted."). In rural Ecuador, and particularly in the Amazon, telecommunications technology is both limited and unstable. See Timura Decl. ¶¶ 7, 10, 11. According to the declaration of

Professor Catherine Timura, a medical anthropologist who has conducted fieldwork research in rural Ecuador periodically since 1999, "the biggest problem with communicating from rural areas—other than the antiquated technology and a general lack of telecommunications infrastructure—is the frequent and unpredictable power outages, which disrupt all phone and internet service." Id. ¶ 10. Even cell phones have "periodic service outages at unpredictable times and of unpredictable duration." Id. ¶ 8. The rural communities in which Mr. Colala-Peñarreta previously taught only had access to public telephones controlled by telephone operators, with long lines limiting access. See Colala Decl. ¶ 11. Internet access and facsimile machines are unlikely to be available at all. See Timura Decl. ¶ 12, 15; Colala Decl. ¶ 10; see also Fink Decl. ¶ 16. The Consul General of Ecuador in Connecticut has stated that Mr. Colala-Peñarreta would have to travel several hours from Pastaza, the province in which Puyo is located, in order to access sufficiently advanced technology to "communicate with his lawyers in the U.S. or testify by video conference." Declaration of Jason Glick [hereinafter Glick Decl.], Ex. A ¶ 4 (Translated Letter from Consul General of Ecuador in Connecticut).

## PROCEDURAL HISTORY

The Proceedings in Diaz-Bernal v. Myers, No. 3:09-cv-1734

On October 28, 2009, Mr. Colala-Peñarreta, Mr. Diaz-Bernal, and eight other Fair Haven residents unlawfully arrested during the June 6, 2007 raids brought suit under the U.S. Constitution and the Federal Tort Claims Act ("FTCA") for compensatory and declaratory relief. See ECF No. 1. Plaintiffs named as defendants the individual ICE agents that raided their homes, the senior ICE officials who authorized the raids knowing that the raids would likely result in

constitutional violations, and the United States.[2] Plaintiffs allege violations of their Fourth, Fifth, and Tenth Amendment rights. Discovery in this case is ongoing, and scheduled to be completed by October 30, 2011. <u>See</u> ECF No. 37. Dispositive motions are scheduled to be filed by December 31, 2011. <u>Id.</u> Defendants filed partial motions to dismiss, <u>see</u> ECF Nos. 16, 38, 42, 47, 51, 52, which Plaintiffs opposed, <u>see</u> ECF Nos. 27, 63, 75, 94, and on which this Court heard argument on October 26, 2010, <u>see</u> ECF No. 109.

<u>Mr. Colala-Peñarreta's Immigration Proceedings</u>

On June 11, 2007, the Department of Homeland Security ("DHS") initiated removal proceedings against Mr. Colala-Peñarreta by filing a Notice to Appear with the Immigration Court. <u>See</u> ECF No. 105-4. Represented at that time by the immigration clinic at the University of Connecticut School of Law, Mr. Colala-Peñarreta filed an application for cancellation of removal. <u>See</u> ECF No. 105-5. IJ Philip Verrillo denied that application and ordered that Mr. Colala-Peñarreta be removed to Ecuador. <u>See</u> ECF No. 38-5. After obtaining the assistance of his current counsel, Mr. Colala-Peñarreta timely appealed to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's decision. <u>See</u> ECF No. 38-22. Mr. Colala-Peñarreta timely filed a petition for review in the Second Circuit, moved for a stay of his removal pending review, and moved for leave to proceed <u>in forma pauperis</u>. <u>See</u> Glick Decl., Ex. A. On September 15, 2010, the Second Circuit granted the government's motion to dismiss, and denied as moot Mr. Colala-Peñarreta's pending motions for a stay and to proceed <u>in forma pauperis</u>. <u>See</u> ECF No. 105-7. Mr. Colala-Peñarreta timely filed a motion for reconsideration and request for reconsideration <u>en banc</u> and a motion for stay of issuance of mandate, which the United States opposed. <u>See</u> Glick Decl., Ex. A. Those motions have been fully briefed and are pending before the Second Circuit.

---

[2] Plaintiffs filed a First Amended Complaint, ECF No. 15, Second Amended Complaint, ECF No. 43, and Third Amended Complaint ("TAC"), ECF No. 46. An eleventh Plaintiff, Mr. Amilcar Soto-Velasquez, joined the Second and Third Amended Complaints.

<u>See</u> <u>id.</u> Mr. Colala-Peñarreta also moved the Second Circuit for a stay of removal pending the disposition of his motion for reconsideration and request for reconsideration *en banc*, which stay motion the Second Circuit denied on November 30, 2010. <u>See</u> <u>id.</u>

<u>Mr. Diaz-Bernal's Immigration Proceedings</u>

On June 11, 2007, DHS initiated removal proceedings against Mr. Diaz-Bernal by filing a Notice to Appear with the Immigration Court. <u>See</u> ECF No. 38-6 at 2. Mr. Diaz-Bernal filed a motion to suppress evidence and terminate his removal proceedings. <u>See</u> <u>id.</u> at 3. On September 4, 2009, based significantly on the testimony of Plaintiff and co-movant Mr. Colala-Peñarreta, IJ Michael Straus granted the motion, concluding that ICE agents' arrest and detention of Mr. Diaz-Bernal egregiously violated his Fourth Amendment rights. <u>See</u> <u>id.</u> at 28-33.[3]

The IJ's opinion repeatedly emphasized Mr. Colala-Peñarreta's credibility and persuasiveness, and the importance of Mr. Colala-Peñarreta's testimony to Mr. Diaz-Bernal's constitutional claims. This was because Mr. Colala-Peñarreta the only witness at the door when the ICE agents forced their way in, and is thus the necessary eyewitness, whereas Mr. Diaz-Bernal was asleep in his bedroom. The IJ found Mr. Colala-Peñarreta to be a "credible, sincere, and veracious witness[]," <u>id.</u> at 28, and that he "testified in a complete and comprehensive [manner] regarding the material portion of his testimony," <u>id.</u> at 30. Mr. Colala-Peñarreta "provided the <u>crucial</u> testimony regarding the immigration agents' entry into" the home shared by the two Plaintiffs. <u>Id.</u> at 29 (emphasis added). Based on Mr. Colala-Peñarreta's testimony, the IJ found that "the agents entered into [Mr. Diaz-Bernal and Mr. Colala-Peñarreta's] home without consent." <u>Id.</u> at 31. The IJ concluded that a "<u>prima facie</u> showing that [Mr. Diaz-Bernal's] constitutional rights were egregiously violated" had been made. <u>Id.</u> at 32.

---

[3] On September 28, 2009, ICE appealed the IJ's decision to the BIA. ECF No. 38-15.

<u>Mr. Colala-Peñarreta's Application for a Temporary Stay of Removal</u>

Mr. Colala-Peñarreta has no remaining administrative remedies to stay his removal. In order to protect his ability to litigate his constitutional claims in the <u>Diaz-Bernal</u> case, and to provide critical testimony in support of Mr. Diaz-Bernal's claims, Mr. Colala-Peñarreta submitted an Application for Stay of Deportation or Removal, or Form I-246, to the ICE Enforcement and Removal Operations ("ERO") office in Hartford, on October 18, 2010, pursuant to 8 C.F.R. § 241.6(a). <u>See</u> ECF No. 105-9. ICE denied Mr. Colala-Peñarreta's I-246 in a letter dated November 9, 2010, sent regular mail and received by undersigned counsel on November 19, 2010. <u>See</u> Glick Decl., Ex. B. ICE concurrently sent Mr. Colala-Peñarreta a notice that he appear before a duty officer on November 23, 2010, to "[p]resent [i]tinerary for departure on or before December 6, 2010." <u>See</u> Glick Decl., Ex. C.[4]

Mr. Colala-Peñarreta has cooperated fully with all of ICE's notices of appointment and other instructions. At the appointment with the ICE duty officer, he presented proof of purchase of an itinerary to depart the United States on December 6, 2010. <u>See</u> Glick Decl. ¶ 10; <u>id.</u>, Ex. D. On December 3, 2010, this Court ordered a one-week stay of removal. <u>See</u> ECF No. 121.

## <u>ARGUMENT</u>

## III.    THIS COURT IS AUTHORIZED TO ISSUE THE TEMPORARY STAY.

The United States may argue that this Court lacks power to enter a temporary stay of removal of Mr. Colala-Peñarreta, but any such contention would be incorrect, as this Court possesses several independent sources of authority to issue a temporary stay.

