DIAZ-BERNAL, et al.,
      Plaintiffs,

      v.

MYERS, et al.,
      Defendants.

No. 3:09cv1734 (SRU)

## RULING ON MOTIONS TO DISMISS

This case involves the constitutional and tort claims of a group of plaintiffs who were the subject of an early-morning immigration raid in June 2007. The plaintiffs have sued the immigration officers who conducted the raid, the officers' supervisors, and the United States, alleging violations of the Fourth and Fifth Amendments, as well as state law tort violations such as negligent hiring, training, and supervision.

In response, the United States challenged the plaintiffs' ability to seek declaratory relief, and sought to dismiss the plaintiffs' claims of negligent hiring, training, and supervision. The individual defendants also filed a motion to dismiss the plaintiffs' Fourth Amendment, procedural due process, substantive due process, and equal protection claims. In addition, the individual defendants claim that this court does not have personal jurisdiction over the supervisory defendants, that *Bivens* is an inappropriate remedy here, and that the court cannot hear the plaintiffs' claims both because of the doctrine set forth in *Heck v. Humphrey* and because of the exclusivity provisions in the federal immigration statutes.

The motions to dismiss are granted in part and denied in part. The Federal Tort Claims Act ("FTCA") only provides for money damages, and the Administrative Procedure Act ("APA") cannot waive sovereign immunity when an applicable statute (such as the FTCA)

expressly limits that waiver. Therefore, the United States' motion to dismiss the claims for declaratory relief is granted. The United States is correct that the plaintiffs allege no facts concerning the defendants' negligent hiring; the motion to dismiss that claim is accordingly granted. The United States acknowledges that the motion to dismiss the claims for negligent training and supervision is more appropriately characterized as a motion for summary judgment; the plaintiffs are granted additional discovery on that claim pursuant to Federal Rule of Civil Procedure 56(d). I also will allow the plaintiffs to conduct jurisdictional discovery before I rule on the individual defendants' motion to dismiss for lack of personal jurisdiction.

The court's subject matter jurisdiction over the plaintiffs' claims is not diminished by the federal immigration statutes, because this is not a case arising from: (1) a proceeding to remove an alien from the United States; (2) a decision by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against an alien; or (3) a decision within the Attorney General's discretion. Similarly, because the plaintiffs do not challenge their detention, *Heck v. Humphrey* does not bar adjudication of this case. Moreover, the existence of a comprehensive immigration scheme does not counsel against a *Bivens* remedy here.

The plaintiffs have alleged facts sufficient to indicate that defendants Julie Myers, John Torres, Bruce Chadbourne, and Jim Martin had notice of constitutional violations under policies they created, implemented, or allowed to continue, and thus the motion to dismiss the Fourth Amendment claims against them is denied. There is no similar evidence regarding defendant George Sullivan, and thus the motion to dismiss Fourth Amendment claims against him is granted. The motion to dismiss the Fourth Amendment claims against defendants Stephen Riccardi and Edgar Vasquez is also granted, because all parties acknowledge that they did not participate in or authorize the raid.

The Fifth Amendment substantive due process claims are more appropriately pled under the Fourth Amendment. The motion to dismiss those claims is therefore granted. The Fifth Amendment procedural due process claims are also dismissed, because the plaintiffs have failed to allege how any procedural deficiencies infringed their liberty interests. Finally, the motion to dismiss the Fifth Amendment equal protection claims is denied, because the plaintiffs have sufficiently alleged a discriminatory motive on the part of the defendants, and because genuine issues of material fact preclude a determination at this point whether the defendants are entitled to qualified immunity.

## I. Background

The instant litigation arises out of an early-morning raid conducted by Immigration and Customs Enforcement ("ICE") agents in the Fair Haven neighborhood of New Haven. 3d Amend. Compl. at ¶ 1. The ICE agents were divided into four teams. Defendants Richard McCaffrey, David Hamilton, Wilfred Valentin, and John Does 1-3, led by defendant Michelle Vetrano-Antuna, comprised team one. *Id*. at ¶¶ 59-60. Team two was comprised of defendants Brian Geary, Derek Moore, David Reilly, and John Does 4-6, led by defendant Ronald Preble. *Id*. at ¶ 61. Team three was composed of defendants George Lewis, David Ostrobinski, Wilfredo Rodriguez, and John Does 7-8, led by defendant James Brown. *Id*. at ¶ 62. The fourth and final team consisted of defendants Stephen Riccardi, Edgar Vasquez, and John Does 9-10. *Id*. at ¶ 63. Hereafter, "raid officers" shall mean those defendants who took part in the Fair Haven raid.

All four teams allegedly entered private residences without search warrants or consent, and arrested persons therein without arrest warrants or probable cause. Team one entered the Peck Street residence and seized plaintiffs Florente Baranda-Barreto, Silvino Trujillo-Mirafuentes, Gerardo Trujillo-Morellano, and Edilberto Cedeño-Trujillo. *Id*. at ¶¶ 60, 88-129.

Team one also entered the Barnes Avenue residence and seized plaintiffs Edinson Yangua-Calva and Jose Solano-Yangua. *Id*. at ¶¶ 60, 130-45. Finally, team one helped team three enter the Atwater Street residence, where they seized plaintiff Amilcar Soto Velasquez. *Id*. at ¶¶ 164-73.

Team two entered the Fillmore Street residence and seized plaintiffs Eduardo Diaz-Bernal and Washington Colala-Peñaretta. *Id*. at ¶¶ 61, 69-87. Team two also entered the Warren Place residence and seized plaintiffs Cristobal Serrano-Mendez and Julio Sergio Paredes-Mendez. *Id*. at ¶¶ 61, 146-63.

Team four entered unspecified residences, and seized persons not parties to this suit. *Id*. at ¶ 63. Team four assisted in processing the plaintiffs once they were arrested. *Id*.

According to the plaintiffs, the defendants detained all of the plaintiffs before learning about their immigration status. *Id*. at ¶ 174. The defendants also did not inform the plaintiffs of their rights or why they were being seized, and the plaintiffs did not feel free to leave. *Id*. at ¶¶ 176-77, 180. Although the plaintiffs' primary language is Spanish, the defendants coerced them into signing English forms with no or minimal translation. *Id*. at ¶¶ 182-89. All of the plaintiffs were detained at the Wyatt Detention Facility for periods ranging from three to twenty-seven days before being released. *Id*. at 192.

The plaintiffs claim that the raid was planned and executed in order to "punish" the City of New Haven for immigrant-friendly policies. The raid came shortly after the New Haven Board of Aldermen voted to approve the Elm City Resident Card program, which was designed to provide persons – including immigrants – with identification cards to enable them more easily to open bank accounts. *Id*. at ¶¶ 198, 202-04, 249-51. The plaintiffs state that the defendants (specifically defendants Walter Wilkowski and McCaffrey) were opposed to the Elm City

Resident Card program, and purposefully engineered the raid to demonstrate that New Haven was not a safe haven for undocumented immigrants. *Id*. at ¶¶ 216-21, 226-34, 238-52.

The raid officers' supervisors have also been sued. They are Julie Myers, the Assistant Secretary for ICE when the raid took place; John Torres, the Director or Acting Director of the ICE Office of Detention and Removal Operations; Bruce Chadbourne, the Field Office Director for the Boston, Massachusetts Detention and Removal Operations regional office, which manages the Hartford field office responsible for the raid; Jim Martin, the Deputy Field Office Director for the Boston regional office; and George Sullivan, the Assistant Field Office Director for the Hartford field office.[1] These defendants will be known as the "supervisory defendants."

The plaintiffs claim that the raid was the foreseeable result of policies put in place by officials at the top of ICE. The plaintiffs specifically point to defendant Torres's treatment of the National Fugitive Operations Program ("NFOP"). NFOP was originally designed to apprehend dangerous criminal fugitives. *Id*. at ¶ 257. Under Torres's direction, the program increasingly began to focus on non-criminal, non-dangerous, non-fugitive immigrants. *Id*. In 2006, Torres instituted a quota system that required Fugitive Operative Teams ("FOTS") to make 1,000 fugitive arrests per year. *Id*. at ¶ 260. He later stated that at least 500 of that number may come from "collateral" arrests (namely bystanders FOTS encounters while searching for actual fugitives). *Id*. at ¶ 266. The quota system was approved by Myers. *Id*. at ¶¶ 269-70.

The plaintiffs assert that the quota system incentivized the arrest of bystanders, and led FOTS to violate constitutional rights in order to meet their quota. *Id*. at ¶¶ 274-77. The New Haven raid was part of a FOTS initiative called "Operation Return to Sender." *Id*. at ¶ 286.

---

[1] Chadbourne and Torres authorized the raid. *Id*. at ¶¶ 239-43.