---

[4] The letter and notice were not postmarked until November 16, 2010, and counsel for Mr. Colala-Peñarreta received the correspondence on November 19, 2010. <u>See</u> Glick Decl., ¶¶ 5-6. In light of the short notice of the scheduled appointment, the considerable expense to Mr. Colala-Peñarreta of obtaining a plane ticket, and the unavailability of counsel during the Thanksgiving holiday, counsel for Mr. Colala-Peñarreta rescheduled the appointment with the ICE duty officer for November 29, 2010. Glick Decl., ¶¶ 7-8.

## A. COURTS HAVE JURISDICTION TO DETERMINE THEIR OWN JURISDICTION.

The Supreme Court has recognized that "a federal court always has jurisdiction to determine its own jurisdiction." United States v. Ruiz, 536 U.S. 622, 628 (2002) (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 291 (1947)). As discussed below, this Court has the power to grant the movants' emergency motion. However, in the event the Court determines further briefing is needed in order to resolve whether the Court has such jurisdiction and authority, the Court indisputably has the power to issue a stay pendente lite. See Memorandum of Law in Support of Emergency Motion for Temporary Stay of Removal of Plaintiff Colala-Penarreta at 6-7 (filed Oct. 25, 2010), ECF No. 105.2; Glick Decl., Ex. K, at 11, 13 (Tr. of Telephone Conference with Chambers, from Dec. 3, 2010).

## B. THE CONSTITUTIONAL ACCESS-TO-COURTS DOCTRINE EMPOWERS THIS COURT TO ISSUE THE TEMPORARY STAY.

The Constitution requires that litigants have "meaningful access to the courts." Bounds v. Smith, 430 U.S. 817, 824 (1977). When government action thwarts a litigant's ability to vindicate "basic constitutional rights," Wolff v. McDonnell, 418 U.S. 539, 579 (1974), or "fundamental civil rights," Bounds, 430 U.S. at 827, courts are empowered to issue appropriate relief. See also Lewis v. Casey, 518 U.S. 343, 349-50, 354-55 (1996) (noting that it is "well-established" that courts are to "provide relief to claimants . . . who . . . will imminently suffer . . . actual harm"). Because Defendants' imminent plan to remove Mr. Colala-Peñarreta would deprive him and Mr. Diaz-Bernal of their opportunity to pursue their claims, this Court is authorized to issue the temporary stay pursuant to the constitutional access-to-courts doctrine.

Meaningful access to the courts is squarely grounded in the guarantees of the Constitution, including the Fifth Amendment Due Process Clause and the First Amendment.

Although courts have articulated various bases for the doctrine, it is indisputably a principle of constitutional significance and cannot be repealed by statute or implication. The "right of access to the courts is . . . [an] aspect of the [First Amendment] right to petition." BE & K Constr. Co. v. NLRB, 536 U.S. 516, 525 (2002) (internal citation omitted). The Supreme Court has recognized the right to petition as "one of the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967). Public access to the courts serves First Amendment interests by "allow[ing] the public airing of disputed facts." BE & K Constr. Co., 536 U.S. at 525. The right of meaningful access to the courts is also based in the Due Process Clauses of the Fifth and Fourteenth Amendments. Procunier v. Martinez, 416 U.S. 396, 419 (1974) (access to the courts is a corollary to "constitutional guarantee of due process of law"), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401 (1989); Johnson v. Avery, 393 U.S. 483, 498 n.24 (1969) ("Reasonable access to the courts . . . is a right . . . secured by the Constitution . . . .") (citations omitted).

The urgent situation faced by Mr. Colala-Peñarreta and Mr. Diaz-Bernal meets the circumstances under which the Supreme Court has held that a court is empowered to issue relief to plaintiffs denied access to the courts.

First, Defendants have taken action that frustrates Plaintiffs' attempt to litigate their constitutional claims. See Christopher v. Harbury, 536 U.S. 403, 413-14 (2002). Defendants' imminent removal of Mr. Colala-Peñarreta would impermissibly defeat his and Mr. Diaz-Bernal's ability meaningfully to pursue their constitutional claims for three reasons: (1) Mr. Colala-Peñarreta would be unavailable to testify in person at trial in support of his claims, and the telecommunications technology available in Puyo or rural Ecuador is not sufficiently accessible or reliable so as to serve as an adequate substitute for live testimony, as it arguably

might be in more developed areas, see supra at Section II; infra at Section V.B.; (2) at trial, Mr. Diaz-Bernal would not be able to rely on the personal testimony of Mr. Colala-Peñarreta regarding his claims, for which Mr. Colala-Peñarreta is a critical witness, see supra at 9-10, and any videoconferencing would be unreliable and inadequate; and (3) during the course of the litigation, including the discovery phase, it would be virtually impossible for counsel to effectively represent Mr. Colala-Peñarreta because he would not have access to sufficiently private, reliable, timely, and affordable methods of communication with his attorneys, see supra at Section II; infra at Section V.B.1. This Court should not permit Defendants to defeat Plaintiffs' opportunity to pursue their meritorious constitutional claims by allowing Defendants to remove Mr. Colala-Peñarreta from the country during the pendency of this case.

Second, Mr. Colala-Peñarreta and Mr. Diaz-Bernal also satisfy the requirement of having carefully identified the claims for relief that give rise to their present access-to-courts plea. See Christopher, 536 U.S. at 417 (identification of underlying claims for relief is prerequisite for an access-to-courts claim). In their Third Amended Complaint, Plaintiffs allege extensive violations of their Fourth, Fifth, and Tenth Amendment rights. See TAC ¶¶ 321-376.

Finally, the remedy that Plaintiffs seek is narrowly tailored to the imminent harm and is fully within this Court's power to issue. Cf. Missouri v. Jenkins, 515 U.S. 70, 88 (1995). The requested stay of removal would operate merely to suspend temporarily the order of removal. Unlike an injunction, the stay is not a "judicial intervention to" "direct[] an actor's conduct." Nken v. Holder, 129 S. Ct. 1749, 1758 (2009) (internal citations omitted). "An alien seeking a stay of removal . . . does not ask for a coercive order against the Government, but rather for the temporary setting aside of the source of the Government's authority to remove." Id.

## C. ARTICLE III EMPOWERS THIS COURT TO ISSUE THE TEMPORARY STAY.

Article III of the Constitution provides independent authority for this Court to issue the requested temporary stay. Federal district courts retain the "inherent power" to issue orders necessary to their jurisdiction over a pending case.[5] Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991); see id. at 58 (Scalia, J., dissenting) ("Some elements of that inherent authority are so essential to the [Article III] judicial Power, that they are indefeasible, among which is a court's ability to enter orders protecting the integrity of its proceedings.").

This Court's inherent judicial power extends to the issuance of stays. See, e.g., Clinton v. Jones, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); Landis v. N. Am. Co., 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court."); see also Carlisle v. United States, 517 U.S. 416, 438 n.1 (1996) (Stevens, J., dissenting) (listing examples of lower federal courts' inherent powers, including "to stay proceedings . . . so as to maintain the orderly processes of justice") (internal citation omitted).

## D. THE ALL WRITS ACT, 28 U.S.C. § 1651, PROVIDES A SEPARATE STATUTORY SOURCE OF AUTHORITY FOR THIS COURT TO ISSUE THE TEMPORARY STAY.