The plaintiffs also claim that the raid resulted in constitutional violations because the NFOP training program was grossly inadequate, and the defendants knew it was inadequate. FOTS officers were only required to take a one-time three-week class, which focused mainly on administrative tasks. *Id*. at ¶¶ 300-01, 307. Some FOTS officers allegedly did not comply with even this minimal training. *Id*. at ¶¶ 302, 304.

Based on the facts alleged, the plaintiffs bring the following claims: (1) Fourth Amendment violation under *Bivens* against all ICE defendants, including the raid officers and the supervisory defendants, in their personal capacities; (2) Fifth Amendment equal protection violations under *Bivens* against the ICE raid officers; (3) Fifth Amendment due process violations under *Bivens* against the raid officers and their supervisors; (4) a Tenth Amendment claim against the individual defendants under *Bivens*, and against the United States under the Declaratory Judgment Act; and (5) FTCA violations against all defendants for assault and battery, false arrest and imprisonment, trespass, unreasonable interference with the seclusion of another, abuse of process, civil conspiracy, and negligent hiring, training, and supervision.

The plaintiffs seek a declaratory judgment that the actions of defendants Myers, Torres, Chadbourne, Martin, Sullivan, Wilkowski, McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, Valentin, John Does 1-10, and the United States that resulted in home-entry, detention, arrest, and post-arrest processing of the plaintiffs violated the United States Constitution and Connecticut common law. *Id*., Prayer for Relief. They seek compensatory and punitive damages, and attorneys' fees. *Id*.

**II. Standard of Review**

The United States moves to dismiss certain claims for lack of standing and lack of subject matter jurisdiction.  Docs. 52 and 47.  The individual defendants[2] move to dismiss certain claims for failure to state a claim, lack of subject matter jurisdiction, and lack of personal jurisdiction. Doc. 51.

## A.  Lack of Subject Matter Jurisdiction under Federal Rule of Civil Procedure 12(b)(1)

The party who seeks to invoke a court's jurisdiction bears the burden of establishing that jurisdiction.  *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  To survive a motion brought under Rule 12(b)(1), a plaintiff must allege facts demonstrating that the plaintiff is a proper party to seek judicial resolution of the dispute.  *Id.*

## B.  Failure to State a Claim under Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *Ashcroft*

---

[2] The individual defendants are those defendants sued in their individual capacities:  Torres, Myers, Chadbourne, Martin, Sullivan, Wilkowski, McCaffrey, Brown, Preble, Riccardi, Vetrano-Antuna, Lewis, Geary, Hamilton, Moore, Ostrobinski, Reilly, Valentin, Vasquez, and John Does 1-10.

*v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 129 S. Ct. at 1940 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

C. Lack of Personal Jurisdiction under Federal Rule of Civil Procedure 12(b)(2)

A plaintiff bears the burden of showing that the court has personal jurisdiction over each defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). At the motion to dismiss stage, if the court relies solely on the parties' pleadings and affidavits, the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). After jurisdictional discovery has been conducted, defendants may renew a motion to dismiss for lack of personal jurisdiction. The court may then consider affidavits and other evidence submitted by the parties. *Ensign-Bickford Co. v. ICI Explosives USA Inc.*, 817 F. Supp. 1018, 1026 (D. Conn. 1993).

**III. Discussion**

      A.  <u>Declaratory Relief against the United States</u>

The United States moved to dismiss the request for declaratory relief against it, arguing that the FTCA only provides for money damages.[3] Mem. in Supp. of Renewed Mot. to Dismiss in Part ("U.S. Mot. to Dismiss") at 7-8, ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . .") (citing 28 U.S.C. § 1346(b)(1)). The plaintiffs assert that declaratory judgment is appropriate both under the FTCA alone, and under the FTCA read in conjunction with the APA.

      1.  *Declaratory Relief under the FTCA*

The plaintiffs' first theory is that the FTCA allows for a remedy of declaratory judgment. To that end, the plaintiffs point to the text of the Declaratory Judgment Act, which states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The plaintiffs argue that the FTCA places suits against the United States within the court's jurisdiction, and the Declaratory Judgment Act then enables the court to issue declaratory judgments in those suits. Pls.' Mem. in Opp'n to Def. U.S. of America's Renewed Mot. to Dismiss in Part ("Pls.' Standing Opp'n") at 6-8.

Similar reasoning was rejected by the Supreme Court when it determined that the Court of Claims did not have power to issue declaratory judgments. *United States v. King*, 395 U.S. 1, 3-5 (1969). In that case, the plaintiff argued that even though the Court of Claims was not

---

[3] The United States also argued that the plaintiffs' Tenth Amendment claim should be dismissed for lack of standing. The plaintiffs' Tenth Amendment claim was orally dismissed without prejudice on October 26, 2010. Doc. 109.

granted jurisdiction for declaratory relief explicitly through the Court of Claims Act, it still had

power to issue declaratory judgments because of the Declaratory Judgment Act's language that

"[i]n a case of actual controversy *within its jurisdiction* . . . any court of the United States . . .

may declare the rights and legal relations of any interested party seeking such declaration." *Id.* at

3-4 (emphasis added). The Supreme Court rejected that argument, stating that the Declaratory

Judgment Act was inapplicable because "cases seeking relief other than money damages from

the Court of Claims have never been '*within its jurisdiction.*'"[4] *Id*. at 4 (emphasis added). The

Court also noted that a waiver of sovereign immunity "cannot be implied but must be

unequivocally expressed." *Id.* The same reasoning applies here, and precludes the plaintiffs'

first theory; the United States has not waived its sovereign immunity for declaratory judgment

suits against it under the FTCA.

The plaintiffs next argue that, although the FTCA only explicitly grants jurisdiction for

suits for money damages, declaratory judgment is merely a procedural step on the road to

damages, and thus the FTCA implicitly allows for declaratory judgments. Pls.' Standing Opp'n

at 8-11. In support, the plaintiffs cite *Pennsylvania Railroad Co. v. United States*, 111 F. Supp.

80 (D.N.J. 1953), in which the District of New Jersey allowed a suit for declaratory relief to

proceed under the FTCA. *Id.* at 86-87. That decision does not stand for the proposition that *all*

suits for declaratory judgment under the FTCA are proper, but only for the more limited

proposition that a federal court may grant declaratory judgment if it is "a procedural device used

by a party seeking a remedy clearly within the scope of the government's waiver of its sovereign

immunity [that is, damages]." *Id.* In *Pennsylvania Railroad*, thousands of plaintiffs had been

injured, and suits had been brought in the state and federal courts of New Jersey, Ohio, New

---

[4] The *King* decision was later superseded by an Act of Congress. Pub. L. No. 92-415 (1972).

York, and Maryland. *Id*. at 84-85. The court's holding rested on the unusual nature of the litigation, and the need to first declare the rights and legal relations of the various parties in order to allow damages to be determined more easily. *Id*. That reasoning is inapplicable here.

Courts holding that declaratory relief is impermissible under the FTCA tend to categorize declaration of rights not as a procedural step toward obtaining monetary judgments, but instead as a separate form of relief more analogous to injunctive relief. Indeed, in almost all of the cases cited by the defendants, courts lumped injunctive and declaratory relief together when determining their availability under the FTCA.[5] *See Harrison v. United States*, 329 Fed. Appx. 179, 181 (10th Cir. 2009) ("[Plaintiff's] claims for injunctive and declaratory relief cannot be brought pursuant to the FTCA."); *Estate of Trentadue v. United States*, 397 F.3d 840, 863 (10th Cir. 2005) ("[T]he district court lacks subject matter jurisdiction under the FTCA to provide injunctive and declaratory relief."); *Lucido v. Mueler*, No. 08-15269, 2009 WL 3190368, at *10 (E.D. Mich. 2009) (FTCA plaintiff cannot bring claims for declaratory or injunctive relief).

Here, the claim for declaratory relief is not a mere precursor to recovering damages. Unlike in *Pennsylvania Railroad*, the plaintiffs do not need a declaratory judgment to enable them to collect damages. They can obtain a damages judgment without a declaratory judgment, and indeed, in addition to a declaratory judgment expressly seek compensatory and punitive damages. 3d Amend. Compl, Prayer for Relief. The arguments advanced by the plaintiffs at oral argument demonstrate that the plaintiffs do not intend to use a declaratory judgment as a procedural device. Instead, the plaintiffs urged the court to issue a declaratory judgment in order to give the plaintiffs a "dignitary value," and deter the United States from taking similar actions

---

[5] It is clear that injunctive relief is impermissible under the FTCA. *See Birnbaum v. United States*, 588 F.2d 319, 335 (2d Cir. 1978) (holding that the government could not be made to send letters of apology, because only money damages are available under the FTCA).

in the future.   Thus, because the plaintiffs are not seeking declaratory relief against the United

States as a mere procedural device, there is no authority supporting their claim for a declaratory

judgment under the FTCA alone.[6]

2. *Declaratory Relief under the APA*

The plaintiffs next argue that, even if the FTCA does not confer jurisdiction for

declaratory judgments, the court "may still issue [a] declaratory judgment in this case under the

[APA's] waiver of sovereign immunity."  Pls.' Standing Opp'n at 11.  The APA provides that:

> An action in a court of the United States seeking relief other than money damages and
> stating a claim that an agency or an officer or employee thereof acted or failed to act in an
> official capacity or under color of legal authority shall not be dismissed nor relief therein
> be denied on the ground that it is against the United States. . . .