The All Writs Act, 28 U.S.C. § 1651, empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The All Writs Act does not enlarge or expand the jurisdiction of the district court but

---

[5] The Supreme Court has affirmed repeatedly that Article III courts' inherent powers can be limited by only the clearest statutes or rules. See, e.g., Chambers, 501 U.S. at 47 ("[W]e do not lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent power.") (internal citation omitted). Of particular relevance to the relief requested here, the Supreme Court has noted that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions . . . ." Califano v. Yamaski, 442 U.S. 682, 705 (1979). Because a temporary stay is a lesser intervention than an injunction, see Nken, 129 S. Ct. at 1758 (contrasting temporary stay of removal with permanent injunction against removal), it follows that lower courts retain the power to issue temporary stays, barring an explicit contrary congressional statement. No such contrary statute or rule exists here. See infra at Section IV.

instead merely confers ancillary <u>authority</u> where jurisdiction is otherwise present and already lodged in the court. This ancillary authority allows courts to enter orders necessary to safeguard their jurisdiction, when that jurisdiction has another basis. <u>See, e.g.</u>, <u>Penn. Bureau of Corr. v. U.S. Marshals Serv.</u>, 474 U.S. 34, 41 (1985) (describing Act as filling the interstices of federal judicial power when those gaps threaten to thwart the otherwise proper exercise of federal courts jurisdiction); <u>Dennis v. I.N.S.</u>, No. 01-279, 2002 WL 295100, at *3 (D. Conn. Feb. 19, 2002) (same); <u>see also</u> 14A Wright & Miller, <u>Federal Practice and Procedure</u> § 3691 (3d ed. 2010) (Act is "not a base of jurisdiction"); 19 <u>Moore's Federal Practice</u> § 204.02 (Matthew Bender 3d ed. 2010) ("The All Writs Act does not enlarge a court's jurisdiction, as established by the Constitution or by statute."). As the Supreme Court has recognized, "[t]he authority to issue a writ under the All Writs Act is not a font of jurisdiction," <u>United States v. Denedo,</u> 129 S. Ct. 2213, 2222 (2009), nor is it "a source of subject-matter jurisdiction," <u>id</u>. Instead, the "court's power to issue any form of relief, extraordinary or otherwise, is contingent on that court's subject-matter jurisdiction over the case or controversy." <u>Id.</u> at 2221. In this case, the Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (<u>Bivens</u> and FTCA claims) and 28 U.S.C. § 1346(b) (FTCA claims). As such, this Court has the authority under the All Writs Act to issue a temporary stay, in connection with its subject-matter jurisdiction over the underlying claims.

## IV. THE IMMIGRATION AND NATIONALITY ACT DOES NOT STRIP THIS COURT OF ITS POWER TO GRANT A TEMPORARY STAY.

The United States may argue that provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 <u>et seq.</u>, bar this Court from granting Mr. Colala-Peñarreta a temporary stay of removal. The government is incorrect, as no statute has divested this Court of its longstanding power to issue orders ancillary to its underlying subject-matter jurisdiction.

## A. 8 U.S.C. § 1252(F) DOES NOT STRIP THIS COURT OF ITS POWER TO ISSUE A TEMPORARY STAY.

Any contention that 8 U.S.C. § 1252(f),[6] entitled "Limit on injunctive relief," strips this Court of its inherent power to issue a temporary stay, would be incorrect.

First, subsection (f)(1) bars all lower federal courts from enjoining or restraining the operation of certain INA provisions. However, subsection (f)(1) "specifies that this ban does not extend to individual cases." Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC"), 525 U.S. 471, 481-82 (1999). Thus, subsection (f)(1) is not a barrier to Mr. Colala-Peñarreta because he is an "individual alien against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1).

Nor does subsection (f)(2) deprive this Court of the power to issue a temporary stay, as subsection (f)(2) applies only to permanent prohibitions and the relief Mr. Colala-Peñarreta seeks is only temporary. Whereas subsection (f)(1) limits the ability of the courts to "enjoin or restrain" operation of certain INA provisions, subsection (f)(2) uses only the word "enjoin." As the Second Circuit has found, the "enjoin or restrain" language in subsection (f)(1) contrasts with the use of "enjoin" in subsection (f)(2), "suggesting that 'enjoin' in (f)(2) applies to a permanent prohibition and that 'enjoin or restrain' applies to both a permanent and an interim prohibition." Mohammed v. Reno, 309 F.3d 95, 99 (2d Cir. 2002).

Just last year, the Supreme Court confirmed that "subsection (f)(2) does not comfortably cover stays," Nken v. Holder, 129 S. Ct. 1749, 1760 (2009), and that "applying the subsection

---

[6] 8 U.S.C. § 1252(f) reads:

    (1) Regardless of the nature of the action or claim or the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

    (2) Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

(f)(2) standard in the stay context results in something that does not remotely look like a stay," id. at 1759. The Supreme Court distinguished between a permanent injunction and a temporary stay, noting that an injunction "is a means by which a court tells someone what to do or not to do" and it does so "with the backing of its full coercive powers," id. at 1757, whereas a stay "simply suspend[s] judicial alteration of the status quo," id. Ultimately, the Supreme Court determined that subsection (f)(2) does not apply to temporary stays. See id. at 1760. Therefore, that subsection does not prohibit this Court from issuing a temporary stay.

### B. 8 U.S.C. § 1252(G) DOES NOT DIVEST THIS COURT OF ITS POWER TO GRANT A TEMPORARY STAY.

Any argument that § 1252(g)[7] strips this Court of the power to issue a temporary stay in aid of its undisputed jurisdiction in this case would be incorrect. First, the Supreme Court has adopted a narrow construction of the terms of § 1252(g), holding that it applies only in limited circumstances. See AADC, 525 U.S. 471, 482, 485 n.9 (1999). In AADC, the Court found that this jurisdictional prohibition "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to commence proceedings, adjudicate cases, or execute removal orders." Id. (emphasis in original). In light of the Court's refusal to read § 1252(g) to apply to "the universe of deportation claims," id. at 482, this Court should interpret § 1252(g)'s scope narrowly, consistent with AADC.

Second, §1252(g) must be read together with § 1252(f), as interpreted by Nken, supra. Section 1252(f)(2), as discussed, establishes the standard for issuance of injunctions in individual

---

[7] 8 U.S.C. § 1252(g), entitled "Exclusive jurisdiction," reads:
> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter (emphasis added).

removal cases, but does not apply to stays of removal. <u>See</u> <u>Nken</u>, 129 S. Ct. at 1760. If a temporary stay of removal is not authorized by § 1252(f)(2), however, as the Supreme Court held in <u>Nken</u>, and the government were correct that the "notwithstanding any other provision of law" clause of § 1252(g) bars all stays of removal except those authorized by § 1252(f), then the Supreme Court would not and could not have gone on to hold in <u>Nken</u> that a temporary stay of removal can issue. In other words, <u>Nken</u> necessarily holds that § 1252(g) does not bar a stay of removal, even when that stay is issued outside of the authorization established in § 1252(f).

Defendants may nevertheless argue that this motion should be denied because the requested temporary stay falls within the "decision or action" to "execute a removal order," but that interpretation misunderstands the proper scope of §1252(g). By its own title and language, § 1252(g) is addressed exclusively to limiting <u>jurisdiction</u>. Because Congress intended § 1252(g) to bar suits filed in district court whose sole purpose was to stay or enjoin removal proceedings, <u>see, e.g.</u>, <u>AADC</u> (suit in district court to enjoin removal proceedings); <u>Scott v. Napolitano</u>, 618 F. Supp. 2d 186, 191 (E.D.N.Y. 2009) (suit in district court seeking injunctive, mandamus and declaratory relief from final order of removal), the plain text of § 1252(g) speaks only of <u>jurisdiction</u>.

As explained above, it is well settled that the All Writs Act confers ancillary <u>authority</u>, not <u>jurisdiction</u>, in aid of jurisdiction conferred elsewhere. <u>See</u> <u>supra</u> at Section III.D. The difference between jurisdiction and ancillary authority is at the heart of All Writs Act jurisprudence. <u>See, e.g.</u>, <u>Penn. Bureau of Corr. v. U.S. Marshals Serv.</u>, 474 U.S. 34, 41-42 (1985). Because the All Writs Act is not itself jurisdictional, the type of jurisdiction stripping § 1252(g) contemplated is not the same type of authority that the All Writs Act confers on courts. It follows that the "notwithstanding any other provision of law (statutory or nonstatutory)"

language pertains only to other provisions of law that confer <u>jurisdiction in the first instance</u>, not to the authority that the All Writs Act provides.

While Congress included reference to the All Writs Act in its list of jurisdictional statutes that § 1252(g) sought to repeal, the language is at best ambiguous as to whether Congress also intended to repeal All Writs Act <u>authority</u>, in aid of jurisdiction otherwise established and not contested, such as this Court's jurisdiction over movants' FTCA and <u>Bivens</u> claims. In light of the ambiguity, this Court should be especially hesitant to conclude that its authority under the All Writs Act, which dates to the First Judiciary Act of 1789, has been repealed in this case. <u>See</u> Judiciary Act of Sept. 24, 1789, c. 20, § 14, 1 Stat. 73, 81-82.

As discussed, § 1252(g) is at best ambiguous as to its impact, if any, on the authority that the All Writs Act confers. This ambiguity must be resolved in favor of Mr. Colala-Peñarreta and Mr. Diaz-Bernal, because of the rule of lenity courts apply to immigration statutes, and because if § 1252(g) were read to repeal this Court's authority under the All Writs Act, such an interpretation would raise serious constitutional problems.