5 U.S.C. § 702.  Thus, the plaintiffs argue, the United States waived its sovereign immunity for

declaratory judgments by enacting the APA.

Although the plaintiffs did not plead any claim under the APA, that is not necessarily

dispositive.  The APA can waive sovereign immunity even for claims brought under other

statutes.  *See Schroeder v. Dep't of Veterans Affairs*, No. 3:09cv351, 2009 WL 1531953, at *1

(D. Conn. June 1, 2009) ("[C]ourts have applied [the waiver of sovereign immunity] to most

actions against the United States regardless whether the action is brought under the APA.").

---

[6] The plaintiffs claim that the Second Circuit would allow declaratory relief under the FTCA because it has allowed
declaratory judgments under the Suits in Admiralty Act ("SAA"), a comparable statute.  *See Luckenbach S.S. Co. v.
United States*, 312 F.2d 545, 552 (2d Cir. 1963).  But the SAA is distinguishable from the FTCA.  The FTCA
specifically limits its jurisdiction to claims for money damages.  28 U.S.C. § 1346(b)(1).  The SSA, on the other
hand, when describing the suits that may be brought against the United States, does not specifically limit them to
suits for money damages.  *See* Pub. L. 86-770, 74 Stat. 912 (Sept. 13, 1960) (the statute in place at the time of
*Luckenbach*) ("In cases where if such vessel were privately owned or operated, or if such cargo were privately
owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained,
any appropriate nonjury proceeding in personam may be brought against the United States or against any
corporation mentioned in section 1 of this Act.").

The waiver of sovereign immunity does not extend to all suits for declaratory relief, however. Section 702 of the APA states that nothing in the Act shall "affect[] other limitations on judicial review." Courts have read that to mean that section 702 only abrogates sovereign immunity when there is no other statute that "provides a form of relief which is expressly or impliedly exclusive." *Sprecher v. Graber*, 716 F.2d 968, 973-74 (2d Cir. 1998) (quoting H.R. No. 94-1656, p. 3, 94th Cong.2d Sess., *reprinted in* U.S.C.C.A.N. 6121, 6123 (1976); *see also Schnapper v. Foley*, 667 F.2d 102, 108 (D.C. Cir. 1981) ("[S]ection 702 retains the defense of sovereign immunity only when another statute expressly or implicitly forecloses injunctive relief."). That is why, when the APA has been held to waive sovereign immunity, typically there is no other statute at issue. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328-29 (D.C. Cir. 1996) (applying APA waiver of sovereign immunity in non-statutory review action); *P & V Enters. v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 2d 134, 141 (D.D.C. 2006) (same). When the APA serves to waive sovereign immunity for a claim brought under a separate statute, that other statute typically does not specifically address sovereign immunity. *See, e.g., Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) (stating that the APA waives sovereign immunity for suits under the Sherman Act).

Courts are more likely to hold that a statute has expressly or impliedly foreclosed injunctive or declaratory relief, even under the APA, when that statute waives sovereign immunity only over a specific class of cases. That is why, for instance, courts in the District of Connecticut have not interpreted the APA to waive sovereign immunity for injunctive relief under the Privacy Act. *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 280 n.35 (D. Conn. 2008) (holding that, although the APA waives the government's immunity for claims seeking non-monetary relief, the Privacy Act "expressly limits the class of plaintiffs to

13

individuals who are U.S. citizens and lawful permanent residents. Accordingly, the Privacy Act implicitly (if not explicitly) forbids nonresident aliens like [the plaintiff] from suing federal agencies [for relief].") (internal citations omitted). That is also why the Second Circuit has not allowed the APA to waive sovereign immunity for injunctive relief under the Tucker Act. *See Presidential Gardens Assoc. v. United States ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) (no waiver of sovereign immunity for declaratory relief via the APA because, "[w]here a claim arises out of a contract with the United States, the Tucker Act 'impliedly forbids' relief other than the remedy provided by the Court of Federal Claims.").

The FTCA limits its waiver of sovereign immunity to plaintiffs seeking monetary relief. Accordingly, many courts that have considered the issue have held that injunctive or declaratory relief is not available under a combination of the APA and FTCA. *See Beale v. Dep't of Justice*, No. 06-2186, 2007 WL 327465, at *6-7 (D.N.J. Jan. 30, 2007) ("[A]lthough the Administrative Procedures [sic] Act generally waives the United States' immunity for 'nonstatutory' equitable actions brought under 28 U.S.C. § 1331, Plaintiffs' claims are statutorily derived from the FTCA and thus, the Administrative Procedures [sic] Act is not applicable."); *United States v. Nicolet*, No. 85-3060, 1986 WL 15017, at *3 (E.D. Pa. Dec. 31, 1986) (stating that, even though the APA can waive sovereign immunity for nonstatutory claims addressing agency action, that is not possible under the FTCA because "the FTCA's waiver of sovereign immunity extends only to actions seeking monetary, not equitable relief"). Thus, the APA does not waive sovereign immunity for declaratory relief in conjunction with the FTCA, and the United States' motion to dismiss the plaintiffs' request for declaratory relief is granted.[7]

---

[7] This ruling does not affect the plaintiffs' claim for declaratory relief against the individual defendants. The Declaratory Judgment Act grants declaratory relief against the individual defendants, even though it does not grant

B.  Negligent Hiring, Training, and Supervision

The United States moved to dismiss for lack of subject matter jurisdiction the plaintiffs' claims of negligent hiring, training, and supervision.  Doc. 47.  The FTCA does not permit suits "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation."  28 U.S.C. § 2680(a).  The United States maintains that the plaintiffs' claims for negligent hiring, training, and supervision fall within that discretionary exception, and as such, cannot be heard in court.  Mem. in Supp. of U.S.'s Renewed Partial Mot. to Dismiss ("U.S.'s Negligent Hiring Mot.") at 4-7.

The plaintiffs argue that the discretionary function exception does not apply here, because the United States' conduct arose from constitutional violations and the United States does not enjoy discretion to violate the Constitution.  Mem. of Law in Opp'n to U.S.'s Renewed Partial Mot. to Dismiss ("Opp'n to U.S.'s Negligent Hiring Mot.") at 15.  The plaintiffs are correct that the government does not have discretion to violate the Constitution.  *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975).  But a valid claim for negligent supervision, training, and hiring does not necessarily equal a constitutional violation.

The plaintiffs rely on *El Badrawi*, where a plaintiff brought suit against the United States under the FTCA for false arrest/false imprisonment, malicious prosecution, vexatious suit, intentional infliction of emotional distress, and abuse of process.  579 F. Supp. 2d at 255.  Judge Janet C. Hall held that those claims did not fall within the discretionary function exception because the alleged torts also constituted constitutional violations.  *Id*. at 274-75.  The plaintiffs here claim that the torts of negligent training, hiring, and supervision also arise from

relief against the United States, because sovereign immunity is not a bar with respect to individual defendants. Whether such relief is appropriate will be determined at a later stage of the litigation.

constitutional violations, because constitutional violations comprise the causation and damages prongs of negligent hiring, training, and supervision. Opp'n to U.S.'s Negligent Hiring Mot. at 16-17, n.13.

The plaintiffs are mistaken. In *El Badrawi*, the basis of the claims for false arrest/imprisonment, malicious prosecution/vexatious suit, intentional infliction of emotional distress, and abuse of process was the plaintiff's (unconstitutional) arrest and detention. 579 F. Supp. 2d at 264-65. Here, however, the conduct underlying the torts of negligent hiring, training, and supervision is not inherently unconstitutional. Instead, the plaintiffs claim that the supervisors' tortious conduct allowed *third parties* to commit unconstitutional actions. Although the United States may have started a chain of conduct that resulted in unconstitutional activity, that is not the same as the United States itself committing unconstitutional acts. Thus, the claims for negligent hiring, training, and supervision must be analyzed under the discretionary function exception.

### 1. *Negligent Hiring*

At oral argument, the plaintiffs acknowledged that they were no longer pressing the negligent hiring claim. Thus, the United States' motion to dismiss the negligent hiring claim is granted.