First, any ambiguity in the statute as to whether it strips this Court of its power under the All Writs Act to issue a temporary stay should be construed in favor of Mr. Colala-Peñarreta and Mr. Diaz-Bernal. The rule of lenity recognizes the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the [alleged] alien." <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 449 (1987); <u>see also</u> <u>Dada v. Mukasey</u>, 128 S. Ct. 2307, 2318 (2008) (applying rule of lenity to interpret immigration statute); <u>INS v. St. Cyr</u>, 533 U.S. 289, 320 (2001) (rule of lenity applies to immigration statutes). In this case, the Court should construe the statute in favor of Mr. Colala-Peñarreta and Mr. Diaz-Bernal by rejecting the argument that § 1252(g) bars the Court from issuing a temporary stay.

Second, under the canon of constitutional avoidance, when a court is deciding "which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." Clark v. Martinez, 543 U.S. 371, 380-81 (2005); see also El Badrawi v. Dep't of Homeland Sec., 579 F. Supp. 2d 249, 268 (D. Conn. 2008) ("The canon of avoidance is appropriately invoked in interpreting § 1252(g). When there are two possible interpretations of an ambiguous statute, and one of those interpretations would raise a substantial constitutional question, the canon of constitutional avoidance requires a court to choose the statutory construction that avoids the constitutional issue.").

Construing § 1252(g) as removing the All Writs Act conferral of authority to issue a temporary stay would impede Mr. Colala-Peñarreta and Mr. Diaz-Bernal's ability to fully and meaningfully litigate their bona fide constitutional claims as plaintiffs in the present civil rights litigation. As discussed above, meaningful access to the courts is a guarantee grounded in the Fifth Amendment Due Process Clause and the First Amendment. These constitutional rights cannot be repealed by statute or implication. Construing § 1252(g) as stripping the Court of its power to issue a temporary stay of removal in this instance would impose a serious impediment to Mr. Colala-Peñarreta's and Mr. Diaz-Bernal's ability to meaningfully access this Court in order to fully and completely litigate their civil rights claims. Because of the serious constitutional problem that would be raised by construing § 1252(g) to impede this Court's power to issue a temporary stay, the Court should avoid such an interpretation.[8]

---

[8] Several courts have concluded that they lack jurisdiction over a free-standing action seeking only a stay of removal, see, e.g., Scott v. Napolitano, 618 F. Supp. 2d 186, 191 (E.D.N.Y. 2009), but these cases have no application here, where the court's underlying jurisdiction pursuant to 28 U.S.C § 1346 and § 1331 is not in doubt.

**V. THE COURT SHOULD GRANT THE TEMPORARY STAY BECAUSE MOVANTS SATISFY THE SUPREME COURT'S FOUR-FACTOR TEST FOR A STAY OF REMOVAL.**

Mr. Colala-Peñarreta and Mr. Diaz-Bernal are entitled to the issuance of a temporary stay of Mr. Colala-Peñarreta's removal during the pendency of their meritorious civil rights action. The Supreme Court has held that courts must considerthe following four factors in deciding whether to issue a stay of removal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Nken, 129 S. Ct. at 1760.[9] These factors are weighed against each other such that "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002) (internal citations and quotations omitted). Thus, a stay should issue where the moving party "has demonstrated some possibility of success and the balance of hardships tips decidedly in his favor." Thapa v. Gonzales, 460 F.3d 323, 335 (2d Cir. 2006). Additionally, the first two factors are the most critical, and the third and fourth factors are merged here because the government is the opposing party. Nken, 129 S. Ct. at 1761-62. Movants satisfy the Nken standard.

**A. THE MOVANTS HAVE DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.**

First, there is a strong likelihood that the two movants will prevail on their Fourth Amendment claims. Cf. Mohammed, 309 F.3d at 100. Due significantly to Mr. Colala-

---

[9] Even if the Court were to conclude that the proper standard on which to evaluate this application for a temporary stay is the traditional one for a preliminary injunction under Fed. R. Civ. P. 65(a), see, e.g., Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010), or a temporary restraining order under Fed. R. Civ. P. 65(b), rather than the standard set forth in Nken and Mohammed, the temporary stay should issue because Mr. Colala-Peñarreta and Mr. Diaz-Bernal satisfy those standards as well.

Peñarreta's "crucial testimony" at Mr. Diaz-Bernal's suppression hearing, see ECF Nos. 38-6 at 29, the IJ found that Defendant ICE agents committed egregious violations of Mr. Diaz-Bernal's Fourth Amendment rights, see id. at 32. Based on this same conduct, both movants are likely to succeed on their related FTCA claims which are not subject of any pending motion to dismiss, see TAC ¶¶ 378-381, 382-384, 385-387, 388-390, 397-400.[10]

### B. THE UNITED STATES' REMOVAL OF MR. COLALA-PEÑARRETA WOULD IRREPARABLY INJURE THE MOVANTS BY THWARTING THEIR ABILITY TO PURSUE THEIR CONSTITUTIONAL CLAIMS.

Mr. Colala-Peñarreta's removal from the United States would irreparably harm him and Mr. Diaz-Bernal by frustrating their ability to vindicate their constitutional rights, cf. Mohammed, 309 F.3d at 100. If the United States removed Mr. Colala-Peñarreta, he would confront numerous practical obstacles that would effectively eliminate his opportunity to litigate his civil rights claims, and to provide crucial testimony for his housemate and lead Plaintiff, Mr. Diaz-Bernal. First, effective litigation of Mr. Colala-Peñarreta's claims requires that he be in constant, reliable, and privileged communication with his attorneys, both oral and written. Mr. Colala-Peñarreta will need to receive documents from and send them to his attorneys in order to respond to the extensive written discovery that Plaintiffs expect Defendants to propound. See Glick Decl., Exs. G-J (noting that in Barrera v. Boughton, a case involving Bivens and FTCA claims against ICE agents arising from unlawful arrest of day-laborers in Danbury, Connecticut, federal defendants propounded on each plaintiff 112 interrogatories, 40 requests for production, and 43 requests for admission, not including subparts). In drafting responses to such propounded discovery, Mr. Colala-Peñarreta will need to be in frequent and reliable contact with his attorneys. He will also need to have frequent communications with counsel in order to make

---

[10] Plaintiffs are also likely to succeed on their Fifth Amendment claims for violations of due process and equal protection, as set forth more fully in Plaintiffs' Opposition to the Individual–Capacity Federal Defendants' Motion to Dismiss, ECF No. 94, and on their FTCA abuse of process claim.

strategic decisions about his case and assist counsel in preparing for depositions and trial. The

locations in Ecuador where Mr. Colala-Peñarreta will likely reside, <u>see</u> Colala Decl. ¶¶ 1, 5-6, do

not have sufficient telecommunications infrastructure to allow Mr. Colala-Peñarreta to maintain

the type of communication necessary to meaningfully litigate his claims. <u>See</u> Colala Decl. ¶ 23;

Section II, <u>supra</u>. Second, the region does not have adequate technology to allow for Mr. Colala-

Peñarreta's video testimony at trial, and even if such technology did exist, it is not an adequate

substitute for in-person testimony due to the particular circumstances in this case.

1. *If Removed to Ecuador, Mr. Colala-Peñarreta Would Not Have Access to Reliable and Private Communications Technology, Which Would Thwart His Ability To Litigate His Claims*

If removed to Ecuador, Mr. Colala-Peñarreta would not have access to adequate

communications technology, whether internet, fax, or phone. <u>See generally</u> Colala Decl. The

limited technology that is available in some areas is subject to frequent power outages,

preventing reliable communication. Timura Decl. ¶ 17; Koenig Decl. ¶ 10. Further, the limited

technology which might be available to him would not be private and would thus destroy the

attorney-client privilege. These communications inadequacies would make it impossible for Mr.

Colala-Peñarreta adequately to litigate his claims.

a. <u>Unavailability and Inadequacy of Internet Access</u>

Although Mr. Colala-Peñarreta's attorneys could theoretically communicate with him by

email were he to reside in Puyo, <u>see</u> Section II, <u>supra</u>. Mr. Colala-Peñarreta does not know how

to use a computer or the internet, and his family's home in Puyo does not have internet access.