### 2. *Negligent Training and Supervision*

Courts must apply a two-step test to determine whether the claims for negligent training and supervision fall within the discretionary function exception. First, courts must determine "whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations." *United States v. Gaubert*, 499 U.S. 315, 328 (1991). If the challenged actions were controlled by mandatory statutes or regulations, the defendant has no

choice but to abide by them, and the conduct is not discretionary. *Id*. at 322. If the conduct is not controlled by a mandatory statute, courts must go to the second step and determine whether the judgment exercised was the kind of discretionary function that "the exception was designed to shield." *Id*. at 322-23 (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

Plaintiffs point to several mandatory regulations, including 8 C.F.R. §§ 287.1(g), 287.5, and 287.8, which require that an immigration officer have training in order to, among other things, carry firearms, conduct searches, make arrests, and use non-deadly force. The plaintiffs allege that the supervisory defendants did not ensure that the raid officers had received this basic training, and thus the mandatory regulations were violated. Opp'n to U.S.'s Negligent Hiring Mot. at 19-20.

The United States does not dispute that those regulations are mandatory, but instead proffers evidence that the raid officers received the necessary training, and thus the regulations in question were not violated. Reply in Supp. of U.S.'s Renewed Partial Mot. to Dismiss at 7-9. The United States' arguments rely upon evidence outside the pleadings and thus are more appropriately considered at the summary judgment stage. Indeed, at oral argument the United States acknowledged that the motion to dismiss could appropriately be converted into a motion for summary judgment.

Under the Federal Rules of Civil Procedure, the court may deny a motion if the party opposing a motion for summary judgment "cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d) (formerly 56(f)). When a party requires additional discovery in order to oppose a motion for summary judgment, a court may deny or continue the motion *sua*

*sponte.  See Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156, 160 n.2 (D. Conn. 2006).

Because only very limited discovery has occurred at this time, the motion for summary judgment on the claims for negligent hiring and supervision is denied, without prejudice to renewal after plaintiffs conduct pertinent discovery.

### C.  Personal Jurisdiction

The individual defendants claim that the plaintiffs have failed to demonstrate personal jurisdiction over the supervisory defendants in this jurisdiction, and thus the claims against them should be dismissed.  I grant limited jurisdictional discovery to the extent necessary to determine if the supervisory defendants are subject to personal jurisdiction in Connecticut.  The plaintiffs shall conduct jurisdictional discovery within the next 90 days and shall file any papers supporting personal jurisdiction within 30 days after the completion of that discovery.

### D.  Subject Matter Jurisdiction

The individual defendants claim that the Immigration and Nationality Act ("INA") deprives this court of subject matter jurisdiction over the plaintiffs' constitutional claims.  Mem. of Law in Supp. of Mot. to Dismiss of Individual-Capacity Federal Defs. ("Individual Defs.' Mot. to Dismiss") at 22-35.  The individual defendants ground their argument in three different provisions of the INA:  sections 1252(b)(9), 1252(g), and 1252(a)(2)(B)(ii).

#### 1.  *INA Section 1252(b)(9)*

Section 1252(b)(9) of the INA states that:

 With respect to review of an order of removal under subsection (a)(1) . . . [j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section.  Except as otherwise provided in this section, no court shall have jurisdiction . . . by any . . . provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).[8]

The plaintiffs argue that the INA only strips district courts of the ability to directly review final orders of removal. Pls.' Mem. of Law in Opp'n to Individual-Capacity Federal Defs.' Mot. to Dismiss ("Opp'n to Individual Defs.' Mot. to Dismiss") at 10. Courts are split on how far the INA's jurisdiction-stripping provisions extend. *Compare Argueta v. U.S. Immigration & Customs Enforcement*, No. 08-1652, 2009 WL 1307236, at *14 (D.N.J. May 7, 2009) (holding that district court review of *Bivens* claim for unlawful search and arrest in violation of the Fourth Amendment was not precluded by section 1252(b)(9)), *with Arias v. U.S. Immigration & Customs Enforcement*, No. 07-1959, 2008 WL 1827604, at *6 (D. Minn. Apr. 23, 2008) (holding that the district court was barred from considering Fourth, Fifth, and Sixth Amendment *Bivens* claims because "Plaintiffs' claims are common in removal proceedings and could directly impact Plaintiffs' immigration status").

Both *Argueta* and *Arias* rely on *Aguilar v. U.S. Immigration & Customs Enforcement*, 510 F.3d 1 (1st Cir. 2007). The *Aguilar* Court stated that the phrase "arising from" in section 1252(b)(9) was intended to "exclude claims that are independent of, or wholly collateral to, the removal process." *Id*. at 11. Thus, the First Circuit stated, right to counsel claims are not independent of removal proceedings, and are precluded by section 1252(b)(9). *Id*. at *13-14.

In enacting section 1252(b)(9), Congress was motivated by concern that aliens could "obtain review in two judicial forums," which was a "waste[ of] scarce judicial and executive

---

[8] Judicial review of matters described in section 1252(b)(9) is not foreclosed entirely, but instead is reserved to the courts of appeals. *See* 8 U.S.C. §§ 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any other provision of this chapter. . . ."); 1252(a)(2)(D) ("Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.").

resources." H.R. Rep. No. 109-72, *reprinted in* 2005 U.S.C.C.A.N. at 299.  It appears that Congress feared identical issues would be litigated before the immigration judge, district court, and court of appeals.

That concern has been echoed by the Second Circuit in other contexts.  In *Merritt v. Shuttle, Inc.*, the court noted that exclusive review provisions "preclude district courts from deciding issues that 'could and should have been' raised in an administrative proceeding or at least in a court of appeals."  245 F.3d 182, 192 (2d Cir. 2001) (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958)).

The individual defendants argue that, under the reasoning of *Merritt*, the court lacks jurisdiction over them, because the plaintiffs raised their constitutional claims during their removal proceedings.  Individual Defs.' Mot. to Dismiss at 26-27.  The plaintiffs disagree, and contend that their *Bivens* claims neither were, nor could have been, brought before the immigration judge, because that judge cannot award damages.  Opp'n to Individual Defs.' Mot. to Dismiss at 14.

Both sides point to Judge Hall's opinion in *El Badrawi*.  There, Judge Hall dismissed the immigrant-plaintiff's constitutional claims arising from detention that occurred after his bond hearing, because the plaintiff was able to obtain administrative relief on that claim.  579 F. Supp. at 272.  She refused to dismiss his pre-hearing detention claims, however, because "any release on bond that [the plaintiff] could have obtained would only have given him prospective relief from the date of the bond determination.  Such release would do nothing to address his claim that he suffered damages from his arrest and pre-bond hearing detention."  *Id*.

Likewise, although the plaintiffs here could have – and, for the most part, did – raise constitutional arguments before the immigration judge, the only potential remedy in that forum

was the suppression of any evidence obtained from their allegedly illegal arrests.  *See, e.g.,* Individual Defs.' Mot. to Dismiss, Ex. B at 12, 22-23, 28-29.  That remedy was also presumably available to the plaintiff in *El Badrawi* for his pre-hearing detention claims, which Judge Hall allowed to proceed.[9]

The claims stemming from the plaintiff's post-hearing detention in *El Badrawi* were dismissed after the plaintiff was afforded a chance at meaningful relief:  the end to his detention.  The immigration judge, however, could not have afforded the *El Badrawi* plaintiff meaningful relief on his pre-hearing detention, and that claim was allowed to move forward in District Court.  The immigration judge here similarly could not have afforded the plaintiffs substantive relief on their constitutional claims.  The most the immigration judge could do was suppress the illegally-obtained evidence.  That is not a compensatory remedy, but instead a way to prevent greater future injury and deter future misconduct.  Thus, because the immigration judge could not have afforded the plaintiffs relief for the constitutional claims raised in this action, those claims do not arise out of the order of removal, and jurisdiction is not barred by section 1252(b)(9).

      2.  *INA Section 1252(g)*

Section 1252(g) of the INA states that:

> [N]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or executive removal orders against any alien under this chapter.

---

[9] El Badrawi's FTCA claims were for false arrest/false imprisonment, malicious prosecution, abuse of process, and intentional infliction of emotional distress.  579 F. Supp. at 264.  The false arrest/false imprisonment claim was based on the plaintiff's arrest and initial detention pending an appearance before an immigration judge; the malicious prosecution and vexatious suit claims were based on his placement in removal proceedings; his abuse of process claim was based on his arrest, initial detention, and subsequent detention after receiving a voluntary departure order; and the intentional infliction of emotional distress claim was based on his arrest, initial detention, and subsequent detention.  *Id*. at 264-65.