<u>See</u> Colala Decl. ¶¶ 21-22. Therefore, Mr. Colala-Peñarreta would have to seek computer

assistance at a public internet cafe in Puyo, subject to the limitations of computer availability,

cost, speed, reliability, power outages, expense, and viruses. See Dorsey Decl. ¶ 7; Fink Decl. ¶¶

9, 10; Koenig Decl. ¶ 9, 10; Timura Decl. ¶ 9; Whitten Decl. ¶ 12; <u>supra</u> Section II. Outside of Puyo, in more rural regions, Mr. Colala-Peñarreta would have virtually no reliable access to internet. <u>See</u> Timura Decl. ¶¶ 10, 11; Fink Decl. ¶ 16. Moreover, travel from the rural areas into Puyo proper in order to access the internet would be difficult. <u>See</u> Timura Decl. ¶¶ 10, 11. Travel is long and cumbersome and often requires journey by foot, horse, or canoe. <u>See</u> Colala Decl. ¶ 9; <u>see also</u> Whitten Decl. ¶ 5 (noting periodic landslides and floods); Timura Decl. ¶ 5 (noting necessity of travel by foot or canoe to reach Puyo from some rural areas). Furthermore, any computer with internet that Mr. Colala-Peñarreta would be able to access in Puyo or more rural areas would have no privacy, and other customers and staff would be able to listen in on or view his communications with his counsel. Timura Decl. ¶ 11; Fink Decl. ¶¶ 12-14; Koenig Decl. ¶ 8.

Because of the unreliability and slow speed of internet in Puyo, Mr. Colala-Peñarreta would be unable to participate in voice or video chat conversations with his counsel. <u>See</u> Timura Decl. ¶ 10 (stating that she is not aware of video conferencing availability in Puyo); Whitten Decl. ¶ 13 (same); Koenig Decl. ¶ 5 (noting that voice chatting is unreliable and drops calls constantly, and he has never attempted video chatting because the internet connection is so weak); Dorsey Decl. ¶ 8 (suggesting that video chatting would be nearly impossible).

### b. <u>Unavailability and Inadequacy of Facsimile Machine Technology</u>

Whether in Puyo or rural Ecuador, Mr. Colala-Peñarreta would not have adequate access to facsimile machines so as to send and receive necessary documents during the course of litigation. In Puyo, Mr. Colala-Peñarreta would have to receive any faxes sent from his counsel at internet cafes, where staff would be able to read any incoming transmissions addressed to Mr. Colala-Peñarreta, thereby removing them from the scope of attorney-client privilege. Timura Decl. ¶ 12 ("I do not see how it would be possible for someone in Puyo to maintain privacy with

respect to fax communications."). In more rural regions, it is highly unlikely that Mr. Colala-Peñarreta would have any access to facsimile machines at all. See Timura Decl. ¶ 12. These constraints on sending and receiving documents would make it virtually impossible for Mr. Colala-Peñarreta to participate in the litigation in a meaningful, consistent, and timely fashion.

<blockquote>c.   <u>Inadequacy of Telephonic Technology</u></blockquote>

Apart from receiving and sending documents and engaging in other written communication, Mr. Colala-Peñarreta will also need to be in frequent telephonic communication with his attorneys regarding developments in this litigation; this essential communication would be significantly impeded while residing either in Puyo or in rural Ecuador. Moreover, not only is the available telephonic technology inadequate and unreliable, it cannot guarantee the privacy required to maintain attorney-client privilege.

Due to high cost, unreliable service, and numerous power outages, it would be nearly impossible for Mr. Colala- Peñarreta to engage in the kind of communication with counsel necessitated by the demands of complex federal civil rights litigation via the current options for long-distance telephone service to the United States in Puyo. Telephone service in Puyo is both unreliable and expensive. Whitten Decl. ¶ 6. Residential long-distance telephone service to the United States is "prohibitively" expensive, Whitten Decl. ¶ 8, and "unstable." Timura Decl. ¶ 8; see also Whitten Decl. ¶ 10 (noting that he must travel to Quito when he needs to conduct sustained telephone conversations for oral examinations). Public long-distance kiosks are available in Puyo, but given the lines and the fact that "[t]he operator will pull the plug on your conversation as soon as he thinks you have used up your deposit," they are unreliable. Whitten Decl. ¶ 7; Colala Decl. ¶ 11. Cellular phones too are expensive, costing around 45-50 cents per minute. See Whitten Decl. ¶ 9; Fink Decl. ¶ 17. Cellular service is spotty and unreliable with

"periodic service outages at unpredictable times and of unpredictable duration." Timura Decl. ¶ 9. Inclement weather can also lead to poor cellular service. See Whitten Decl. ¶ 9; Fink Decl. ¶ 17. All of this is complicated by "frequent and unpredictable" power outages that affect all telephone service. Timura Decl. ¶ 13; Koenig Decl. ¶ 10.

Telephone service in rural Ecuador does not provide the kind of reliable communication Mr. Colala-Peñarreta would require for meaningful participation in his case. The telephonic service that exists in rural Ecuador is largely cellular, but service outages are frequent and can last up to eighteen hours. Timura Decl. ¶ 9. In other rural areas, there is no cellular service at all. Fink Decl. ¶ 17. Mr. Colala-Peñarreta's recent efforts to contact his mother, who lives a rural part of the Morona Santiago province, highlight the inadequacy of rural telephone service Mr. Colala-Peñarreta has been absolutely unable to contact his mother in the past three weeks, due to power outages and spotty service. See Colala Decl. ¶ 12.

        d.   <u>The Lack of Communications Privacy Would Destroy the Attorney-Client Privilege.</u>

In addition to the extraordinarily high barriers to reliable and private internet and email communication (including videoconferencing and internet-based telephone calls) that Mr. Colala-Peñarreta would face, the public internet cafes and phone kiosks in Puyo and rural Ecuador are not capable of providing the privacy necessary for attorney-client communication. Internet cafes throughout Puyo and rural Ecuador do not have fully enclosed spaces where a private phone or video call may be made, or from which private email may be sent. See Timura Decl. ¶ 11. Although some cafes do have partitions between computers that block the view of an adjacent customer, usually there are no partitioned spaces. See Fink Decl. ¶ 12. In such facilities, other customers and staff would be able to listen in on Mr. Colala-Peñarreta's communications with his counsel and in many instances, view his use of a computer. See Timura Decl. ¶ 11; Fink

Decl. ¶ 12. Privacy is a serious obstacle with other methods of communication as well; for example, if Mr. Colala-Peñarreta requires the use of public phone kiosks or pay phones, either in Puyo or in rural Ecuador. See supra Section II.

Based on these conditions in public internet cafes and phone kiosks, Mr. Colala-Peñarreta's communication with his attorneys from such facilities would not be confidential and would undermine attorney-client privilege, thereby prejudicing Mr. Colala-Peñarreta's case. Attorney-client privilege may be invoked in: "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." Restatement (Third) of The Law Governing Lawyers § 68 (2000). If removed, Mr. Colala-Peñarreta would be communicating via phone, computer, or facsimile with his attorneys for the purpose of obtaining legal assistance, yet that communication would not be in confidence because of the conditions described supra. A communication is only in confidence if "at the time and in the circumstances of the communication, the communicating person reasonably believes that no one will learn the contents of the communication except a privileged person." Restatement (Third) of The Law Governing Lawyers § 71 (2000). Because Mr. Colala-Peñarreta would reasonably believe that in public facilities non-privileged third parties would hear and see his communication with his attorneys, see Section II, supra, such communication would not be subject to attorney-client privilege. See Restatement § 71 note C. The inability to maintain privileged communications with his attorneys would undermine Mr. Colala-Peñarreta's ability to effectively litigate his case by making his communication from internet cafes and phone kiosks discoverable and thereby thwarting his ability to deploy an effective litigation strategy.

*2. As a Crucial Witness, Mr. Colala-Peñarreta's Testimony Will Be Necessary at Trial; He Would Not Be Able Adequately To Testify Via Videoconference from His Region of Ecuador.*

Mr. Colala-Peñarreta's "credible, sincere, and veracious" testimony was fundamental to the Immigration Court's holding that ICE agents egregiously violated the Fourth Amendment in entering the two movants' home without warrant or consent. See ECF No. 38-6 at 28; supra Section II. Mr. Colala-Peñarreta's testimony is certain to be indispensable in this case as well, both for his own claims as well as for Mr. Diaz-Bernal's. See TAC ¶¶ 69-71, 73-74, 76-87.