8 U.S.C. § 1252(g).[10]  The defendants argue that the plaintiffs' Fifth Amendment equal protection, Fifth Amendment due process, and Fourth Amendment claims are all barred by section 1252(g).  An analysis of each follows.

a.  *Equal Protection Claims*

The individual defendants argue that the plaintiffs' equal protection claims are analogous to selective enforcement claims, which numerous courts have held are barred by section 1252(g)'s prohibition of claims arising from the commencement of removal proceedings. Individual Defs.' Mot. to Dismiss at 29-30.  The cases cited by the defendants, however, are distinguishable.  Those cases raised constitutional challenges to a national policy, the National Security Entry Exit Registration System ("NSEERS"), which required foreign nationals from designated countries to comply with certain registration requirements.  *See, e.g., Daud v. Gonzales*, 207 Fed. Appx. 194, 200 (3d Cir. 2006); *Hadayat v. Gonzales*, 458 F.3d 659, 660-62 (7th Cir. 2006).  The plaintiffs here base their equal protection claims not on any national policy about which individuals' immigration status is subject to review, but instead on the raid officers' decision to enter their homes and detain them.  3d Amend. Compl. at ¶¶ 343-46.  Notably, the plaintiffs do not allege that the supervisory defendants who implemented NFOP violated their equal protection rights.

The Supreme Court has advised that section 1252(g) should not be construed too broadly, and that it does not cover all claims with some connection to deportation proceedings.  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 478, 482 (1999) ("*AADC*").  Instead, the

---

[10] The "Attorney General" also includes the Secretary of the Department of Homeland Security.  *Ali v. Mukasey*, 524 F.3d 145, 150 (2d Cir. 2008).

Court held, it covered only three "discrete" actions: *commencing* proceedings, *adjudicating* cases, and *executing* removal orders. *Id.*

In keeping with *AADC*, the District of Connecticut does not have jurisdiction to hear claims arising from the decision to issue a notice to appear, but *does* have jurisdiction to hear claims arising from a plaintiff's arrest and detention because those "were decisions that were separate and discrete from the agency's decision to initiate removal proceedings." *El Badrawi*, 579 F. Supp. 2d at 265-66. As Judge Hall noted, section 1252(g) was designed to prevent the "deconstruction, fragmentation, and hence prolongation of removal proceedings," but because the suit at hand was for money damages, it posed "no such risk of prolonging removal proceedings." *Id.* at 268 (quoting *AADC*, 525 U.S. at 487).

In a case with facts virtually identical to this case, the District of New Jersey held that a claim arising from an unlawful entry and arrest could be heard in district court. *Argueta*, 2009 WL at *16. The court noted that the unlawful entry and arrest did not commence removal proceedings, particularly because the officers did not enter the house with the specific intention of arresting the plaintiff. "[T]he decision to commence proceedings against [the plaintiff] arose from his arrest, rather than that his arrest arose from a decision to commence proceedings." *Id.* The same is true here, where the decision to commence removal proceedings against the plaintiffs was not made until *after* they had been the subject of allegedly unlawful entry and detention. Thus, the plaintiffs' equal protection claims are not barred by section 1252(g).

### b. *Procedural Due Process Claims*

The plaintiffs' Fifth Amendment procedural due process claim is based on the conditions of the plaintiffs' arrest and confinement, including their lack of access to counsel, their lack of information about their rights, and their being coerced to sign documents that they may not have

understood.  Those claimed violations do not deal with the defendants' commencement of proceedings against the plaintiffs, the adjudication of their cases, or the execution of their removal.  Several circuits have ruled that due process claims that do not implicate commencement of proceedings or execution of removal are not barred by section 1252(g).  *See, e.g., Sulit v. Schiltgen*, 213 F.3d 449, 453 (9th Cir. 2000) (holding that the court could consider plaintiffs' claim that their due process rights had been violated when green cards were improperly seized); *Mustata v. U.S. Dep't of Justice*, 179 F.3d 1017, 1021-22 (6th Cir. 1999) (ineffective assistance of counsel claim is not barred by section 1252(g)); *Selgeka v. Carroll*, 184 F.3d 337, 342 (4th Cir. 1999) (due process claim based on inadequate record is not barred by section 1252(g)).  The procedural due process claims here are not barred by section 1252(g).

c.  *Fourth Amendment Claims*

The court has jurisdiction to hear the Fourth Amendment claims against the raid officers for the same reason it has jurisdiction to hear the equal protection claims:  the Fourth Amendment violations were separate from any decision to initiate removal proceedings against the plaintiffs.

The more difficult question is whether section 1252(g) bars the Fourth Amendment claims against the supervisory defendants.  Those claims are based on the supervisors' decision to approve the New Haven raid and to institute NFOP arrest quotas, and are thus more analogous to the NSEERS decisions than are the claims against the raid officers.

In *Hadayat*, the plaintiff challenged NSEERS when he was targeted for registration *and* his removal proceedings were initiated based on his race and ethnicity.  458 F.3d at 664-65.  That case is distinguishable because, although the decision to initiate proceedings would be within the ambit of section 1252(g), plaintiffs here do not challenge that decision.  *Daud*, on the other hand,

more strongly suggests that the supervisory defendants' actions are not reviewable. In that case, the Fourth Circuit held that section 1252(g) barred district court review of the constitutionality of NSEERS' registration requirements. 207 Fed. Appx. at 203. I respectfully disagree with the reasoning of the court in that case. The court did not focus on whether NSEERS involved the commencement, adjudication, or execution of the plaintiff's case. Instead, the court focused on the fact that the Supreme Court had foreclosed review of discriminatory practices in *AADC*. *Id*. at 202-03. Yet *AADC* involved the decision to initiate removal proceedings – a decision that is clearly within the scope of section 1252(g). Because the supervisory defendants' actions in this case did not involve the commencement, adjudication, or execution of removal proceedings against the plaintiffs, review of those actions is not barred by section 1252(g).[11]

3. *INA Section 1252(a)(2)(B)(ii)*

The final provision of the INA raised by the defendants, section 1252(a)(2)(B)(ii), provides that no court shall have jurisdiction to review "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii).

The plaintiffs claim that section 1252(a)(2)(B)(ii) is inapplicable, because the defendants were acting beyond their discretion by violating the Constitution. Opp'n to Individual Defs.' Mot. to Dismiss at 23. This argument is supported by *El Badrawi*, in which the court held that "[b]ecause ICE officials do not have discretion to violate the Constitution, [section

---

[11] During oral argument, the individual defendants discussed at length the Ninth Circuit's decision in *Sissoko v. Rocha*, 509 F.3d 947 (9th Cir. 2007). In that case, the Ninth Circuit declined to exercise jurisdiction over a claim by a plaintiff whose challenged detention "arose from [the defendant's] decision to commence expedited removal proceedings." *Id*. at 949-50. Here, the plaintiffs' detention was not a result of the commencement of removal proceedings; those proceedings did not commence until after the plaintiffs had been detained.

1252(a)(2)(B)(ii)] will not bar [the plaintiff's] claims based on the unconstitutional conduct by these officials." 579 F. Supp. 2d at 268; *see also Myers & Myers*, 527 F.2d at 1261 ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.").

The individual defendants respond that the plaintiffs' constitutional argument is misplaced, because the text of section 1252(a)(2)(B)(ii) is prefaced with "notwithstanding any other provision of law (statutory or nonstatutory)." Their argument is, quite simply, that the statute precludes suits even for unconstitutional actions taken in furtherance of the Attorney General's discretion. The individual defendants cite to *Elgharib v. Napolitano*, 600 F.3d 597 (6th Cir. 2010), in which the Sixth Circuit held that, throughout section 1252, "any other provision of law" includes the Constitution. *Id.* at 601-05. Yet the Sixth Circuit's pronouncement is mere dicta in regards to section 1252(a)(2)(B)(ii). The crux of that case was whether "any other provision" includes constitutional claims under sections 1252(a)(5) and 1252(g). *Id*. at 605. The court did not consider whether an official can exercise her or his discretion in a manner that violated the Constitution, and then preclude a court from hearing a lawsuit complaining of the constitutional violation.

The individual defendants attempt to distinguish *El Badrawi* by correctly noting that that case involved the discretionary decision of arresting officers, but not the discretion of senior officers such as Torres or Myers. Reply Mem. in Supp. of the Individual-Capacity Defs.' Mot. to Dismiss ("Reply to Individual Defs.' Mot. to Dismiss") at 7. Yet it is not clear why that distinction matters. If low-level officers cannot exercise their discretion by violating the Constitution, neither can high-level officials. *See Sierra v. Immigration & Naturalization Serv.*, 258 F.3d 1213, 1217 (10th Cir. 2001) (noting, in discussing section 1252(a)(2)(B)(ii), that "[i]t is

never within the Attorney General's discretion to act unconstitutionally"). Accordingly, I conclude that the constitutional claims at issue here are not barred by section 1252(a)(2)(B)(ii).[12]

### 4. Heck v. Humphrey

The individual defendants argue that, under the doctrine of *Heck v. Humphrey*, plaintiffs who have lost their Fourth-Amendment-based motions to suppress in their removal proceedings should not be allowed to bring Fourth Amendment claims in federal court.[13] Individual Defs.' Mot. to Dismiss at 35. In *Heck*, 512 U.S. 477 (1994), the Supreme Court held that a plaintiff could not bring a civil tort action if a ruling in that action would call into question the validity of a conviction or sentence, unless the conviction/sentence was first in some way reversed or vacated by the courts or the Executive. *Id.* at 486-87. Thus, in order to bring a civil suit arising out of a criminal conviction, the plaintiff must demonstrate that the suit would not "necessarily imply the invalidity of his conviction or sentence." *Id*. at 487. The Court reasoned that to hold otherwise could lead to inconsistent criminal and civil verdicts, and challenge the principles of finality and consistency. *Id*. at 484-85.