As an initial matter, written testimony, through reading of deposition transcripts, would be an "inadequate substitute for the presence of" Mr. Colala-Peñarreta. Loinaz v. EG & G, Inc., 910 F.2d 1, 7-8 (1st Cir. 1990) (noting that with only the reading of a deposition transcript, the jury "could not judge the credibility of the man who spoke the words"). Even a recorded video deposition could not adequately substitute for live testimony, because "[t]he immediacy of a living person is lost" and a videotape in general is "no substitute for direct personal contact." Stoner v. Sowders, 997 F.2d 209, 213-14 (6th Cir. 1993). See also infra Section VI.B.4.

The lack of adequate, reliable telecommunications technology in Puyo and rural Ecuador would make it nearly impossible to obtain live, video testimony from Mr. Colala-Peñarreta during trial.[11] If Mr. Colala-Peñarreta were in Puyo during trial, he would face a series of technological obstacles that would make him unable to appear before a jury via video. Internet connections are so slow as to make it difficult to use Skype for even a voice-only call without experiencing frequent dropped calls. See Koenig Decl. ¶¶ 5, 7; Timura Decl. ¶ 16. Videoconferencing, which requires higher connection speeds, is unreliable even in Ecuador's largest cities, see Dorsey Decl. ¶¶ 8-9, and even if videoconferencing capacity exists in Puyo, it

---

[11] Even if counsel for Defendants agree to travel to Ecuador to depose Mr. Colala-Peñarreta, that does not change the fact that Mr. Colala-Peñarreta would remain unable to testify, either in person or through any reliable communications technology, during trial.

is likely to be similarly unreliable, see Dorsey Decl., ¶ 8; Koenig Decl. ¶ 5. Periodic power outages, especially during the rainy season, make telecommunications capacity even more unpredictable. See Fink Decl., ¶ 15; Koenig Decl., ¶ 10. In the rural parts of Ecuador where Mr. Colala-Peñarreta may be posted, access to even the most basic internet facilities are nearly completely unavailable. See Koenig Decl. ¶ 11; Fink Decl. ¶ 16.

Even if Mr. Colala-Peñarreta had the opportunity, through some unforeseen technological development, to provide testimony at trial through videoconference, this would not be an adequate substitute for his live presence before a jury. The inability for the jury in this case to assess the credibility of Mr. Colala-Peñarreta's testimony through his live presence, will cause irreparable harm to him and Mr. Diaz-Bernal. Video conference testimony "is substantially less than an equal substitute for live testimony" delivered by a witness in the courtroom. Baucham v. Florida, No. 07-550, 2008 WL 4186996, at *1 (N.D. Fla. Sept. 6, 2008). Where, as here, the witness is a party and his testimony is critical to the disposition of the action, plaintiff's absence from the courtroom is especially detrimental because "personal impression may be a crucial factor in persuasion." Edwards v. Logan, 38 F. Supp. 2d 463, 467 (W.D. Va. 1999). The jury's opportunity to observe demeanor and assess credibility is also lessened by video conferencing. See id. In addition, a live two-way video conference with Mr. Colala-Peñarreta, assuming that it would be feasible, would not allow all participants meaningfully to see, hear, and interact with each other. Further, because Mr. Colala-Peñarreta's testimony will be translated, it will already be mediated through the voice of a third party; the jury will rely even more than usual on their assessment of his demeanor.

### C. THE RELIEF THAT MOVANTS REQUEST IS WITHIN THE PUBLIC INTEREST.

Finally, a temporary stay of removal is within the public interest and would not substantially injure the government. Mr. Colala-Peñarreta has no criminal record. Colala Decl., ¶ 29. Mr. Colala-Peñarreta provides financial assistance to his two United States citizen children, his two Ecuadorian-born children, and his wife. See Colala Decl. ¶¶ 16-18. Allowing him to remain temporarily in the United States would not pose a danger to the public. Additionally, the Government will not incur any detention costs, because Mr. Colala-Peñarreta is currently free on bond set by the Immigration Court. See ECF No. 105-13. Further, Mr. Colala-Peñarreta has complied with all requests by ICE, including purchasing an itinerary for departure from the United States and appearing for an appointment on November 29, 2010. See Glick Decl. ¶ 10. Any conceivable administrative burden resulting from this temporary delay is far outweighed by the public's interest in ensuring that the federal law enforcement officers do not violate the constitutional and common-law rights of Connecticut residents.

### VI. THE COURT SHOULD ISSUE A WRIT OF HABEAS CORPUS <u>AD TESTIFICANDUM</u> TO ICE TO SECURE MR. COLALA-PEÑARRETA'S TESTIMONY AT TRIAL.

In the alternative, Plaintiffs respectfully move this Court to exercise its common law and statutory discretion to issue a writ of habeas corpus <u>ad testificandum</u> directed at ICE officials commanding them to transfer custody of Mr. Colala-Peñarreta to the United States Marshals Service for the purpose of securing his testimony at trial in the above-captioned case.

### A. THE COURT HAS AUTHORITY TO ISSUE THE WRIT IN THIS CASE

The Court's authority to issue the writ in this context is beyond dispute. The most common purpose of a writ of habeas corpus <u>ad testificandum</u> is "to direct the custodian of one who is in confinement to produce a person for appearance in court, in order that he or she may

testify in a cause on trial." 98 Corpus Juris Secundum § 65. The Supreme Court has long recognized the power to issue the writ of habeas corpus _ad testificandum_ as inherent in a court's common law authority. Were this not so, the Court "could not protect itself from insult and outrage . . . . It could not compel the attendance of a witness, it could not oblige him to testify." Ex Parte Bollman, 8 U.S. (4 Cranch) 75, 79 (1807). Notably, the Court in Bollman noted that the power was not limited to a court's exercise of its criminal jurisdiction. See id.

Moreover, the power to issue the writ is also recognized by statute, provided that certain requirements are met. Under the All Writs Act, 28 U.S.C. § 1651, the Court has the power to issue "all writs necessary or appropriate in aid of [its] jurisdiction[] and agreeable to the usages and principles of law," and under 28 U.S.C. § 2241(c)(5), the "writ of habeas corpus shall not extend to a prisoner unless . . . [i]t is necessary to bring him into court to testify or for trial."[12] Together, these provisions give the Court the statutory power to issue the writ. See Atkins v. City of New York, 856 F. Supp. 755, 757 (E.D.N.Y. 1994) ("28 U.S.C. § 2241(c)(5), in tandem with 28 U.S.C. 1651(a), permit a federal court, when necessary, to issue a writ of habeas corpus _ad testificandum_."). Indeed, the authority supplied by 28 U.S.C. § 2241(c)(5) to issue writs of habeas corpus _ad testificandum_ to secure the testimony of a witness or a litigant augments the Court's broad power "'to promote efficiency in [its] courtroom[] and to achieve justice in [its] results.'" Dennis, 2002 WL 295100, at *3 (quoting Eash v. Riggins Trucking Inc., 757 F.2d 557, 564 (2d Cir. 1985)).

The government may advance an expanded interpretation of the INA to argue that the Court's jurisdiction to issue a writ of habeas corpus _ad testificandum_ in this case has been

---

[12] The habeas corpus writ includes many writs, including the writ _ad testificandum_. Bollman, 4 Cranch at 84.

stripped by 8 U.S.C. § 1252 subsections (f) and (g).[13] This line of argument would present

considerable constitutional questions counseling against such an interpretation. I.N.S. v. St. Cyr,

533 U.S. 289, 304 (2001). The authority of courts to issue writs of habeas corpus is

constitutionally protected; indeed, the statutory authority granted by 28 U.S.C. § 2241 only

"implements the constitutional command that the writ of habeas corpus be made available."

Jones v. Cunnigham, 371 U.S. 236, 238 (1963). The Suspension Clause of the Constitution

provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when

in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. Art. I, § 9. The

Supreme Court has noted that "the Framers deemed the writ to be an essential mechanism in the

separation-of-powers scheme," and viewed "the Suspension Clause as an 'exception' to the

'power given to Congress to regulate courts.'" Boumediene v. Bush, 553 U.S. 723, 743-44

(2008) (quoting 3 Debates in the Several State Conventions on the Adoption of the Federal

Constitution 460-64 (J. Elliot 2d ed. 1876)).