The individual defendants insist that the principles of *Heck* can be held to apply to the civil immigration context. Individual Defs.' Mot. to Dismiss at 35. To that end, they point to *Cohen v. Clemens*, 321 Fed. Appx. 739 (10th Cir. 2009), in which the Tenth Circuit held that *Heck* barred a plaintiff's claim for damages arising from his incarceration. *Id.* at 741-42 ("Because [the plaintiff] would need to prove that his detention was unlawful in order to receive an award of damages for that detention, the district court correctly concluded that *Heck* applied

---

[12] The individual defendants make their section 1252 motion only in respect to constitutional claims, and not the other FTCA claims.

[13] The individual defendants state that those plaintiffs are Paredes-Mendez, Serrano-Mendez, Solana-Yangua, Velasquez, and Yangua-Calva. Individual Defs.' Mot. to Dismiss at 35 n.24.

to bar [his] *Bivens* action."). The other cases cited by the individual defendants also all involve plaintiffs seeking damages for an unlawful detention. *See Kulakov v. Immigration & Naturalization Serv.*, No. 06-cv-0754, 2007 WL 1360728, at *1 (W.D.N.Y. May 7, 2007) (plaintiff challenging his illegal detention by ICE); *Calix-Chavarria v. Gonzalez*, Civil No. 1: CV-06-0820, 2006 WL 1751783, at *1 (M.D. Pa. June 22, 2006) (plaintiff alleging that he was illegally detained during his removal proceedings in violation of his constitutional rights).

Here, although the plaintiffs challenge the circumstances leading up to their detention, they do not allege that their detention itself was unconstitutional. As such, a judgment in their favor would not call into question the validity of their detention or removal, and thus would not implicate the concerns of *Heck*. This result is in line with *Huang v. Johnson*, 251 F.3d 65 (2d Cir. 2001), in which the Second Circuit held that *Heck* did not apply to an individual who challenged the length, but not validity, of his conviction. *Id*. at 75. The Second Circuit noted that a "procedural defect [does] not 'necessarily imply the invalidity' of the [conviction]." *Id*. at 74 (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Thus, because the plaintiffs do not challenge the validity of their detentions or removal in the instant litigation, *Heck* does not bar their claims.

5. *Appropriateness of* Bivens

The individual defendants next argue that the individual defendants cannot recover for constitutional harms under an implied civil cause of action as recognized in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). The defendants do not argue that Fourth Amendment harms cannot be remedied by *Bivens*, since *Bivens* itself squarely allowed remedies for Fourth Amendment violations. Instead, they argue that review of any constitutional harm in the immigration context is inappropriate under *Bivens*.

In determining whether courts can remedy a plaintiff's constitutional harm through a *Bivens* action, a court must consider (1) whether there is an alternative process that could protect the plaintiffs' constitutional rights, and which gives the court a "convincing reason" to bar review; and (2) even if there is no such alternative, whether there are "special factors" that indicate a court should not recognize a cause of action. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

The individual defendants claim that both of those prongs counsel against review in this case. According to them, the first step must take into account that the INA is a "comprehensive federal statutory scheme" governing immigration. Individual Defs.' Mot. to Dismiss at 38-39. The individual defendants point in particular to the fact that the plaintiffs were able to raise constitutional challenges in their removal proceedings. *Id*. at 39-40.

The cases cited by the defendants are inapposite, because those cases involved a more complete remedying of the plaintiff's harm. For instance, the Court in *Schweiker v. Chilicky*, 487 U.S. 412 (1988), refused to allow a *Bivens* remedy because the statute provided that the harm (there, the plaintiff's loss of Social Security benefits) could be reversed (by paying the benefits retroactively). *Id*. at 428-29. The harm here, however, cannot be remedied pursuant to any provision in the INA.

Similarly, in *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), the Second Circuit found a *Bivens* action inappropriate where Congress had created a statutory scheme by which the plaintiffs' claims could be adjudicated in federal court in the Southern District of New York.[14] *Id*. at 126. Although the plaintiffs here can raise their constitutional issues before the

---

[14] That case also involved the "special factor" of the United States government's response to disasters. *Id*.

immigration judge, they can only do by seeking to suppress evidence, and not by seeking affirmative relief.

Furthermore, although the INA contains a comprehensive scheme governing the appeal of removal proceedings and the Attorney General's discretionary decisions, it does *not* provide a remedial scheme for violations committed by immigration officials outside of removal proceedings. That is why *Hui v. Castaneda*, 130 S. Ct. 1845 (2010), cited by the individual defendants at oral argument, is inapplicable. In *Castaneda*, the Supreme Court held that the Public Health Service Act (PHSA) precluded a *Bivens* remedy. *Id*. at 1854-55. In that case, a plaintiff who was denied medical treatment while in immigration detention later died from that lack of treatment. *Id*. at 1848-49. The text of the PHSA states that it provides the *exclusive* basis for a civil action against employees whose act or omission in the "performance of medical, surgical, dental, or related functions" led to personal injury or death. *Id*. at 1850-51 (quoting 42 U.S.C. § 233(a)). As a result, the Court barred the plaintiff's claim. In contrast, the INA does not govern the specific claims at issue (that is, constitutional violations that preceded removal proceedings). If a *Bivens* remedy were precluded, the present plaintiffs would have no forum in which to seek a remedy for the defendants' alleged constitutional violations. Thus, because there is no alternative remedial scheme, the first prong of *Wilkie* does not counsel against a *Bivens* remedy.

The second prong examines whether "special factors" counsel against allowing a *Bivens* remedy. Special factors typically involve "judicial deference to indications that congressional inaction has not been inadvertent." *Schweiker*, 487 U.S. at 423. Special factors have included the fact that Congress, not the judiciary, has authority over military justice, *Chappell v. Wallace*,

462 U.S. 296 (1983), and the *combination* of immigration and national security concerns, *El Badrawi*, 579 F. Supp. 2d at 264.

The individual defendants analogize to *Chappell*, and argue that, just as Congress has plenary power over the military, so, too, does it have plenary power over immigration. Individual Defs.' Mot. to Dismiss at 41. Yet in *Chappell* Congress did not have control only over the military, but over military *justice*. Although Congress does have great control over immigration, including over removal proceedings, that does not mean that Congress has great control over *all* claims brought by immigrants. Again, the plaintiffs here do not question their removal, but instead allege independent constitutional harms that were committed against them prior to the commencement of removal proceedings. Thus, a *Bivens* remedy is appropriate in this context.

E.  Fourth Amendment Violations

The individual defendants challenge the plaintiffs' Fourth Amendment claims against the supervisory defendants (Myers, Torres, Chadbourne, Martin, and Sullivan).[15] In this circuit, to sufficiently allege that a supervisor committed a constitutional violation, a plaintiff must show that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant

_____

[15] Although the individual defendants only challenge the Fourth Amendment claims against the supervisory defendants, the plaintiffs note that defendants Riccardi and Vasquez were not present for the search and seizure of the plaintiffs, and thus voluntarily dismiss their Fourth Amendment claims against them. Opp'n to Individual Defs.' Mot. to Dismiss at 49-50 n.46. That dismissal is hereby approved.

exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). The *Colon* factors were clearly established at the time of the Fair Haven raid, and thus any supervisor who violated them is not protected against that violation by qualified immunity.

The individual defendants argue that the *Colon* factors were diminished by *Iqbal*. Individual Defs.' Mot. to Dismiss at 50 n.30. In *Iqbal*, the Supreme Court rejected the idea that a supervisor could be liable for an employee's equal protection violations based on their "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." 129 S. Ct. at 1949. In rejecting the supervisors' liability, the Supreme Court insisted that supervisors "may not be held accountable for the misdeeds of their agents. . . . [E]ach government official . . . is only liable for his or her own misconduct. . . . [P]urpose rather than knowledge is required to impose *Bivens* liability . . . for unconstitutional discrimination."[16] *Id.* The Second Circuit has recently suggested that at least some of the *Colon* factors survive *Iqbal*. *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) ("To be sure, '[t]he personal involvement of a supervisory defendant may be shown by evidence that: . . . the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.'") (citing *Colon*, 58 F.3d at 837).