Any interpretation of the INA that would limit the Court's jurisdiction to hear habeas

corpus proceedings would run counter to "the longstanding rule requiring a clear statement of

congressional intent to repeal habeas jurisdiction." St. Cyr, 533 U.S. at 298. In St. Cyr, the INS

argued that certain provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA")

and the Illegal Immigration Reform and Immigrant Responsibility Act deprived federal courts of

jurisdiction to hear the habeas corpus application at issue. Id.[14] In its analysis, the Court cited the

long history of the availability of the writ of habeas corpus to nonenemy aliens, id. at 301-02,

---

[13] See supra Section IV.
[14] In addition to the clear statement rule, the Court identified other canons of statutory interpretation counseling against the INS's interpretation, noting that "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result," and that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems." Id. at 299-300 (internal citations and quotation marks omitted).

and explained that habeas corpus jurisdiction has "regularly [been] invoked on behalf of noncitizens, particularly in the immigration context," id. at 305. Accordingly, the Court warned that the INS's reading would present "difficult and significant" questions regarding the scope and applicability of the Suspension Clause. Id. at 304. The Court further held that the provisions invoked by the INS lacked a "clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas," and thus refused to "adopt[ ] a construction that would raise serious constitutional questions." Id. at 314. Likewise, in this case, an interpretation of § 1252 to eliminate this Court's authority to hear this petition would raise significant questions as to whether such an interpretation was consistent with the constitutional protections afforded the courts' habeas jurisdiction, and would require an expansive reading of the INA beyond the express meaning of its text.

The writ of habeas corpus ad testificandum may be used to obtain the presence of a witness, such as Mr. Colala-Peñarreta, who is subject to removal from the country. Courts have employed the writ to secure the testimony of witnesses prior to their deportation pursuant to a final order of removal. See United States v. Seijo, 595 F.2d 116, 118 (2d Cir. 1979) (noting that "in order to prevent deportation of [certain witnesses subject to final orders of deportation], the prosecutor secured from [a district court judge] a writ of habeas corpus ad testificandum directed to the INS"); United States v. Mejia, 376 F. Supp. 2d 460, 464-65 (S.D.N.Y. 2005); United States ex rel. Cefalu v. Shaughnessy, 117 F. Supp. 473, 473-74 (S.D.N.Y. 1954) (noting that witness's deportation was "interrupted by the issuance by a judge of this Court of a writ of habeas corpus ad testificandum").

Nor can there be any doubt that Mr. Colala-Penñarreta is "under custody" as required by the statute. As the Second Circuit has stated, "courts have long recognized that the writ [of

habeas corpus] is available to those who, although not actually imprisoned, suffer such a curtailment of liberty as to render them 'in custody,' . . . [and] an alien who has been released on bail from INS detention but is subject to a final order of removal is in INS custody." <u>Simmonds v. I.N.S.</u>, 326 F.3d 351, 354-55 (2d Cir. 2003).

Because Mr. Colala-Peñarreta is under custody, this Court has the authority to issue a writ commanding his transfer from the custody of ICE to the custody of the United States Marshals Service for the duration of his civil trial. <u>See</u> <u>Rangolan v. County of Nassau</u>, 370 F.3d 239, 249 (2d Cir. 2004) (noting writ of habeas corpus <u>ad testificandum</u> that "ordered federal immigration officials . . . to deliver [the witness] to [the United States Marshals Service] for trial"); <u>Ballard v. Spradley</u>, 557 F.2d 476, 481 (5th Cir. 1977) ("The raison d'être of the Marshals Service is to service the federal forum in civil as well as criminal litigation."). In <u>Mejia</u>, for example, a witness testified for the government at a defendant's first trial. 376 F. Supp. 2d at 461. After the defendant's first trial, but before the defendant's subsequent re-trial, the witness was scheduled to be deported. <u>Id.</u> at 464. In order to preserve the witness's testimony for the re-trial, "the Government . . . prevented his deportation at that time by obtaining a writ of habeas corpus <u>ad testificandum</u> and a material witness warrant, pursuant to which [the witness] was placed in custody." <u>Id.</u> The government represented that "it had attempted to obtain approval from the Immigration Authorities to permit [the witness] to remain at liberty in the United States pending [defendant's] re-trial," and proposed that the witness "be required to sign a $10,000 personal recognizance bond" and be released from custody. <u>Id.</u> (quotation marks omitted). The Magistrate Judge who heard the petition granted the request. <u>Id.</u>[15] For these reasons, the Court

---

[15] Consistent with <u>Mejia</u>, Plaintiffs respectfully request that Plaintiff Colala-Penarreta be transferred to the custody of the United States Marshals Service. Once in the custody of the United States Marshals, Plaintiffs propose that Plaintiff Colala-Penarreta be released subject to a bond, similar to the arrangement under which Plaintiff Colala-Penarreta has been living since his release from detention in June 2007. <u>See</u> ECF No. 105-13.

plainly has the power to grant the relief requested.

## B. THE BALANCE OF THE EQUITIES WEIGHS HEAVILY IN FAVOR OF GRANTING THE WRIT

"The decision to issue a writ of habeas corpus ad testificandum is committed to the sound discretion of the district court." Atkins, 856 F. Supp. at 757; see also Twitty v. Ashcroft, 712 F. Supp. 2d 30, 31-32 (D. Conn. 2009). Perhaps the most important factor that weighs in a court's assessment is an analysis of not merely whether the expected testimony of the witness "would be relevant, but rather, whether such testimony is necessary." Atkins, 856 F. Supp. at 758 (emphasis in original); see also Gordon v. Woodring, No. 04 Civ. 4182, 2005 WL 464636, at *1 (N.D. Cal. Feb. 28, 2005). In addition, courts considering whether to grant the writ analyze: "[1] whether the prisoner's presence will substantially further the resolution of the case, [2] the security risks presented by the prisoner's transportation and safekeeping, and [3] whether the suit can be stayed until the prisoner is released without prejudice to the cause asserted." Atkins, 856 F. Supp. at 757 (alteration in original) (quotation marks omitted); see also Ballard, 557 F.2d at 480. Finally, courts also consider the expense of transportation and safekeeping. Ballard, 557 F.2d at 480. All relevant equitable factors weigh strongly in favor of granting the writ.

### 1. Mr. Colala-Peñarreta's Testimony Is Vital To This Case.

Mr. Colala-Peñarreta's testimony is crucial to his case as well as to the other Plaintiffs' cases, in particular, Mr. Diaz-Bernal's.[16] A litigant may demonstrate the necessity of proposed testimony by "'aver[ing] facts which, if true, would be relevant to any issue in the case . . . unless the averments are inherently incredible on their face, or unless the [opponent] shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the

---

[16] The writ is available to secure testimony for the person being brought forth to testify, as well as for others. See 98 Corpus Juris Secundum § 65 (citing Van Vlissingen v. Van Vlissingen, 173 Ill. App.124 (1st Dist. 1912)).

request is otherwise frivolous.'" Greene v. Prunty, 938 F. Supp. 637, 639 (S.D. Cal. 1996) (quoting United States v. Sims, 637 F.2d 625, 627 (9th Cir. 1980)).

As set forth above, Mr. Colala-Peñarreta's testimony will be "necessary" and pivotal for proving Plaintiffs' claims, and the deportation of Mr. Colala-Peñarreta would deprive Plaintiffs of his critically important testimony. See Gordon, 2005 WL 464636, at *3 ("[T]he Court exercises its discretion to issue the writ, finding that the probative value of [plaintiff-witness's] testimony is not outweighed by the costs to the government . . . or by security concerns."); Atkins, 856 F. Supp at 759 ("In sum, the substantial probative value of [the witness's] in-court testimony, coupled with the absence of controlling authority directing a jurisdictional restraint, leads the Court to conclude that the requested writ should be issued.").

2. *There Is No Security Risk Involved In Granting The Writ*.

Courts have identified prohibitive security risks where the potential witness had "a significant history of violent and disruptive behavior during his incarceration in the Federal Prison System," and where the witness was "an extreme escape risk . . . show[ing] the propensity to engage in violent and disruptive behavior." Twitty, 712 F.Supp.2d at 33; see also Gordon, 2005 WL 464636, at *3 (granting writ where opponent offered no evidence that "transporting [the witness] would entail substantial security risks"). It is beyond dispute that no such risks would pertain to the issuance of a writ in this case. Mr. Colala-Peñarreta has been in the United States since 1995 and has no criminal convictions. See Colala Decl. ¶¶ 7, 29 . Indeed, Mr. Colala-Peñarreta is currently free on bond set by the Immigration Court, see ECF No. 105-13, a factor supporting the issuance of the writ. See In re Smith, Bankr. No. 05-10041, 2007 WL 1199253, at *2 (Bankr. M.D.N.C. Apr. 19, 2007) (recommending writ of habeas corpus ad testificandum be issued in part because witness was already on work-release and spent time away

from jail unsupervised). In addition, Defendant DHS has already determined, through its own bond hearing process, that Mr. Colala-Peñarreta poses neither a threat nor a flight risk, and on this basis released Mr. Colala-Peñarreta on bond over three years ago. <u>See</u> ECF No. 105-13. Thus this factor should provide no barrier in the Court's determination of the propriety of a writ of habeas corpus <u>ad testificandum</u>.