### 1. *Myers and Torres*

---

[16] Post-*Iqbal*, at least one judge in the Southern District of New York has held that some of the *Colon* factors are no longer good law. *See Spear v. Hugles*, No. 08-4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009) ("[O]nly the first and third *Colon* factors survived the Supreme Court's decision in *Iqbal*."). Other courts have recognized that the *Colon* factors may have been called into question, but have declined to resolve the matter. *See Young v. NY Office of Mental Retardation & Dev. Disabilities*, 649 F. Supp. 2d 282, 293-94 (S.D.N.Y. 2009) ("Precisely what remains of the [*Colon*] rule in light of *Iqbal* is not entirely clear.").

The plaintiffs claim that Myers and Torres created, implemented, and allowed to continue a policy under which unconstitutional practices occurred: namely, the policy requiring FOTS to make one thousand arrests a year and allowing bystander arrests to count toward the satisfaction of that quota, coupled with inadequate training about avoiding constitutional violations. 3d Amend. Compl. at ¶¶ 328-29. Failure to train can constitute the kind of "deliberate indifference" necessary to hold a supervisor liable when an employee violates the Constitution. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

The individual defendants argue that, although Myers and Torres created and implemented that policy, they did not intend for it to lead to the violation of the plaintiffs' constitutional rights, and had no knowledge of "widespread constitutional violations." Individual Defs.' Mot. to Dismiss at 51-52.

There is evidence to suggest that Myers and Torres should have been on notice of the unconstitutional practices of ICE officers.[17] For instance, the plaintiffs cite a number of lawsuits brought after the change in FOTS policy, but before the Fair Haven raid, in which ICE officers were accused of Fourth Amendment violations. *See Arias*, 2008 WL 1827604 (filed Apr. 19, 2007); *Mancha v. U.S. Immigration & Customs Enforcement*, No. 1:06-cv-2650, 2007 WL 3144012 (N.D. Ga. Oct. 24, 2007) (filed Nov. 1, 2006); *Reyes v. Alcantar*, No. 08-02271 (N.D.

---

[17] To the extent this information arises from the plaintiffs' briefs, plaintiffs may amend their complaint to include allegations relating to it.

Cal.) (filed Apr. 26, 2007). The *Reyes* suit specifically dealt with Operation Return to Sender, and Myers and Torres were named defendants in the *Arias* litigation. That litigation should certainly have put them on notice that unconstitutional practices were allegedly occurring as a result of their policies.

At oral argument, the individual defendants maintained that the *Arias* litigation could not have provided Myers and Torres with notice of unconstitutional conduct because they were eventually dismissed from the case on the grounds of qualified immunity. But they were not dismissed from the litigation until April 23, 2008, almost a year after the New Haven raid was conducted, and their entitlement to qualified immunity could not have affected their notice concerning allegations of constitutional wrongdoing by employees.

The individual defendants also argue that notice of grievances alone does not amount to personal involvement. Individual Defs.' Mot. to Dismiss at 51-52. In support they cite *Mateo v. Fischer*, 682 F. Supp. 2d 423 (S.D.N.Y. 2010). But *Mateo* and the line of cases cited therein are expressly limited to the prison context. *Id*. at 430 ("The reason [receipt of letters or grievances is insufficient notice] is simple: DOCS commissioners and prison superintendents receive large numbers of letters from inmates, and they delegate subordinates to handle them.") (internal quotations omitted).

The individual defendants also argue that there is no causal connection between Myers and Torres's policies and the allegedly unconstitutional acts that occurred. For support, the individual defendants cite *Al-Jundi v. Rockefeller*, 885 F.2d 1060 (2d Cir. 1989). That case involved a riot at Attica prison, in which the defendant-governor approved a rescue of hostages, but played no role in the planning or implementation of the rescue. *Id*. at 1063. During and after that raid many hostages and prisoners were killed or severely injured. *Id*. at 1063-64. The court

held that the governor was not responsible for any wrongs committed by others. *Id*. at 1064-65. In that case, unlike in this case, the defendant did not craft or implement the plan, and so could not be responsible for its failings. Here, the plaintiffs have put forth a plausible claim that Myers and Torres are subject to supervisory liability because their actions imposing intense pressure to make arrests, allowing bystander arrests, and providing inadequate training created a policy under which constitutional violations occurred.[18]

### 2. *Chadbourne and Martin*

Chadbourne and Martin are not liable under the same theory as Myers and Torres, because they did not create the FOTS arrest quota, and the litigation plaintiffs point to as providing notice to the defendants did not allege unconstitutional conduct in Connecticut or Massachusetts, where Chadbourne and Martin were supervisors. Instead, Chadbourne and Martin are potentially liable for creating a policy of conducting large-scale raids without adequately training raid officers.

Courts split over whether a failure to train claim can be the basis for supervisory liability post-*Iqbal. Compare Newton v. City of New York*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme

---

[18] The individual defendants cite *Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003), in which a young boy was seized from his family's home. The court held that allegations that the defendants had approved or knew of the raid were not enough to plausibly allege liability. *Id*. at 1235. But liability here is not based on Myers or Torres' approval of the raid; it is based on their creation, implementation, and continuation of a policy which they allegedly knew fostered unconstitutional conduct.

The individual defendants also note that the Second Circuit has previously dismissed a failure to train claim where the plaintiff had neglected to provide evidence concerning the inadequacies in the defendant's training program and the causal relationship between those inadequacies and the constitutional harms. *Amnesty Am. v. West Hartford*, 361 F.3d 113, 129 (2d Cir. 2004). Here, the plaintiffs allege the raid officers' training was inadequate because it failed to teach raid officers what was constitutionally permissible (again, to the extent this information was provided at oral argument, the plaintiffs can amend their complaint to incorporate it). Moreover, *Amnesty America* involved a case at the motion for summary judgment stage, not the motion to dismiss stage.

Court's recent decision in *Ashcroft v. Iqbal*."), *with D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (*Colon's* bases for liability survive because they "are not founded on a theory of *respondeat superior*, but rather on a recognition that 'personal involvement of defendants in alleged constitutional deprivations' can be shown by nonfeasance as well as misfeasance.") (quoting *Colon*, 58 F.3d at 873).

I agree with the latter line of cases. A supervisor who has been deliberately indifferent in failing to train is not liable for a passive constitutional violation based on the theory of *respondeat superior*. Instead, a failure to train can be an active violation on the part of a supervisor who has willfully chosen to allow the harm resulting from a lack of training. In these cases, a failure to train is more akin to those situations in which a defendant "create[s] a policy or custom under which unconstitutional practices occurred, or allow[s] the continuance of such a policy or custom," which the Second Circuit post-*Iqbal* has recognized as a basis for liability. *Scott*, 616 F.3d at 110 (quoting *Colon*, 58 F.3d at 873).

There is some evidence here that Chadbourne and Martin should have been on notice about unconstitutional conduct on the part of raid officers, so that their failure to train might be found to constitute deliberate indifference. An opinion piece in the Boston Globe, for instance, detailed a workplace raid that occurred in New Bedford, Massachussets just two months before the Fair Haven raid. Carol Rose & Christopher Ott, *Inhumane Raid Was Just One of Many*, Boston Globe, Mar. 26, 2007. The article mentions allegations of unconstitutional behavior on the part of raid officers, including Fourth Amendment violations.

The individual defendants at oral argument correctly noted that the raid described by the Boston Globe was a workplace raid, while the raid that occurred in Fair Haven was a residential raid. But it is plausible that Chadbourne and Martin were put on notice that their officers were

inadequately trained to conduct immigration raids, whether in the workplace or residential context. At the motion to dismiss stage, plaintiffs have done enough to hold Chadbourne and Martin potentially liable for creating a policy or custom under which unconstitutional practices occurred, or for allowing the continuation of such a policy or custom.

3. *Sullivan*

The Boston Globe article could not have put Sullivan on notice that officers under his supervision were acting in violation of the Constitution because it involved raids by Massachusetts teams, and Sullivan is responsible for ICE officers in Hartford, Connecticut. No news articles presented by the plaintiffs detail unconstitutional conduct by Connecticut officers. Furthermore, only one lawsuit cited by the plaintiffs involved conduct by Connecticut officers. *Danbury Area Coal. for the Rights of Immigrants v. U.S. Dep't of Homeland Sec.*, No. 3:06-cv-1992, 2008 WL 2622782 (D. Conn. June 30, 2008). That litigation dealt with Freedom of Information Act requests for documents held by ICE officials. *Id.* at *1. The lawsuit did not allege unconstitutional conduct by ICE officers engaged in search and arrest activities.

The last source of notice the plaintiffs point to is a March 2007 report by the Office of the Inspector General for the Department of Justice. 3d Amend. Compl. at ¶¶ 306-07. They do not allege that report was ever given or shown to Sullivan, so it cannot serve as proper notice to him of prior constitutional violations. Thus, without more, the motion to dismiss Fourth Amendment claims against Sullivan is granted.