### 3. *The Costs Associated With Issuing The Writ Would Be Minimal*.

In addition, the Court need not be concerned with any significant costs associated with issuing the writ. Mr. Colala-Peñarreta would not need to be detained, nor would there be any transportation costs. The only cost to the government would be in the administrative transfer of custody from ICE to the United States Marshals Service, which would constitute a minor burden at best. In any event, "'[o]nce the district court has determined that the prisoner's presence is essential and not outweighed by security concerns, the possibility that a lack of transportation funds or personnel will develop is not a justification for refusing to issue the writ [of habeas corpus ad testificandum].'" <u>Hawks v. Timms</u>, 35 F. Supp. 2d 464, 468 (D. Md. 1999) (quoting <u>Greene</u>, 938 F. Supp. at 640) (second alteration in original).

### 4. *Other Considerations Favor Granting The Writ*.

Other equitable considerations also favor granting the writ of habeas corpus <u>ad testificandum</u>. Plaintiffs expect the Government to argue that the writ should not be granted because no trial date is set. First, the party seeking the writ need not represent that a prospective witness will be called at trial in order for a writ of habeas corpus <u>ad testificandum</u> to be appropriate. <u>See, e.g.</u>, <u>United States v. Melvin</u>, 39 Fed. App'x 43, 49 (4th Cir. 2002) (noting that defendant did not call an inmate as a witness "despite seeking and securing the issuance of a writ of habeas corpus <u>ad testificandum</u> for [that witness's] appearance at trial"); <u>United States v.</u>

Thevis, 469 F. Supp. 490, 510 n.14 (D. Conn. 1979) (noting that a prospective witness was transferred "pursuant to the defendant's petition for writ of habeas corpus Ad testificandum; however, he was never called as a witness").

If the writ is not granted now, Plaintiffs will lose any chance of obtaining Mr. Colala-Peñarreta's testimony at trial through a writ of habeas corpus ad testificandum. If Plaintiffs' request is denied, Mr. Colala-Peñarreta will be deported to Ecuador on Monday, December 13, 2010. Moreover, it is the position of the United States that a federal court lacks the authority to require the Government to bring a noncitizen into the United States. See Br. for Resps. at 22-47, Kiyemba v. Obama, 130 S. Ct. 1235 (2010) (No. 08 Civ. 1234), 2010 WL 497333. Plaintiffs therefore have no other means of securing Mr. Colala-Peñarreta's testimony at trial.

Not only is Mr. Colala-Peñarreta's testimony critical for Plaintiffs' claims for relief regarding the violation of their constitutional rights, but so is Mr. Colala-Peñarreta's ability to deliver such testimony in-court in front of the trier of a fact. There can be no doubt that "[t]he power of in-court testimony . . . would exceed substantially the presentation of such evidence through the reading of a deposition transcript." Atkins v. City of New York, 856 F. Supp. 755, 758 (granting writ of habeas corpus ad testificandum). The deportation of Mr. Colala-Pennarreta will effectively preclude him from the power – and benefits – of in-court testimony so often recognized by federal courts in exercising their discretion to order writs of habeas corpus ad testificandum and beyond. See Twitty, 712 F. Supp. 2d at 31 (noting the "importance of presenting live testimony in court" as a factor in the court's exercise of discretion). Indeed, numerous federal circuits, including the Second Circuit Court of Appeals, have also emphasized

in various contexts the importance of a witness's live testimony to the trier of fact's evaluation of credibility and demeanor.[17]

Where, as here, a witness's testimony and credibility are central to establishing the causes of action, "a deposition is an inadequate substitute for the presence of that witness." Loinaz v. EG&G, Inc., 910 F.2d 1, 7-8 (1st Cir. 1990). Even a video deposition cannot adequately substitute for live testimony because "[t]he immediacy of a living person is lost" and a videotape in general is "no substitute for direct personal contact." Stoner, 997 F.2d at 213 (noting that a "[v]ideo tape is still a picture, not a life").

The uniqueness and non-cumulative nature of Plaintiff Colala-Penarreta's testimony – who is not just a witness but also a Plaintiff – only compounds the detriment he and the other Plaintiffs will suffer if his testimony is not presented live. See Loinaz, 910 F.2d at n.7. Because Plaintiffs here intend to invoke their right to a jury trial on their constitutional claims, the diminished effect of the testimony of this key witness – a witness who has already been found to be "credible, sincere, and veracious," see ECF No. 38-6 at 28 – will be further compounded because a jury is inherently less well-equipped than a judge to interpret and digest deposition excerpts presented at trial. See Carborundum Co., Pollution Control Div. v. Bay Fabricators, Inc., 461 F. Supp. 437, 440 (E.D. Tenn. 1978).

Testimony presented via live video conference "is substantially less than an equal substitute for live testimony" delivered by a witness present in the courtroom. Baucham v. Florida, No. 4:07-550, 2008 WL 4186996, at *1 (N.D. Fla. 2008); Edwards v. Logan, 38 F.Supp. 2d 463, 467 (W.D. Va. 1999) (same). Where, as here, the witness is a party and his testimony is

<hr>

[17] See Iragorri v. United Techs. Corp., 274 F.3d 65, 75 (2d Cir. 2001), and the persuasiveness of live testimony compared to a trial by deposition (whether written or video), see Stoner v. Sowders, 997 F.2d 209, 213-14 (6th Cir. 1993); see also Louis v. Blackburn, 630 F.2d 1105, 1109 (5th Cir.1980) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses.").

critical to the disposition of the action, plaintiff's absence from the courtroom is especially detrimental because "personal impression may be a crucial factor in persuasion." Edwards, 38 F.Supp. 2d at 467. The jury's opportunity to observe demeanor and assess credibility is also lessened by video conferencing. See id. Moreover, the detriment to Plaintiffs' case resulting from the preclusion of Mr. Colala-Peñarreta's live in-court testimony would be caused by the very federal agency whose agents are defendants in this action. To allow ICE to achieve a litigation benefit through its deportation of Mr. Colala-Peñarreta would yield a plainly inequitable result.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court temporarily stay the removal of Mr. Colala-Peñarreta until the completion of trial in this case.[18] In the alternative, Plaintiffs respectfully request that this Court issue a writ of habeas corpus ad testificandum for the purpose of securing Mr. Colala-Peñarreta's testimony at trial.

Dated: December 6, 2010
New Haven, Connecticut

BY: _____/s/_____
Muneer I. Ahmad, Esq., Federal Bar No. ct28109
Michael J. Wishnie, Esq., Federal Bar No. ct27221
Jeffrey Chase, Law Student Intern
Estella Cisneros, Law Student Intern
Jason Glick, Law Student Intern
Alice Hwang, Law Student Intern
Mark Pedulla, Law Student Intern
Rebecca Scholtz, Law Student Intern
Matthew Vogel, Law Student Intern

---

[18] In the event the Court is inclined to deny the request for a temporary stay, Mr. Colala respectfully requests that the Court deem his motion as one for a preliminary injunction and enter an order refusing the injunction, thereby permitting Mr. Colala an opportunity for timely interlocutory review. See 28 U.S.C. § 1292(a)(1) (courts of appeals have jurisdiction to review interlocutory orders refusing injunctions); see also Haitian Ctrs. Council, Inc. v. McNary, No. 92-1258, 1992 WL 155853, at *11 (E.D.N.Y. June 5, 1992) (treating plaintiffs' request for a temporary restraining order as a request for preliminary injunction and denying same so as to afford plaintiffs opportunity for interlocutory appeal).

THE JEROME N. FRANK LEGAL SERVICES
ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

Thomas J. Moloney (ct11765)
Jennifer Gorskie (phv 04154)
Jorge Tenreiro (phv 04153)
Melissa Fernandez
Hedayat Heikal
Aliza Hochman

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

       I herby certify that on December 6, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

BY: _____/s/_____
Michael J. Wishnie, Esq., Federal Bar No. ct27221

JEROME N. FRANK LEGAL SERVICES
ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800
*Counsel for Plaintiffs*