F. Fifth Amendment Substantive Due Process

The plaintiffs' substantive due process claim is based on allegations that the Fair Haven raid was motivated by retaliation against the City of New Haven, and that the defendants' arrest quota was arbitrary and likely to lead to constitutional violations. 3d Amend. Compl. at ¶¶ 348-

50, 354-60.  The individual defendants claim that a Fifth Amendment substantive due process claim is inappropriate because the conduct at issue is more properly analyzed under the Fourth Amendment.  Individual Defs.' Mot. to Dismiss at 60-62.

The individual defendants are correct that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

The alleged retaliatory nature of the Fair Haven raid does not alter the analysis of the substantive due process claim.  The underlying harm that arose from the raid was still the allegedly unlawful searches and arrests.  The motivation for the raid does not change that essential fact.

The Supreme Court and Second Circuit have held that a claim for malicious prosecution, if brought under the Constitution, must be brought under the Fourth Amendment rather than under the substantive due process provisions of the Fourteenth Amendment.  *Id*. at 271-75; *Washington v. Cnty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004).  The elements of malicious prosecution include a defendant initiating criminal proceedings against the plaintiff maliciously. *Woodhouse v. Ridley*, No. 3:08-cv-1260, 2010 WL 1279068, at *4 (D. Conn. Mar. 29, 2010); *see also Nadeau v. Anthony*, No. 3:03-cv-834, 2003 WL 22872150, at *2 (D. Conn. Dec. 2, 2003) (holding that a claim for freedom from arrest without probable cause must be brought under the Fourth Amendment, not the substantive due process provision of the Fourteenth Amendment). Although the plaintiffs here do not plead malicious prosecution, the cited decisions demonstrate

that a Fourth Amendment claim of unlawful arrest does not change the harm from a Fourth Amendment to Fifth Amendment violation when motivated by a malicious purpose.

The plaintiffs' attempt to find a substantive due process violation in the defendants' failure to train, use of an outdated target list, and discriminatory arrests is similarly unavailing. Even egregious failure-to-train claims of the type brought here are more properly brought under the Fourth Amendment. *See Terebesi v. Solomon*, No. 3:09-cv-1436, 2010 WL 3926108, slip op. at *5-6 (D. Conn. Sept. 30, 2010) (failure to train claim in which officers broke into home and killed unarmed occupant who was not trying to flee was more properly analyzed under the Fourth Amendment). When tortious conduct leads to Fourth Amendment violations, the Fourth Amendment is the most appropriate framework for assessing liability. *Id.*

G. Fifth Amendment Procedural Due Process

The plaintiffs also allege Fifth Amendment procedural due process violations. Opp'n to Individual Defs.' Mot. to Dismiss at 60, n.56. The crux of their claims is that the defendants: (1) did not apprise the plaintiffs of their legal rights upon arrest, (2) left the plaintiffs handcuffed in a van without telling them where they were going, (3) interviewed the plaintiffs without a lawyer present and denied their requests for a phone call, (4) coerced the plaintiffs into signing forms in English even though the plaintiffs' primary language is Spanish, and (5) unlawfully left the plaintiffs detained at a facility in Rhode Island for lengthy periods of time. *Id.*

The plaintiffs have not asserted how the procedural defects in question caused a prolonged detention. They do not state what forms they were required to sign, except to note that at least some of those forms gave the plaintiffs permission to contact counsel.[19] The

---

[19] If the plaintiffs had been coerced into signing inculpatory statements, that might have constituted a due process violation. *See Zinermon v. Burch*, 494 U.S. 113 (1990) (patient was deprived of due process when he was admitted

plaintiffs acknowledge that, because deportation proceedings are not criminal in nature, there is no *Miranda* requirement. *See Avila-Gallegos v. Immigration & Naturalization Serv.*, 525 F.2d 666, 667 (2d Cir. 1975). It also appears that the plaintiffs were at some point allowed access to a lawyer. 3d Amend. Compl. at ¶ 191. Without some allegation that procedural deficiencies deprived plaintiffs of a protected liberty interest, their procedural due process claim cannot stand.

### H. Equal Protection

The plaintiffs claim that defendants McCaffrey, Brown, Preble, Riccardi, Vasquez, Vetrano-Antuna, Geary, Hamilton, Lewis, Moore, Ostrobinski, Reilly, Rodriguez, Valentin, and John Does 1-10 violated their Fifth Amendment rights to equal protection by investigating, detaining, and arresting them based on their race, ethnicity, and/or perceived national origin.[20] 3d Amend. Compl. at ¶ 344. The defendants argue that those claims should be dismissed because they are not supported by factual allegations and each defendant is entitled to qualified immunity. Individual Defs.' Mot. to Dismiss at 62-63.

#### 1. *Sufficiency of the Allegations*

To sufficiently plead an equal protection violation, the plaintiffs must allege that the defendants acted with a discriminatory purpose. *Iqbal*, 129 S. Ct. at 1948-49. Although the plaintiffs have done so, the individual defendants argue that the allegations of discriminatory intent are nothing more than "mere conclusory statements," unsupported by factual allegations. Individual Defs.' Mot. to Dismiss at 64.

---

to mental facility based on admission forms signed while medicated and disoriented). But the plaintiffs do not allege that the statements signed by the plaintiffs were inculpatory in any way.

[20] All parties agree that the equal protection claims against Riccardi and Vasquez should be dismissed, because those defendants were not present during the search and seizure of the plaintiffs.

To the contrary, the plaintiffs have alleged that the defendant officers targeted a primarily Latino neighborhood, arrested people who appeared Latino, detained one plaintiff solely because he spoke Spanish and appeared Latino, and taunted one plaintiff's girlfriend by saying the plaintiffs were being taken to see Mexican singer Juan Gabriel. 3d Amend. Compl. at ¶¶ 56, 126-27, 137. That is enough to plausibly allege that the defendants were motivated by a discriminatory purpose. Although the defendants offer contrary explanations (such as that the neighborhood in question contained residents who had outstanding warrants as fugitive aliens (individual defs.' mot. to dismiss at 66)), at this stage of the proceedings all of the plaintiffs' plausible allegations are accepted as true. Thus, the plaintiffs have sufficiently alleged a discriminatory purpose.

### 2. *Qualified Immunity*

The individual defendants argue that, even if the plaintiffs have asserted a cognizable equal protection claim, the motion to dismiss must be granted because the individual defendants are entitled to qualified immunity. Individual Defs.' Mot. to Dismiss at 68-69. Government officials are entitled to qualified immunity when they perform discretionary functions if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The defendants argue they have qualified immunity not only because it was not clearly established that their conduct was unconstitutional, but also because their conduct in fact *was* constitutional. Individual Defs.' Mot. to Dismiss at 69. They specifically point to 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.5(c)(1)(i), which together state that any border patrol agent "shall have power without a warrant to arrest any alien . . . in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation

and is likely to escape before a warrant can be obtained for his arrest." Furthermore, the individual defendants argue, officers can consider ethnic appearance when determining whether to question someone about their immigration status. *Id*. at 69 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)).

*Brignoni-Ponce* is inapplicable here, because it explicitly limits its holding to border areas. Furthermore, even in border areas, immigration officials are only allowed to make stops where race or nationality is one of several factors indicating that individuals may be unauthorized immigrants. 422 U.S. at 881-82, 885-87 ("Even if [the officers] saw enough to think that the [car's] occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country."). Thus, *Brignoni-Ponce* actually stands for the proposition contrary to the defendants' assertion: if the defendants searched, detained, and arrested the plaintiffs solely on the basis of race or national origin, they have violated clearly established constitutional rights.

At the time of the raid, it was clearly established that law enforcement officers could not act with discriminatory animus on the basis of race or ethnic origin when making arrests. *See Brown v. City of Oneonta*, 221 F.3d 329, 336-39 (2d Cir. 2000), *overruled in part on other grounds by Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *United States v. Scopo*, 19 F.3d 777, 786 (2d Cir. 1994) (Newman, J., concurring); *see also United States v. Avery*, 137 F.3d 343 (6th Cir. 1997). The question whether the officers were actually so motivated is a classic issue of fact. As a result, genuine issues of material fact preclude a determination at this stage whether the individual defendants are entitled to qualified immunity with respect to the equal protection claims.

**III.  Conclusion**

For the reasons set forth above, the United States' motion to dismiss (doc. #47) is GRANTED IN PART and DENIED IN PART.  The United States' motion to dismiss on standing grounds (#52) is GRANTED as applied to declaratory relief (the motion to dismiss as applied to Tenth Amendment claims was already granted at oral argument).  The individual defendants' motion to dismiss (doc. #51) is GRANTED IN PART and DENIED IN PART.  The plaintiffs may file a further amended complaint consistent with this ruling within 21 days.

It is so ordered.

Dated at Bridgeport, Connecticut, this 16th day of December 2010.


/s/ Stefan R. Underhill_____
Stefan R. Underhill
United States District Judge